UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BERTRAM PAYNE,

                              Plaintiff,

                                                        9:15-cv-00392

v.

                                                        (GLS/TWD)

C.O. COBURN, et al.,

                              Defendants.

_____

APPEARANCES:                          OF COUNSEL:

BERTRAM PAYNE
Plaintiff, *pro se*
303 Vernon Avenue
Apt #19B
Brooklyn, New York 11206

HON. ERIC T. SCHNEIDERMAN           SHANNAN C. KRASNOKUTSKI, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

        This *pro se* civil rights action commended pursuant to 42 U.S.C. § 1983 by Plaintiff

Bertram Payne, a former inmate in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS"), has been referred for Report and Recommendation by

the Hon. Gary L. Sharpe, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule ("L.R.") 72.3(c).

Plaintiff commenced this action on April 4, 2015, alleging numerous violations of his constitutional rights during his confinement at Eastern New York Correctional Facility ("Eastern"). (Dkt. No. 1.) The Defendants remaining after the Court's initial review are Corrections Officer ("C.O.") Coburn, C.O. Cruz, C.O. Friedman, C.O. Jamil, C.O. Warren, C.O. Carr, Sergeant ("Sgt.") Milteer, Sgt. Tschirky, Deputy Superintendent ("Supt.") Colao, Supt. Larkin, and Director of Special Housing ("DSH") Prack. (Dkt. No. 7.) Plaintiff's amended complaint, the operative pleading, was accepted for filing on November 23, 2015. (Dkt. No. 35.) The remaining claims are: (1) Eighth Amendment excessive force claims against C.O. Coburn and C.O. Cruz, and failure to intervene claim against C.O. Friedman; (2) Fourteenth Amendment procedural due process claim against Deputy Supt. Colao, Supt. Larkin, and DSH Prack; and (3) First Amendment retaliation claims against C.O. Friedman, C.O. Jamil, C.O. Warren, C.O. Carr, Sgt. Milteer, and Sgt. Tschirky.

Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 54.) Plaintiff has not responded in opposition to the motion. For reasons explained below, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 54) be denied in part and granted in part.

## I.      BACKGROUND

### A.      Plaintiff's Amended Complaint

Plaintiff claims he was subjected to excessive force based upon incidents of sexual abuse on March 22, 2012, and on March 31, 2012. (Dkt. No. 35.) On March 22, 2012, Plaintiff alleges C.O. Coburn verbally abused him and engaged in acts of sexual abuse by squeezing Plaintiff's penis and fondling his testicles. *Id*. at ¶¶ 17-37. Plaintiff claims C.O. Friedman was present

during the March 22, 2012, sexual assault, failed to intervene, encouraged C.O. Coburn's action, and verbally threatened Plaintiff. *Id.* at ¶¶ 35-37.

On March 31, 2012, Plaintiff claims that during a pat frisk outside C.O. Cruz verbally and physically abused him by pushing Plaintiff into the wall, twisting his arm, and engaged in sexual abuse by inserting his finger into Plaintiff's rectum. *Id.* at ¶¶ 38-50.

Plaintiff also alleges First Amendment retaliation claims for filing grievances against C.O. Coburn, C.O. Cruz, and C.O. Friedman. Specifically, Plaintiff alleges the following retaliatory conduct: (1) C.O. Friedman sneaking into Plaintiff's cell on April 12, 2012, and attempting to steal Plaintiff's razor (*id.* at ¶¶ 58-68); (2) Sgt. Milteer authorizing a "rambunctious" and "unruly" cell search on April 20, 2012, conducted by C.O. Jamil, C.O. Warren, and C.O. Carr (*id.* at ¶¶ 69-78); (3) C.O. Friedman issuing Plaintiff a false April 27, 2012, inmate misbehavior report ("IMR") (*id.* at ¶¶ 79-82); and (4) Sgt. Tschirky sending Plaintiff to the special housing unit ("SHU") based on the April 27, 2012, IMR (*id.* at ¶¶ 83-105). During his May 18, 2016, deposition Plaintiff also testified that he believed C.O. Cruz sexually assaulted him on March 31, 2012, in retaliation for filing a grievance against C.O. Coburn. (Dkt. No. 54-18 at 112-13.[1])

Plaintiff also alleges violations of his Fourteenth Amendment procedural due process rights based upon Deputy Supt. Colao's conduct during the Tier III disciplinary hearing based on the April 27, 2012, IMR, and Supt. Larkin and DSH Prack affirming Deputy Supt. Colao's unconstitutional disciplinary determination. (Dkt. No. 35 at ¶¶ 118-24.)

---

[1] Page references to documents identified by docket number are to the page assigned by the Court's electronic filing system.

**B.      Defendants' Motion for Summary Judgment**

Generally, Defendants make four major arguments in support of their motion for summary judgment.  (Dkt. No. 54-19.)  First, Defendants argue Plaintiff received all the process he was due at the Tier III disciplinary hearing based on the April 27, 2012, IMR.  *Id.* at 10-13.  In the alternative, Defendants argue Deputy Supt. Colao, Supt. Larkin, and DSH Prack are entitled to qualified immunity.  *Id.* at 17.

Second, Defendants contend Plaintiff's excessive force and failure to intervene claims against C.O. Coburn, C.O. Cruz, and C.O. Friedman are inherently inconsistent, unsupported, and demonstrably at odds with all evidence in the record.  *Id.* at 18-22.  Alternatively, Defendants argue that any force used on Plaintiff was *de minimis*.  *Id.* at 23.

Third, as to the retaliation claims, Defendants argue that C.O. Cruz's alleged sexual assault of Plaintiff on March 31, 2012, and C.O. Friedman's alleged theft of Plaintiff's razor on April 12, 2012, could not have been retaliatory because the adverse conduct pre-dated any protected activity undertaken by Plaintiff.  *Id.* at 25.  With respect to C.O. Jamil, C.O. Carr, C.O. Warren, Sgt. Milteer, and Sgt. Tschirky, Defendants argue there is insufficient evidence of a causal connection between Plaintiff's protected activity and Defendants' alleged retaliatory conduct because the only grievances filed at the time of the alleged adverse conduct were against C.O. Cruz, C.O. Coburn, and C.O. Friedman.  *Id.* at 26-27.  Alternatively, Defendants argue that the cell searches do not constitute adverse action.  *Id.* at 27-28.  As to the April 27, 2012, IMR issued by C.O. Friedman, Defendants contend that Plaintiff's account of the event is inherently inconsistent and implausible and, therefore, should not be credited.  *Id.* at 28-31.  Additionally, Defendants claim they are entitled to qualified immunity with respect to the cell searches and misbehavior report.  *Id.* at 31.

Fourth, Defendants argue the Eleventh Amendment bars all claims against them in their official capacities. *Id.* at 31-32.

## II.     APPLICABLE LEGAL STANDARD

Pursuant to Rule 56, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the . . . motion for summary judgment"). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)[2] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'") (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

---

[2] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

In *Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014), the Second Circuit made clear that "[i]n the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id.* at 194 (citing Fed. R. Civ. P. 56(c)(3)). "A verified complaint is to be treated as an affidavit . . . and therefore will be considering in in determining whether material issues of fact exist . . . ." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (internal citations omitted).

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the courts to conduct a search and independent review of the record to find proof of a factual dispute where a nonmovant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 469-70 (2d Cir. 2002).[3]

For this reason, courts in this District have routinely enforced L.R. 7.1(a)(3)[4] in cases in which the nonmovant has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts to have been admitted where: (1) the facts are supported by evidence in the record;[5] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the

---

[3] *See also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.").

[4] L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. Each fact shall set forth a specific citation to the record where the fact is established . . . . The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment.

[5] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

possible consequences of failing to respond to the motion.[6]  *See Champion*, 76 F.3d at 486; *see also Jackson*, 766 F.3d at 194 (a nonmovant who fails to respond to a summary judgment motion "runs the risk of unresponded-to-statements of undisputed facts proffered by the movant being deemed admitted").  While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules."  *Liberati v. Gravelle*, No. 9:12-CV-00795 (MAD/DEP), 2013 WL 5372872, at *6 (N.D.N.Y. Sept. 24, 2013) (internal citations and punctuation omitted).

In light of Plaintiff's failure to respond to Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiff's verified amended complaint, are accepted as true.  *See, e.g.*, *McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff [who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) . . ., supplemented by Plaintiff's verified Complaint . . ., as true.").

---

[6] Plaintiff was provided with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 56.)

As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1(a)(3), in light of the procedural posture of this case the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Liberati*, 2013 WL 5372872, at *7 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.  DISCUSSION

### A.  Official Capacity Claims

Plaintiff has sued Defendants for money damages in their official capacities under § 1983.  (Dkt. No. 23 at ¶ 13.)  The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978).  The Supreme Court has determined that § 1983 does not override states' Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006).  Thus, the Eleventh Amendment bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985).

Therefore, the Court recommends that Defendants be granted summary judgment on Plaintiff's claims for money damages under § 1983 asserted against them in their official capacities on Eleventh Amendment immunity grounds.

### B.  Eighth Amendment Excessive Force and Failure to Intervene Claims

Plaintiff asserts excessive force claims against C.O. Coburn and C.O. Cruz based upon incidents of sexual abuse on March, 22, 2012, and March 31, 2012, respectively.  (Dkt. No. 35 at ¶¶ 17-37, 38-50.)  Plaintiff claims C.O. Friedman was present during the first assault and failed

to intervene. *Id.* at 35-37. Defendants seek summary judgment, arguing that "Plaintiff's allegations of excessive force are based on no more than Plaintiff's own statements, whose lack of credibility may be determined on summary judgment because they are demonstrably inconsistent with all other evidence in the record." (Dkt. No. 54-19 at 18-22.) Defendants also contend they are entitled to summary judgment "because, construing all evidence in Plaintiff's favor, even if any force was used, it was necessarily *de minimis*." *Id.* at 23. For the reasons explained below, the Court recommends that Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claims be denied.

### 1.    Legal Standard

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . . including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and internal quotation marks omitted). An Eighth Amendment excessive force claim has two elements – "one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268)) (internal quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury

and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)).

The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

In addition, a corrections officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate in the use of force. *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. May 24, 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010). Indeed, an official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Cicio*, 2010 WL 980272, at *13. In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Tafari*, 714 F. Supp. 2d at 342; *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). Thus, "[a] corrections officer's intentional contact with an inmate's genitalia or other

intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Crawford v. Cuomo*, 796 F.3d 252, 256-57 (2d Cir. 2015).

### 2. March 22, 2012

In his verified amended complaint, Plaintiff states that on March 22, 2012, he "encountered C.O. Coburn on B3-Block, while viewing the callout at Eastern[.]" (Dkt. No. 35 at ¶ 17.) C.O. Coburn told Plaintiff to "hurry the fuck up and get up the stairs!" *Id*. at ¶ 18. Plaintiff followed the direct order and asked C.O. Coburn "why he had spoken to him with such profanity." *Id*. at ¶ 19. C.O. Coburn told Plaintiff to "shut the fuck up and just do what I say . . . as a matter of fact, just give me your fucking I.D. card." *Id*. at ¶ 20. C.O. Coburn proceeded to write Plaintiff's information on a small note pad. *Id*. at ¶ 21. Plaintiff asked C.O. Coburn what he would be charged because "he had not misbehaved." *Id*. at ¶ 22. C.O. Coburn responded by ordering Plaintiff to "get on the wall." *Id*. at ¶ 23. Plaintiff complied and assumed the standard pat frisk position. *Id*. at ¶ 24.

C.O. Coburn unbuckled Plaintiff's belt and ordered Plaintiff to take his shoes off. *Id*. at ¶ 24. C.O. Coburn shouted, "who the fuck do you think you are motherfucker," "you want to go," "we can go right now," and "I'll put you in the infirmary motherfucker!" *Id*. at ¶ 25.

C.O. Coburn then stated, "your [sic] not tough, your [sic] not a man, you're a bitch, I'll show you what I do to bitches." *Id*. at ¶ 25. C.O. Coburn reached into Plaintiff's underwear and squeezed Plaintiff's penis. *Id*. at ¶ 28-29. While squeezing Plaintiff's penis, C.O. Coburn stated, "you like that bitch?" *Id*. at ¶ 29. C.O. Coburn pulled Plaintiff's pants down to his ankles, "and fondled his testicles in a caressing motion while breathing heavly [sic] in his ear." *Id*. at ¶ 30. Plaintiff could "feel C.O. Coburn's body and erection against his buttocks." *Id*. at ¶ 31. Plaintiff

begged C.O. Coburn to stop.  *Id*. at ¶ 32.  When asked at his deposition how long did C.O. Coburn squeeze his penis and fondle his testicles, Plaintiff answered, "It seemed like forever.  I couldn't tell you exactly a time frame.  I was too concentrated on the pain of the whole situation. (Dkt. No. 54-18 at 47.).  Plaintiff also testified the incident was physically painful, and that he "buckled" forward when C.O. Coburn applied pressure.  *Id*. at 47-48.

After the assault, C.O. Coburn stated, "I knew you were a bitch, take your shit and go to your cell."  (Dkt. No. 35 at ¶ 32.)  C.O. Coburn started shoving Plaintiff "up the stairway in an attempt to further his abusive tactics."  *Id*. at ¶ 33.  As Plaintiff walked toward his cell, C.O. Coburn threatened, "If you tell anyone I'll kill you."  *Id*. at ¶ 44.

According to Plaintiff, C.O. Friedman was present during the March 22, 2012, sexual assault, failed to intervene, and encouraged C.O. Coburn's behavior.  (Dkt. No. 35 at ¶ 35.) Specifically, C.O. Friedman yelled, "Yeah, punch him in his big mouth."  *Id*. at ¶ 35. Afterwards, C.O. Friedman also threatened Plaintiff, "If you open your big fucking mouth about this your [sic] going to pay, we have ways of making you disappear."  *Id*. at ¶ 36.  During his deposition, Plaintiff testified that C.O. Friedman was present at the top of the stairs where the pat frisk and physical assault occurred, but was not present at the bottom of the stairs, where the verbal assault and incident began.  (Dkt. No. 54-18 at 51-52.)  Plaintiff explained C.O. Friedman was "inside of the squared area" where "officers usually go inside to unlock and lock the cells from the lockbox."  *Id*. at 51.  Plaintiff also testified that after the assault, he "walked back up the stairs."  *Id*. at 49.

Plaintiff testified that he told his mother about the March 22, 2012, assault, and he spoke to a mental health counselor.  *Id*. at 63.  Plaintiff did not, however, tell any inmates about the incident.  *Id*.

In their declarations in support of Defendants' motion for summary judgment, C.O. Coburn and C.O. Friedman categorically deny subjecting Plaintiff to excessive force and failing to intervene. (Dkt. Nos. 54-1 and 54-2.) In his declaration, C.O. Coburn denies subjecting Plaintiff to excessive force on March 22, 2012, or at any time. (Dkt. No. 54-1.) C.O. Coburn declares, "I was not verbally abusive toward Plaintiff on March 22, 2012, or at any time. I did not use any force against Plaintiff on March 22, 2012, or at any time. I did not sexually assault Plaintiff on March 22, 2012, or at any time." (Dkt. No. 54-1 at ¶ 7.) C.O. Coburn further declares that he has "never observed anyone else use force against Plaintiff, or sexually assault Plaintiff." *Id*. at ¶ 8. C.O. Coburn indicates that he only had routine contact with Plaintiff and had never had any one-on-one interactions with Plaintiff. *Id*. at ¶ 6.

Similarly, C.O. Friedman claims that Plaintiff's allegations against her are patently false. (Dkt. No. 54-4 at ¶ 5.) C.O. Friedman explains that she "had no interaction with Plaintiff whatsoever on March 22, 2012, and the events that Plaintiff described never occurred at any time." *Id*. Specifically, C.O. Friedman declares, "I was not verbally abusive toward Plaintiff on March 22, 2012, or at any time. I have never observed C.O. Coburn or anyone use force against Plaintiff, or sexually assault Plaintiff. I certainly have never encouraged anyone to use force against Plaintiff, or to assault him physically or sexually." *Id*. at ¶ 6.

### 3. March 31, 2012

Plaintiff alleges he was also sexually assaulted by C.O. Cruz. (Dkt. No. 38.) On March 31, 2012, Plaintiff encountered C.O. Cruz while entering the mess hall. *Id*. at ¶ 38. C.O. Cruz was conducting a pat frisk of another inmate and ordered Plaintiff "to get against the wall." *Id*. at ¶¶ 39-40. Plaintiff complied. *Id*. at ¶ 40. C.O. Cruz exclaimed, "I have been waiting for you fucker." *Id*. at ¶ 41. C.O. Cruz then ordered Plaintiff to empty his pockets. *Id*. at ¶ 42. C.O.

Cruz ordered Plaintiff to untie his shoes and unbuckle his belt. *Id*. at ¶ 44. C.O. Cruz stated, "Listen asshole, if you keep fucking with my boy C.O. Coburn, your [sic] going to get fucked up." *Id*. at ¶ 46.

C.O. Cruz then placed his hand inside the back of Plaintiff's underwear. *Id*. at ¶ 48. Plaintiff tried to move away from the wall. *Id*. at ¶ 49. C.O. Cruz pushed Plaintiff back toward the wall, twisting his arm. *Id*. C.O. Cruz then inserted his finger inside of Plaintiff's rectum, and stated, "you don't look so tough now motherfucker!" *Id*. at ¶ 50.

Afterwards, Plaintiff placed his belongings back into his pockets. *Id*. at ¶ 51. After exchanging "words," Plaintiff was placed on keeplock. *Id*. at ¶ 52.

In his declaration, C.O. Cruz states he had no interaction with Plaintiff on March 31, 2012, and further denies subjecting Plaintiff to excessive force on March 31, 2012, or at any time. (Dkt. No. 54-3 at ¶ 4.) However, C.O. Cruz explains that he "believe[s] that Plaintiff's allegations relate to an interaction that occurred between us on March 29, 2012." (Dkt. No. 54-2 at ¶ 4.) According to C.O. Cruz, on March 29, 2012, he was "conducting random pat frisks" outside mess hall one and he:

> pulled over inmate Payne and directed him to the wall for a pat frisk. During the pat frisk, inmate Payne began speaking to me aggressively, attempting to give me "instructions" as to the proper way to conduct a pat frisk. I responded that I was conducting the pat frisk on inmate Payne per directive. When I completed the pat frisk upon inmate Payne, he grabbed his belongings and stated to me, "You're scared! What are you gonna do?" I did not know what inmate Payne meant by this, and I did not respond.

*Id*. at ¶¶ 5-6.

C.O. Cruz declares: "I was not verbally abusive toward Plaintiff on March 29, 2012, March 31, 2012, or at any time. I did not use force against Plaintiff on March 29, 2012, March 31, 2012, or at any time. I did not sexually assault Plaintiff on March 29, 2012, March 31, 2012,

or at any time. I have never observed anyone else use force against Plaintiff, or sexually assault Plaintiff." *Id*. at ¶¶ 8-9.

### 4. DOCCS Grievance Records

On April 16, 2012, Plaintiff filed a grievance, titled "Wants Harassment to Stop." (Dkt. No. 54-14.) Plaintiff claimed, among other things, that C.O. Friedman "directed threats at [him] in retaliation of an incident that occurred with C.O. Coburn, which she witnessed & whom of which she is of close affiliation with." *Id*. at 13. Specifically, over the weekend of April 14 and 15, 2012, C.O. Friedman stated, "watch yourself, crybaby." *Id*. Plaintiff asked C.O. Friedman what she meant and C.O. Freidman replied, "I told you not to open your bigmouth, but you had to go call your mommy & have her call & make complaints against my boys, Coburn and S. Cruz." *Id*. C.O. Friedman stated, "I got your number. I told you we have ways of making you disappear." *Id*.

In his declaration, Sgt. Tschirky has stated that he investigated Grievance No. 25002-12 filed by Plaintiff against C.O. Coburn, C.O. Cruz, and C.O. Friedman, relating to the March 22, 2012, incident, the March 31, 2012, incident, and the April 12, 2012, cell search. (Dkt. No. 54-4 at ¶ 4.) After interviewing Plaintiff and all three officers, Sgt. Tschirky found Plaintiff's grievance to be unsubstantiated. *Id*. at ¶ 5. In his memorandum to Supt. Larkin dated April 24, 2012, Sgt. Tschirky stated there was "no merit to this grievance." *Id*. at ¶ 5.

On April 25, 2012, Supt. Larkin found "no merit" to Plaintiff's grievance. *Id*. at 6. In his decision, Supt. Larkin indicated that C.O. Friedman denied all allegations attributed to her, the "second officer" stated "no interaction with grievant, only normal routine contact[,]" and the "mess hall officer state[d] grievant was selected for pat frisk wherein grievant became aggressive and was counseled by area sergeant." *Id*.

Plaintiff appealed to the Central Office Review Committee ("CORC"), arguing "the record indicates C.O. Friedman's presence on 29 company where she is not assigned . . . C.O. Coburn is not being truthful . . . [and] C.O. Cruz did not issue a misbehavior report to substantiate his claim of [his] aggressive behavior[.]" *Id*. On September 5, 2012, CORC upheld Supt. Larkin's determination. *Id*. at 2.

### 5. DOCCS Medical Records

Plaintiff's Ambulatory Health Record Progress Notes indicate Plaintiff was seen on eleven occasions from March 22, 2012, through May 2, 2012, mostly for sick calls. (Dkt. No. 55-1.) The entry on May 2, 2012, indicates, "Interview with RN [after] allegation by offender that he had been sexually assaulted." *Id*. at 6. "Offender confirmed that he had filed grievance" and stated he was sexually assaulted on March 22, 2012, and on March 31, 2012, by two different individuals. *Id*. The note indicates Plaintiff stated there was penetration on March 31, 2012, by "a finger." *Id*.

### 6. Analysis

Here, Plaintiff alleges he was sexually assaulted on two occasions, and Defendants claim there was no use of force at all. The rule in determining whether to grant summary judgment is that credibility determinations, weighing evidence, and drawing inferences are functions for the jury, not the court. *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007) (citing *Liberty Lobby*, 477 U.S. at 255); *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matter for the jury, not for the court on summary judgment."). Although this is a close call, and there is very limited evidence supporting Plaintiff's contentions, this Court finds that a rational jury could find

Plaintiff was sexually assaulted on March 22, 2012, and March 31, 2012, as he claimed. (Dkt. No. 54-19 at 18, 22.)

There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately rely on contrary evidence presented by the defendants to conclude, at the summary judgment stage, that no reasonable jury would credit the plaintiff's testimony. *Id*. at 554-55.

Defendants argue summary judgment is warranted because Plaintiff's account of the alleged sexual assault "is inherently inconsistent and implausible, and should not be credited." (Dkt. No. 54-19 at 18-22.) To be sure, there are variations and inconsistencies between Plaintiff's sworn statements and testimony, and Defendants have marshalled persuasive evidence in support of their motion.

For example, as Defendants highlight in their memorandum of law, Plaintiff's statements vary "as to whether the abuse happened at the bottom of the stairs or the top." (Dkt. No. 54-19 at 19.) In his amended complaint, Plaintiff claims he "followed [C.O. Coburn's] direct order" to get upstairs prior to the alleged pat frisk. (Dkt. No. 35 at ¶ 19.) However, Plaintiff also alleges that after the incident, C.O. Coburn "started shoving [him] up the stairway" toward his cell. *Id*. at ¶ 32. Defendants note that Plaintiff's deposition testimony was "similarly confused as to this issue." (Dkt. No. 54-19 at 19.) Plaintiff initially testified that C.O. Coburn "followed him upstairs" before the assault; however he later testified that "walked back up the stairs after the assault." *Id*. at 45, 50. Defendants further note that Plaintiff testified there were no officers

present in the "immediate area where we had the back and forth." *Id*. at 44. Later, Plaintiff attempts to explain the inconsistencies by stating C.O. Friedman was present during the physical assault at the top of the stairs, but not at the bottom of the stairs. *Id*. at 50-21.

As to the March 31, 2012, incident, Defendants argue Plaintiff's description of his encounter with C.O. Cruz is "similarly illogical" because during his deposition Plaintiff could not recall whether C.O. Cruz was alone before the pat frisk, whether the incident occurred during afternoon or evening "chow," and despite claiming an argument occurred after the sexual abuse, Plaintiff could not recall anything that was said. (Dkt. No. 54-19 at 19-20.)

To be sure, "[s]uch inconsistencies in [Plaintiff's] various statements may affect his credibility; but the court cannot determine credibility issues in a motion for summary judgment." *Jordan v. Fischer*, 773 F. Supp. 2d 255, 270 n.15 (N.D.N.Y. 2011) (Sharpe, D.J.) (citing *Curry v. City of Syracuse*, 316 F. 3d 324, 333 (2d Cir. 2003) ("It is well-established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for a court on a motion for summary judgment.")).

As for the record evidence, Defendants have testified that neither of these incidents occurred. (Dkt. No. 54-1, 54-2, and 54-4.) Similarly, during the investigation of Plaintiff's grievance, C.O. Coburn, C.O. Cruz, and C.O. Friedman denied Plaintiff's allegations. (Dkt. No. 54-6 at ¶ 5.) Defendants further call attention to the fact that Plaintiff is unable to identify any witnesses to these alleged events, Plaintiff has provided no credible explanation or motive for the alleged assaults, Plaintiff did not file a grievance until more than two weeks after the alleged incident with C.O. Cruz, and Plaintiff did not report any sexual abuse to medical staff until May 2, 2012, despite receiving medical services on eleven occasion between March 22, 2012, and May 2, 2012. (Dkt. No. 54-19 at 21-22.)

In *Jordan v. Fischer*, the inmate-plaintiff alleged that he was brutally beaten and the defendant-corrections officers claimed there was no use of force at all. 773 F. Supp. 2d at 269. There, despite noting several inconsistencies between the complaint and the plaintiff's deposition testimony about the "broader" events of the use of force, such as whether after the assault plaintiff was escorted to his cell injured and bruised, or was forced to walked back to his cell when he could hardly walk, or whether he went to chow with other inmates and then returned to his cell, the Court found the *Jeffreys* exception should not apply because Plaintiff had been consistent about the circumstances of the alleged use of force. *Id.* at 269 n.12.

Similarly, Plaintiff has also been consistent about the circumstances of the alleged use of force. Indeed, Plaintiff has consistently sworn and testified under oath that on March 22, 2012, C.O. Coburn squeezed his penis and fondled his genitals while C.O. Friedman was present, failed to intervene, and encouraged C.O. Coburn's actions, and that on March 31, 2012, C.O. Cruz inserted his finger into Plaintiff's rectum and stated, "You don't look so tough now."

In light of the foregoing, this Court finds *Jeffreys* should not apply in this case. *See, e.g.*, *Galunas v. Reynolds*, No. 8:11-cv-14 (MAD/RFT), 2013 WL 316618, at *6 (N.D.N.Y. Jan. 28, 2013) (declining to apply *Jefferys* even though the plaintiff contradicted himself on several occasions because the plaintiff "consistently maintained" that the defendant used excessive force). Based on all of the evidence, this Court finds that Plaintiff's excessive force and failure to intervene claims will turn on issues of credibility that cannot be determined on a motion for summary judgment.

Defendants also argue that they are entitled to summary judgment "because, construing all evidence in Plaintiff's favor, even if any force was used, it was necessarily *de minims*." (Dkt. No. 54-19 at 23.) Specifically, Defendants contend that "the two isolated incidents alleged

(March 22 and 31, 2012), even if they occurred, are not sufficiently severe to demonstrate an

Eighth Amendment excessive force claim." *Id*. The Court disagrees.

In *Crawford*, the Second Circuit explained that "[i]n determining whether an Eighth

Amendment violation has occurred, the principal inquiry is whether the contact is incidental to

legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is

undertaken to arouse or gratify the officer or humiliate the inmate." 796 F. 3d at 257-58. To

determine the purpose of a correction officer's conduct during a frisk, the Second Circuit has

looked to the timing of the frisk, the comments made during the frisk, and subsequent comments

made by the officers. *Shepherd v. Fisher*, No. 08-CV-9297 (RA), 2017 WL 666213, at *18

(S.D.N.Y. Feb. 16, 2017) (citing *Crawford*, 796 F.3d at 258-59). Therefore, "a single incident of

sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights

no less than repetitive abusive conduct." *Crawford*, 796 at 259. Contact that does not occur

during the course of "a justifiable frisk or search of an inmate's person" is subject to greater

scrutiny than contact occurring during a frisk or search. *Hayes v. Dahkle*, 9:16-CV-1368

(TJM/CFH), 2017 WL 384066, at *6 (N.D.N.Y. Jan. 27, 2017); *Allah v. Morrison*, 14-CV-

6735L (MWP), 2016 WL 4017340, at *3 (W.D.N.Y. July 22, 2016).

As set forth above, on March 22, 2012, C.O. Coburn stated to Plaintiff, "your [sic] not

tough, your [sic] not a man, you're a bitch, I'll show you what I do to bitches" and then squeezed

Plaintiff's penis, fondled Plaintiff's testicles, breathed in Plaintiff's ear, pressed his body and

erection against Plaintiff's buttocks, and stated "you like that bitch?" (Dkt. No. 35 at ¶¶ 17-37.)

On March 31, 2012, C.O. Cruz stated before the pat frisk, "I have been waiting for you fucker."

*Id*. at ¶ 41. C.O. Cruz then inserted his finger into Plaintiff's rectum and stated, "you don't look

so tough now motherfucker!" *Id*. at ¶ 50.

Here, under the facts alleged and viewed in the light most favorable to Plaintiff, there was no penological justification for those actions, and Plaintiff's testimony, if credited, supports a finding that C.O. Coburn and C.O. Cruz derived sexual arousal and/or intended to humiliate Plaintiff.

Based upon the foregoing, the Court recommends that Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive force and failure to intervene claims against C.O. Coburn, C.O. Cruz, and C.O. Friedman be denied.

### C.    Fourteenth Amendment Procedural Due Process Claim Against Deputy Supt. Colao, Supt. Larkin, and DSH Prack

Plaintiff alleges his due process rights were violated during the Tier III disciplinary conducted by Deputy Supt. Colao. *Id*. at ¶¶ 111-24. Specifically, Plaintiff claims Deputy Supt. Colao denied him witnesses and documentary evidence and based his guilty determination upon the false April 27, 2012, IMR, and that Supt. Larkin and DSH Prack failed to remedy the constitutional violations committed during the hearing. *Id*.

### 1.    Legal Standard

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices . . . ." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted). To establish a procedural due process claim under

§ 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

The Fourteenth Amendment due process protections afforded a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira*, 380 F.3d at 69 (citation and internal quotation marks omitted). The constitutionally mandated due process requirements include: (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell*, 418 U.S. 539, 564-70 (1974); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

In addition, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). Due process in this context requires only that the hearing officer's decision not be arbitrary. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). A decision is not "arbitrary" if it is supported by "some evidence." *Id.* at 454. "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.'" *Id.* at 76 (quoting *Luna*, 356 F.3d at 488).

Furthermore, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g.*, *Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

### 2. April 27, 2012, IMR

On April 27, 2012, at approximately 1:27 p.m., C.O. Friedman was on 29 company assisting with the inmate moves. (Dkt. No. 54-5 at 4.) C.O. Friedman opened Plaintiff's cell and instructed him to start packing his property. *Id*. Plaintiff refused and asked for moving bags. *Id*. C.O. Friedman informed Plaintiff that there were no moving bags. *Id*. C.O. Friedman ordered Plaintiff to start moving his property. *Id*. Plaintiff refused and yelled, "What's your problem, you fucking bitch? You mad at me because you fucked up!" *Id*. Plaintiff then headed down the stairs leaving the company. *Id*. C.O. Friedman ordered Plaintiff to return upstairs but Plaintiff refused. *Id*. C.O. Freidman issued a second direct order to return to the company and also to "lock in." *Id*. Plaintiff turned around and headed back up the stairs, and yelled, "good, that's what the fuck I wanted, now you can go get the [sergeant] and send him to my cell!" *Id*. Plaintiff refused to "lock in" until the area sergeant was called to cell B-3, at which point Plaintiff "locked in." *Id*.

Based on the above incident, C.O. Friedman charged Plaintiff with violation of 106.10 (direct order), 107.10 (interference), and 107.11 (harassment). *Id*.

### 3.     Tier III Disciplinary Hearing

On April 28, 2012, Deputy Supt. Colao was designated by Supt. Larkin to conduct the Tier III disciplinary hearing on an April 27, 2012, IMR.  (Dkt. No. 54-8 at ¶ 5.)  Plaintiff received a copy of the April 27, 2012, IMR, and was provided with an assistant.  (Dkt. No. 54-10 at 2-3.)

After an initial extension was granted, Plaintiff's disciplinary hearing began on May 4, 2012.  (Dkt. No. 54-8 at ¶ 6.)  Deputy Supt. Colao read the April 27, 2012, IMR into the record.  (Dkt. No. 54-10 at 16-17.)  Plaintiff pleaded not guilty to all of the charges.  *Id*. at 17.  Further extensions to conduct the hearing were granted.  (Dkt. No. 54-8 at ¶ 6.)  During the hearing, Deputy Supt. Colao heard testimony from Plaintiff, as well as from C.O. Jamil, whose testimony Plaintiff had requested.  (Dkt. No. 54-10 at 2, 5-7.)

On May 21, 2012, Deputy Supt. Colao found Plaintiff guilty of the three violations and imposed a penalty of three months in the SHU with a corresponding loss of privileges and recommended loss of good time.  (Dkt. No. 54-11 at 8-9.)  Plaintiff filed an appeal.  (Dkt. No. 54-12 at 3-9.)  On August 1, 2012, Deputy Supt. Colao's determination was affirmed.  *Id*. at 2.

### 4.     Declaration of Deputy Supt. Colao

In his declaration, Deputy Supt. Colao had stated that he conducted Plaintiff's Tier III hearing in a "scrupulously fair and impartial manner."  (Dkt. No. 54-9 at ¶ 14.)  Deputy Supt. Colao declares that he followed all applicable directives and protocols in conducting Plaintiff's Tier III disciplinary hearing.  *Id*.

During the hearing, Plaintiff acknowledged that he received notice of the charges and was provided with assistance prior to the hearing in obtaining requested documents.  *Id*. at ¶ 9.  Deputy Supt. Colao adjourned the hearing on two separate occasions in order to obtain witnesses

and additional documents requested by Plaintiff. *Id.* Plaintiff was permitted to question C.O. Jamil as a witness. *Id.* at ¶ 15.

Although Plaintiff requested the testimony of two inmate witnesses, the inmates refused to testify and stated that they had no knowledge of the incident. *Id.* at ¶ 8. Deputy Supt. Colao states that during the hearing he showed Plaintiff the refusal forms completed and signed by both inmates. *Id.* Plaintiff never requested copies of the forms during the hearing. *Id.*

Deputy Supt. Colao denied Plaintiff's request to question Sgt. Tschirky since Plaintiff "indicated that his intended line of questioning related to the absence of an entry in the logbook regarding [Plaintiff] being placed on keeplock." *Id.* at ¶ 15. Because Plaintiff's "placement on keeplock was not a matter in dispute," Deputy Supt. Colao determined that Plaintiff's request to question Sgt. Tschirky was an "attempt to prolong the hearing unnecessarily." *Id.*

With the exception of prior filed grievances against DOCCS officers, Plaintiff received every document he requested. *Id.* at ¶ 14. Deputy Supt. Colao denied Plaintiff copies of his prior grievances because they were not relevant to the issue of whether Plaintiff had engaged in the conduct charged in the IMR. *Id.*

At the conclusion of the Tier III disciplinary hearing, Deputy Supt. Colao found Plaintiff guilty of the three violations. *Id.* His decision was based in large part "upon the body" of the IMR written by C.O. Friedman. *Id.* Plaintiff did not request to question C.O. Friedman as a witness. *Id.*

### 5.   Analysis

Plaintiff alleges he was deprived of a liberty interest without due process of law. (Dkt. No. 35 at ¶¶ 111-24.) Defendants contend summary judgment is warranted because Plaintiff was

afforded all the due process he was due during his Tier III disciplinary hearing. (Dkt. No. 54-19 at 11.[7]) The Court agrees with Defendants.

a.     <u>Opportunity to be Heard and to Present Witnesses</u>

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69. Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative").

The record evidence demonstrates Plaintiff was present at the hearing, voiced objections, received documentary evidence, and was permitted to question C.O. Jamil. (Dkt. No. 54-10.)

---

[7] Defendants do not challenge whether the penalties imposed on Plaintiff implicate a liberty interest even though the record evidence demonstrates Plaintiff was sentenced to three months in the SHU and Plaintiff testified that he served "[m]aybe about a hundred days" in the SHU as a result of the hearing. (Dkt. No. 54-18 at 126.) "The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or fewer does not constitute an "atypical and significant hardship" sufficient to create a liberty interest. *See, e.g.*, *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009); *Taylor v. Rodriguez*, 238 F.3d 188, 195 (2d Cir. 2001); *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)); *Judd v. Guynup*, Civ. No. 9:12-CV-00058 (NAM/RFT), 2012 WL 5472113, at *5 (N.D.N.Y. Oct. 17, 2012).

Plaintiff claims Deputy Supt. Colao denied him the opportunity to question two inmates and Sgt. Tschirky, all of whom were "material" witnesses. (Dkt. No. 35 at ¶ 113.)

As to the inmate witnesses, Plaintiff claims the record "does not reflect any reason for the witness' refusal to testify, or that any inquiry was made of them as to why they refused or that [Deputy Supt. Colao] communicated with the witnesses to verify they're [sic] refusal to testify." *Id*. at ¶ 114. Plaintiff's claims are belied by the record. During the hearing, Deputy Supt. Colao stated, "Okay, just for your information the two [inmate] witnesses you requested did not want to testify. They didn't know anything about the issue. Both of them signed forms that said they didn't know anything. Okay?" (Dkt. No. 54-10 at 3.) Deputy Supt. Colao has also stated that he "showed [Plaintiff] the refusal forms completed and signed by both of these inmates" during the hearing. (Dkt. No. 54-8 at ¶ 8.)

As to his request to question Sgt. Tschirky as a witness, Plaintiff explained that he wanted to question Sgt. Tschirky about the absence of an entry in the logbook relating to Plaintiff's placement on keeplock after the April 27, 2012, incident. (Dkt. No. 54-10 at 10.) The record evidence demonstrates that Deputy Supt. Colao determined Sgt. Tschirky's testimony would be irrelevant to the pending charges and believed that Plaintiff was attempting to unnecessarily prolong the hearing. (Dkt. No. 54-10 at 10; Dkt. No. 54-8 at ¶ 15.)

As set forth above, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse*, 201 F. 3d 103, 109 (2d Cir. 1999). Courts have consistently held that a hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process. *See Abdur-Raheem v. Caffery*, No. 13-CV-6315 (JPO), 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015) (collecting cases, and finding the hearing officer did not violate inmate's due process rights when he proceeded without the testimony of a

proposed witness, where that witness had indicated, by way of an inmate refusal form, that he would not testify); *see also Hinton v. Prack*, No. 9:12-CV-1844 (LEK/RFT), 2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses.") (citing *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 213 (W.D.N.Y. 2010) (finding no due process violation where two witnesses called by inmate refused to testify)).  Having explained and stated his reasons for not calling the inmate witnesses and Sgt. Tschirky to testify, the Court was provided the opportunity to be heard and to present witnesses.

As to the documentary evidence, the record demonstrates that with the exception of his prior grievances, Plaintiff received all requested documents.  (Dkt. No. 54-10 at 3.)  Plaintiff claims Deputy Supt. Colao denied his requests for prior grievances "without reason."  (Dkt. No. 35 at ¶111.)  Plaintiff's inmate assistant form indicates that this request was "denied" as "immaterial."  (Dkt. No. 54-11 at 4; *see also* Dkt. No. 54-18 at 124-125.)  During the hearing, Plaintiff admitted that he was provided with assistance prior to the hearing in obtaining requested documents, the majority of which he received, and that only his grievances were "denied."  (Dkt. No. 54-10 at 3.)  Even assuming Deputy Supt. Colao failed to state the reason why the grievances were denied on the hearing record, the Court finds such error was harmless.  During his deposition, Plaintiff conceded that the prior grievances would not have shown "anything about what did or didn't happen" on April 27, 2012.  (Dkt. No. 54-18 at 126.)  Rather, Plaintiff wanted to introduce past grievances to "establish retaliation" as C.O. Friedman's motivation to issue that false April 27, 2012, IMR.  *Id.*  Because the past grievances would not have affected the outcome of Plaintiff's disciplinary hearing any error pertaining to the denied documents was harmless.

In light of the above, the Court finds no evidence of any constitutional deficiency in Plaintiff's opportunity to call witnesses and to present rebuttal evidence during his Tier III disciplinary hearing conducted by Deputy Supt. Colao.

### b. Some Evidence

Due process requires that the determination be "supported by some evidence in the record." *Hill*, 472 U.S. at 455-56 (citations omitted). However, the "some evidence" standard is "narrowly focused." *Sira*, 380 F.3d at 76. "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached . . . ." *Hill*, 472 U.S. at 455-56 (citations omitted).

Plaintiff claims Deputy Supt. Colao "made an erroneous determination upon his finding of Plaintiff's guilt on an obvious fraudulently reported misbehavior report." (Dkt. No. at ¶ 108.) As reflected in the hearing disposition form, Deputy Supt. Colao relied primarily on the "body of the misbehavior report" issued by C.O. Friedman on April 27, 2012. (Dkt. No. 54-11 at 9.) During the hearing, Deputy Supt. Colao read the IMR into the record. (Dkt. No. 54-10 at 3-4.) Notably, the record evidence demonstrates Plaintiff did not request C.O. Friedman as a witness. (Dkt. No. 54-8 at ¶ 10; *see also* Dkt. No. 54-10.) In her declaration, C.O. Friedman has stated:

> As I wrote in the [IMR], I gave inmate Payne a direct order to begin moving his property, he refused to do so. Inmate Payne then demanded that I give him moving bags. When I told him I had none, inmate Payne began shouting at me and using profanity. Inmate Payne then began walking down the stairs, in an attempt to leave the area. He refused multiple direct orders from me that he return to the area and "lock in" to his cell. Instead, inmate Payne refused to "lock in" until I summoned Sergeant Tschirky to the area.

(Dkt. No. 54-4 at ¶¶ 10-11.)

Here, the record evidence demonstrates that Deputy Supt. Colao's decision was supported by "some evidence" sufficient for due process. *See, e.g.*, *Hinton*, 2014 WL 4627120, at *15 ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident); *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

Based upon the foregoing, the Court finds Plaintiff was afforded the minimum requirements of due process during the Tier III disciplinary hearing. Accordingly, the Court recommends granting summary judgment to Deputy Supt. Colao.

c.      Appeal

Plaintiff alleges Supt. Larkin and DSH Prack "reviewed Plaintiff's disciplinary proceeding individually and failed to correct the blatant Constitutional violations (procedural) making them liable for the substantive violations . . . ." (Dkt. No. 35 at ¶ 124.) However, for the reasons set forth above, the Court finds Plaintiff was afforded the minimum requirements of due process during his Tier III disciplinary hearing. As such, Plaintiff cannot establish a Fourteenth Amendment due process claim against Supt. Larkin and DSH Prack based on the affirmance of a constitutional disciplinary hearing. *See, e.g.*, *Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (N.D.N.Y. July 16, 2015) (dismissing due process claim against DSH Prack "[b]ecause his only involvement in the plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court . . . found comported with due process"); *Cole v. New York State DOCCS*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *28 (N.D.N.Y. Aug. 25, 2016); *see also Wesolowski v. Harvey*, 784 F. Supp. 2d 231, 234 (W.D.N.Y. 2011) (finding no

constitutional claim against supervisor where no underlying constitutional violation occurred); *see also Alston v. Bendheim*, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) ("The failure to state a claim for an underlying constitutional violation forecloses supervisory liability.").

Accordingly, the Court also recommends granting summary judgment to Supt. Larkin and DSH Prack. Inasmuch as the Court is recommending summary judgment to Deputy Supt. Colao, Supt. Larkin, and DSH Prack on Plaintiff's Fourteenth Amendment due process claim, the Court will not address Defendants' alternative arguments. (*See* Dkt. No. 54-19 at 14-17.)

### D. First Amendment Retaliation Claims Against C.O. Cruz, C.O. Friedman, C.O. Jamil, C.O. Warren, C.O. Carr, Sgt. Milteer, and Sgt. Tschirky

Plaintiff alleges he was subjected to several acts of misconduct, which he claims were retaliatory in nature. Specifically, in his amended complaint, Plaintiff alleges that (1) on April 12, 2012, C.O. Friedman searched and attempted to remove Plaintiff's razor from his cell (Dkt. No. 35 at ¶¶ 58-68); (2) on April 20, 2012, C.O. Jamil, C.O. Carr, and C.O. Warren searched his cell in an unruly manner under the direction of Sgt. Milteer (*id*. at ¶¶ 69-78); (3) on April 27, 2012, C.O. Friedman issued a false IMR against Plaintiff (*id*. at ¶¶ 79-82); and (4) on April 27, 2012, Sgt. Tschirky authorized Plaintiff's keeplock status based on the April 27, 2012, IMR and "fraudulently through deceptive tactics gained authorization to have Plaintiff placed in the SHU" (*id*. at ¶¶ 83-105). Plaintiff has also testified that he believed the March 31, 2012, sexual assault was retaliatory conduct. (Dkt. No. 54-18 at 112-13.)

#### 1. Legal Standard

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v.*

*Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

Regarding the first element, there is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Regarding the second element, the Second Circuit defines "adverse action" in the prison context as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotations and citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id*.

Regarding the third element, several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Those factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id*. "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id*.

The Court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, the plaintiff must set forth non-conclusory allegations. *Id*. Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d

Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted).

### 2. Analysis

Plaintiff alleges that he engaged in protected conduct by filing a series of grievances and complaints regarding his mistreatment by C.O. Coburn, C.O. Friedman, and C.O. Cruz. (Dkt. No. 35 at ¶ 54.) The record evidence demonstrates Plaintiff filed grievances on April 16, 2012 (No. 25002-12), May 2, 2012 (No. 25020-12), and May 23, 2012 (No. 25043-12). (*See* Dkt. Nos. 54-14, 54-15, and 54-16.) As set forth above, the filing of a grievance against prison officials is constitutionally protected conduct. *Scott*, 344 F.3d at 288 (2d Cir. 2003); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Thus, for purposes of this motion, the Court finds Plaintiff engaged in protected conduct.

### a. March 31, 2012, Sexual Assault

At his deposition, Plaintiff alleged for the first time that C.O. Cruz sexually assaulted him in retaliation for filing a grievance against C.O. Coburn. (Dkt. No. 54-18 at 113.) However, Plaintiff could not recall whether he filed a grievance against C.O. Coburn before or after the alleged March 31, 2012, sexual assault. *Id*. Plaintiff explained that "what led [him] to believe" that the March 31, 2012, sexual assault was "retaliatory" was because C.O. Cruz "mentioned [C.O.] Coburn's name and he used basically the same tactics as far as the belt, unbuckling the belt and shoe, untying the shoes." *Id*.

The record evidence demonstrates that the first grievance Plaintiff filed was received by the facility on April 16, 2012. (Dkt. No. 54-14 at 10.[8]) In this instance, because the alleged adverse conduct occurred before Plaintiff's alleged protected conduct, Plaintiff can show no causal connection. *See Seale v. Madison*, No. 5:11-CV-0278 (GTS/ATB), 2015 WL 667531, at *22 (N.D.N.Y. Feb. 17, 2015) ("[I]t is obvious that protected activity must precede any purported retaliation to [establish] a First Amendment retaliation claim.") (citation and internal quotation marks omitted); *see, e.g.*, *Thompson v. Racette*, No. 9:11-cv-1372 (GLS/ATB), 20132 12884469, at *3 (N.D.N.Y. Aug. 2, 2012) (dismissing inmate's retaliation claim where grievance was filed three months *after* the alleged retaliatory conduct), *aff'd* 519 F. App'x 32 (2d Cir. 2013) (summary order).

Accordingly, to the extent Plaintiff purports to bring a First Amendment retaliation claim based on the alleged March 31, 2012, sexual assault, the Court recommends granting summary judgment to C.O. Cruz.

b.      April 12, 2012, Cell Search

Plaintiff alleges that on April 12, 2012, C.O. Friedman retaliated against him for filing grievances by "attempting" to remove Plaintiff's razor from his cell, presumably as a predicate to a disciplinary action. (Dkt. No. 35 at ¶¶ 58-68.) Because Plaintiff cannot demonstrate adverse action and causal connection, the Court recommends granting summary judgment to C.O. Friedman on this claim.

---

[8]  Plaintiff testified that he mistakenly dated Grievance No. 25002-12 "March 12, 2012," instead of April 12, 2012. (Dkt. No. 54-18 at 87-88.) Plaintiff admitted the correct date is April 12, 2012, as that was the date C.O. Friedman searched his cell and attempted to steal his razor. *Id.*

Here, for the same reasons discussed above, Plaintiff can show no causal connection between his protected conduct, Grievance No. 25002-12, filed April 16, 2012, and the alleged April 12, 2012, incident, which pre-dates the protected conduct by four days.

Further, "[a]dverse action, as it relates to a retaliatory cell search, requires more than a search alone." *Phelan v. Thomas*, No. 9:10-cv-11 (GLS/DJS), 2017 WL 519246, at *3 (N.D.N.Y. Feb. 8, 2017) (citing *Stewart v. Richardson*, No. 15 CV 9034 (VB), 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016)). Here, Plaintiff admits that none of his property was taken or destroyed. Rather, Plaintiff testified that his razor was in a different location from where he normally keeps it. (Dkt. No. 54-18 at 83-84.) As such, Plaintiff cannot demonstrate adverse action.

Therefore, the Court recommends granting summary judgment to C.O. Friedman on this retaliation claim.

c.  April 20, 2012, Cell Search

Plaintiff alleges that on April 20, 2012, C.O. Jamil, C.O. Carr, and C.O. Warren—under Sgt. Milteer's direction—searched Plaintiff's cell in a "rambunctious" and "unruly" manner and destroyed Plaintiff's property in retaliation for filing grievances against C.O. Coburn, C.O. Cruz, and C.O. Friedman. (Dkt. No. 35 at ¶¶ 70, 75.) However, as a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See, e.g.*, *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving another corrections officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro v.*

*Gillespie*, 791 F. Supp. 2d 353, 369 (plaintiff failed to provide any basis to believe corrections counselor would retaliate for a grievance in which she was not personally named); *Ciaprazi v. Goord*, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *8-9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on the plaintiff's conclusory allegations of retaliatory animus, in part, because the plaintiff filed grievances against individuals other than the defendants involved in the alleged adverse action).

Here, because Plaintiff filed a grievance on April 16, 2012, the Court assumes for purposes of this motion that Plaintiff engaged in protected conduct. However, as set forth above, "[a]dverse action, as it relates to a retaliatory cell search, requires more than a search alone." *Phelan*, 2017 WL 519246, at *3 (N.D.N.Y. Feb. 8, 2017) (citation omitted). "Indeed, the plaintiff must demonstrate a search and 'other wrongful conduct,' such as the destruction or confiscation of property, that evinces the requisite deterrent of a similarly situated inmate of ordinary firmness from exercising his or her constitutional rights." *Id.* (quoting *Stewart*, 2016 WL 7441708, at *5); *see also Guillory v. Haywood*, No. 9:13-cv-1564 (MAD/TWD), 2015 WL 268933, at *21 (N.D.N.Y. Jan. 21, 2015).

Here, Plaintiff alleges that during this cell search, Defendants "ripped up and destroyed legal documentation that was germane to a then pending civil action/motion for Summary Judgment, in which the misconduct impeded [his] ability to adequately appeal the final determination thereof." (Dkt. No. 35 at ¶ 75.) However, Sgt. Tschirky has declared that he examined Plaintiff's cell after receiving an informal complaint and he observed no signs of destruction or damage. (Dkt. No. 54-6 at ¶ 6.) Here, viewing the evidence most favorable to the nonmoving party, the Court finds Plaintiff has raised a triable issue of fact as to adverse action.

What is lacking, however, are any allegations of fact that connect the April 16, 2016, grievance and the alleged April 20, 2016, adverse conduct. In his amended complaint, Plaintiff claims that "prior to the search," C.O. Jamil stated, "I just sent one to the box, and I'm about to send another one to the box" while walking to Plaintiff's cell. (Dkt. No. 35 at ¶ 73.) Plaintiff contends that "this statement is an indication of conscience malfeasance on the part of C.O. Jamil and to wit; C.O. Friedman, it illustrates an [sic] premeditated intention to have a significant hardship placed upon the Plaintiff, in the form of disciplinary sanctions resulting in SHU time, or worse, criminal charges, through thier [sic] retaliation." *Id.* at ¶ 74. Such conclusory allegations are insufficient to withstand summary judgment. *See Flaherty*, 713 F.2d at 13. Furthermore, Plaintiff testified that he only became aware of the April 20, 2012, search upon returning to his cell, and only was aware of which officers conducted the search because he saw them leaving his cell. (Dkt No. 54-18 at 108.)

At his deposition, Plaintiff suggested that Sgt. Milteer authorized the cell search because he was motivated by a disagreement between them that occurred on February 26, 2012. *Id.* However, the record evidence demonstrates Plaintiff did not file a grievance against Sgt. Milteer until May 2, 2012. (Dkt. No. 54-15 at 45-52.) Nor could Plaintiff recall having any conversations with C.O. Jamil, C.O. Carr, or C.O. Warren about any of the grievances that he had previously filed. (Dkt. No. 54-18 at 112.) Plaintiff admitted that C.O. Jamil, C.O. Carr, and C.O. Warren had never threatened him about filing grievances. *Id.*

In his grievance filed on May 2, 2012 (No. 25020-12), regarding the April 20, 2012, cell search, Plaintiff suggests that because C.O. Freidman's "plan was foiled" on April 12, 2012, to steal Plaintiff's razor, C.O. Freidman "employed the assistance of . . . C.O. Jamil . . . to retaliate against [Plaintiff] for exercising [his] First Amendment right to redress of grievances, . . . where

C.O. Jamil then employed the likes of C.O. Carr who she is commonly in cahoots with in the performance of misconduct & C.O. Warren who is fairly new & easily influenced by the more seasoned C.O. Jamil" to search Plaintiff's cell. (Dkt. No. 54-15 at 37). Plaintiff also claims that Sgt. Milteer "aided these officers in carrying out their ulterior motives by authorizing a second so-called security unscheduled search, through motives of his own." *Id*. Plaintiff suggests Sgt. Milteer was motivated to retaliate against him because Plaintiff was found "not guilty" during a Tier II disciplinary hearing based on a "false ticket" that Sgt. Milteer co-authored in February of 2012, against six targeted industry workers. *Id*. at 38-39. As discussed above, conclusory statements are not sufficient to support causation on retaliation claims; the claims must be supported by specific facts. *See Flaherty*, 713 F.2d at 13.

In this instance, Plaintiff cannot rely solely upon the temporal proximity of the protected conduct and the alleged retaliatory act to survive summary judgment. Indeed, temporal proximity alone is generally insufficient to carry the plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584 (TJM), 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033 (PKC), 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005). Furthermore, as noted above, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See Wright*, 554 F.3d at 274.

Here, the record is devoid of evidence, admissible or otherwise, that supports Plaintiff's theory that Sgt. Milteer authorized C.O. Jamil, C.O. Carr, and C.O. Warren to conduct a "rambunctious" and "unruly" cell search on April 20, 2012, in retaliation for a grievance Plaintiff filed on April 16, 2012, against C.O. Freidman, C.O. Coburn, and C.O. Cruz.

Based upon the foregoing, the Court recommends granting summary judgment to C.O. Jamil, C.O. Carr, C.O. Warren, and Sgt. Milteer on this retaliation claim.

###### d.    April 27, 2012, IMR

Plaintiff alleges C.O. Friedman issued the April 27, 2012, IMR in retaliation for the grievances filed against her, which resulted in disciplinary SHU confinement.  (Dkt. No. 35 at ¶¶ 79-82.)  "In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, '[t]he difficulty lies in establishing a retaliatory motive.'"  *Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *11 (Mar. 31, 2009) (quoting *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007)).

Here, for purposes of this motion, the Court assumes that Plaintiff has satisfied the first and second elements of this retaliation claim.  *See Colon*, 58 F.3d at 872; *Pidlypchak*, 389 F.3d at 384.  However, Plaintiff has offered no evidence from which a reasonable factfinder could conclude that the April 27, 2012, IMR was motivated by retaliatory animus.  In her sworn declaration, C.O. Friedman denies any retaliatory motives and states that she issued the misbehavior report to document Plaintiff's "violation of the facility rules on April 27, 2012[.]" (Dkt. No. 54-4 at ¶ 9.)  C.O Friedman declares that the April 27, 2012, IMR is an "accurate description" of Plaintiff's behavior on that date.  *Id*. at ¶¶ 9-11.

Plaintiff, on the other hand, has advanced only his speculation that C.O. Friedman issued the April 27, 20912, IMR against him in retaliation for his complaints against her.  Plaintiff claims C.O. Freidman "fabricated the supposed incident of the misbehavior report, in order to have Plaintiff erroneously placed in SHU in retaliation for the three prior Grievances/Complaints he wrote against her, the record of the disciplinary hearing will substantiate this claim[.]"  (Dkt. No. 35 at ¶ 82.)  Such conclusory allegations unsupported by specific facts giving rise to an

inference of retaliatory animus, are insufficient to support a retaliation claim. *See Flaherty*, 713 F.2d at 13. Additionally, Plaintiff was found guilty of all three violations at the Tier III disciplinary hearing. (Dkt. No. 54-11 at 8.)

The only evidence offered by Plaintiff which could potentially support the finding of a nexus between the protected activity and the subsequent misbehavior report is the inference that that might be drawn by the timing of his protected conduct and the April 27, 2012, IMR. "It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report, can sometimes suffice to defeat a summary judgment motion seeking dismissal of a retaliation claim." *Crump v. Ekpe*, No. 9:07-CV-1331 (LEK/DEP), 2010 WL 502762, at * 11 (N.D.N.Y. Feb. 8, 2010) (citing *Colon*, 58 F.3d at 872). In many circumstances, however, this alone is insufficient to avoid summary judgment. *Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (citing *Ayers v. Stewart*, 101 F.3d 687, *1 (2d Cir. 1999) (unpublished opinion)); *see also Ethier*, 2006 WL 1007780, *7.

Moreover, "[t]he Second Circuit has held that, '[r]egardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred.'" *Phelan*, 2017 WL 519246, at *3 (quoting *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK)(GWG), 2007 WL 1544629, at *22 (S.D.N.Y. May 29, 2007) (quoting *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003))); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002).

Here, in light of the absence of any evidence offered by Plaintiff to support this allegation of retaliation, and given C.O. Friedman's denial of retaliatory animus and the hearing officer's finding of guilt with regard to the charges lodged in the misbehavior report at issue, the Court

finds Plaintiff has not satisfied his burden that C.O. Friedman issued the misbehavior report in retaliation for Plaintiff having engaged in protected activity. Even assuming C.O. Friedman's actions were retaliatory, the Court finds she would nonetheless be entitled to summary judgment because the record evidence demonstrates that C.O. Friedman would have issued the February 27, 2012, IMR even without any retaliatory animus. (*See* Dkt. No. 54-4.)

Based on the foregoing, the Court recommends granting summary judgment to C.O. Friedman on this retaliation claim.

e.       Confinement to the SHU

Plaintiff alleges Sgt. Tschirky retaliated against him for filing grievances by sending him to the SHU based on the false April 27, 2012, IMR. (Dkt. No. 35 at ¶¶ 104-05.[9]) For the reasons set forth above, the Court assumes for purposes of this motion that Plaintiff has satisfied the first and second elements of this retaliation claim.

However, Plaintiff has provided only conclusory and speculative allegations that the filing of a grievance against other officers was a substantial or motivating factor behind Sgt. Tschirky's alleged adverse conduct. (Dkt. No. 35 at ¶ 104.) On the other hand, Sgt. Tschirky unequivocally declares, "I did not determine or direct that inmate Pane should be placed in SHU." (Dkt. No. 54-6 at ¶ 13.) Sgt. Tschirky declares he did not conspire with C.O. Friedman "in order to fabricate the report and create a justification for sending Plaintiff to [the] SHU." *Id.*

_____

[9] Defendants have also moved for summary judgment on Plaintiff's retaliation claims based on (1) Sgt. Tschirky failing to credit Plaintiff's allegations when Plaintiff complained to him about the April 12, 2012, and April 20, 2012, cell searches, and (2) Sgt. Tschirky listening in on Plaintiff's interview with an investigator from the Inspector General's office on April 27, 2012, regarding Plaintiff's grievances against C.O. Coburn, C.O. Cruz, and C.O. Friedman. (Dkt. No. 54-19 at 26-27.) Those claims, however, did not survive the District Court's initial review. (Dkt. No. 7 at 6, 17-19.) Indeed, such actions do not constitute "adverse action" that would support a First Amendment retaliation claim.

at ¶ 11. Sgt. Tschirky further states, "I did not make the decision to transfer Plaintiff to the SHU. It is my understanding that the review Lieutenant made that decision, after my shift had concluded, based on the Lieutenant's review of the [April 27, 2012, IMR]." *Id.*

To the extent Plaintiff relies on the temporal proximity of Sgt. Tschirky "listening" in on his April 27, 2012, interview with the investigator from the Inspector General's Office, and being sent to the SHU as a result of the April 27, 2012, IMR, Plaintiff admitted at his deposition he had no "direct proof" that Sgt. Tschirky listened in on his interview and "[t]hat was just something that was inferred based on the event that took place thereafter, but I can't say with certainty that –I can't say that I saw him do that." (Dkt. No. 54-18 at 101.)

Additionally, as discussed above "a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred.'" *Phelan*, 2017 WL 519246, at *3 (citations omitted). In this instance, Sgt. Tschirky has declared that he "never engaged in any retaliatory conduct against Plaintiff, and each of the actions that Plaintiff challenges was taken for legitimate reasons." (Dkt. No. 54-6 at ¶ 9.) Indeed, "[p]rison officials have broad administrative and discretionary authority over the institutions they manage." *Gonzalez v. Narcato*, 363 F. Supp. 2d 486, 495 (E.D.N.Y. 2005) (quoting *Lawrence v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (other citation omitted)).

Further, to Sgt. Tschirky's knowledge, Plaintiff never filed a grievance before the alleged adverse conduct. (Dkt. No. 54-6 at ¶ 8.) As discussed above, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another corrections officer. *See Wright*, 554 F.3d at 274.

Because the record contains no evidence, admissible or otherwise, from which a reasonable factfinder could conclude that there exists a causal connection between Plaintiff's protected conduct and the alleged adverse action by Sgt. Tschirky, the Court recommends granting summary judgment to Sgt. Tschirky on this retaliation claim.

## IV.    CONCLUSION

Based on the above findings, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 54) be denied in part and granted in part.  If the District Court accepts this Report and Recommendation, only Plaintiff's Eighth Amendment excessive force and failure to intervene claims against C.O. Coburn, C.O. Cruz, and C.O. Friedman in their individual capacities will remain for trial.  Thus, it is also recommended that Deputy Supt. Colao, Supt. Larkin, DSH Prack, C.O. Jamil, C.O. Warren, C.O. Carr, Sgt. Milteer, and Sgt. Tschirky be dismissed from this action.

**WHEREFORE,** it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 54) be **DENIED IN PART** and **GRANTED IN PART**; and it is further

**RECOMMENDED** that summary judgment be **DENIED** to C.O. Coburn, C.O. Cruz, and C.O. Friedman on the Eighth Amendment excessive force and failure to intervene claims and that summary judgment be **GRANTED** to Defendants on all other claims; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: August 29, 2017
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5372872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aldo Contreras LIBERATI, Plaintiff,

v.

GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. johnson, Esq, Mary E. Kissane, Esq, of Counsel, Malta, NY, for Defendant.

### ORDER

MAE A. D'AGOSTINO, District Judge.

**\*1** On May 14, 2012, Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that upon arrival at Clinton County Correctional Facility, Defendant used excessive force against Plaintiff, causing him injury. See Dkt. No. 1. On December 28, 2012, Defendant moved for summary judgment seeking dismissal of Plaintiff's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Dkt. No. 22–7 at 5. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated Plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. See generally Dkt. No. 22–7. Plaintiff failed to oppose Defendant's motion for summary judgment. See Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated August 9, 2013, Magistrate Judge Peebles recommended that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's complaint. See Dkt. No. 31 at 2. Specifically, although Magistrate Judge Peebles found that questions of fact preclude granting the motion on

exhaustion grounds, he found that the motion should be granted on the merits because no reasonable factfinder could conclude that Defendant violated Plaintiff's Eighth Amendment rights. See id. at 21. Neither party objected to Magistrate Judge Peebles Report–Recommendation and Order.

On February 5, 2012, Plaintiff was transferred to Clinton Correctional Facility ("Clinton") located in Dannemora, New York. See Dkt. No. 22–2 at 3. During the transfer, the corrections officers escorting Plaintiff called Clinton to notify them that Plaintiff was difficult and combative. See id. Upon arrival, the staff at Clinton prepared Plaintiff for housing by performing the routine intake and booking procedures. See id. at 4. Part of the normal procedure was to conduct a patdown search to detect any contraband that was not detected by the "BOSS" chair. See id. at 3. During the pat-down, Plaintiff disobeyed orders on at least two occasions when he refused to face and keep his hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff had a second layer of pants underneath his jeans, they instructed him to remove them in a private changeout room. See id. at 4. After removal of the pants Plaintiff refused to remain on the wall, so they attempted to physically restrain him. See id. at 5. Upon hearing this commotion, Defendant entered the changeout room to assist with the situation. See id. He observed Plaintiff resisting the officers that were trying to restrain him. See id. Defendant administered "a single, one second, application of O.C. spray towards other officers to continue to gain control over Plaintiff and secure his hands." Id . After he administered the spray, Defendant placed it back in his holster and retreated to allow the other officers to gain control of Plaintiff. See id. Although Defendant remained in the room, he used no further force against him other than to place his feet near the Plaintiff to prevent him from putting his hands under his body. See id. at 5–6. When the Plaintiff was fully secured, Defendant left the room. See id. at 6. Plaintiff was then escorted to a holding cell to provide him an opportunity to calm down, decontaminate his eyes with eye wash and see medical staff at the facility. See id.

**\*2** Plaintiff's verified complaint alleges that Defendant punched him in the head twice and that he did not file a grievance regarding these allegations because the corrections officers at Clinton refused to provide him with the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' *"Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See *id.* at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976)) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two componentsone subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The

subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport, plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair. [2] Id. at ¶¶ 3, 10.

[2]     A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

 **\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately administered one, single application of "O.C. spray" to regain control of plaintiff. [3]  Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13,

14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

[3]     The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*

Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his

entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendant's Motion*
The court's local rules require that a party seeking summary judgment must submit a statement of material facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[4] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

[4]    Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.[5] See *generally* Docket Sheet.

[5]    Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was

over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

B. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if

the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event the initial burden is met, the opposing party must then, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also* Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which

imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [7]

6    In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

7    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate

grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

There are grievance procedures in place and available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

[8]     18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

### D. *Plaintiff's Excessive Force Claim*
In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect."

*Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 559 U.S. at 37; *Hudson,* 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and

sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support this claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed plaintiff only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton following the incident, nothing in the record, including

plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at *3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted. [9]

[9]     Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

IV. *SUMMARY AND RECOMMENDATION*

In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5372872

---

KeyCite Yellow Flag - Negative Treatment
Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State Attorney General, The Capitol, Keith J. Starlin, AAG, of Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order, *see* Dkt. No. 81, and Plaintiffs objections thereto, *see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision, commenced this action pursuant to 42 U.S.C. § 1983. In his original complaint, Plaintiff asserted claims against Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. *See* Dkt. No. 49. By Report–Recommendation and Order dated July 6, 2012, Magistrate Judge Homer recommended that this Court dismiss all claims against the named individuals and direct Plaintiff to join Harold Call as a Defendant. *See* Dkt. No. 55. This Court accepted

the Report and Recommendation and Order in its entirety and directed Plaintiff to file an amended complaint to "include only one cause of action a procedural due process claim in connection with his disciplinary hearing and one Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and requested compensatory and punitive damages. *See* Dkt. No. 64, Amended Complaint at 4. In this amended complaint, Plaintiff alleged that Defendant violated his constitutional rights under the First, Eighth and Fourteenth Amendments. *See* Dkt. No. 64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 74. In a Report–Recommendation and Order dated October 9, 2014, Magistrate Judge Hummel recommended that this Court grant Defendant's motion in part and deny his motion in part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to Magistrate Judge Hummel's recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a magistrate judge's report and recommendation, the court conducts a *de novo* review of those recommendations. *See Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781, \*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no objections or makes only conclusory or general objections, however, the court reviews the report and recommendation for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–458, 2009 WL 1794741, \*1 (N.D.N.Y. June 23, 2009) (quotation omitted). After conducting the appropriate review, a district court may decide to accept, reject, or modify those recommendations. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, \*10 (N.D.N.Y. Sept. 29, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general or conclusory, given his *pro se* status, the Court has conducted a *de novo* review of Magistrate Judge Hummel's Report–Recommendation and Order. Having completed its review, the Court hereby

**\*2** **ORDERS** that Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order is

**ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION AND ORDER [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"),[2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor,

Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action —a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2] McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

### I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c).

"A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]     Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]     Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork do you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]     All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470

F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity

can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the

reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse

action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N. A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he

suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish

(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. **Denial of Liberty Interest**

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d

19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Compl. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general

prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564).

"[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

ii. **Hearing Officer Bias/Pre-determination of Guilt**

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D.N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate] section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence

that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at * 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. **Failure to Investigate**

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did

not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, \*5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

**\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court

action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied

upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at *3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at *4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating

rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

 **\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir.

13–111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."))； *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 **\*17** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is

hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at *12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. Qualified Immunity

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue

was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon —the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing,

it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

## IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

  a. dismissing plaintiff's First Amendment claims;

  b. dismissing plaintiff's Eighth Amendment claims;

  c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

  d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

  a. plaintiff's Fourteenth Amendment procedural due process claims;

  b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,
v.
PERRARA, Corr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Colleen D. Galligan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against
the six above-captioned New York State correctional
employees, are the following: (1) Defendants' motion
for partial summary judgment (requesting the dismissal
of Plaintiff's claims against Defendant Russell, and
his claims against the remaining Defendants in their
official capacities); and (2) United States Magistrate
Judge Randolph F. Treece's Report–Recommendation
recommending that Defendants' motion be granted.
(Dkt.Nos.70, 80.) Neither party filed an objection to
the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.)
After carefully reviewing the relevant filings in this
action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Treece employed

the proper standards, accurately recited the facts, and
reasonably applied the law to those facts. As a result, the
Court accepts and adopts the Report–Recommendation
for the reasons stated therein. (Dkt. No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is *ACCEPTED* and
*ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is *GRANTED;* and it is further

**ORDERED** that the following claims are *DISMISSED*
from this action: (a) all claims asserted against Defendant
Russell, and (b) all claims asserted against Defendants
in their official capacities only. The Clerk is directed to
terminate Defendant Russell from this action; and it is
further

**ORDERED** that the following claims *REMAIN
PENDING* in this action: (a) Plaintiff's claim that
Defendants Whittier, Mulligan, Perrara and/or Lawrence
subjected him to inadequate prison conditions by
depriving him of meals for approximately five consecutive
days in December 2009, in violation of the Eighth
Amendment; (b) Plaintiff's claim that Defendants
Whittier, Mulligan, Perrara and Lawrence used excessive
force against him, and that Defendant Deluca failed
to protect him from the use of that excessive force, in
violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant
Deluca was deliberately indifferent to Plaintiff's serious
medical needs (following the assaults) in violation of the
Eighth Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel,
a final pretrial conference with counsel will be scheduled
in this action before the undersigned, at which time the
Court will schedule a jury trial for Plaintiff's remaining
claims as set forth above against Defendants Whittier,
Mulligan, Perrara, Lawrence and DeLuca. Counsel are

directed to appear at the final pretrial conference with settlement authority from the parties.

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]   Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential*

*Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

### B. Personal Involvement

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him

to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8.[2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

2    Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

 **\*4** With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior*

cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]   The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d at 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's

participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5**  Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion, he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

### C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment

thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court

finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

## All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

---

2010 WL 980272
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.

No. 9:08-CV-534 (NAM/DEP).
|
March 15, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action for declaratory and monetary relief under 42 U.S.C. § 1983, claiming excessive use of force, failure to intervene, and denial of adequate medical care stemming from a disturbance involving 17 or more inmates occurring in a "holding pen" or "cage" at Auburn Correctional Facility ("ACF") on March 7, 2006. Plaintiff moved for summary judgment (Dkt. No. 35) and defendants cross-moved for summary judgment (Dkt. No. 38). Upon referral of the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles issued a Report and Recommendation (Dkt. No. 41) recommending that this Court deny plaintiff's motion, grant defendants' motion, and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42). Plaintiff states that the Court should have reviewed the transcripts from his disciplinary hearing, because the testimony of defendants Peter M. Sigona and Richard D. Ruston, III at that hearing "contradicts the reports that [Magistrate Judge Peebles] relied on in making [his] decision." Plaintiff gives no specifics and thus appears to be interposing a general objection directed to the issues of excessive force and failure to intervene. His objection does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where, as here, a party interposes only general objections to a report and recommendation, the Court reviews for clear error or manifest injustice. *See Davis v. Chapple,* 2010 WL 145298, \*2 (N.D.N.Y. Jan.8, 2010), *Brown v. Peters,* 1997 WL 599355,\*2-\* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

The Court accepts and adopts Magistrate Judge Peebles' Report and Recommendation. In view of plaintiff's objection, which, as noted, appears to be directed to the evidence on the issues of excessive force and failure to intervene, the Court briefly revisits these issues. Although plaintiff interposes only a general objection on these issues, in light of his *pro se* status and the nature of the objection, the Court conducts a *de novo* review. Plaintiff requests the Court to obtain the transcript of the disciplinary hearing and contends that the testimony given by Sigona and Ruston at that hearing contradicts the reports relied on by Magistrate Judge Peebles; however, as explained below, the award of summary judgment to defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force and failure to intervene claims is briefly summarized as follows. In a declaration supporting the motion for summary judgment, Sigona, a sergeant at ACF, states:

**\*2** On March 7, 2006, I was supervising the hospital depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and

that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

**\*3** \* \* \*

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

\* \* \*

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?

A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

 *4 A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them–intentionally or not–pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

**\*5** The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In

view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

I. *BACKGROUND*

The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer out a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

**\*7** Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

**\*8** As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn, on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008. [1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical

needs arising from the incident. [2] *See generally* Complaint (Dkt. No. 1).

This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

[2]    In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated. *Avent v. Doe,* No. 9:05-CV-1311, 2008 WL 877176, at *8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

**\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged;

and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson)*. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more

than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

### B. *Excessive Force/ Failure To Intervene*

At the heart of plaintiff's complaint is his claim that on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

#### 1. *Excessive Force*

Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290,

291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. - - - -, --- S.Ct. ----, --- L.Ed.2d - - - -, 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This

is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffin,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

*12 Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002).[3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down", or who kneed him in the nose, and could not say whether there were also

officers on the floor with him. [4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

[4] Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights. [5]

[5] By plaintiff's own account, the injuries suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

### 2. *Failure to Intervene*

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive

force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. *Medical Indifference*

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed

within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* )*; Waldo,* 1998 WL 713809, at *2 (same).

### 1. *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A

serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."

*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

**\*16** Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

### D. *Personal Involvement*
In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate indifference claim, his cause of action against defendant

Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

## IV. SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 980272

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 316618
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Matthew GALUNAS, Plaintiff,

v.

Detective Robert REYNOLDS, Ulster County Police
Department; and Brian Robertson, Detective,
Ulster County Police Department, Defendants.

No. 8:11–cv–14 (MAD/RFT).
|
Jan. 28, 2013.

**Attorneys and Law Firms**

Matthew Galunas, Dannemora, NY, pro se.

Shantz & Belkin, Derek L. Hayden, Esq., of Counsel,
Latham, NY, for Defendant Reynolds.

Cook, Netter, Cloonan, Kurtz & Murphy, P.C., Erik M.
Kurtz, Esq., of Counsel, Kingston, NY, for Defendant
Robertson.

### MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** On January 6, 2011, Plaintiff commenced this
civil rights action alleging that Defendants violated his
constitutional rights. *See* Dkt. No. 1. Currently before the
Court are Defendants' motions for summary judgment.
*See* Dkt. Nos. 26, 28.

### II. BACKGROUND

In his complaint, Plaintiff alleges that, "[o]n February
26, 2008, [upon] exiting my home at 25 Park Drive,
Woodstock, N.Y. 12491, various personnel from a multi-
agency Task Force, composed of Ulster and Kingston
County police officers, absent a warrant, effectuated
my arrest based upon allegations of Criminal Sale of
Controlled Substance(s)." *See* Dkt. No. 1 at 4.[1] Plaintiff

claims that, upon exiting his home, he complied with the
officers commands to drop to the ground and to place
his arms behind his back. Plaintiff alleges that, despite
his compliance, Defendant Robertson, without an arrest
warrant, placed him in handcuffs, "ramm[ed] his knee in
[his] rib cage while [Defendant] Re[y]nolds smashed [him]
with his tazer gun." *See* Dkt. No. 35–4 at ¶ 4. After this
alleged altercation, Plaintiff claims that, because of the
pain he was suffering, he was unable to stand up. *See id.* at
¶ 5. When Plaintiff failed to stand, he claims that he was
"dragged" across his yard and then "yanked ... up while
handcuffed behind [his] back" by Defendant Reynolds,
who then continued to assault him. *See id.* Plaintiff alleges
that several officers observed this alleged assault and only
eventually intervened for fear of who may be watching.
*See* Dkt. No. 35 at ¶ 3.

[1]   To avoid confusion, anytime the Court references a
      specific page number for an entry on the docket, it
      will cite to the page number assigned by the Court's
      electronic filing system.

As a result of this alleged assault, Plaintiff asserts that
he now suffers from "diffused discs L4–L5 L5–S1." *See
id.* Moreover, although Plaintiff admits that he suffered
from "minor bulging discs" prior to February 26, 2008, he
claims that Defendants' use of excessive force caused his
previous condition to worsen, leaving him with permanent
disabilities. *See id.* Plaintiff further alleges that, after the
incident, he "was unable to walk without being helped"
and that the attack left the entire right side of his face
bruised, including a laceration. *See id.* at ¶ 7. Plaintiff
claims that, despite his compliance, he was "hit in the
side of the head two times with the 'Tazor Gun' and
one time with Det. Reynolds 'Service Revolver.' " *See
id.* Although Defendants do not dispute that some force
was used while arresting Plaintiff, they contend that it
was a reasonable amount of force in light of the fact
that Plaintiff was not complying with their commands
and because Plaintiff had evaded arrest the day before by
fleeing from them. Defendants further contend that once
Plaintiff was subdued and placed in handcuffs, they did
not strike him or employ any additional force.

Shortly after his arrest, Plaintiff was evaluated by medical
personnel at the Ulster County Jail. *See* Dkt. No. 28–
5 at Exhibit "G." Plaintiff complained of lower back
pain but the medical notes indicate that, upon exiting the
vehicle, he was able to put equal weight on both legs, was
ambulatory, and was not limping. *See id.* at 10. Moreover,

the medical notes indicate that there were no bruises, swelling or redness present on Plaintiff's back, but that he had a "contusion" to the area above his right eye. *See id.* Moreover, the notes indicate that Plaintiff was alert and that he denied losing consciousness at any point. *See id.* Although Plaintiff claims that he had a "gaping wound" above his right eye, the notes indicate that it was merely a "superficial scratch" with only slight swelling and bruising. *See id.*

**\*2** On February 28, 2008, Plaintiff was sent to Benedictine Hospital, where it was observed that he was ambulatory but still complaining of back pain. *See* Dkt. No. 28–5 at Exhibit "H." Plaintiff informed the medical staff that he "has a history of nonspecific low back pain" and that he did not lose consciousness during or after the event. *See id.* at 16. Upon review of a CAT scan, it was determined that Plaintiff "had disk herniation L4–L5 and L5–S1" and the "clinical impression" was that his lower back pain was "secondary to disk disease." *See id.* at 17; *see also id .* at 18–19 (providing the specific findings of the radiology consultation).

On January 6, 2011, Plaintiff commenced this civil rights action alleging that Defendants violated his Eighth Amendment rights. *See* Dkt. No. 1 at 6. Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos. 26, 28.

## III. DISCUSSION

### A. Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U .S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 303 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, \*2 (S.D.N .Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### B. Relief under 42 U.S.C. § 1983

**\*3** Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991)

(citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, she must establish a causal connection between the acts or omissions of each defendant and any injury or damages she suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

#### C. Personal involvement

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation and citations omitted). " '[W]hen monetary damages are sought under § 1983, the [ ] doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quotation omitted). There is a sufficient showing of personal involvement of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue;

or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

#### D. Excessive force [2]

[2]   Although Plaintiff claims that Defendants violated his Eighth Amendment rights, because the complained of conduct occurred while Defendants were effecting Plaintiff's arrest, it is clear that his claim is properly brought under the Fourth Amendment. *See Bonilla v. Jaronczyk,* 354 Fed. Appx. 579, 581 (2d Cir.2009) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). As such, in light of Plaintiff's *pro se* status, the Court will treat Plaintiff's excessive force claim as arising under the Fourth Amendment and deny Defendant Reynolds' suggestion that the Court should dismiss Plaintiff's complaint because of this mistake. *See* Dkt. No. 28–7 at 3.

**\*4** Claims that a law enforcement officer used excessive force in the course of making an arrest are "analyzed under the Fourth Amendment's 'objective reasonableness' standard[.]" *Graham v. Connor,* 490 U.S. 386, 388 (1989); *Scott v. Harris,* 550 U.S. 372, 381 (holding that "a claim of 'excessive force in the course of making [a] ... "seizure" of [the] person ... [is] properly analyzed under the Fourth Amendment's "objective reasonableness" standard' " (quotation omitted)); *Terranova v. New York,* 676 F.3d 305, 308 (2d Cir.2012) (quotations and other citation omitted). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U .S. at 396 (quotations and other citation omitted); *see also Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010). "[T]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396. Proper application of the Fourth Amendment's "objective reasonableness" standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,*

490 U.S. at 396; *see also Terranova,* 676 F.3d at 308; *Tracy,* 623 F.3d at 96.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396; *see also Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (quotations and other citation omitted); *see also Tracy,* 623 F.3d at 96. However, allegations that an "officer twisted [the plaintiff's] arm, 'yanked' her, and threw her up against a car, causing only bruising" have been held to be sufficient to survive summary judgment. *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (citing *Robison v. Via,* 821 F.2d 913, 924–25 (2d Cir.1987)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97; *see also Tracy,* 623 F.3d at 96; *Jones,* 465 F.3d at 61 (citation omitted). "As in other Fourth Amendment contexts, ... the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397; *see also Jones,* 465 F.3d at 61. "Given the fact-specific nature of the [objective reasonableness] inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable fact-finder could conclude that the officers' conduct was objectively unreasonable." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004) (citation omitted).

**\*5** In the present matter, although questions of fact preclude the Court from granting Defendant Reynolds' motion for summary judgment on this ground, the undisputed evidence shows that Defendant Robertson was not present during the alleged attack and, therefore, that he was not personally involved. Specifically, Defendant Robertson contends that while several members of the task force traveled to Plaintiff's home, he proceeded to the Town of Hurley Justice Court to obtain a warrant for Plaintiff's arrest. *See* Dkt. No. 26–

5 at ¶ 7. After Defendant Robertson obtained the arrest warrant, he radioed to the officers at the scene to advise them that the arrest warrant had been issued. *See id.* at ¶¶ 8–9. Due to heavy snowfall on February 26, 2008, it took Defendant Robertson approximately ten (10) minutes to travel to Plaintiff's residence. *See id.* at ¶ 10. By the time Defendant Robertson arrived at the scene, Plaintiff had already been placed in handcuffs and was being escorted across the front lawn by Defendant Reynolds. *See id.* at ¶ 11. According to Defendant Robertson's affidavit, the only contact he had with Plaintiff was to hold "on to one of [his] arms to keep him standing upright and position him next to the vehicle as officers at the scene awaited a patrol vehicle to pick [him] up and transport him for processing." *See id.* at ¶ 11.

Defendant Robertson's account of the events at issue is corroborated by Defendant Reynolds and Eric Paulding, a detective for the City of Kingston Police Department, who is not a party to this action. *See* Dkt. No. 28–6 at ¶ 11; Dkt. No. 26–6 at ¶¶ 5–6. Specifically, Detective Paulding states that he was on the scene during the arrest and provided "cover" to Defendant Reynolds during the arrest process. *See* Dkt. No. 26–6 at ¶ 4. Detective Paulding further states that Defendant Robertson was not at the scene while Plaintiff was being arrested. *See id.* at ¶ 5. Defendant Reynolds also confirms that Defendant Robertson was not present during the arrest because he was en route from having obtained the arrest warrant. *See* Dkt. No. 28–6 at ¶ 11.

Although Plaintiff contends that Defendant Robertson was there and participated in the alleged use of force, the uncontroverted evidence establishes that he was not. Although Defendant Robertson does admit that he assisted in escorting Plaintiff across the yard by holding his arm, no reasonable trier of fact could find that such contact amounted to an unreasonable use of force. Finally, a review of Plaintiff's affidavit in opposition to Defendant Robertson's motion for summary judgment makes clear that the only specific factual allegations concerning excessive force involve Defendant Reynolds, not Defendant Robertson. *See* Dkt. No. 35–7. [3]

3    As is discussed in more detail below with regard to Defendant Reynolds' motion for summary judgment, although the Court should not usually engage in credibility determinations when deciding a motion for summary judgment, since Plaintiff's

evidence against Defendant Robertson is comprised of almost exclusively his own allegations, which are controverted by other evidence in the record, including the testimony of a non-party, the Court may appropriately judge the credibility of Plaintiff's account in determining whether a jury could reasonably find for Plaintiff. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005).

Based on the foregoing, the Court grants Defendant Robertson's motion for summary judgment.

As to Defendant Reynolds, however, issues of fact exist which preclude the Court from granting his motion. Although Defendant Reynolds is correct that Plaintiff had a preexisting back condition, in an excessive force case, a plaintiff may recover damages for the aggravation of a preexisting injury caused by the use of excessive force. *See Ramos v. Samaniego,* No. 07–CV300, 2008 WL 3539252, *6 n. 8 (W.D.Tex. July 24, 2008) (citing *Dunn v. Denk,* 79 F.3d 401, 403 (5th Cir.1996)). Although Defendant Reynolds is correct that Plaintiff has contradicted himself on several occasions regarding the severity of his injuries, Plaintiff's inconsistent statements are more appropriately addressed by a jury since they concern Plaintiff's credibility.

**\*6** Defendant Reynolds argues that the Court should grant his motion because "no reasonable person would undertake the suspension of disbelief necessary to give credit to the plaintiff's allegations[.]" *See* Dkt. No. 28–7 at 6 (citing *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005)). Specifically, Defendant Reynolds argues that the Court should apply the exception set forth in *Jeffreys,* which allows the Court to make a credibility determination that would normally be made by the jury because of contradictions that Plaintiff has made and the lack of corroborating evidence. *See id.* at 6–7.

Although Plaintiff has contradicted himself on several occasions regarding the severity of the attack and his injuries, Plaintiff's versions of the events underlying this action are far less contradictory than those at issue in *Jeffreys* and in the cases cited by Defendant Reynolds. In *Jeffreys,* the plaintiff alleged in his complaint that police officers beat him and threw him out a window. *See Jeffreys,* 426 F.3d at 551. Before filing the complaint, he confessed on at least three occasions that he had jumped out of the window rather than having been thrown. *See id.* at 552. Further, the plaintiff first alleged that police officers threw him out of the window approximately nine

months after the incident. *See id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *See id.*

Affirming the district court's decision granting the defendants' motion for summary judgment, the Second Circuit held that "[w]hile it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Id.* at 554 (internal quotation marks and citation omitted).

In the present matter, the Court is not persuaded that the exception set forth in *Jeffreys* should be applied as to Defendant Reynolds. Unlike the situation in *Jeffreys,* Plaintiff has consistently maintained that Defendant Reynolds used excessive force while effecting his arrest. Moreover, Defendant Reynolds admits that force was used while placing Plaintiff in handcuffs because he was uncooperative; Defendant Reynolds simply maintains that the force used was not excessive and was reasonable in light of the circumstances. Further, it is uncontested that Plaintiff suffered a laceration during the arrest; the severity of which is dependent entirely on whose testimony you credit. Moreover, Plaintiff contends that even after he was placed in handcuffs, he was subjected to further assault, including being "yanked" up while his hands were handcuffed behind his back, which caused him to feel as though his "arms were going to be ripped out of the sockets[.]" Also, while Detective Paulding does contend that Plaintiff was noncompliant during the arrest, he does not state his opinion as to whether the force Defendant Reynolds' used was reasonable and necessary. *See* Dkt. No. 26–6.

**\*7** Finally, Plaintiff was seen by medical personnel immediately upon arrival at the prison and was taken to Benedictine Hospital two days after his arrest. Although the medical records do make clear that Plaintiff has suffered from chronic back issues since at least 2004, it is unclear whether the L4–L5 and L5–S1 disk herniations

he was diagnosed with immediately following his arrest are the result of force used during the arrest, if the condition was exacerbated by any force that was used, or if the condition was entirely preexisting and not impacted in any way by the force that was employed. *See* Dkt. No. 28–5 at Exhibit "H." Whether Defendant Reynolds used reasonable force in subduing Plaintiff and the extent of Plaintiff's injuries, if any, all require credibility determinations that must be resolved by the jury. *See Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, *9 (N.D.N.Y. Jan. 7, 2010) (holding that because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where the plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by the defendants, notwithstanding the relatively minor injuries that the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* No. 9:08–CV–431, 2010 WL 1063875, *7–8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on the plaintiff's claim that the defendant hit him several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that the plaintiff suffered only a minor bruise).

Based on the foregoing, the Court finds that questions of fact exist which preclude the Court from granting Defendant Reynolds' motion for summary judgment.

### E. Qualified immunity

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent."*

*Mollica v. Volker,* 229 F.3d 366, 370–71 (2d Cir.2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting [the] officers ... was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to believe their acts did not violate those rights.' " *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007) (quotation and other citation omitted).

**\*8** "Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York,* 612, F.3d 149, 165 (2d Cir.2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness.... That is, '[e]ven if the right at issue was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.' " *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner,* 494 F.3d at 367 (citing *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case." ' " *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman,* 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal

determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003) (quotation omitted); *see also Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (quotation omitted).

In the present matter, Defendant Reynolds contends that, on February 25, 2008, Plaintiff evaded arrest by fleeing from police, "driving in the wrong lane at 100 mph, forcing at least one motorist off the road and narrowly missing several police vehicles." *See* Dkt. No. 28–2 at ¶ 1. When Defendant Reynolds attempted to arrest Plaintiff on the following day, he claims that Plaintiff "ignored at least five shouted orders to put his hands up and to get down on the ground." *See id.* at ¶ 4. At this point, Defendant Reynolds contends that he pushed Plaintiff to the ground from behind. *See id.* at ¶ 5. Defendant Reynolds claims that Plaintiff only sustained a "small scrape near his right eye during his arrest[,]" and that there was no bruising, swelling or redness on Plaintiff's back. *See id.* at ¶¶ 6, 17. Further, Defendant Reynolds claims that he "never put [his] knee into [Plaintiff's] back or jumped onto his back during his arrest or while he was in custody." *See* Dkt. No. 28–6 at ¶ 12. Finally, Defendant Reynolds asserts that did not strike Plaintiff with either a Tazer gun or revolver during the incident in question. *See id.* at ¶ 14.

**\*9** Plaintiff, on the other hand, has repeatedly asserted that he obeyed all commands while Defendant Reynolds was attempting to place him under arrest. *See* Dkt. No. 35–3 at ¶ 9. Despite his compliance, Plaintiff claims that Defendant Reynolds "brutally attacked" him until fellow officers ordered him to stop. *See id.* Further, Plaintiff claims that Defendant Reynolds then dragged him across the yard, told him that "he oughta put a bullet in [his] ... head and do everybody a favor," and then struck him in the head with a weapon. *See id.* Plaintiff claims that he was never charged with resisting arrest as proof that he complied with Defendant Reynolds' orders. *See id.* at ¶ 12. Although Plaintiff's version of events may have slightly varied throughout the course of this litigation, unlike the situation in *Jeffreys,* he has consistently alleged that he was subjected to these incidents without provocation, including leading up to and during his criminal trial.

In light of the drastically different account of what occurred on February 26, 2008, the Court finds that questions of fact exist which preclude granting Defendant Reynolds' motion at this time. For the Court to find that Defendant Reynolds is entitled to qualified

immunity, it would have to engage in improper credibility determinations, which it is unwilling to do. Taking Plaintiff's version of events as true, only a *de minimis* amount of force would have been required to effect his arrest, yet Defendant Reynolds is alleged to have applied considerably more force in both effecting the arrest and after Plaintiff was placed in handcuffs. These questions of fact are material to the reasonableness of the force used and the question of qualified immunity and, therefore, must be decided by a jury. *See Breen v. Garrison,* 169 F.3d 152, 153 (2d Cir.1999) (reversing grant of qualified immunity on excessive force claim where facts were disputed as to allegations that the defendant officer jumped on the plaintiff's back, yanked his head and neck, pushed his face into a table, intentionally tightened his handcuffs, and hit him); *Calamia v. City of New York,* 879 F.2d 1025, 1035 (2d Cir.1989) (holding that qualified immunity on excessive force claim was a question for the jury, where the defendant officer shoved the plaintiff to floor, the handcuffs were unduly tight, and the plaintiff was left in an uncomfortable position for several hours); *Robison v. Via,* 821 F.2d 913, 923–24 (2d Cir.1987) (holding that summary judgment was inappropriate where the parties disputed material facts regarding the plaintiff's allegations that she was pushed against a car, yanked out, thrown against the fender, and had her arm twisted behind her back).[4]

[4] In his reply to Plaintiff's opposition to the motion for summary judgment, Defendant Reynolds argues that the Court should deem as admitted all statements in his statement of material facts because of Plaintiff's failure to comply with the requirements of Local Rule 7.1(a)(3). *See* Dkt. No. 39 at 3. Although Defendant Reynolds is correct that Plaintiff failed to strictly comply with Local Rule 7.1's requirements and that the Court may deem as admitted all of the statements in Defendant Reynolds' statement of material facts that have not been specifically controverted, the Court declines to do so. In his response to Defendant Reynolds' motion for summary judgment, Plaintiff makes specific reference to documents in evidence, including the medical records and his deposition transcript. While the Court is not required to ignore violations of Local Rule 7.1 simply because Plaintiff is proceeding *pro se,* the Court will not turn a blind eye to evidence in the record that creates material issues of fact.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant Reynolds' motion for summary judgment is **DENIED;** and the Court further

 **\*10**  **ORDERS** that Defendant Robertson's motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 316618

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 666213
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Eon Shepherd, Plaintiff,

v.

Commissioner Brian Fisher, et al.,[1] Defendants.

No. 08-CV-9297 (RA)
|
Signed 02/16/2017

[1]    The Clerk of the Court is respectfully requested
       to amend the spelling of Defendants' names in the
       caption to conform to the spelling used in this
       Opinion.

**Attorneys and Law Firms**

Dustin Philip Smith, Vilia B. Hayes, Hughes Hubbard &
Reed LLP, New York, NY, for Plaintiff.

Bradley Gordon Wilson, Daniel A. Schulze, Donald
Nowve, Samuel Yaggy, John Eric Knudsen, New York
State Department of Law Litigation, New York, NY, for
Defendants.

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

In this action brought pursuant to 42 U.S.C. § 1983,
Plaintiff Eon Shepherd, who is currently incarcerated,
alleges a variety of federal constitutional claims, all of
which arise from events that allegedly occurred between
October 2005 and August 2008, while he was an inmate
at New York State's Green Haven Correctional Facility
("Green Haven"). Defendants are more than two dozen
current and former employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), on behalf of whom the Attorney General of
the State of New York has filed the consolidated motion
for summary judgment. For the reasons that follow,
Defendants' motion is denied in part and granted in part.

**PROCEDURAL HISTORY**

Plaintiff filed his Amended Complaint on September
13, 2011. (Am. Compl. (Dkt. 61).) In it Plaintiff brings
sixteen separate causes of action against more than thirty
Defendants. (Am. Compl. 14-16.) Each cause of action
encompasses several individual incidents, spread across a
period of more than three years. Shepherd alleges that
Green Haven medical staff failed to properly treat his
chronic back condition, did not let him out of his cell
to receive his prescription medication on at least three
occasions, refused to provide proper work boots, ignored
his complaints that his painkillers were no longer working,
violated his right to medical confidentiality, hindered the
delivery of adequate mental health treatment through
intimidation, and failed to comply with existing consent
orders regarding the delivery of medical and mental health
care at Green Haven. He also alleges that improper
searches by Green Haven Correction Officers ("C.O.s")
on five occasions amounted to sexual abuse and, in
several instances, were retaliatory. Additionally, Shepherd
claims that his hair—which, as a Rastafarian, he considers
sacred—was improperly searched in violation of his First
Amendment rights on five separate occasions spanning
more than a year, with one such search resulting in the
discovery of several ounces of methamphetamine secreted
in his dreadlocks. Shepherd further complains that he was
denied religious meals on two Rastafarian holidays. He
also argues that his sentence of nine months in the Special
Housing Unit ("SHU"), imposed for his possession of
the methamphetamine, violated his due process rights as
a consequence of the hearing officer's alleged failure to
adhere to a host of evidentiary rules and other procedural
safeguards. Lastly, Shepherd alleges that on at least one
occasion, a C.O. improperly confiscated his legal mail. For
these alleged abuses, Plaintiff seeks $ 100,000 in punitive
damages and $200,000 in compensatory damages from
each Defendant. (*Id.* at 17.)

Due to the need to identify a number of "Doe" Defendants
and other service issues, Defendants answered Plaintiff's
Amended Complaint in a piecemeal fashion, with all
Defendants answering by June 28, 2013. (Dkt. 85.) On
April 2, 2014, Defendants filed their consolidated motion
for summary judgment, arguing that the majority of
Plaintiff's claims are precluded as a matter of law, and
that he failed to properly exhaust the remainder, as
required by the Prison Litigation Reform Act ("PLRA"),

42 U.S.C. § 1997e *et seq.* (Dkt. 109.) On March 31, 2015, the Court granted in part and denied in part Defendants' motion for summary judgment, and the case was referred to Magistrate Judge Ellis for settlement, which was unsuccessful despite the parties' efforts. (Dkts. 127, 128.) On October 9, 2015, pro bono counsel appeared on behalf of Plaintiff. [2] The Court subsequently ordered additional briefing on Defendants' motion for summary judgment with respect to Plaintiff's allegations of sexual abuse in light of the Second Circuit's ruling in *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015). (Dkt. 159.) [3]

[2]     Prior to October 9, 2015, Plaintiff represented himself *pro se.*

[3]     On March 25, 2016, Defendants also filed a motion for sanctions seeking to dismiss Plaintiff's complaint with prejudice (Dkt. 175.), but on June 17, 2016, Defendants withdrew that motion (Dkt. 191).

**\*2** This Opinion sets forth the Court's reasoning for its summary judgment ruling. The Court has reconsidered its decision to grant summary judgment to Defendants on Shepherd's claims that he was sexually assaulted in violation of the Eighth Amendment and that he was denied religious meals for two Rastafarian holidays in violation of the Free Exercise Clause, and for the reasons stated herein the Court is convinced that summary judgment as to these claims must be denied.

Accordingly, Defendants' motion for summary judgment is denied as to the following five claims: (1) Defendant Bentivegna was deliberately indifferent to Plaintiff's requests for pain medication on or about March 3, 2008, violating the Eighth Amendment; (2) Defendants Tweed, Sarles, and Ferrick sexually assaulted Shepherd between 2006 and 2008, violating the Eighth Amendment; (3) Defendant Sarles frisk searched Shepherd on January 23, 2007 in retaliation for filing grievances, violating the First Amendment; (4) Defendants Towkartz, Swan, Castine, Sample, Alexander, La Ports, Scott, Raetina, Freeman, and Wilson searched Shepherd's hair, which as a Rastafarian he considers sacred, in February 2007 and on March 12, 2007, March 6, 2008, March 15, 2008, and August 15, 2008, violating the First Amendment; and (5) Defendant Ercole denied Shepherd two religious meals during Rastafarian holidays important to Shepherd's religious beliefs on October 7, 2005 and May 5, 2008, violating the First Amendment.

Due to the scope and complexity of Plaintiff's allegations, and because each cause of action encompasses a distinct set of incidents, the Court will address the factual record underlying each cause of action in conjunction with its legal analysis.

**STANDARD OF REVIEW**

Summary judgment is proper only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

In deciding whether to grant summary judgment, "courts must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir. 2008) (quotation marks omitted). Within that framework, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and the failure to meet that burden warrants denial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If the moving party meets its burden, it falls to the adverse party to demonstrate that there are genuine issues of material fact that remain for trial. *See Anderson*, 477 U.S. at 250.

**DISCUSSION** [4]

[4]     Unless otherwise noted, all facts are drawn from the undisputed portions of Defendants' Local Rule 56.1 Statement. Because Plaintiff verified his Amended Complaint, it "is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995). Additionally, when the Court describes concessions made by Defendants, it refers to factual allegations that Defendants concede solely for the purposes of this motion, unless otherwise noted. (*See* Defs.' Local R. 56.1 Statement.)

## I. Plaintiff's Medical Claims

**\*3** Plaintiff brings seven causes of action related to inadequate medical or mental health care (Am. Compl. 14–16), the majority of which can be construed as raising "deliberate indifference" claims under the Eighth Amendment. Defendants are granted summary judgment on all of these claims with the exception of Plaintiff's deliberate indifference claim against Defendant Bentivegna regarding his requests for pain medication on or about March 3, 2008.

### A. The Factual Record

#### 1. Treatment of Plaintiff's Chronic Back Pain

Many of Plaintiff's claims relate to the alleged ineffective treatment of his chronic lower back pain. In October 2004, while incarcerated at Wende Correctional Facility ("Wende"), Plaintiff was diagnosed with an L5/S1 stenosis, or narrowing, in his lower back, likely the result of a herniated or degenerative disc. DOCCS medical staff at Wende recommended surgical intervention to decompress and fuse his lumbar spine.

Defendants assert that this procedure was scheduled multiple times, with Plaintiff refusing to undergo surgery each time. (Defs.' R. 56.1 Statement ¶¶ 4–5; Schulze Decl. Ex. C ¶ 4, Ex. A MED 324–326.) Plaintiff, however, asserts that this surgery was scheduled only once, and that he decided not to have the surgery—despite initially consenting—after "consulting with [his] family" and speaking to his orthopedic surgeon, who informed him that there was only a fifty percent chance the surgery would succeed. (Pl.'s Aff. ¶¶ 8-9.)

While at Wende, Plaintiff's back pain was treated with a variety of over-the-counter and prescription muscle relaxants and pain killers. (Defs.' R. 56.1 Statement ¶ 7; Pl.'s Aff. ¶¶ 5-6.) Among those drugs prescribed to Plaintiff was Ultram, a non-narcotic pain reliever (Pl.'s Aff. ¶ 5-6; Schulze Decl. Ex. A MED 325), which Plaintiff asserts offered him "no relief" (Pl.'s Aff. ¶ 6.) Defendants have not addressed Plaintiff's experience with Ultram at Wende. Eventually, Plaintiff's prescription was changed to Percocet, which appears to have provided Plaintiff relief.

In June 2005, Plaintiff was transferred to Green Haven, where Dr. Bhapale was assigned as Plaintiff's primary medical care provider. (Pl.'s Aff. ¶ 11 (acknowledging that Dr. Bhapale was his "health care provider," but clarifying that Dr. Bernstein, the "facility health service director," made all final decisions as to his healthcare)). Dr. Bhapale prescribed Shepherd a variety of medications, including Percocet, to manage his lower back pain.

On October 16, 2005, Plaintiff was unable to pick up his pain medication, as C.O. White did not let Plaintiff out of his cell until after the medical office had closed for the day. The next day, however, Plaintiff saw Dr. Bhapale, who renewed his prescriptions for Percocet and other medications. Plaintiff otherwise alleges that he was prescribed Percocet without incident until November 2006. (Am. Compl. ¶ 10.)

Shepherd alleges that he received "ineffective, meaningless care for [his] chronic excruciating lower back pain" from November 26, 2006 until late March 2007. (Am. Compl. ¶ 11.) As a result of this allegedly ineffective care, Plaintiff asserts he "was in extreme pain and discomfort, unable to dress and undress, use the toilet, sneeze, and ambulate without extreme pain and discomfort and [he] was unable to sleep." (Pl.'s Aff. ¶ 60.)

The record suggests that this period of allegedly ineffective care began on November 9, 2006, after a consultation with Dr. Bhapale—several weeks earlier than Plaintiff alleges in his Amended Complaint. (Schulze Decl., Ex. A at MED 782, Ex C. ¶ 8; Pl.'s Opp. Ex. Bern. #1.) Following this consultation, Plaintiff's prescription for Percocet was discontinued, and Plaintiff only received non-narcotic pain medication for his back pain until February 13, 2007, when he was prescribed OxyContin. (Schulze Decl., Ex C. ¶¶ 12-13.)

**\*4** Exactly what occurred during the Plaintiff's November 9, 2006 consultation with Dr. Bhapale is disputed. Plaintiff asserts that Dr. Bhapale "took [him] off [his] pain medication and issued a no work permit," despite Plaintiff "never ask[ing] the doctor to discontinue [his] pain medication." (Pl.'s Aff. ¶ 13.) But in a letter to Dr. Bernstein dated November 9, 2006, Plaintiff acknowledges that the "no working permit" was previously issued and the consultation with Dr. Bhapale was scheduled because Plaintiff sought to have the earlier "no working permit" rescinded so that he could return to his job as a porter. (Pl.'s Opp. Ex. Bern. #1.) In the same letter, Plaintiff also acknowledges that Dr. Bhapale

informed him he could return to work only if he ceased taking Percocet, a narcotic, and that Dr. Bernstein had ordered Dr. Bhapale to begin transitioning Plaintiff off of Percocet. (*Id.*) This account is largely consistent with Dr. Bhapale's consultation notes from November 9, 2006, which suggest that Plaintiff requested to "cancel 'no work' ' and was told that he could not return to work unless he went off Percocet. (*See* Schulze Decl. Ex. A at MED 782.) A factual dispute nevertheless remains as to whether Plaintiff requested to be taken off Percocet, or whether this change in treatment was ordered, over Plaintiff's objection, by Drs. Bhapale and Bernstein.

The nature of the treatment Plaintiff received immediately following his November 9, 2006 consultation is unclear. Several of Plaintiff's exhibits—his letters to various members of the Green Haven medical staff—indicate that he was without any pain medication for some period of time (*see* Pl.'s Opp. Exs. Bern. #2, Bern. #4, Bern. #5). But a later letter to Dr. Koenlgamann suggests that Plaintiff's Percocet prescription was reduced, not discontinued entirely, after the November 9, 2006 consultation; that Plaintiff continued to receive this reduced—and, he asserts, ineffective—dosage through November 26, 2006; that he received no medication for his "pain[,] period" for a short duration, but was, at some point, prescribed an emergency four-day dose of Percocet to last until his next consultation with Dr. Bhapale; and that, at this consultation on December 6, 2006, Dr. Bhapale prescribed a course of Ultram. (Pl.'s Opp. Ex. Keog. #1.) Plaintiff's medical records, offered by Defendants, indicate that his Percocet prescription was not fully discontinued until December 5, 2006. (Schulze Decl. Ex. A at MED 774-76.) Defendants, meanwhile, assert that Plaintiff was temporarily housed at another facility after his November 9, 2006 consultation, but that he was prescribed Ultram as soon as he returned to Green Haven. (Schulze Decl. Ex. C ¶ 8.)

Regardless, by early December, Plaintiff had been prescribed Ultram and began to complain that it did not adequately address his back pain. On December 7, 2006, for instance, Plaintiff wrote Drs. Bernstein and Koenlgamann to complain about its ineffectiveness. (Pl.'s Opp. Exs. Bern. #6, Keog. #1.) Plaintiff also wrote similar letters of complaint to Dr. Lester Wright, Associate Commissioner of Health Services at DOCCS, and DOCCS Commissioner Goord. (Pl.'s Opp. Exs. Wrght #1, Goord #1), in addition to filing a formal

grievance (*id.* Ex. Griev. #1). Plaintiff's medical records, offered by Defendants, suggest that his doctors were responsive to these complaints. (Schulze Decl. Ex. A at MED 774-76.) They show that, after being prescribed Ultram on December 5, 2006, Plaintiff was then prescribed Toradol two days later and again on December 11, 2006; was prescribed a short dose of Percocet on December 13, 2006; and was prescribed MS Contin on December 15, 2006. (*Id.*)

Indeed, Plaintiff concedes that from mid-December 2006 until mid-February 2007, he received short courses of various alternative pain medications in response to his complaints about Ultram. Plaintiff, however, asserts his medical records clearly indicate that Ultram—the initial medication on which Plaintiff was placed after his prescription for Percocet was discontinued—had not sufficiently mitigated the severity of his back pain when prescribed to him in the past, a fact of which, he asserts, Defendants should have been aware. (Pl.'s Aff. ¶ 15; Pl.'s Opp. Exs. Bern. #6, Keog. #1.)

During this mid-December to mid-February period, Plaintiff was also referred to an outside specialist in pain management. According to Defendants, this specialist determined that Plaintiff was exaggerating his symptoms and recommended that he be treated with non-narcotics and given narcotics only if necessary and in the lowest dosage possible. (Schulze Decl. Ex. A at MED 771, Ex. C ¶ 11.) Plaintiff, however, asserts that the specialist was unable to successfully examine him, as the examination itself caused excruciating pain, but acknowledges that the specialist found nothing wrong with his back. (Pl.'s Aff. ¶ 17.) During this period, Dr. Bernstein also scheduled Plaintiff for an MRI and again recommended surgical intervention, which Plaintiff declined. (Pl.'s Aff. ¶ 18.)

**\*5** On February 13, 2007, Plaintiff was prescribed OxyContin to manage his back pain, which offered him relief, at least initially. (Pl.'s Aff. ¶ 17.) Defendants assert that, after February 2007, Plaintiff did not complain of serious back pain or request a change in medication. (Schulze Decl. Ex. C ¶¶ 13-14.) Plaintiff disputes this account. Specifically, he asserts that, beginning on March 3, 2008, he complained to Defendant Bentivegna, his medical provider in the SHU, that his pain medication "was not offering [him] any relief as it did prior." (Pl.'s Aff. ¶ 24; *see* Am. Compl. ¶ 16.) Plaintiff purportedly explained to Dr. Bentivegna that "Dr. Bohaple had explained to

[him] that after being on a medication, taking the same dosage for a long period of time, that the medication will no longer offer [him] relief and the dosage has to be raised in order for the pain medication to offer relief and be effective. [He] informed Dr. Bentivegna that the medication [he] was taking was a low dosage and had been taking the said dosage for close to a year and [he] was not receiving relief for [his] pain." (Am. Compl. ¶ 16; *see* Pl.'s Aff. ¶ 24; *see also* Pl.'s Opp. Ex. Bern. #7.) Dr. Bentivegna allegedly "ignored [him] and did nothing to offer [him] effective treatment." (Pl.'s Aff. ¶ 24.) An affidavit from fellow inmate, Derrick Bonner, on March 31, 2008, corroborates Plaintiff's assertion that his back was "killing him" during this time and that Shepherd communicated that to Dr. Bentivegna. (Pl.'s Opp. Ex. Aff. of Bonner.)

During this time, Dr. Bentivegna also spoke to Plaintiff at his cell door about his pain medication, such that officers and other inmates could overhear their conversation. Plaintiff asserts that Dr. Bentivegna carried on these conversation despite a request by Plaintiff that they discuss his medical issues in private. (Pl.'s Aff. ¶ 25.) Defendants concede that Plaintiff's conversations with Dr. Bentivegna were audible to other officers and inmates, but have not otherwise responded to Plaintiff's allegations regarding Dr. Bentivegna's conduct. (Defs.' R. 56.1 Statement ¶ 78.)

Around this same time, on February 26 and February 27, 2008, Plaintiff was allegedly prevented from getting his evening doses of pain medication by C.O. Smith, which he asserts caused him "excruciating pain." (Pl.'s Aff. ¶¶ 22, 23.) Plaintiff's medical records indicate that he was seen by medical staff on February 28 and February 29, 2008, and that they did not find Plaintiff to be in acute distress, but nonetheless renewed his OxyContin prescription. (Schulze Decl. Ex. A at MED 104.)

### *2. Medical Boots*

Plaintiff also claims that he was provided improper medical boots by Defendants. Plaintiff's medical records indicate that on May 10, 2000, he was first prescribed a "Lightweight Boot" by Dr. Albert Paolano at Great Meadow Correction Facility, where Plaintiff was incarcerated at the time. (Pl's. Opp. Ex. A.) Dr. Paolano's report indicates that he prescribed a lightweight boot to

"minimize strain" on Plaintiff's right knee, and to "help / w hammer Toes also." (*Id.*) The medical significance of lightweight boots is disputed; Defendants contend that "the weight of the boot is of no medical significance whatsoever." (Schulze Decl. Ex. C ¶ 17.)

At Green Haven, Plaintiff alleges that he was without "special issue boots from December 2006, [u]ntil August 2007." (Am. Compl. ¶ 13.) [5] Plaintiff's account of this issue is inconsistent, disputed by Defendants, and contrary to the record.

[5] In his opposition papers, Plaintiff also alleges, for the first time, that his "medical boots [were] taken from him on or about 2/28/08, [and] he was not issued 'light weight' medical boots until June 2010," (Pl.'s Opp. 22). This allegation is not properly before the Court as it is both new and inconsistent with the original timeframe set out in Plaintiff's Amended Complaint. *Cf. Paul v. Bailey,* No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (considering factual allegations raised by pro se plaintiff in his opposition papers that were "consistent" with those in the initial and amended complaints).

Defendants assert that Plaintiff requested new boots in December 2006, which he was prescribed "[s]hortly thereafter." (Schulze Decl. Ex. C. ¶ 15.) The record indicates that Plaintiff received special issue boots on May 15, 2007 (Schulze Decl. Ex. A at MED 842), but that he complained to Defendants Bernstein, Bhapale, Fisher, and Koenlgamann on May 24, 2007 that, although these special issue boots "fit," they were too heavy. (Schulze Decl. Ex. A at MED 842; *see also* Pl.'s Aff. ¶¶ 19, 20). On September 21, 2007, after his request for new boots was denied by Drs. Koenlgamann and Bernstein, Plaintiff visited Dr. Bhapale, who, after speaking with Dr. Bernstein, told Plaintiff that his request had been reviewed and that new boots were "not medically indicated." (Schulze Decl. Ex. A at MED 836; *see also* Pl.'s Aff. ¶ 20). [6]

[6] Plaintiff's medical records contain notes from Dr. Bhapale's September 21, 2007 consultation with Plaintiff that refer to a July 2, 2007 consultation, and indicate that it was on the basis of this earlier consultation that lightweight boots were determined not to be "medically indicated." (Schulze Decl. Ex. A at MED 836.) It is unclear with whom Plaintiff met

on July 2, 2007 and Defendants have failed to provide any information about that consultation. (*Id.*)

**\*6** Plaintiff, meanwhile, acknowledges both that "he requested lightweight medical boots ... because the boots that [he] had were worn down," and that he was eventually issued boots by Dr. Bhapale in response to this request. (Pl.'s Aff. ¶ 19.) Plaintiff does not specify, however, when he was issued such boots. Nor does he provide any basis —beyond his affidavit—for his claim that he was without boots until August 2007. It is similarly unclear what occurred in August 2007 to resolve Plaintiff's concerns regarding his medical boots, as it does not appear he was ever issued the "lightweight" boots he sought.

### 3. Access to Mental Health Treatment

Plaintiff also asserts that due to threats and harassment by DOCCS officers on three separate occasions, he was denied mental health treatment. (*See* Pl.'s Aff. ¶¶ 26-30.)

According to his medical records, Plaintiff suffers from post-traumatic stress disorder ("PTSD") (Pl.'s Opp. Exs. D1-D3), for which he has seen a therapist and been prescribed medication (Pl.'s Aff. ¶ 26). On three separate occasions, January 18, 2006, January 10, 2007, and January 23, 2007, Plaintiff visited the mental health unit at Green Haven to see his therapist. (Pl.'s Aff. ¶¶ 26-30.) On at least one occasion, however, Plaintiff asked to be returned to his cell. (Pl.'s Aff. ¶ 29.)

Defendants assert that Plaintiff asked to be returned to his cell because he did not want to speak to his therapist, but acknowledge—for the purposes of summary judgment— that C.O.s Sarles, Eagon, and Morris were present in the mental health unit on these occasions and spoke "rudely" to Plaintiff. (Defs.' R. 56.1 Statement ¶ 35.) Plaintiff asserts that he refused to see his therapist after these C.O.s verbally and physically threatened him. (*See* Pl.'s Aff. ¶¶ 26-30.)

On or about January 18, 2006, Plaintiff asserts that he went to see his therapist, Morales, in the mental health unit at Green Haven. (*Id.* ¶ 26; Pl.'s Opp. Exs. Morales #1, Morales #2.) While there, he asserts that "prison guards Sarles and [Eagon] approached [him] and began using profane, abusive language towards [him] threatening [him] asking why [he did] not want to speak to the therapist." (Pl.'s Aff. ¶ 27.) Shepherd further asserts

that he did speak to his therapist, but that as he was speaking, "Sarles was at the door listening and when [Plaintiff] came out, he began mocking [him]." (*Id.* ¶ 28.) [7]

> [7]  Defendants' Local Rule 56.1 Statement and Plaintiff's Affidavit identifies the date of this incident as February 18, 2006, but Plaintiff's letters concerning these same facts are dated January 18, 2006, and state that the incident occurred "today" (Pl.'s Opp. Ex. Morales #1) and on "January 18, 2006" (Pl.'s Opp. Exs. Goord #2). Accordingly, the Court assumes that the event occurred on January 18, 2006.

In two letters dated January 18, 2006, Plaintiff complained about this incident to Commissioner Goord and his therapist. (Pl.'s Opp. Exs. Goord #2, Morales #1.) Plaintiff's letter to Morales suggests that Plaintiff and Morales did speak on the date of the incident, but that Plaintiff prematurely ended the session after noticing he was being watched by C.O. Sarles. (Pl.'s Opp. Ex. Morales #1.) In the same letter, Plaintiff elaborates on the nature of the threats he allegedly received from Defendant Sarles, although the precise timing of these threats is unclear: "officer Sarl[e]s started to curse at [Plaintiff] stating that [Plaintiff] think[s] [he is] running shit up there [in the mental health unit] and [Plaintiff] always caus[es] a fucking problem and that he would fuck [Plaintiff] up and have [him] set up and placed in the box because he use[d] to run the box up stairs and he has a lot of friends in this prison and he would get [Plaintiff] hurt." (*Id.*) As a consequence of these threats, Plaintiff alleges that he was "in fear for [his] well being," and asked Morales, "Please leave me alone, do not call me up there for anything, I do not want anything to do with those officer[s] up there and I do not feel safe coming up there after being threatened by the officer because his fellow officers can do as he threatened to be done." (*Id.*) Plaintiff's letter to Commissioner Goord addresses a largely identical set of concerns but add that Officer Sarles "said that he will cut my dread lock off and shove it up my ass." (Pl.'s Opp. Ex. Goord #2.)

**\*7** On January 10, 2007, Plaintiff was again called to the mental health unit. Plaintiff asserts he was "in fear for [his] life and safety, and requested to return to [his] housing unit," and that C.O. Morris "began threatening [him], using profane, degrading language." (Pl.'s Aff. ¶ 29.)

On January 23, 2007, Plaintiff was called back to the mental health unit a third time. Plaintiff asserts that on

this visit, "C.O. Sarles conducted a pat frisk in a rough sexual manner using a hand scanner pushing it between [Plaintiff's] buttocks cheeks roughly saying he was going to fuck [Plaintiff] in [his] ass with said scanner because [Plaintiff] wrote him up." (*Id.* ¶ 30; Schulze Decl. Ex. B 100:12-102:19.) In his Amended Complaint, Plaintiff further alleges that he initially refused to see his therapist on January 23, 2007, but that C.O. Sarles "ordered [him] to shut the fuck up and sit down, which [he] did due to fear for [his] safety." (Am. Compl. ¶ 20.) Plaintiff also alleges that "while [Plaintiff was] speaking to the doctor, [C.O. Sarles] was at the door listening to [Plaintiff's] conversation and when [Plaintiff] left the offices, Sarles began mocking [Plaintiff] repeating things that [Plaintiff] had revealed to the doctor." (*Id.*)

Plaintiff asserts that he reported this third incident to C.O. Sarles' "supervisors and the superintendent" and that he "filed grievances that was labeled physical assault which was appealed to Albany." (Pl.'s Aff. ¶ 30.) Plaintiff's exhibits, however, include only a letter to Morales about the incident and a January 16, 2008 opinion by the Central Office Review Committee ("CORC"), the highest level of appeal for the State's Inmate Grievance Program ("IGRP"), which discusses in general terms mental health concerns raised by Plaintiff, but does not provide detail sufficient to determine whether it represents the final disposition of Plaintiff's grievance of the January 23, 2007 incident. (Pl.'s Opp. Exs. Morales #2, Griev. #4.) For the purposes of their motion, Defendants accept Plaintiff's characterization of C.O. Sarles' conduct (Defs.' Mem. 6), but contend that Plaintiff did not properly appeal his grievance related to this incident (*id.*; Hale Decl. ¶¶ 11-13.)

A January 30, 2007 letter to Plaintiff from Viktoria Fisher, a risk management specialist at the Central New York Psychiatric Center, a state facility, suggests that Plaintiff reported suffering anxiety and difficulty sleeping as a consequence of his denied mental health treatment. (Pl.'s Opp. Ex. E.) Plaintiff does not assert that he otherwise suffered any psychological trauma.

**B. Legal Analysis**

The Eighth Amendment's prohibition on the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, applicable to the states by the Fourteenth Amendment, *Estelle v. Gamble,* 429 U.S. 97, 101 (1976), "applies to prison officials when they provide medical care to inmates," *Hathaway v. Coughlin,* 37 F.3d 63,

66 (2d Cir. 1994). The mere "inadvertent failure to provide adequate medical care cannot be said to" violate the Eighth Amendment, however. *Estelle,* 429 U.S. at 105. Instead, prison officials must act with "deliberate indifference to serious medical needs." *Id.* at 106.

The "deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway,* 37 F.3d at 66. A prisoner must demonstrate both that "the alleged deprivation [was] sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exist[ed]," and that the official acted with a "sufficiently culpable state of mind." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted).

**\*8** The objective prong is highly "contextual and fact-specific," *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003) (quotation marks omitted), and itself entails two separate inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir. 2006). This inquiry turns on the reasonableness of the provided care. "[P]rison officials who act reasonably cannot be found liable," while those who "fail[ ] to take reasonable measures" can be found liable under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 845, 847 (1994). Where a prison official has acted unreasonably, the second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 280. That inquiry turns on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith,* 316 F.3d at 186.

To satisfy the subjective prong of deliberate indifference, a prisoner must show that prison officials acted—or failed to act—while "actually aware of a substantial risk that serious inmate harm [would] result." *Salahuddin,* 467 F.3d at 280. Thus, a prisoner must prove at least that officials acted recklessly: an "official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Id.*; *see also Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009). Importantly, however, neither "mere disagreement over the proper treatment" nor "negligence, even if it constitutes medical malpractice," rise to the level of constitutional violation.

*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998). *See also Hill,* 657 F.3d at 123 ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment.").

Pursuant to this framework, the Court analyzes each of Plaintiff's "deliberate indifference" causes of action, in turn.

### 1. Deliberate Indifference to Serious Medical Needs

In his first cause of action, Plaintiff alleges that Defendants Koenlgamann, Bhapale, Bernstein, and Bentivegna (collectively, the "Medical Defendants") showed deliberate indifference to his serious medical needs by failing to provide "effective pain medication that offered relief as well [as] failing to prescribe light weight boots." (Am. Compl. 14.) In his second cause of action, Plaintiff similarly alleges that Defendants Bhapale and Bernstein "knowingly and intentionally discontinued effective pain medication for several months, failing to provide [Plaintiff] with effective adequate, meaningful care." (*Id.*)

Although Plaintiff considered his special issue boots inadequate and alleges that they caused him "discomfort and pain when walking," (Am. Compl. ¶ 13), this is not a case in which "he was denied care that a doctor prescribed as appropriate," *Giambalvo v. Sommer,* No. 10-CV-6774, 2012 WL 4471532, at *5 (S.D.N.Y. Sept. 19, 2012). Defendants have demonstrated that Plaintiff was provided a pair of boots fitted to his individual knee and toe conditions, and was denied a request for lighter boots not out of caprice, but on the basis that they were not "medically indicated." (Schulze Decl., Ex. A at MED 836.) Plaintiff's claim that the Medical Defendants failed to prescribe lightweight boots cannot, therefore, survive the objective "reasonableness" prong of the deliberate indifference standard. Even if it could, Plaintiff can at best show that the Medical Defendants were negligent.[8] Because Plaintiff's claim that the Medical Defendants failed to prescribe lightweight boots amounts only to "mere disagreement over [what constitutes] proper treatment," *Chance,* 143 F.3d at 703, Defendants' motion for summary judgment on this issue is granted.

[8]   Plaintiff's medical boots claims fail as to Defendant Bentivegna for a more basic reason: Plaintiff has failed to allege any facts demonstrating Defendant Bentivegna's personal involvement in this issue.

**\*9**  Plaintiff's claim that he was without "special issue boots from December 2006, [u]ntil August 2007," (Am. Compl. ¶ 13), is also precluded as a matter of law. First, Defendants have demonstrated that Plaintiff received new, special issue boots at least by May 15, 2007. (Schulze Decl., Ex. A at MED 842.) Plaintiff's claim that he lacked boots until August of 2007 is thus erroneous. Second, even if Plaintiff did lack special issue boots from December 2006 to August 2007, and even assuming that his purported discomfort during this period was sufficiently severe,[9] he has not alleged that he lacked proper boots as a consequence of Defendants' deliberate indifference. He does not claim, for instance, that he requested new boots and that this request was denied—facts that might tend to show Defendants acted unreasonably, or with constitutionally cognizable culpability. Indeed, he acknowledges that Defendants did, upon request, provide him new boots, and contends only that these boots were unsatisfactory because they were not sufficiently lightweight. (Pl.'s Aff. ¶ 19.) Defendants' motion for summary judgment is granted as to this issue. Plaintiffs' medical boots claims cannot go forward.

[9]   *But cf. Hernandez v. Goord,* 02-CV-1704, 2006 WL 2109432 at *1, 5-6 (S.D.N.Y. July 28, 2006) (finding plaintiff's painful injured foot, diagnosed as hammertoe with an overlap, insufficiently severe to state a viable deliberate indifference claim).

Plaintiff's claim that Defendants failed to prescribe effective pain medication for his chronic lower back pain is also precluded as a matter of law. The record demonstrates that Plaintiff's ongoing need for pain medication arose, at least in part, from his own choice to forego the surgical intervention recommended by his treating physicians.[10] Defendants, moreover, did not cease treatment of Plaintiff's chronic lower back pain in response to his refusal to undergo surgery. Plaintiff acknowledges that he received effective pain medication (Percocet) until at least mid-November 2006 (Am. Compl. ¶¶ 10, 11; *see also* Pl.'s Opp. Exs. Wrght #1; Schulze Decl., Ex. C at ¶ 5.), although there was at least one instance in which he was let out of his cell too late to pick up this pain medication. Plaintiff alleges that he received "ineffective meaningless care for [his] chronic excruciating lower back pain" from November 26, 2006 until late March 2007. (Am. Compl. ¶ 11.) Construing the facts in Plaintiff's

favor, on November 9, 2006, Plaintiff saw Defendant Bhapale, his primary medical care provider at Green Haven (Schulze Decl. Ex. A at MED 782, Ex C. ¶ 8; Pl.'s Opp. Ex. Bern. #1); following that consultation Plaintiff's prescription for Percocet was discontinued (Pl.'s Aff. ¶ 13; Schulze Decl. Ex. C ¶ 8); and that Plaintiff did not receive relief from his back pain until he was prescribed OxyContin on February 13, 2007. (Schulze Decl. Ex. A at MED 776.) Even if the significant inconsistencies in his own exhibits are resolved in Plaintiff's favor the record suggests that Plaintiff was without medication entirely for less than a month at most—as his medical records indicate that he received a prescription for Ultram on December 5, 2006. (Schulze Decl. Ex. A at MED 776.)

10    In a February 20, 2007 letter to Defendant Koenlgamann, Plaintiff asserts he was told that there was "a 50, 50 chance that the operation will not help, and even if it did help, [he would] still have back pain." (Pl.'s Opp. Ex. Keog #2; *see also* Pl.'s Aff. ¶ 19.) Defendants have not presented conflicting evidence, so the Court assumes that the surgery, if effective, would not have entirely eliminated Plaintiff's back pain or the need for some degree of continuing pain management.

Defendants have not responded to Plaintiff's related contention, supported in the record, that they were, or should have been, aware that Ultram—the initial medication on which Plaintiff was placed after his prescription for Percocet was discontinued on December 5, 2006—had not sufficiently mitigated the severity of Plaintiff's back pain when it had been prescribed to him at an earlier facility. (*See* Pl.'s Aff. ¶ 15; Pl.'s Opp. Exs. Bern. #6, Keog. #1.) But Plaintiff has not alleged that Defendants were actually aware of Plaintiff's history with Ultram as of November 9, 2006, and the record indicates that Plaintiff was switched from Ultram to Toradol, a painkiller with which Plaintiff alleges no previous experience, on December 7, 2006 (Schulze Decl., Ex. A at MED 776), the same day Plaintiff appears to have first written Defendants Bernstein and Koenlgamann to complain about the ineffectiveness of Ultram (Pl.'s Opp. Exs. Bern. #6, Keog #1.) Plaintiff even concedes that Defendants prescribed various alternative pain medications immediately after he began complaining that the Ultram he was taking did not adequately control his back pain.

*10    Construed in the light most favorable to Plaintiff, Defendants' conduct thus does not rise to the level of constitutional violation. This is not a case in which Defendants "refused to treat [Plaintiff's] condition, failed to provide prescribed treatment, or placed unreasonable conditions on the receipt of treatment." *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir. 2004) (summary order). Instead, Defendants repeatedly offered surgical intervention, continually readjusted their strategies for managing Plaintiff's chronic pain, and relented in their efforts to manage his pain using non-narcotic painkillers after less than three months. When actually made aware of Ultram's ineffectiveness, Defendants tried—several times —to find a drug that would adequately manage Plaintiff's pain.

Moreover, if Defendants had acted unreasonably when they discontinued Plaintiff's Percocet prescription, Plaintiff has not demonstrated that they did so with deliberate indifference. Plaintiff asserts only that this change in treatment was made over his objections, not that Defendants acted with "a conscious disregard of a substantial risk of serious harm." *Hill,* 657 F.3d at 123.[11] In short, he has not shown that the "prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition, much less ... that defendants were ... aware that their prescribed treatment plan was medically inadequate." *Reyes,* 93 Fed.Appx. at 285. Accordingly, Defendants' motion for summary judgment as to this claim is granted. *See Veloz v. New York,* 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (granting summary judgment where plaintiff's allegation was "essentially a disagreement with his medical providers' decision not to prescribe stronger pain medication than Tylenol rather than a claim that medical attention was denied entirely."), *aff'd,* 178 Fed.Appx. 39 (2d Cir. 2006).[12]

11    For the purposes of deciding Defendants' motion, the Court assumes that Defendants' back pain during this period was sufficiently severe for Eighth Amendment purposes. *See Nelson v. Rodas,* No. 01-CV-7887, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) ("Severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment."); *see also Guarneri v. Hazzard,* No. 9:06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008).

12    As with Plaintiff's medical boots claims, his claims regarding this period of pain management fail

as to Defendant Bentivegna because Plaintiff has failed to allege any facts demonstrating Defendant Bentivegna's personal involvement in this issue.

Summary judgment is denied, however, as to Plaintiff's allegations that Defendant Bentivegna, who served as Plaintiff's primary medical care provider while he was confined to SHU, "did nothing to change [his] medication and prescribe effective medication for [his] extreme pain," despite Plaintiff informing Defendant that "the medication [he] was taking was a low dosage and had been taking the said [dosage] for close to a year and [he] was not receiving relief for [his] pain." (Am. Compl. ¶ 16; *see* Pl.'s Opp. Ex. Bern #7.). Defendants have not responded to these allegations. In his affidavit in opposition to summary judgment, Plaintiff restates these allegations, asserting that, beginning "on or about 3/3/08," Defendant Bentivegna "ignored [his requests for pain relief] and did nothing to offer [him] effective treatment." (Pl.'s Aff. ¶ 24.)

Because Plaintiff has provided an affidavit from a fellow inmate corroborating that his back was "killing him" while in the SHU (Pl.'s Opp. Ex. Aff. of Bonner), there is at least some evidence to suggest that the consequences of Bentivegna's purported failure to provide Plaintiff adequate medical care were sufficiently severe for Eighth Amendment purposes, thus meeting the objective prong. Plaintiff, moreover, has asserted that he made Defendant Bentivegna aware of his suffering, and that Defendant still refused to act—a factual basis from which it is possible to infer that Bentivegna acted with constitutionally cognizable culpability, thus sufficiently alleging facts to meet the subjective prong. Given Defendants' failure to respond to this claim with any evidence to the contrary, summary judgment is denied.

### 2. Interference with Pain Medication

**\*11** In his fourth cause of action, Plaintiff alleges that Defendants White and Smith "knowingly and intentionally denied and interfered with [his] medical care, denying [him] prescribed pain medications, leav[ing] [him] in extreme pain [and] suffering." (Am. Compl. 14.) Plaintiff asserts that he was denied his pain medication three times, once by Defendant White, on October 16, 2005, when he was let out of his cell too late to pick up his medication, and twice by Defendant Smith, on February 26, 2008 and February 27, 2008, while confined to his cell for disciplinary reasons. Plaintiff asserts that the

first incident left him in "extreme pain," (Pl.'s Aff. ¶ 12), and that the latter two incidents left him in "excruciating pain," (*id.* ¶ 22-23).

This claim fails as a matter of law. No reasonable jury could find that Defendants White and Smith acted with deliberate indifference to Plaintiff's serious medical needs. Plaintiff was promptly seen by Green Haven medical staff within a day or two of the dates he alleges that he was let out of his cell too late to pick up his medication and there is no allegation he suffered lasting damage as a result. (*See* Schulze Decl. Ex. A at MED 104, 310). Therefore, the particular risk of harm faced by Plaintiff as a consequence of Defendants' actions was not sufficiently serious. *See Evans v. Bonner,* 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (granting defendants judgment as a matter of law where plaintiff's medications were delivered late and plaintiff alleges that he suffered pain as a result). Nor would Plaintiff be able to show that either Defendant acted with the requisite state of mind, as he has not asserted that they were aware of the risk that Plaintiff would suffer severe pain as a consequence of missing one or two doses of pain medication.

Defendants' motion for summary judgment is granted as to Plaintiff's fourth cause of action.

### 3. Access to Mental Health Treatment

In his fifth cause of action, Plaintiff alleges that Defendants Sarles, Eagon, and Morris, "denied [him] mental health treatment and/or access to such treatment." (Am. Compl. 14.) Although Defendants Sarles, Eagon, and Morris are not medical personnel, such claims are nonetheless evaluated under the "deliberate indifference" framework of the Eighth Amendment. Non-medical personnel, like prison guards, manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle,* 429 U.S. at 104–05; *see also Hodge v. Coughlin,* No. 92-CV-0622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994) (explaining that non-medical prison officials violate the Eighth Amendment where they have either "intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or ... the inmate [has] suffered a complete denial of medical treatment."), *aff'd,* 52 F.3d 310 (2d Cir. 1995).

If an inmate fails to demonstrate that prison officials knew, or should have known of an underlying mental health condition that, left untreated, could result in serious injury or harm, courts have entered judgment in favor of defendants because plaintiff has failed to create a genuine issue of fact as to the subjective requirement of an Eighth Amendment claim. *See Doe v. Selsky,* 973 F. Supp. 2d 300, 303 (W.D.N.Y. 2013) (granting summary judgment in favor of prison officials as to claim that they failed to prevent inmate's suicide attempt where no indication inmate "told them that he was having suicidal thoughts, or that they knew of any other information that he might be at risk for suicide."); *see also Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 138 (2d Cir. 2013) (reversing district court's denial of prison officials' summary judgment motion where plaintiff-inmate's "version of the facts raise[d] no genuine issue as to [the] subjective element, because there [was] no evidence that [officials] thought that denying [plaintiff's] request for a leave of absence" for unspecified essential medical care "would cause him serious harm."). Here, Plaintiff has not asserted that Defendants Sarles, Eagon, or Morris had any reason to know of Plaintiff's PTSD diagnosis. Even assuming that Defendants should have inferred that Plaintiff had a mental health condition from his visits to a prison therapist, there is no basis for finding that Defendants were, or should have been aware, of the particular nature or severity of Plaintiff's condition.

**\*12** If "[D]efendants deliberately interfered with [Plaintiff's] medically prescribed treatment solely *for the purpose* of causing him unnecessary pain, they may be subject to liability despite the likelihood that he suffered no permanent injuries," *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987) (emphasis added), but Plaintiff has not alleged that Defendants acted with such deliberateness here. Read in the light most favorable to Plaintiff, the record shows only that Defendants deliberately taunted or harassed Plaintiff, not that they did so to exacerbate his underlying psychological condition—or even with an awareness of such a risk. Aside from his presence in the mental health unit, moreover, nowhere has Plaintiff asserted that he was in "extreme [psychological] pain and [that he] made his medical problems known to the attendant prison personnel." *Hodge,* 1994 WL 519902, at \*11; *see Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir. 2000) ("rudeness and name-calling does not rise to the level of a constitutional violation"). Plaintiff has thus

failed to show that Defendants acted with constitutionally cognizable culpability.

Plaintiff also has not shown any injury or demonstrated that he was actually denied reasonable psychological care. Plaintiff, for instance, asserts that on January 18, 2006, he was able to speak to his therapist. (Pl.'s Aff. ¶ 28.) Similarly, as to the January 23, 2007 incident, it appears that Plaintiff was able to visit with his therapist, despite Defendant Sarles conducting a pat frisk. (Am. Compl. ¶ 20.) Only as to the January 10, 2007 incident does Plaintiff assert that he did not see his therapist and asked to return to his cell because of threatening language from the guards. (*Id.* ¶ 29.)

Even as to this isolated incident, however, Plaintiff has not alleged that his PTSD symptoms intensified or worsened, or any other related harm, as a consequence of not speaking with his therapist. *See R.T. v. Gross,* 298 F. Supp. 2d 289, 296 (N.D.N.Y. 2003) ("Because Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis, he cannot be said to be have had a serious medical need."). Thus, although Plaintiff asserts that Defendants' conduct placed him in "fear of going to the mental health unit for treatment," (Pl.'s Aff. ¶ 28), he cannot, as a matter of law, make out the objective or subjective prongs of a "deliberate indifference" claim on the record before the Court.[13] Defendants' motion for summary judgment is granted as to the claims encompassed by Plaintiff's fifth cause of action.

[13]    A letter addressed to Plaintiff from a New York State mental health official suggests that Plaintiff may have suffered from anxiety and trouble sleeping as a consequence of not seeing his therapist (Pl.'s Opp. Ex. E), but nowhere else is this implication directly alleged, asserted, or even addressed.

### *4. Training and Supervision*

Plaintiff's tenth, twelfth, and thirteenth causes of action consist, in part, of claims that senior DOCCS officials, including Green Haven Superintendent Ercole, DOCCS Commissioner Fisher, and Green Haven Deputy Superintendent of Security Koskowski (collectively, the "Supervisory Defendants") failed to properly train and supervise their subordinates as to the delivery of Plaintiff's medical and mental health care. (*See* Am. Compl. 15-16.)

In his tenth cause of action, Plaintiff alleges in part that the Supervisory Defendants failed to "ensure their subordinates were adequately and properly trained in dealing with mental health prisoners." (*Id.* at 15.) Similarly, in his twelfth cause of action, Plaintiff alleges in part that Defendants Ercole and Fisher "failed to ensure that [he] received effective, adequate meaningful medical treatment, [and also] fail[ed] to ensure that employees in the medical department were adhering to DOC[C]S health policies, directives, and patient bill of rights." (*Id.* at 16.) And in his thirteenth cause of action, Plaintiff alleges in part that Defendants Fisher and Ercole "failed to ensure, medical staff were adequately trained and properly supervised." (*Id.*)

**\*13** "It is well-settled that a supervisory defendant must have been personally involved in a constitutional deprivation to be held liable under § 1983." *Brooks v. Prack,* No. 13-CV-6338, 2014 WL 7499458, at \*7 (W.D.N.Y. Dec. 31, 2014) (citing *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006)). In *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit held:

> [P]ersonal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

More than a decade later, however, in *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009), the Supreme Court appeared to abrogate much of *Colon,* stating "vicarious liability is inapplicable to ... § 1983 suits, [so] a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [14]

[14] Since 2009, "[t]here has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent." *James v. Orange Cnty. Corr. Facility,* No. 09-CV-7226, 2011 WL 5834855, at \*4 (S.D.N.Y. Nov. 18, 2011) (collecting cases); *Marom v. City of N.Y.,* No. 15-CV-2017, 2016 WL 916424, at \*15 (S.D.N.Y. Mar. 7, 2016), *on reconsideration in part,* No. 15-CV-2017, 2016 WL 5900217 (S.D.N.Y. July 29, 2016) (collecting cases). In a 2013 case, the Second Circuit appears to have reaffirmed at least part of the *Colon* test, stating that a "supervisory official may be liable in an action brought under § 1983 if he 'exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring,' " *Vincent v. Yelich,* 718 F.3d 157, 173 (2d Cir. 2013) (quoting *Colon,* 58 F.3d at 873 (emphasis omitted)); *cert. denied sub nom., Annucci v. Vincent,* 135 S. Ct. 948 (2015). The continued validity of the second and fourth prongs of the *Colon* test remains uncertain. *See Raspardo v. Carlone,* 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after *Iqbal.*"); *Bellamy v. Mount Vernon Hosp.,* No. 07-CV-1801, 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009) *aff'd,* 387 Fed.Appx. 55 (2d Cir. 2010).

The Court need not decide the continued validity of each of the five *Colon* methods for demonstrating personal involvement of a supervisory defendant because even assuming arguendo all five continue to be valid, Plaintiff has still not demonstrated the personal involvement of any of the Supervisory Defendants in the incidents giving rise to his medical. He has not alleged that the Supervisory Defendants participated directly in the acts comprising his medical claims (*Colon* prong one), or that the Supervisory Defendants directly participated in the adjudication of his various medical grievances and appeals (*Colon* prong two), or that the Supervisory Defendants created a policy or custom pursuant to which the allegedly unconstitutional medical treatment arose (*Colon* prong three). Nor has Shepherd shown any facts suggesting that the Supervisory Defendants acted with gross negligence (*Colon* prong four).

**\*14** As to *Colon*'s fifth prong, Plaintiff did send an April 21, 2008 letter directly to Defendant Fisher, in which he alleges "being denied medical treatment as well [as] mental health." (Pl.'s Opp. Ex. Fish. #1.) Aside from this conclusory statement, however, the specific allegations recounted in Plaintiff's letter are not the subject of this suit, and instead relate to a variety of medical concerns regarding Plaintiff's knee. (*Id.*) As to the particular claims raised by Plaintiff in the lawsuit pending before this Court, a reasonable jury could not find that Plaintiff's letter constituted "information indicating that unconstitutional acts were occurring" or that any failure by Defendant Fisher to act on this information constituted "personal involvement" for the purposes of Section 1983. *Colon*, 58 F.3d at 873. Nor can Plaintiff show Defendants Ercole's or Koskowski's personal involvement on this basis, as he has provided no evidence indicating that they possessed specific information regarding the unconstitutional acts Plaintiff alleges.

In addition, because the Court finds that none of Plaintiff's allegations—aside from his allegation of deliberate indifference by Defendant Bentivegna—amount to potential constitutional violations, the question of the Supervisory Defendants' personal involvement is largely moot. Defendants' motion for summary judgment is thus granted as to those portions of Plaintiff's tenth, twelfth, and thirteenth causes of action concerning inadequate medical treatment.

### 5. Medical Confidentiality

In his sixteenth cause of action, Plaintiff alleges that Defendant Bentivegna "knowingly, willingly and intentionally violated [his] right to medical confidentiality, by allowing inmates and officials to hear [his] medical complaints." (Am. Compl. 16.)

As a general matter, "[p]risoners do not have a constitutional right to complete confidentiality of medical records." *Cortes v. Johnson*, 114 F. Supp. 2d 182, 185 (W.D.N.Y. 2000). But prisoners "do not shed all fundamental protections of the Constitution at the prison gates." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). Instead, "prison officials can impinge on [the right to maintain the confidentiality of previously undisclosed medical information] only to the extent that their actions are 'reasonably related to legitimate penological interests.'

" *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.")).

In *Powell*, for instance, the Second Circuit held that disclosure of an inmate's HIV-positive and transsexual status "under certain circumstances and absent legitimate penological purposes, could constitute deliberate indifference to a substantial risk that such inmate would suffer serious harm at the hands of other inmates." *Id.* at 115. That holding, however, was premised on a finding that the inmate's confidential medical information was disclosed "as humor or gossip," a justification that evinced no legitimate penological interest, and that disclosure of the inmate's transsexual status "in the sexually charged atmosphere of most prison settings ... might lead to inmate-on-inmate violence." *Id.* at 112-113.

Otherwise, even outside the prison context, the Second Circuit has stated "that the interest in the privacy of medical information will vary with the condition," and that "[c]onfidential medical conditions are those that are excruciatingly private and intimate [in] nature such as those likely to provoke ... an intense desire to preserve one's medical confidentiality." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 64 (2d Cir. 2011) (quotation marks omitted) (second and third alterations in original). In *Matson,* the Second Circuit found that in the non-prison context, the plaintiff teacher was not entitled to a constitutionally-protected right to privacy as to her fibromyalgia because "although fibromyalgia is a serious medical condition, it does not carry with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition." *Id.* at 67 ("we have also focused our constitutional analysis on whether revealing one's condition would expose a person not to understanding or compassion but to *discrimination* and *intolerance*" (quotation marks omitted)).

**\*15** Plaintiff generically alleges that he wanted to address his "medical issues" in private when he was seen by Dr. Bentivegna during sick call rounds while he was held in the SHU. (Pl.'s Aff. ¶ 25.) But he does not identify what specific medical issues were discussed. All of Plaintiff's allegations involving Dr. Bentivegna, however, concern

treatment for his back pain. Back pain is more akin to the fibromyalgia in *Matson* then the HIV-positive and transsexual status in *Powell*. Plaintiff has not asserted —nor can the Court find—any elevated risk of inmate violence associated with the disclosure of Plaintiff's back pain, nor has Plaintiff asserted that Defendant Bentivegna disclosed his conditions as mere gossip, or for any other non-penological reason. *See Cortes*, 114 F. Supp. 2d at 185 ("Such innocuous concerns [as back and leg pain] simply do not present a similar risk to [plaintiff's] safety from other inmates, and do not compel the same heightened confidentiality as information concerning an inmate's HIV positive status or transsexualism."). The Court thus grants Defendants' motion for summary judgment as to this cause of action.

## II. Plaintiff's *Milburn* Claims

Plaintiff's third cause of action alleges that Defendants Koenlgamann, Bernstein, and Fisher "failed to ensure that the stipulations in the judgment of Milburn v. [C]oughlin, 79CV5077 were adhered to and enforced, violat[ing] [his] rights." (Am. Compl. 14; *see id.* at ¶ 36.) *Milburn* was a "class action brought on behalf of 'all persons who are or will be inmates at Green Haven' to challenge the adequacy of Green Haven's health care services. The parties entered into a series of agreements culminating in 1991 in a 'modified consent decree,' which established guidelines for the provision of medical care at Green Haven." *Shire v. Greiner,* No. 02-CV-6061, 2007 WL 840472, at *13 n.6 (S.D.N.Y. Mar. 15, 2007). Nowhere does Plaintiff set forth the basis for his *Milburn* claim, but even if he had, "any application to enforce the *Milburn* consent decree must be brought as a contempt proceeding before the district judge assigned to that case, not as a separate Section 1983 action." *Id.*[15] Summary judgment is thus granted as counts three and twelve.

[15]     In his twelfth cause of action, Plaintiff alleges, in part, that Defendants Ercole and Fischer failed to ensure that Green Haven employees complied with the *Milburn* consent decree. (Am. Compl. 16.) Because Plaintiff has not properly brought this *Milburn* claim, that cause of action is similarly precluded as a matter of law and hereby dismissed.

## III. Sexual Abuse and Assault Claims

In his sixth cause of action, Plaintiff alleges that C.O.s Tweed, Sarles, and Ferrick knowingly and intentionally sexually assaulted him during five separate pat frisks. Shepherd contends that the assaults by Sarles and Ferrick were in retaliation for complaints he had filed against them. (Am. Compl. 14.) Although the Court previously granted Tweed and Ferrick summary judgment, on reconsideration, the Court concludes that there are disputed issues of material fact, which if resolved in Shepherd's favor, would allow a reasonable factfinder to conclude that his constitutional rights were violated. Defendants have not met their burden of proving either that they are entitled to qualified immunity or that Shepherd failed to exhaust any of these claims. Defendants' motion for summary judgment as to count six is thus denied.

### A. Reconsideration

On March 31, 2015, the Court granted Defendants' motion for summary judgment on Shepherd's sexual abuse claims, with one exception,[16] with an opinion to follow. (Dkt. 127.) After delays due to the Court's attempt to find Shepherd a lawyer and the parties' efforts to resolve the matter, the Court ordered supplemental briefing on the dismissal of the sexual assault claims in light of the Second Circuit's decision in *Crawford v. Cuomo,* 796 F.3d 252 (2d Cir. 2015), decided in the intervening months.

[16]     The Court denied summary judgment as to the First Amendment retaliation claim against Sarles for the January 23, 2007 frisk search. Dkt. 127.

**\*16** As a threshold matter, the Court must decide whether it should reconsider its prior ruling granting summary judgment to Defendants on these claims. Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see Bergerson v. N. Y. State Office of Mental Health, Cent. N. Y. Psychiatric Ctr.,* 652 F.3d 277, 288 (2d Cir. 2011) ("[A] district court has the authority to revise an interlocutory order, such as a partial denial of summary judgment, at any time before the entry of final judgment."). Although "there is a strong presumption against amendment of prior orders" due to the law of the case doctrine, *Bergerson,* 652 F.3d at 288, reconsideration is justified where there is "an intervening change of controlling law, the availability of new evidence, or the

need to correct a clear error or prevent manifest injustice," *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956* F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478 at 790).

Upon further consideration, and after reviewing the supplemental briefing from the parties, the Court is convinced that it should reconsider its prior grant of summary judgment on Plaintiff's sexual assault claims to correct a clear error and prevent manifest injustice. For the reasons that follow, Plaintiff's sexual assault allegations state a claim for a violation of his constitutional rights, and there are disputed issues of material fact making summary judgment inappropriate. Moreover, given the procedural posture of this case, Defendants will not be unduly prejudiced by this determination. *See United States v. Uccio,* 940 F.2d 753, 759 (2d Cir. 1991) ("Having given Uccio sufficient notice and an opportunity to be heard, it was well within the court's discretion to decline to deem itself bound by a ruling that it had come to view as wrong.").

**B. The Factual Record**

Shepherd alleges that between 2006 and 2008, he was sexually assaulted five times, and was directed to expose himself and threatened with sexual violence on two other occasions. First, Shepherd claims that on November 22, 2006, C.O. Tweed squeezed his penis, ran his hands between his buttocks cheeks, pressed on his anus, and whispered in Shepherd's ear that "he has a thing for big cocks." (Pl.'s Aff. ¶ 31.) Second, on November 23, 2006, Tweed again squeezed Shepherd's penis and fondled his testicles during a pat frisk—and when Shepherd asked to see a supervisor, Tweed "refused threatening to fuck [Shepherd] with his baton, threatening to hurt [him] if [he said] anything." (*Id.* ¶ 32.) [17] Third, on January 23, 2007, when Shepherd was called to the mental health unit, Sarles allegedly pat frisked him in a "rough sexual manner using a hand scanner, pushing it between [Shepherd's] buttocks cheeks roughly saying he was going to fuck [him] in the ass with said scanner because he [Shepherd] wrote [Sarles] up." (Pl.'s Aff. 30.) Fourth, on May 13, 2008, Shepherd claims Ferrick came to his cell, ordered him to submit to a pat frisk, which he did, and handcuffed him, ordering Shepherd to place his hands "high above the cell." (Pl.'s Aff. ¶ 34.) Then "Ferrick grabbed [Shepherd's] genitals and began squeezing them roughly making sexual

comments." (Pl.'s Aff. ¶ 34; *see also* Am. Compl. ¶ 23; Schulze Decl. Ex. B 109:9-14.) Fifth, on June 10, 2008, Ferrick purportedly threatened Shepherd saying "the next time he searches [Shepherd], he will squeeze[ ] [his] testicles harder and he knows that [Shepherd] like[s] it." (Am. Compl. ¶ 23.) Sixth, on July 31, 2008, "Ferrick again squeezed [Shepherd's] testicles hard and roughly ran his hands between [Shepherd's] buttocks cheeks to [his] ass hole applying pressure for several seconds." (Pl.'s Aff. ¶ 34.) That assault resulted in testicular pain for which Shepherd was seen by sick call. (*Id.*) Seventh, hours later on July 31, 2008, Ferrick allegedly "bang[ed] on the window [of Shepherd's cell] telling [him] to pull [his] boxers down so he can see [his] dick because he knows [he has] a big dick, he felt it." (*Id.*) Ferrick "continued banging on the window urging [him] to take off [his] under-ware and turn around so he can see [his] penis." (Am. Compl. ¶ 23; *see also* Schulze Decl. Ex. B 109:24-110:9.) Plaintiff contends that Ferrick's conduct was in "further retaliation of ... grievances and complaints filed against him." (Am. Compl. ¶ 23.) Plaintiff also alleges that he was "caus[ed] swelling and pain in [his] testicles and penis." (Am. Compl. 17.) [18]

[17] Defendants concede for purposes of this motion that on the two occasions described by Plaintiff, Tweed "touched plaintiff's clothed buttocks and 'put [plaintiff] on the wall, and then sta[r]ted to search [Plaintiff] in a sexual manner, grabbing [his] penis and genitals and squeezing it.' " (Defs.' R. 56.1 Statement ¶ 37 (quoting Schulze Decl. Ex B 95:10-12).)

[18] Defendants concede for purposes of their motion for summary judgment that on two occasions—May 13, 2008 and July 31, 2008—Ferrick squeezed Plaintiff's testicles during a frisk and during the later frisk Ferrick made "sexual comments." (Defs.' R. 56.1 Statement ¶¶ 42-43.)

**C. Legal Analysis**

**\*17** The sexual abuse and assault of prisoners is proscribed by the Eighth Amendment. *Crawford,* 796 F.3d at 257. "[C]ourts considering a prisoner's [Eighth Amendment] claim must ask both if the officials act[ed] with a sufficiently culpable state of mind and if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian,* 503 U.S. 1, 8 (1992) (second alteration original) (quotation marks omitted). As to the subjective prong, "where no legitimate law enforcement or penological purpose can be inferred

from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Crawford,* 796 F.3d at 257 n.4 (quoting *Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir. 1997)).

The objective component of the Eighth Amendment is contextual and "depends upon the claim at issue" because "the Eighth Amendment's prohibition of cruel and unusual punishments draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Hudson,* 503 U.S. at 8 (quotation marks omitted). The objective harm required to state an Eighth Amendment claim based on conditions of confinement, for example, must be "extreme" because "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 9 (quotation marks omitted). In contrast,

> [i]n the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency *always are violated....* whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Id.* (emphasis added); *Wilkins v. Gaddy,* 559 U.S. 34, 38 (2010) (per curium) (explaining that in assessing an Eighth Amendment claim "[i]njury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). The Second Circuit has described "the malicious use of force to cause harm" as constituting a "per se" violation of the Eighth Amendment. *Harris v. Miller,* 818 F.3d 49, 64 (2d Cir. 2016) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir. 1999)).

"A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no

penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Crawford,* 796 F.3d at 257. The *Crawford* court explained that "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257-58 (citing *Whitley v. Albers,* 475 U.S. 312, 320-21 (1986) and *Hudson,* 503 U.S. at 6-7); *see also Wilkins, 559* U.S. at 37 ("The 'core judicial inquiry,' we held, was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " (quoting *Hudson,* 503 U.S. at 7)). Furthermore, "even if contact between an officer and an inmate's genitalia was initially justified, if the officer finds no contraband, continued sexual contact may be actionable." *Crawford,* 796 F.3d at 257; *see also Boddie,* 105 F.3d at 861.

**\*18** To determine the purpose of a correction officer's conduct during a frisk, the Second Circuit has looked to the timing of the frisk, the comments made during the frisk, and subsequent comments made by the officers. *See Crawford,* 796 F.3d at 258-59. Both plaintiffs in *Crawford* were found to have stated an Eighth Amendment claim when a corrections officer allegedly squeezed and fondled their penises during frisks because, under the facts alleged, there was no penological justification for those actions. 796 F.3d at 258-59. As to plaintiff Corley, the Circuit held that the timing of the frisk (in the middle of a visitation rather than at the beginning or the end) combined with the alleged statement by the corrections officer that he wanted to "make sure Mr. Corley did not have an erection" showed the frisk was gratuitous or sexually-motivated fondling. *Id.* at 258. Similarly, the Circuit explained that the frisk of plaintiff Crawford was not incidental to any legitimate duties, and the accompanying comments made by the corrections officer, including "that doesn't feel like a penis to me," "I'll run my hands up the crack of your ass if I want to," and subsequent taunts about having seen Crawford's penis, suggested the corrections officer "undertook the search to arouse himself or humiliate Crawford, or both." *Id.* at 259. In so doing, the *Crawford* court rejected as too narrow an interpretation of the *Boddie* case, the position adopted by some district courts, that conduct must reach a high level of severity, such as

direct contact with uncovered genitalia, physical injury, or penetration to implicate the Constitution. *Id.* at 257. "Under *Boddie,* no amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes ... is permitted by the Constitution." *Id.* at 258. [19]

[19] Not all searches involving contact with an inmate's genitals are the proper subject of a lawsuit; "[i]ndeed prison security and safety may require frequent searches of an intensely personal nature." *Crawford,* 796 F.3d at 258; *see Shaw v. Prindle,* No. 15-CV-2883, 2016 WL 4578630, at *2 (2d Cir. Sept. 1, 2016) ("We cannot infer solely from the thoroughness of the search at issue here" that defendant "had intended to search [plaintiff] with intent to arouse or gratify [defendant's] sexual desires or to humiliate [plaintiff].").

Like the conduct at issue in *Crawford,* the alleged conduct of Tweed, Sarles, and Ferrick, if true, violates the Eighth Amendment. Even if each pat frisk, if properly conducted, could have served a valid penological objective, the alleged aggressive squeezing and fondling of Plaintiff s genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officers lacked a penological purpose and intended to sexually gratify themselves, to humiliate Shepherd, or both.

### 1. Defendant C.O. Tweed

Plaintiff's Eighth Amendment claims against Tweed based on the allegedly improper frisks conducted on November 22 and 23, 2006 survive summary judgment. Shepherd alleges that during a pat frisk on November 22nd, Tweed "began touching my testicles and penis squeezing it in a trough [sic] manner and running his hands between my buttocks cheeks where his hand pressed on my anus hole. I protested and was ordered to shut the fuck up, as he whispered in my ear that he has a thing for big cocks." (Pl.'s Aff. ¶ 31.) On November 23rd, Shepherd alleges that Tweed "began to pat frisk me where he began fondling my testicles, squeezing my penis. I requested to see a supervisor and Twe[ed] refused threatening to fuck me with his baton, threatening to hurt me if I say anything." (Pl.'s Aff. ¶ 32.)

Even if these pat frisks initially had penological justification, [20] that justification would not immunize subsequent conduct that exceeded constitutional bounds. *See Crawford,* 796 F.3d at 257-58. The facts alleged here could support a finding that Tweed's squeezing and fondling of Shepherd's genitals went beyond the contact necessary to achieve the penological justification of the pat frisk. And from Tweed's alleged comment that "he has a thing for big cocks" and threat to "fuck [Shepherd] with his baton," a reasonable jury could conclude that the physical contact was undertaken for his own sexual gratification, to humiliate Shepherd, or both. If the disputed issues of fact were resolved in Shepherd's favor, a reasonable factfinder could thus conclude that Shepherd suffered an objective harm that violates the Constitution and that Defendant Tweed undertook to inflict that harm with a sufficiently culpable state of mind. *See Jumpp v. Terranova,* No. 3:16-CV-683, 2016 WL 2858775, at *1-2 (D. Conn. May 16, 2016) (finding that "the complaint alleges sufficient facts to proceed" where plaintiff claimed that defendant on one occasion "slapp[ed] his buttocks and grabb[ed] his penis" and "threatened further sexual abuse" without any penological purpose).

[20] Both frisks occurred as Plaintiff returned from the inmate recreation area to his cell, and a grievance filed by Plaintiff on November 24, 2006 suggests that the purportedly improper frisk on November 22, 2006 occurred after Plaintiff's knee brace set off a metal detector. (Pl.'s Opp. Ex. Griev. #2.)

### 2. Defendant C.O. Sarles

**\*19** The facts Plaintiff alleges concerning Sarles may also constitute a violation of the Eighth Amendment. Plaintiff contends that Defendant Sarles conducted a pat frisk on January 23, 2007 in a "rough sexual manner using a hand scanner pushing it between [Shepherd's] buttock checks roughly saying he was going to fuck [Shepherd] in [his] ass with said scanner because [Shepherd] wrote him up." (Pl.'s Aff. 30.) Based on that comment, a reasonable factfinder could conclude that Sarles touched Shepherd in a sexual manner to humiliate or intimidate Shepherd, not for a permissible penological purpose—a harm that objectively violates the Eighth Amendment. *See Hudson,* 503 U.S. at 8; *Goins v. Wosneack,* No. 6:15-CV-6234, 2016 WL 1271701, at *5 (W.D.N.Y. Mar. 30, 2016) (holding plaintiff stated an Eighth Amendment claim when she alleged the officer "intentionally touched her

in an intimate area (i.e. by rubbing his penis against her buttocks) with the intent to gratify his own sexual desire and for no legitimate penological purpose."). The subjective prong necessary for an Eighth Amendment violation is also met because Sarles' conduct, if credited, could be sufficient to establish a culpable state of mind. *See Crawford,* 796 F.3d at 257 n.4.

Defendant Sarles' motion for summary judgment is also denied as to Plaintiff's allegation that the January 23, 2007 frisk was in retaliation for speech protected by the First Amendment.[21] "To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir. 2014) (quotation marks omitted) (alteration in original).

[21]    The Court denied summary judgment on this claim on March 31, 2015. (Dkt. 127.)

Here, Shepherd asserts that Sarles expressly linked the January 23, 2007 sexual assault and related threat to Shepherd's prior complaints against him. Shepherd contends that Sarles said "he was going to fuck [Shepherd] in the ass with said [hand] scanner because [Shepherd] wrote him up." (Pl.'s Aff. ¶ 30; Schulze Decl. Ex. B 100:12-102:19.) That allegation is sufficient to satisfy Plaintiff's initial "burden of showing that the protected conduct was a substantial or motivating factor in the prison officials' disciplinary decision." *Holland,* 758 F.3d at 225 (quotation marks omitted). Because Defendants do not address Plaintiff's retaliation claims at all, they have not met their "burden of establishing that the disciplinary action would have occurred even absent the retaliatory motivation." *Id.* at 226 (quotation marks omitted). Ordinarily, the time between Plaintiff's letters of complaint regarding the prior frisk by Defendant Sarles on January 18, 2006 and the alleged retaliatory frisk on January 23, 2007 might be "too attenuated to establish a causal relationship." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009). But here, a reasonable factfinder could infer a causal relationship based on Plaintiff's assertion that Sarles expressly linked these events in his statements to Plaintiff.[22]

[22]    Defendant Sarles, moreover, is not entitled to qualified immunity on Plaintiff's retaliation claim—at least not on the basis of the record now before the Court. "Qualified immunity is an affirmative defense that must be pled and proved by the defendant," *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 270 (2d Cir. 1996), and Defendant Sarles has not even attempted to satisfy this burden here, as he has argued only that he is entitled to qualified immunity for Plaintiff's excessive force claims, discussed *infra.* (Defs.' Mem. 27.)

### 3. Defendant C.O. Ferrick

A reasonable factfinder could also find that the allegedly improper frisks conducted by Ferrick, each of which involved "rough" contact with Plaintiff's genitals and were accompanied by violent threats and abusive sexual language, violated Shepherd's Eighth Amendment rights. (*See* Pl.'s Aff. ¶ 34.) The first challenged frisk occurred on May 13, 2008 in Shepherd's cell. While Shepherd was handcuffed, Ferrick allegedly squeezed and grabbed his genitals while making sexual comments. Shepherd complained about that assault, and thereafter, on June 10, 2008, Ferrick told him that "next time he searches [Shepherd] he will squeeze[ ] [his] testicles harder and [Ferrick] knows that [Shepherd] like [s] it." (Amend. Compl. ¶ 23.) Then on July 31, 2008, Ferrick allegedly "again squeezed [Shepherd's] testicles hard and roughly ran his hands between [Shepherd's] buttocks checks to [his] ass hole applying pressure for several seconds" during a pat frisk. (Pl.'s Aff. ¶ 34.) That assault resulted in testicular pain, for which Shepherd was seen by sick call. (*Id.*) Shepherd also asserts that several hours later, Ferrick banged on the window of his cell "telling [Shepherd] to pull [his] boxers down so he can see [Shepherd's] dick because he knows [he has] a big dick, he felt it." (*Id.*; Am. Compl. ¶ 23.) A reasonable factfinder could find that there is no penological purpose for squeezing an inmate's testicles "hard," applying extended pressure to his anus, threatening sexual assault, or making comments regarding the size of his penis, and could conclude from such conduct that the defendant acted with a sufficiently culpable state of mind to violate the Eighth Amendment. *See Allah v. Morrison,* No. 14-CV-6735L, 2016 WL 4017340, at *4 (W.D.N.Y. July 22, 2016) ("Allah has plausibly alleged that Morrison intentionally grabbed his genitals for no legitimate penological purpose and subjected him to offensive sexual taunts. Such allegations are sufficient to

state a claim for sexual harassment in violation of Allah's Eighth Amendment rights."); *see also Crawford,* 796 F.3d at 257.

**\*20** Summary judgment is granted to Defendant Ferrick as to Plaintiff's claims of retaliation by him, however. Claims of retaliation "must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir. 2000) (quotation marks omitted). Plaintiff has provided no evidence of retaliation beyond a conclusory allegation in his Amended Complaint. (*See* Am. Compl. ¶ 23 ("Ferrick['s] actions were in further retaliation of the grievances and complaints filed against him.").) Plaintiff has thus failed to state a cognizable claim for retaliation.

### *4. Qualified Immunity*

Having determined that Shepherd raises genuine issues of material fact as to whether Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment, the Court now turns to whether Defendants are entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (citations and quotation marks omitted). "The contours of the right [alleged to have been violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. Where "no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't,* 577 F.3d 415, 433 (2d Cir. 2009). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," *Saucier,* 533 U.S. at 205, not to insulate officers "who knowingly violate the law," *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Defendants argue that even if Shepherd states a claim for a violation of the Eighth Amendment under *Crawford,* Defendants are entitled to qualified immunity because "[a]t the time these incidents occurred, it was not clearly established that the alleged conduct would have violated the Eighth Amendment ... [because] binding precedent, *Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir. 1997), established that such conduct was not an Eighth Amendment violation." (Opp. to Pl.'s Ltr. Brief at 5 (Dkt. 163).) The Court disagrees.

*Crawford* did not change the law. As the *Crawford* Court itself stated: "[t]he standard set forth in *Boddie* ... remains the same today." *Crawford,* 796 F.3d at 255; *see id.* at 256 ("*Boddie* recognized that a single act of sexual abuse may violate the Eighth Amendment if, as in this case, it is entirely gratuitous and devoid of penological purpose."); *id.* at 258 ("Under *Boddie,* no amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes, as was the case here—is permitted by the Constitution."); *cf. Willey v. Kirkpatrick,* 801 F.3d 51, 70 (2d Cir. 2015) (describing *Crawford* as "giv[ing] new guidance on the meaning of *Boddie*").

*Boddie* itself clearly establishes that the officers' conduct alleged here, if true, violates the Eighth Amendment. *Boddie* made "clear that the sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim." 105 F.3d at 859. Specifically, *Boddie* set out the legal standard for when an officer violates the Eighth Amendment by such conduct: "there can be no doubt" that the objective prong is met by "severe or repetitive sexual abuse of an inmate by a prison officer." *Id.* at 861. "[S]exual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and 'is simply not part of the penalty that criminal offenders pay for their offenses against society.' " *Id.* (quoting *Farmer,* 511 U.S. at 834). The subjective prong is met by claims of sexual abuse because "a prison official who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights." *Id.* "Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.* The court in *Crawford* described its holding in *Boddie* as follows:

**\*21** In *Boddie,* we left no doubt that sexual abuse by a corrections officer can give rise to an Eighth Amendment claim.... *Boddie* made clear that "severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violations." ... *Boddie* also made clear that "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind."

*Crawford,* 796 F.3d at 257 & n.4 (last alteration in original) (quoting *Boddie,* 105 F.3d at 859, 861).

In *Boddie* the court described the conduct plaintiff complained of there as "isolated episodes of harassment and touching." *Id.* at 861. Boddie's allegations were as follows: a female corrections officer "made a statement" that Boddie believed amounted to "a pass" at him but about which he "could not be sure;" the next day, the female officer "squeezed his hand, touched his penis, and said, '[Y]ou know your [sic] sexy black devil, I like you.' " *Id.* at 859-60 (alterations in original). A few weeks later, the same officer stopped Boddie, accused him of wearing an orange sweatshirt, a color inmates were prohibited from wearing, and told him to take off the sweatshirt. *Id.* at 860. Boddie refused because the hallway was cold, and he told the officer he would give the sweatshirt to her when they returned to his cellblock. *Id.* The officer stopped him, and twice "bump[ed] into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." *Id.* (second, third, and fourth alterations in original). When he tried to pass her again, the officer again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door." *Id* (alterations in original). The Second Circuit held that the alleged actions were "despicable" but did not involve a harm of federal constitutional proportions. *Id.* at 861. [23]

[23] Notably, the conduct the female officer was accused of in *Boddie* may not have violated New York State law as it existed in 1997 because at that time, the law only criminalized sex offenses committed by men. Sexual misconduct was defined by New York State law as when "a male ... engages in sexual intercourse with a female without her consent" or when "he engages in deviate sexual intercourse with another person without the latter's consent." 1965

Sess. Law News of N.Y. Ch. 1030. A person was guilty of sexual abuse when "he subjects another person to sexual contact." *Id.* In 2000, New York State recognized that women, as well as men, could perpetrate sexual assault. 2000 Sess. Law News of N.Y. Ch. 1 (changing the law so that a person can be guilty of sexual misconduct and sexual abuse if "he or she" commits the crime). As the Second Circuit observed in *Crawford,* the gender of the officer accused of assault in *Boddie* may have been significant to the court, "today—more so than 18 years ago—we recognize that a *female* corrections officer is equally capable of sexually abusing a male inmate and the harm that could result from such abuse." 796 F.3d at 260 n. 10.

The facts Shepherd alleges are far more serious, threatening, and more repetitive than those alleged by the plaintiff in *Boddie.* Shepherd asserts that his genitals were squeezed, fondled, and grabbed, prolonged pressure was applied to his anus, and phallic objects were rubbed roughly between his buttock cheeks by officers who threatened sexual violence, including to rape him with a baton or hand scanner. On one occasion, Shepherd says that he was in such pain as a result of the forceful squeezing of his testicles that he was seen by sick call. Such conduct simply more egregious than the "isolated episodes of harassment and touching" that the *Boddie* court addressed. Moreover, the alleged seven incidents of sexual abuse, five of which involved sexual contact, are more repetitious than what Boddie experienced. While recognizing that several officers are alleged to have been involved in the sexual assaults of Shepherd, each officer's conduct on its own was so severe that a reasonable officer would know it was "objectively, sufficiently serious" to violate the Eighth Amendment. *Boddie,* 105 F.3d at 861.

**\*22** *Boddie*'s announcement of the legal standard by which sexual assault allegations were to be considered under the Eighth Amendment made "the contours of a right" not to be sexually assaulted by a corrections officer "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd,* 563 U.S. at 741 (alterations and quotation marks omitted). [24] Applying the legal standard from *Boddie* to the facts of this case, the sexual assaults of Shepherd were both objectively "severe" and "repetitive." These correction officers must have known it was impermissible to "squeeze[]," "fondle[]," and "grab[]," Shepherd's penis and testicles, apply prolonged pressure to his anus, and threaten to "fuck [him] in the ass" with a foreign object,

amongst other threats of sexual violence. (Pl.'s Aff. ¶¶ 30-34.) "[N]o legitimate law enforcement or penological purpose can be inferred from the [D]efendant[s'] alleged conduct," and Defendants have offered none; thus the abuse itself, if true, is "sufficient evidence of a culpable state of mind." *Boddie,* 105 F.3d at 861. Under the clearly established legal standard in *Boddie,* every reasonable officer was on notice that intentionally engaging in the conduct alleged was unlawful. *See id*; *Hope,* 536 U.S. at 739 ("qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.' " (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001))).

24    As the Supreme Court stated in *al-Kidd,* for a right to be clearly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." 563 U.S. at 741; *see also Jennings v. Jones,* 499 F.3d 2, 17 n.18 (1st Cir. 2007) ("It is true that the *right* allegedly violated must be defined at the appropriate level of specificity before a court can determine if it is clearly established,' but this requirement does not imply that the relevant *case law* must be particularized to address the alleged violation. Rather, once the right allegedly violated has been defined, the court must examine whether the unlawfulness of particular conduct will be apparent *ex ante* to reasonable public officials.") (citations omitted) (quoting *Wilson,* 526 U.S. at 613, 615).

Even if reliance on *Boddie* alone was insufficient for the officers to have been on notice that their conduct was unlawful, the Court would deny Defendants qualified immunity for two additional reasons. First, Supreme Court precedent has long made clear that the malicious use of force to cause harm violates the Eighth Amendment. Second, the officers' conduct at the time it was alleged to have been committed was a crime under New York State law, and eliminating such conduct had been the goal of national legislation, reaffirming the Court's conclusion that any reasonable officer would have had fair warning that this behavior would violate an inmate's rights.

Supreme Court precedent has long clearly established that the intentional infliction of harm without penological purpose, regardless of the injury alleged, violates the Eighth Amendment. "The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth

Amendment," *Whitley v. Albers,* 475 U.S. 312, 319 (1986) (quotation marks and alterations omitted), and "[a]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (quotation marks omitted). There is no "injury threshold" that a prisoner must meet to state an Eighth Amendment claim for excessive force. *Wilkins,* 599 U.S. at 39; *see id.* at 41 ("*Hudson* ... discarded the requirement of serious injury ... the Court concluded that force, rather than injury, is the relevant inquiry, and that a prisoner who alleges excessive force at the hands of prison officials and suffers nothing more than *de minimis* injury can state a claim under the Eighth Amendment." (Thomas, *J.,* concurring in judgment)); *cf. Harris,* 818 F.3d at 64 ("[C]ertain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations per se. This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated.") (quoting *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir. 1999)); *cf. Johnson v. Breeden,* 280 F.3d 1308, 1321 (11th Cir. 2002) ("[I]t is clearly established that all infliction of excessive force on a prisoner sadistically and maliciously for the very purpose of causing harm and which does cause harm violates the Cruel and Unusual Punishment Clause. So, where this type of constitutional violation is established there is no room for qualified immunity."). Every reasonable officer would thus know that engaging in the physical conduct alleged here, while making explicit threats of sexual violence, was a malicious use of force that constituted cruel and unusual punishment and violates an inmate's Eighth Amendment rights.

**\*23** Moreover, the fact that the alleged conduct constituted a crime under New York State law, [25] and was the subject of national legislation aimed at stopping such conduct in prisons, [26] reinforces the conclusion that every reasonable officer would have known that it violated the Eighth Amendment. In assessing what every reasonable officer would have known, courts consider not only case law interpreting the constitutional right alleged to be violated, but other precedent that would put officers on notice that their conduct was inappropriate, including an agency directive, *Groh v. Ramirez,* 540 U.S. 551, 564 (2004), state regulation, *Hope,* 536 U.S. at 744, and a Department of Justice report, *id.* at 744-45. Although "officials sued for constitutional violations do not lose their qualified immunity merely because their conduct

violates some statutory or administrative provision, we may examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights." *Okin,* 577 F.3d at 433-34 (citations and alterations omitted). If a reasonable officer had fair warning, qualified immunity is not appropriate because it is not the purpose of qualified immunity to protect "those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Rodriguez v. McClenning,* 399 F. Supp. 2d 228, 238-39 (S.D.N.Y. 2005) ("A corrections officer who sexually assaults a prison inmate does not mistakenly judge how he should carry out his duties; instead, such conduct blatantly disregards a New York State criminal statute and Second Circuit case law.").[27]

[25]   2003 Session Law News of N.Y. Ch. 264 provides: "A person is guilty of forcible touching when such person intentionally, and for no legitimate purpose: 1. forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire; ... For the purposes of this section, forcible touching includes squeezing, grabbing or pinching. Forcible touching is a class A misdemeanor." (codified at N.Y. Penal Law § 130.52).

[26]   In 2003, the United States Congress unanimously passed the Prison Rape Elimination Act ("PREA"), which defines "rape" to include "sexual fondling." 42 U.S.C. § 15609(9). "The term "sexual fondling" means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification. *See id.* § 15609(11). Amongst PREA's defined purposes is to "protect the Eighth Amendment rights of Federal, State, and local prisoners," *Id.* § 15602(7), based on Congress's finding that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution." *Id.* § 15601(13). Other purposes of the PREA include "establish[ing] a zero-tolerance standard for the incidence of prison rape in prisons in the United States" and "mak[ing] the prevention of prison rape a top priority in each prison system." *Id.* § 15602(1), (2).

[27]   Defendants also argue that the existence of district court cases, which Defendants contend involved "similar factual allegations," but reached the

conclusion that there was no constitutional violation, show that the law was not clearly established. (Opp. to Pl.'s Ltr. Brief at 5-6 (Dkt. 163).) The Court disagrees. In determining whether a right has been established with reasonable clarity, this Court must look to Supreme Court and Second Circuit precedent. *See, e.g., Doninger v. Niehoff* 642 F.3d 334, 345 (2d Cir. 2011); *see also Hope v. Pelzer,* 536 U.S. 730, 747, 756-27 (2002).

The officers here had fair notice at the time of the conduct alleged that such conduct violates the Eighth Amendment. Defendants' request for qualified immunity was is denied.

## 5. Exhaustion

The Prison Litigation Reform Act instructs that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Failure to exhaust administrative remedies is an affirmative defense ... not a pleading requirement," *Williams v. Correction Officer Priatno,* 829 F.3d 118, 122 (2d Cir. 2016). Even when defendants meet this burden, however, failure to exhaust may still be excused where an inmate shows that administrative remedies were not in fact available to the inmate. *Id.* at 123. As the Supreme Court recently explained, "an inmate's duty to exhaust 'available' remedies does not come into play" when "an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake,* 136 S. Ct. 1850, 1859 (2016). As the Second Circuit explained, the Supreme Court noted three circumstances, where an administrative remedy may be "unavailable":

**\*24** First, an administrative remedy may be unavailable when "it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Williams,* 829 F.3d 118, 123-24 (citations omitted) (quoting *Ross,* 136 S. Ct. at 1859). As the Second Circuit noted, "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of that case." *Id.* at 124 n.2. Thus, there may be other circumstances that could "render an otherwise available administrative remedy actually incapable of use." *Id.*

Defendants contend that Plaintiff did not properly appeal his grievances regarding the alleged improper frisks by Tweed and Sarles, or the July 31, 2008 alleged improper frisk conducted by Ferrick, (Hale Decl. ¶¶ 8-13), but appear to concede that Plaintiff did properly appeal his grievance regarding Ferrick's May 13, 2008 frisk. (*See* Opp. to Pl.'s Ltr. Brief at 7-8 (Dkt. 163).) Plaintiff asserts that he did file grievances and appeals regarding each of the instances of excessive use of force and retaliation that he now presses before the Court. (*See* Pl.'s Ltr. Brief at 18 n.11-13 (Dkt. 160).)

In light of the factual disputes about the grievances filed by Shepherd, the Court previously determined that a limited evidentiary hearing was appropriate. (*See* Tr. of Apr. 17, 2015 Teleconference at 5 (Dkt. 149).) There continue to be factual disputes that prevent the Court from deciding whether Shepherd exhausted his claims and/or whether the "administrative remed[ies], although officially on the books," were actually available to Shepherd. *Ross v. Blake,* 136 S. Ct. at 1859. Whether these claims were properly exhausted is a disputed issue of fact reserved for the Court and not the jury. *See Messa v. Goord,* 652 F.3d 305, 309-310 (2d Cir. 2011). Accordingly, the Court's will schedule and conduct a limited evidentiary hearing on the issue of exhaustion. [28] *See Gomez v. Chill,* No. 11-CV-6844, 2015 WL 1853110, at *6 (S.D.N.Y. Apr. 17, 2015), *report and recommendation adopted,* 2015 WL 3862709 (S.D.N.Y. June 9, 2015). Defendants' motion for summary judgment based on Shepherd's alleged failed to exhaust his claims of sexual assault is denied.

[28]   Plaintiff—now with the benefit of counsel—argues that "there has not been sufficient discovery to fully develop the record" on the issue of exhaustion and there is a "need for additional discovery." (*See* Pl.'s Reply Ltr. Brief at 7 (Dkt. 166).) On February 25, 2016 the Court reopened discovery on the "limited

issue of exhaustion for those claims that survived the motion for summary judgment." (Dkt. 171.)

## IV. Plaintiff's Free Exercise Claims

Plaintiff is a practicing Rastafarian, and several of his claims relate to alleged violations of his religious rights. In his seventh cause of action, Plaintiff alleges that Green Haven Deputy of Security Koskowski, Sergeants Kelly, Scott, and Alexander, Lieutenants La Ports, Towkartz, Wilson, and Hann, and C.O.s Filipponi, Bonafede, Raetina, Dryer, Trembath, Miller, Swan, Castine, Sample, and Freeman "knowingly willingly and intentionally caused [his] covenant and holy temple to be desecrated by touching, ripping/tearing [his] dread locks in violation of [the] free exercise clause." (Am. Compl. 15.) [29] Similarly, in Plaintiff's ninth cause of action, he alleges that Deputy Koskowski, Sergeants Scott and Alexander, Lieutenants Towkartz, Hann, Wilson, and La Ports, and C.O.s Trembath, Bonafede, Miller, Freeman, Dryer, Castine, Swan, and Sample "failed to stop their subordinates from ripping/tearing and desecrating [his] dread locks, and knowingly allowed [the] free exercise clause ... to be violated." (*Id.*) In his fifteenth cause of action, Plaintiff also alleges, in part, that Defendant Hann "discriminated against [him] due to [his] religion." (*Id.* 16.)

[29]   Although Plaintiff names C.O. Dryer in his cause of action, he is not named as a defendant in the case and Plaintiff has not sought leave to amend his complaint to add Dryer as a defendant pursuant to Federal Rule of Civil Procedure 15. To the extent Plaintiff asserts claims against C.O. Dryer, these claims are not properly before the Court and will not be considered.

### A. The Factual Record

**\*25**   As a Rastafarian, Plaintiff considers his hair sacred; his beliefs do not allow for his hair to be cut, or for it to be touched by others. (Pl.'s Aff. ¶¶ 1, 37; Am. Compl. ¶ 25.) Plaintiff alleges that his hair was improperly searched by Green Haven guards on five separate occasions: an unspecified date in February 2007 (Am. Compl. ¶ 26); March 12, 2007 (*id.* ¶ 27); February 28, 2008 (*id.* ¶¶ 28-29); March 6, 2008 (*id.* ¶ 30); and March 15, 2008 (*id.* ¶ 31). As Defendants concede, Plaintiff was also denied religious meals on two occasions: on October 7, 2005, during celebrations for the holiday of Negust, (Pl.'s Aff. ¶ 35) and on May 5, 2008, during celebrations for Fasika, (Am. Compl. ¶ 32).

### 1. Searches of Plaintiff's Hair

During the time period in question, Plaintiff had "an abundance of hair ... matted together," into dread locks. (Pl.'s Aff. ¶ 43.) An incident report provided by Defendants suggests that, Plaintiff's hair would, unfurled, stretch to six feet (Schulze Decl. Ex. E at 35), and a video of the February 28, 2008 search of Plaintiff's hair shows that his hair consisted of a single, large matted dreadlock —what Plaintiff refers to as the Bongo dreadlock style (*id.* Ex. I; Pl.'s Aff. ¶ 36.). As both parties concede, there were "empty spaces" within this large mass of hair where Plaintiff's hair did not "reach all the way to [his] scalp," which Plaintiff asserts C.O. Tweed created by improperly ripping Plaintiff's hair in 2003. (Pl.'s Aff. ¶ 144.) Defendants, meanwhile, assert that these "empty spaces" pose a potential security risk, providing places in which "the inmate could conceal fairly large objects, such as weapons and drugs." (Schulze Decl. Ex. G ¶ 3.)

DOCCS protocols afford Rastafarian inmates the opportunity to avoid searches by prison officials if they "run their fingers through their hair in a manner sufficient to demonstrate that contraband is not concealed therein." (*Id.* ¶ 4; *see also* Schulze Decl. Ex. L § III(B)(1).) If inmates comply with this so-called "pat frisk" procedure and can "demonstrate the absence of contraband," officers will then not search their hair. (Schulze Decl. Ex. G ¶ 5.) Where an inmate refuses to comply with this procedure, however, "security staff must then touch the hair to identify concealment pockets and detect foreign objects"—what is referred to as a "strip search." (Schulze Decl. Ex. H ¶ 8; *id.* Ex. L § III(D)(1).) Even where an inmate complies with the initial pat frisk procedure, moreover, officers may supplement this procedure by use of a hand-held metal detector. (Schulze Decl. Ex. L § III(B) (2).) Defendants' exhibits also suggest that, where there is probable cause for an officer to believe that "an inmate is hiding contraband on his or her body," officers can conduct a strip search without first providing the inmate an opportunity to demonstrate the absence of contraband. (*Id.* § III(D), (F).)

Defendants assert that this set of procedures "is essential to [DOCCS'] ongoing effort to maintain security of the facility, safety of the inmates, employees, visitors and the community, inmate discipline," and that it reflects DOCCS' effort to "accommodate[ ] [religious strictures] to the extent that it can reasonably do so without compromising its need to control the possession/use of contraband." (Schulze Decl. Ex. H ¶ 8.) Defendants also assert that these procedures represent the "least intrusive means available to counteract a well known and frequently used method of concealing contraband." (Schulze Decl. Ex. H ¶ 9.) In an affidavit from non-party Colonel Kirkpatrick, Defendants provide an illustrative list of incidents in which drugs, weapons, and other contraband, have been recovered from inmates during such searches. (*Id.*)

**\*26** Despite these carefully tailored procedural protections, Plaintiff asserts he was "constantly harassed" because of his dreadlocks while in Green Haven, and that "officials were always making degrading comments regarding [his] hair." (Pl.'s Aff. ¶ 36.) He alleges that Lieutenant Hann, on several separate occasions, "sent her subordinates who threatened [him] about cutting [his] hair," and that on January 16, 2007, these same, unnamed officers were sent to take pictures of his hair. (*Id.*) On January 16, 2007, Plaintiff sent a "formal complaint" to the superintendent of Green Haven—presumably Ercole —regarding this purported harassment, which requested that it "be stopped immediately." (Pl.'s Opp. Ex. G-H Supt.) In his complaint, Plaintiff also informed the superintendent of a court order "stating that [his] hair must not be cut due to the fact that [he is] a Rastafarian." (*Id.*) Plaintiff has not provided a copy of this court order.

On January 17, 2007, Plaintiff wrote a similar letter to DOCCS Commissioner Goord. (Pl.'s Opp. Ex. Goord #3.) In the letter, he asserts that Lieutenant Hann ordered her subordinates to "cut [Plaintiff's] dreadlocks" or "issue [Plaintiff] a misbehavior report." (*Id.*) He also asserts that the photographs of his hair were taken to "determine whether [his] hair [was] in compliance with the directives, policy procedures," and that "every day" comments "call [his] hair shit and make foul comments about [his] dreadlocks." (*Id.*) Plaintiff's letter further requests an "immediate investigation," and references his January 16, 2007 complaint to Green Haven's superintendent. (*Id.*)

In February 2007, Plaintiff contends that he was returning from Green Haven's clinic with several other prisoners, "when numerous officers began searching all of the prisoners and the officer who was searching [Shepherd] began pulling on [his] hair ripping several locks out." (Pl.'s

Aff. ¶ 37.) Plaintiff claims that Lieutenant Towkartz observed this search, and that he informed Lieutenant Towkartz that he considered the search a "violation of [his] religious belief." (*Id.*) Towkartz allegedly responded by explaining to Plaintiff that the searching officer "did nothing wrong even though [Plaintiff's] hair was ripped out," and then ordered Plaintiff to "shut up and face the wall." (*Id.*)

On March 12, 2007, Plaintiff asserts he was again searched, along with several other prisoners, on his way to evening recreation. (*Id.* ¶ 38.) Plaintiff contends that the searching officers, C.O.s Sample and Castine, "ran their hands under [his] boots bottom and began touching [his] hair," (Am. Compl. ¶ 27) leading him to "protest making the officer aware of [his] religious beliefs and it was against [his] religion to have [his] hair touched," (Pl.'s Aff. ¶ 38.) Plaintiff asserts that, in response, the searching officers "began pulling [his] hair roughly which caused [his] hair to be ripped." (*Id.*) Plaintiff also asserts that, during the search, he heard Sergeant Alexander comment that his "hair was dirty and smelled like shit and the Rastafarians are assholes whose hair should be cut off." (*Id.* ¶ 39.)

Plaintiff claims he later reported the searching officers for improperly touching and ripping his hair, and Sergeant Alexander, for his "degrading comments." (*Id.*) In a formal grievance filed on March 16, 2007 regarding the February 2007 and March 12, 2007 searches of his hair, Plaintiff describes harassment regarding his hair beginning in December 2006, when the "administration [of Green Haven] started a crusade" against him. (Pl.'s Opp. Ex. Griev. #5.) Plaintiff alleges that "an attorney" spoke with Abuna Fox, a Rastafarian priest and DOCCS' Statewide Rastafarian Coordinator, who purportedly told that attorney that Plaintiff's hair "was legal and due to his religious beliefs[ ] he did not have to cut his hair." (*Id.*) In his grievance, Plaintiff also requested that new officers be trained not to "touch, grab or pull [Plaintiff's] hair any time they ... conduct a search of his person[ ]," and that the officers "change their gloves after searching a prisoner." (*Id.*)

**\*27** Also on March 16, 2007, Plaintiff's wife received a letter from DOCCS Deputy Commissioner Lucien J. Leclaire, Jr., informing her that "allegations of harassment concerning [Plaintiff's] hairstyle w[ere] investigated," and that these investigations revealed "a legitimate security concern regarding the frisking

of [Plaintiff's] hair." (Pl.'s Opp. Ex. F.) Deputy Commissioner Leclaire further informed Plaintiff's wife that photographs of Shepherd's hair "were taken and forwarded to the Department's Counsel's Office for review," and that Plaintiff had been interviewed regarding his hair. (*Id.*) The letter further acknowledged that Fox had met with Plaintiff, and that Green Haven officials had "been advised" that Fox considered Plaintiff's hairstyle to be "within the guidelines of the Rastafarian religion." (*Id.*)

Plaintiff's hair was again searched on February 28, 2008. The circumstances surrounding this search are both complicated and sharply disputed.

Plaintiff asserts that on February 28, 2008, he was taken from his cell and brought to a downstairs room, the G block bathroom, where Sergeant Kelly and C.O. Filipponi strip searched him, using a hand-held metal detector to scan his hair. (Pl.'s Aff. ¶ 40; *see also* Schulze Decl. Ex. F. at 18:19-20.) Plaintiff asserts that the scanner did not detect any contraband, but that he was nonetheless taken to "F & G corridor" where he was subject to additional searching by Lieutenants Towkartz and La Ports. (*See* Pl.'s Aff. ¶ 40; Pl.'s Opp. Ex. G8 (describing search as a pat frisk—not a strip search—and identifying the site of this frisk as the "F&G Strip Frisk Room" in DOC report signed by W. Kelly); *see also* Schulze Decl. Ex. F. at 18:21.) In particular, Plaintiff claims that Green Haven officials sat him in a chair and ordered him to "rip [his] hair in order to see [his] scalp," but that he refused to comply with this order. (Pl.'s Aff. ¶ 41.) During this search, Plaintiff was purportedly handcuffed, and he claims that a guard positioned behind him improperly tampered with his hair, which he realized only after this officer ripped a portion of his hair. (*Id.*) While in "F & G corridor," Plaintiff also claims to have heard Lieutenants Towkartz and La Ports tell Sergeant Kelly and C.O. Filipponi that they did "not care what happens as long as they find contraband in [Plaintiff's] hair." (*Id.* ¶ 42.)

Plaintiff was then purportedly taken in handcuffs to Green Haven's clinic, where he was placed in a room with Sergeant Kelly and C.O. Filipponi. (*Id.* ¶ 43; *see also* Schulze Decl. Ex. F. at 18:21-24.) Plaintiff asserts that while Sergeant Kelly spoke with him, C.O. Filipponi again tampered with his hair, which he became aware of only after he felt a "tugging of [his] hair." (Pl.'s Aff. ¶ 43.)

After two hours in the clinic room, Plaintiff was allegedly taken to Green Haven's hospital, where he was again strip searched and shackled. (Pl.'s Aff. ¶ 45.) Sergeant Kelly appears to have reported Plaintiff's failure to comply with DOCCS pat frisk procedures to the Green Haven Watch Commander, who contacted Green Haven's Deputy of Security, Koskowski. Deputy Koskowski directed the officers to frisk Plaintiff's hair if Plaintiff did not comply with a further direction to run his own fingers through his hair. (Defs.' R. 56.1 Statement ¶ 57.) Deputy Koskowski further insisted the frisk be videotaped. (*Id.*) Lieutenant La Ports purportedly communicated these orders to Plaintiff, telling Plaintiff that authorization had been given to search his hair, and that he could either "assist [the officers] or ... have the guards hold [him] down and search[ ] [his] hair." (Pl.'s Aff. ¶ 45.) Plaintiff asserts that he attempted to comply with these directions, but "was not willing to rip[ ] [his] hair." (*Id.*) Accordingly, the officers searched Plaintiff's hair for him. C.O. Miller "held the handcuffs and chain while another went in [his] hair tearing and ripping [his] hair," (*id.* ¶ 46), and C.O. Bonafede videotaped this search (*see* Schulze Decl. Ex. I), while C.O. Trembath observed (Am. Compl. ¶ 29).

**\*28** Plaintiff acknowledges that the searching officer alleged that he found two black balloons in Shepherd's hair, one empty, and another containing an unknown substance. (Pl.'s Aff. ¶ 46.) Both balloons were shown to the camera, as Plaintiff concedes, although he argues that the substance inside of them was not properly videotaped. (*Id.* ¶ 47.) Plaintiff also contends that these balloons were planted on him by Lieutenant Towkartz or C.O. Filipponi, the officers that tampered with his hair during the searches in "F & G corridor" and in the clinic. (Am. Compl. ¶ 29; *see also* Schulze Decl. Ex. F at 19:1-18.) The affidavit of James Odam, a fellow inmate, offers some corroboration for Shepherd's assertion that Lieutenant Towkartz planted the contraband. (*See* Pl.'s Opp. Ex. Aff. of Odam (recounting Lieutenant Towkartz's alleged admission on May 16, 2008, "Yeah, that's me, I'm the one who put that Junk in your boy Shepherd's hair," and, "[w]hen you get back to your cell ask that asshole 'Shepherd' how he liked that meth I hooked him up with, for me, would you.").) Plaintiff asserts that he "experienced headaches" as a consequence of the February 28, 2008 search of his hair. (*Id.*)

Defendants characterize the February 28, 2008 search differently. Specifically, they assert that "[o]n or about

February 28, 2008, DOCCS received a tip—alternately described as a "confidential" or "anonymous" letter—that Plaintiff had hidden illicit drugs in his hair. (Schulze Decl. Ex. E at 24, [30] 25, [31] 35, Ex. F at 52:11-20.) Defendants assert that Sergeant Kelly, after verifying the reliability of this tip, authorized C.O. Filipponi to conduct a pat frisk of Plaintiff. (Schulze Decl. Ex. E at 24.) Some evidence presented by Defendants suggests that this initial pat frisk revealed a bulge in Plaintiff's groin area, on the basis of which a strip search was conducted, but that this search failed to reveal any contraband. (*Id.* at 35; *see also* Pl.'s Opp. Ex. G8.)

[30]    This page of Defendants' exhibit was also submitted by Plaintiff as Pl.'s Opp. Ex. G4.

[31]    This page of Defendants' exhibit was also submitted by Plaintiff as Pl.'s Opp. Ex. G6.

Defendants' exhibits make no reference to searches conducted in the G block bathroom, the F and G corridor, or the clinic room. Instead, they indicate that Plaintiff was moved from his cell, where the initial frisk and search appear to have been conducted, to a hospital visitation room where, after Plaintiff again refused to spread apart his hair for visual inspection, several officers conducted a forcible, videotaped search of Plaintiff's hair. (Schulze Decl. Ex. E at 24, 25, 35.) Defendants' exhibits indicate that C.O. Bonafede videotaped this forcible search using a hand held video camera, C.O. Miller controlled the mechanical restraints (handcuffs) applied to Plaintiff after Defendants assert he became agitated and refused to remain still, C.O. Filipponi conducted the search of Plaintiff's hair using single-use latex gloves, and Lieutenant La Ports and Sergeant Kelly observed. (*Id.* at Ex. E at 22, 24, 25, 35)

Video of the incident corroborates Defendants' account, at least as to the search conducted in the hospital visitation room. Plaintiff, surrounded by a roomful of officers, is first shown calmly refusing to part his hair. (Schulze Decl. Ex. I.) Sergeant Kelly then instructs the searching officer, C.O. Filipponi, to search Plaintiff's hair manually, to which Plaintiff initially consents, saying "Go ahead." (*Id.*) After Plaintiff raises his hands in professed pain and repeatedly requests that the officers do not rip his hair —which he asserts took him twenty years to grow— Plaintiff clarifies that he is refusing the search and that he considers it to constitute a violation of his religious rights. (*Id.*) The officers then handcuff Plaintiff and begin

forcibly searching his hair, at which time Plaintiff becomes mildly agitated. (*Id.*) The officers repeatedly assert that they are trying to search Plaintiff's hair as carefully as possible, and C.O. Filipponi, at times with the assistance of other officers, is shown using his gloved fingers and a small flashlight to look and feel between or inside of Plaintiff's dread locks. (*Id.*) After approximately six minutes of searching, Defendants discover one small, clear bag with unknown contents in Plaintiff's hair. (*Id.*) C.O. Filipponi continues the search, discovering two small, black balloons. (*Id.*) After the second balloon is discovered, an unknown officer is heard asking Plaintiff how much more contraband Plaintiff has in his hair, to which Plaintiff appears to answer, "That's it. There's one, and one empty." (*Id.*)

**\*29** Defendants assert that no hair was cut, torn, or otherwise removed from Plaintiff during this search, although video of the incident is limited to the search in the hospital, and does not show any of the earlier searches that day to which Plaintiff asserts he was initially subjected. (Schulze Decl. Ex. I; *id.* Ex. G ¶ 7 (attesting to the accuracy of the video copy submitted by Defendants).) Defendants also assert, as the video shows, that three items, not two, were recovered from Plaintiff's hair: one clear plastic bag containing a "green clumpy substance," one tied black balloon, which was "later determined to contain a green clumpy substance, and one black opened balloon." (Schulze Decl. Ex. E at 24; *see also id.* at 25, 35 (indicating only that the searching officers recovered a clear plastic bag, not that it contained any substance).) The "green clumpy substance" was sent by C.O. Filipponi for testing at Green Haven's lab that same evening where it was later revealed to consist of 9.2 grams of methamphetamine. (Pl.'s Opp. Ex. G3; *see also* Schulze Decl. Ex. E at 22.)

Plaintiff acknowledges that the officers conducted the February 28, 2008 search on the basis of information suggesting Plaintiff had hidden such contraband in his hair (Pl.'s Aff. ¶ 42), [32] and Defendants assert the search was penologically justified for this reason. (Schulze Decl. Ex. H ¶ 9.) In his opposition memorandum, however, Plaintiff highlights several perceived discrepancies in the officers' account of the February 28, 2008 search, contending that the search was without valid "penological justification." (Pl.'s Opp. 27-28.)

[32]     On the basis of this purported confidential information, Sergeant Bucolo authorized a search of Plaintiff's cell the same evening, which an incident report indicates recovered a state razor, a wooden fork, a wooden spoon, a metal hot pot, and an altered radio—but no drugs. (Pl.'s Opp. Ex. G7.)

Plaintiff, for instance, highlights a series of certain discrepancies in the justification offered by Defendants for their search of his hair: "confidential reliable information received that [inmate] was in possession of contraband (drugs)," on the basis of which Plaintiff was required to submit to a urinalysis test (*id.* Ex. G3); "confidential information that drugs are in cell," on the basis of which—according to a February 28, 2008 document prepared by Sergeant Bucolo—a search was conducted of Plaintiff's cell (*id.* Ex. G7); and an anonymous letter indicating that Plaintiff and another prisoner were involved in drug activity, as well as Plaintiff's failure to part his hair on his own (Schulze Decl. Ex. F at 52:11-15, 57:9-12). Plaintiff also points to discrepancies between a 5:30 p.m. report from February 28, 2008 in the "F&G Strip Frisk Room" indicating that Plaintiff was initially frisked on the basis of "an unknown object in groin area," (*id.* Ex. G8), and a 7:00 p.m. report from the same day in the "Hosp. IPC" indicating that the basis for additional searching was "inmate is unable to run hands through. Hand scanner continues to ring on inmates [sic] hair" (*id.* Ex. G9.)

On April 1, 2008, Plaintiff wrote a letter to Commissioner Fisher detailing the harassment he faced as a consequence of his hair, alleging he was set up, and asking for a complete investigation into the February 28, 2008 incident, so it could be expunged from his record. (Pl.'s Opp. Ex. Fish #4.) Plaintiff was eventually sentenced to nine months in SHU for possession of the contraband recovered during the February 28, 2008 search. The fairness of the disciplinary proceeding that resulted in this sentence is the subject of Plaintiff's due process claims. *See supra* Part V.

Plaintiff also alleges that his hair was again searched on March 6 and 15, 2008, but has provided no evidence of these incidents beyond his verified Amended Complaint. (Am. Compl. ¶¶ 30-31.) On March 6, 2008, he alleges that non-party C.O. Dryer pulled his dreadlocks and ripped out portions of his hair during a strip search. (*Id.* ¶ 30.) On March 15, 2008, Plaintiff alleges that he was "stripped frisked and searched by C.O. Raetina who then used the hand scanner to scan[ ] my hair

and no metal was detected." (*Id.* ¶ 31.) Plaintiff alleges that Sergeant Scott nonetheless ordered C.O. Raetina to manually search Plaintiff's hair, despite Plaintiff's protestations. (*Id.*) Plaintiff further alleges that Sergeant Scott telephoned Lieutenant Wilson during the search, and informed Plaintiff that Lieutenant Wilson "gave the order" for his hair to be searched. (*Id.*) Plaintiff alleges that the search was observed by C.O. Freeman and one other, unnamed officer, and that the search caused his dreadlocks to be ripped. (*Id.*)

**\*30** In his affidavit, Plaintiff also describes a search that allegedly occurred on August 15, 2008. (Pl.'s Aff. ¶ 48.) Plaintiff's Amended Complaint, however, does not describe this search, and so the Court declined, in a May 13, 2015 Order (Dkt. 155), to consider these allegations. Plaintiff contends that the March 15, 2008 date in his Amended Complaint was a typographical error, and that he intended to refer instead to an August 15, 2008 search. While it is true that some of the facts regarding the March 15, 2008 search described in his Amended Complaint mirror those that Plaintiff, in his affidavit, attributes to an August 15, 2008 search, there are also important discrepancies in these accounts, which suggest that the error may have been more than merely typographical. Nonetheless, because Defendants had no reason to seek discovery regarding an August 15, 2008 search, allowing Plaintiff to pursue this claim and amend his complaint —for a second time—would, at this late date, be unduly prejudicial.

Although Defendants dispute Plaintiff's account of the February 28, 2008 search, as to the searches conducted in February 2007, and on March 12, 2007, March 6, 2008, and March 15, 2008, Defendants contend only that they were less intrusive than the February 28, 2008 search, as evidenced by the fact that they were not videotaped. (Schulze Decl. Ex. G ¶ 8.) Plaintiff claims that all five allegedly improper searches violated his religious rights (Am. Compl. 15), and appears to contend that these searches also constituted "excessive force"—at least to the extent his dreadlocks were torn. (*Id.*) Plaintiff appears to have properly exhausted his administrative remedies regarding these allegedly improper searches of his hair. Defendants, at least, do not contend otherwise.

### *2. Religious Meals*

Plaintiff asserts he was denied two religious meals on religious holidays by Superintendent Ercole. First, Shepherd alleges on or about October 7, 2005 he was denied a religious meal during the Negust day celebration, which "is a sacred day to all Rastafarians," and for which he had fasted the day before. (Am. Compl. ¶ 24; *see* Pl.'s Aff. ¶ 35.)[33] Second, Shepherd alleges he was similarly denied a religious meal during Fasika or Ethiopian Passover, "[o]ne of the most holiest days Rastafarians comm[emor]ate," on May 5, 2008 (Am. Compl. ¶ 32). "Fasika is celebrated with fasting, a special cooked meal to break the fast." (*Id.*) Plaintiff alleges that on both occasions he forwarded a letter to prison officials requesting a religious meal (*Id.* ¶¶ 25, 32; *see also* Pl.'s Opp. Ex. Griev. #6), and has provided an October 1, 2005 letter to a Green Haven chaplain requesting delivery of his "Holy day meal," (Pl.'s Opp. Ex. L). In his grievances, Plaintiff alleges that he "was informed by the clerk for the Rastafarian Church that a request was made for keep-lock Rastafarian prisoners to receive their meals and the administration cross[ed] out the request."[34] (Pl.'s Opp. Ex. Griev. #5.)

[33]   The Court notes that there appears to be a factual inconsistency in Plaintiff's allegations regarding the denial of a religious meal in October 2005. In Plaintiff's Affirmation and Amended Complaint, he alleges that the religious holiday meal he was denied on or about October 7, 2005 was for the "Negust celebration." (Am. Compl. ¶ 24; Pl.'s Aff. ¶ 35.) In his grievances, however, Plaintiff alleges he was denied "his Fasika Meal on October 6, 2005," not his "Negust" day meal. (*See* Pl.'s Opp. Ex. Griev. #5, Griev. #6.)

[34]   "[K]eeplock units are housing units that consist of cells grouped so as to provide separation from the general population, and may be used to house inmates confined pursuant to the disciplinary procedures described in regulations." N.Y. Correct. Law § 2(23).

In deposition testimony, Shepherd asserts that Superintendent Ercole, the Superintendent of Green Haven, "runs the facility," and was responsible for the denial of his religious meals because "[w]hen it comes to any type of religious issues, you contact the superintendent." (Schulze Decl. Ex. B 177:9-177:24.) He also alleges that "[t]he superintendent is supposed to be aware" of religious holidays that require religious meals and that the "superintendent is also aware of all who is registered as Rastafarian" and that he was

registered as Rastafarian at Green Haven. (Schulze Decl. Ex. B 178:12-178:25.) Defendants have not submitted any evidence regarding the procedure for requesting or receiving religious meals at Green Haven.

**\*31** Plaintiff also asserts he properly grieved both incidents. Defendants allege Shepherd failed to exhaust the October 7, 2005 incident. (Hale Decl. ¶ 16.) Shepherd, however, has provided documentation of his initial complaints, dated October 7, 2005 and May 7, 2008. (Pl.'s Opp. Ex. Griev. #5, Griev. #6.) Plaintiff also provides a grievance dated October 21, 2005, in which he states that he has not yet received a response to his previously filed grievance. (Pl.'s Opp. Ex. Griev. #5.) Additionally, Plaintiff submits a letter dated August 8, 2008 to Director Bellamy appealing the denial of his religious meal. (Pl.'s Opp. Ex. CORC #4.). In that letter, Plaintiff alleges that he is "being hindered from filing grievances and appeals because the Guards in the Special Housing Unit are tampering with [his] mail not delivering [his] mail to the Grievance departments" and asks "Could you please file the Enclosed Grievances and appeals." (*Id.*)

### B. Legal Analysis

As an initial matter, because Plaintiff exclusively seeks damages from the Defendants (Am. Compl. 17), his freedom of expression claims are cognizable under the First Amendment's Free Exercise Clause, pursuant to 42 U.S.C. § 1983, and not the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq. See Holland v. Goord,* 758 F.3d 215, 224 (2d Cir. 2014) ("RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities.").

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003). These constitutional protections are not limitless, however. Instead, a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75. Even then the challenged conduct will pass constitutional muster insofar as "it is reasonably related to legitimate penological interests," *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (quotation marks omitted), which the prison officials "bear the relatively limited burden of identifying," *Salahuddin,* 467 F.3d at 275.

In determining whether the conduct of prison officials is reasonably related to penological interests, courts look to four factors: "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right." *Id.* at 274. Inmates, moreover, retain the burden of showing that the legitimate penological interests identified by prison officials are "irrational." *Id.* at 275.

### *1. Alleged Improper Searches of Plaintiff's Hair*

At the outset, the Court finds that a reasonable factfinder could determine that the challenged searches of Plaintiff's hair substantially burdened his sincere religious beliefs. As a Rastafarian, Plaintiff considers his hair sacred, and his professed beliefs do not allow for his hair to be cut, or to be touched by others. (Pl.'s Aff. ¶¶ 1, 37, 38.) Defendants urge the Court to find that Shepherd's beliefs were not sincere at the time of the challenged searches, arguing that "conceal[ing] a large qua[t]ity of illegal drugs within his dreadlocks" was "inconsistent" with Plaintiff's "professed belief in the sanctity of his hair." (Defs.' Mem. 32.) Defendants, however, have not adduced evidence as to the sincerity of Plaintiff's beliefs or the contours of his Rastafarian faith, and the Second Circuit has cautioned courts against making "conclusory judgments about the unimportance of the religious practice to the adherent." *Ford,* 352 F.3d at 593. The Court thus cannot conclude that no reasonable fact finder could find Plaintiff's beliefs to be sincere.

**\*32** The Court also finds that the Green Haven policy for conducting searches of Plaintiff's hair is reasonably related to legitimate penological objectives. Defendants have presented significant evidence that searching inmates' hair is necessary to identify and seize contraband, ensure the safety of inmates, officers, and visitors, and maintain prison security. (Schulze Decl. Ex. H ¶¶ 8—9.) They have also demonstrated that DOCCS protocols offer Rastafarian inmates the opportunity to avoid searches by prison officials in violation of their religious beliefs. (*See* Schulze Decl. Ex. L.) Rastafarian inmates may first run their fingers through their own hair to demonstrate

the absence of contraband, and their hair is only to be searched by officers if they refuse to comply with this procedure or if officers have probable cause to believe that an inmate is hiding contraband on his or her person. (*See* Schulze Decl. Exs. G, H.) This policy allows prison officials to address legitimate security concerns, while permitting Rastafarian inmates to keep their hair as they wish (at least within proscribed limits not relevant here). Although the policy is a permissible one, the Court must nonetheless analyze whether the specific searches described by Plaintiff impermissibly burdened Plaintiff's exercise of his religious beliefs.

The Court finds that prison officials did comply with these procedures during the February 28, 2008 search of Plaintiff's hair. Although Plaintiff argues that Defendants have articulated inconsistent justifications for this search, the Court can find no meaningful discrepancy in the various official accounts of this incident. The record clearly demonstrates that Defendants, despite possessing incriminating information from an anonymous source, nonetheless afforded Plaintiff the opportunity to avoid a forcible search of his hair by allowing him to part his own dreadlocks to demonstrate the absence of contraband. Only when Plaintiff declined to follow this procedure did Defendants search his hair themselves. The video of this search shows dutiful compliance with the DOCCS procedures by the searching officers, and no finder of fact could determine on the record before the Court that Defendants acted without legitimate penological justification. Defendants' motion for summary judgment is thus granted as to this incident.

The Court, however, has before it no evidence to establish that prison officials complied with the DOCCS procedures in the other searches about which Plaintiff complains. Defendants have provided no justification for these searches, asserting only that they were less intrusive than the February 28, 2008 search. (Schulze Decl. Ex. G ¶ 8.) Intrusiveness, however, is not the only consideration when assessing whether the challenged conduct infringed on an inmate's Free Exercise right. At least to the extent that Plaintiff asserts—in sworn statements—that each search substantially burdened his religious beliefs by ripping or tearing his dreadlocks, defendants must show that the search was reasonable related to legitimate penological interests. *O'Lone,* 482 U.S. at 349.

Here, the record contains evidence, in the form of Plaintiff's sworn statements, that Plaintiff's hair was ripped during the February 2007 search overseen by Defendant Towkartz, for which there is no evidence of probable cause justifying a strip search or evidence suggesting that Plaintiff was afforded the initial opportunity to demonstrate the absence of contraband. Indeed, Defendants offer no justification at all for the search. So too with the March 12, 2007 search conducted by Defendants Swan, Castine, Sample, and Alexander; the March 6, 2008 search conducted by non-party Dryer and ordered by Defendant La Ports; and the March 15, 2008 search conducted by Defendants Scott, Raetina, and Freeman and ordered by Defendant Wilson. Although this evidence may well exist, it has not been presented to the Court. Accordingly, in each case, on the current record, a reasonable factfinder could determine both that the exercise of Plaintiff's religious beliefs was substantially burdened, and that the particular manner in which the search was conducted was not reasonably related to legitimate penological objectives.

The Defendants involved in these allegedly non-compliant searches are not entitled to qualified immunity at this time. "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does,* 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir. 2007)). Here, Defendants contend that they are entitled to qualified immunity because their actions did not violate clearly established law. (Defs.' Mem. 33.) In a case involving this very plaintiff, however, the Second Circuit stated that "Circuit precedent holds that a policy requiring haircuts of all male inmates upon incarceration violates the free exercise rights of Rastafarians," and that "the extension of [this precedent] to corrections officers pulling out dreadlocks is straight-forward." *Shepherd v. Sanchez,* 27 Fed.Appx. 31, 33 (2d Cir. 2001). As Defendants themselves note, moreover, DOCCS procedures—procedures followed during the February 28, 2008 search—also prohibit manual searches of an inmate's hair where there is no probable cause or where the inmate is not first afforded the opportunity to demonstrate the absence of contraband himself. Defendants' failure to offer any penological justification for, or other evidence regarding, these searches prohibits summary judgment

in their favor, because it was clearly established that ripping a Rastafarian's dreadlocks, without penological justification, infringes on an inmate's Free Exercise right. Defendants' motion for summary judgment is thus denied as to the February 2007, March 12, 2007, March 6, 2008, and March 15, 2008 searches, with which Plaintiff alleges Defendants Towkartz, Swan, Castine, Sample, Alexander, La Ports, Scott, Raetina, Freeman and Wilson were personally involved.[35]

[35]  Defendants are granted summary judgment on Plaintiff's claims that Defendants Raetina, Filipponi, Sample, Swan, Castine, and non-party Dryer "knowingly and intentionally use[d] excessive force by ripping/tearing [his] dread locks" during these searches, and that Defendants Trembath, Freeman, Scott, Kelly, Alexander, Miller, Bonafede, Towkartz, and La Ports, "did nothing to stop their subordinates from violating [his] rights." (Am. Compl. 15.) "[T]he Eighth Amendment's prohibition against cruel and unusual punishment does not extend to 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.' " *Wright v. Goord,* 554 F.3d 255, 269 (2d Cir. 2009) (quoting *Hudson,* 503 U.S. at 10). Plaintiff has not alleged that he suffered any injury as a result of the ripping/tearing of his dreadlocks that was "objectively 'harmful enough' to establish a constitutional violation." *Hudson,* 503 U.S. at 8. "[T]he absence of any significant injury to [Plaintiff] does not end the Eighth Amendment inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic, *Wright,* 554 F.3d at 270, but here Plaintiff has not alleged that officers ripped or tore his dreadlocks with such motivation."

**\*33** Defendants' motion for summary judgment is granted, however, as to Plaintiff's claims of harassment by Defendant Hann. Even taking as true Defendant Harm's purported threat to cut Plaintiff's hair, communicated to Plaintiff by her subordinate officers, this threat was never realized and Plaintiff's religious exercise was thus never actually burdened.

Defendants' motion for summary judgment is also granted as to Plaintiff's claim in his tenth cause of action that DOCCS Commissioner Fisher, Superintendent Ercole, or Deputy Koskowski, "[failed] to ensure their subordinates were adequately and properly trained in knowing and understanding [his] religious beliefs ... and adhering to said beliefs." (Am. Compl. 15.) Although the Court finds that Plaintiff has shown facts sufficient to withstand summary judgment as to all but the February 28, 2008 search of his hair, the record does not establish that Defendants Fisher, Ercole, and Koskowski were directly involved in these incidents, that they acted with gross negligence, or that they promulgated a policy or custom pursuant to which these incidents arose. Indeed, the record demonstrates that DOCCS officials promulgated a frisk policy carefully designed to safeguard inmates' religious rights (Schulze Decl. Ex. L), and that Green Haven officers—judging from their dutiful compliance with this policy on February 28, 2008—were both aware of the policy and knew how to follow it. Under *McKenna,* moreover, even if Defendants Fisher and Ercole did participate in the adjudication of Plaintiff's grievances regarding these incidents, because Plaintiff has not alleged that either was directly responsible for the supervision and training of the frisking officers, he cannot show that they failed to remedy a wrong of which they were aware. *See McKenna,* 386 F.3d at 437-38; *Colon,* 58 F.3d at 873. In his role as Deputy of Security, Defendant Koskowski may have been directly responsible for such supervision and training, but Plaintiff has not alleged that he was involved in any way in the adjudication of Plaintiff's grievances. Plaintiff's letter to Superintendent Ercole (Pl.'s Opp. Ex. G-H Supt.), also fails to provide a basis for liability under existing Second Circuit precedent. *See Sealey,* 116 F.3d at 51.[36]

[36]  For a more extended discussion of the standard for supervisory liability see *infra* Section I.B.4.

### 2. Alleged Denial of Religious Meals

The constitutional protection afforded prisoners under the Free Exercise Clause of the First Amendment "extends to a prisoner's right to a diet consistent with his or her religious scruples." *Williams v. King,* No. 11-CV-1863, 2014 WL 3925230, at \*5 (S.D.N.Y. 2014), *order clarified,* No. 11-CV-1863, 2014 WL 4670866 (S.D.N.Y. 2014) (quotation marks omitted). Even if an inmate's free exercise rights are abridged, however, the conduct is constitutional as long as it "was reasonably related to some legitimate penological interests." *Ford v. McGinnis,* 352 F.3d 582, 594 (2d Cir. 2003).

In *Ford v. McGinnis,* the Second Circuit assumed without deciding that a prisoner must demonstrate that the burden on his religious exercise is substantial, and held that the denial of even one religious meal that prevented the inmate from participating in a religious holiday important to that inmate's practice of his religion constituted a substantial burden. 352 F.3d at 594; *see also Williams v. Does,* 639 Fed.Appx. 55, 57 (2d Cir. 2016) (summary order) (holding district court's determination that the burden on inmate's free exercise rights was "*de minimis* because only a few of his meals were delivered prematurely" during the month of Ramadan when inmate was fasting was "inconsistent with this Court's case law, which cautions against the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent." (quotation marks omitted)).

**\*34** Here, Plaintiff asserts he was denied a religious meal on two Rastafarian holidays, which he alleges were important to his religious practice. (Pl.'s Aff. ¶ 35; Am. Compl. ¶ 32.) Therefore, Plaintiff has adequately alleged there was a substantial burden on his religious rights. Moreover, Defendants have not presented any evidence that Shepherd was denied these religious meals for any penological purpose.

Defendants argue that Plaintiff has sued the wrong person —that he cannot establish Defendants Commissioner Fisher and Superintendent Ercole "were personally involved in the alleged events." (Defs.' Mem. 33.) But viewing the facts in the light most favorable to the nonmoving party, Shepherd has alleged the personal involvement of Superintendent Ercole. Shepherd asserts that the Superintendent is the person "you contact" "[w]hen it comes to any type of religious issues." More specifically, he contends that it is the superintendent's role at Green Haven to "be aware" of religious holidays that require religious meals and be "aware of all who [are] registered as Rastafarian," including Shepherd. (Schulze Decl. Ex. B 178:12-178:25; *see* Pl.'s Opp. at 30 ("The superintendent of the facility has the day to day operation of the facility and is responsible for ensuring that plaintiff receives his religious meals.").) Defendants have not introduced any evidence to refute these sworn statements by Shepherd. Thus, on the current record, the Court must conclude that Shepherd has adequately alleged the personal involvement of Superintendent Ercole. The Court agrees however, that Shepherd has not sufficiently alleged the personal involvement of Commissioner Fisher,

and grants Defendant Fisher's motion for summary judgment.

Because Court is bound by Second Circuit case law that makes clear that a denial of a single religious meal can violate an inmate's constitutional rights if it occurs on a significant religious holiday, and because there are at least genuine issues of material facts about whether Ercole was personally responsible for this deprivation, the Court reconsiders its prior grant of summary judgment to Defendants on this claim pursuant to Federal Rule of Civil Procedure 54(b). *See Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.,* 652 F.3d 277, 288 (2d Cir. 2011). Defendants' motion for summary judgment is thus denied as to Plaintiff's religious meal claims against Defendant Ercole.

## V. Plaintiff's Procedural Due Process Claims
In his fourteenth cause of action, Plaintiff alleges that Captain Burnett and DOCCS Commissioner Fisher "knowingly violated [his] due process rights, unlawfully and illegally confining [him] to segregation, as defendant Fisher affirmed Burnett's guilty determination." (Am. Compl. 16.)

### A. The Factual Record
Following the February 28, 2008 search of Shepherd's hair, he was issued a ticket charging him with various offenses, including possession of contraband— specifically, methamphetamine. (Defs.' R. 56.1 Statement ¶ 66.) Plaintiff received advanced written notice of these charges, and was provided an assistant, who helped him gather evidence in advance of a hearing. (*Id.* ¶¶ 67-68.) Following the hearing, Plaintiff was issued a written statement of the disposition, including a summary of the evidence on which the hearing officer, Burnett, relied and the grounds for the disciplinary action taken. (*Id.* ¶ 71.) Plaintiff was convicted of the possession offense, the most serious charge brought against him, and was sentenced to nine months in the Special Housing Unit ("SHU"). (*Id.* ¶ 72.)

**\*35** Plaintiff raises several concerns with the procedural fairness of the hearing. First, he alleges that Burnett refused to provide him several pieces of documentary evidence: the anonymous note on which the February 28, 2008 search for contraband in Plaintiff's hair was purportedly premised; a color photo of the

alleged contraband (as the charging ticket identified the contraband in part by its color); a color photo of the drug test indicating the contraband substance was methamphetamine;[37] and lab reports from an independent test of the substance supposedly conducted by the State police. (Am. Compl. ¶ 33; *see also* Pl.'s Aff. ¶¶ 51-52.)[38]

[37]    A summary of this test, which states that the tested substance was methamphetamine, is attached to Plaintiff's opposition memorandum as exhibit G10.

[38]    A summary of the State police investigation is attached to Plaintiff's Opposition Memorandum as exhibit H.

Second, Plaintiff contends that Burnett violated his due process rights by admitting into evidence scientific tests of the contraband, without first laying a proper foundation as to the procedures employed in these tests or establishing that the testing officers in fact complied with these procedures; photographs of the contraband, without properly establishing a chain of custody as to who took the photographs and when they were taken; and the State police tests, without first establishing who turned the contraband over to the State police for testing and when they did so. (Am. Compl. ¶ 34.)

Finally, Shepherd contends that Burnett did not act as a "fair and impartial" hearing officer. (Am. Compl. ¶ 35.) Specifically, Plaintiff alleges that Burnett himself gave testimony as to the testing of the contraband, despite not having personally conducted the tests; improperly explained a discrepancy as to when the contraband was turned over to the Green Haven testing officer, despite Plaintiff directing his question to that officer, and not Burnett; improperly asked a pharmacist-witness questions "as to whether methamphetamine could be spread or sprinkled/soaked on any other substance" without any "basis" for this line of questioning; and failed to disclose his personal involvement in the State police investigation of the contraband substance, in part by lying as to whether it had been turned over to the police at all. (Am. Compl. ¶ 35.) Plaintiff asserts that the initial ticket he received following the February 28, 2008 search did not mention that the contraband was turned over to the State police; that prison officials denied that the substance was turned over to the police during Plaintiff's disciplinary hearing; and that only several years later did he discover the substance had been turned over to the State police and that

Burnett had been personally involved in the State police investigation. (Pl.'s Aff. ¶¶ 49-50; *see also id.* ¶ 54-55 ("Any person conducting a disciplinary hearing cannot be part of any investigation concerning the subject matters of the misbehavior report.").) In his opposition papers, Plaintiff also contends that his hearing assistant failed to provide him "with documentation needed in order to prepare and present an[ ] adequate defense," including the State police reports and independent testing results. (Pl.'s Opp. 32.)

Plaintiff has also produced a single page of a State police report summarizing their investigation of the February 28, 2008 incident, which indicates that Burnett met with the investigating police officer on March 7, 2008, and provided him with a copy of the "Unusual Incident Report." (Pl.'s Opp. Ex. H.) This same report indicates that the investigating officer also attempted to interview Plaintiff on March 7, 2008, but that Plaintiff refused to come out of his cell in SHU to speak with the officer. (*Id.*) The report also suggests that the contraband was turned over to the State police, although the limited version of the document provided to the Court does not indicate whether the police then conducted additional testing. (*Id.*)

**\*36**   As a consequence of these alleged procedural errors, Plaintiff contends that he was "unlawfully confined ... in segregation for nine months with loss of good time, phone commis[s]ary and recreation." (Am. Compl. ¶ 35.) Plaintiff also continues to assert that "officials planted the items they found in [his] hair, there was never reason for them to search [his] hair, the officials set [him] up, and Lt. Towkart[z] said as much to another prisoner that was housed in SHU." (Pl.'s Aff. ¶ 59; *see also* Pl.'s Opp. Aff. of Odam.)

### B. Legal Analysis

Prisoners may avail themselves of the "protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Prison disciplinary proceedings, however, "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.* Indeed, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner,* 515 U.S. 472, 485 (1995).

Inmates are "nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004). Although the "duration of SHU confinement ... is not the only relevant factor" in determining whether special confinement imposes an atypical hardship, absent "abnormal or unusual SHU conditions, periods of confinement of less than 101 days" are unlikely to implicate a protected liberty interest. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004). Here, the Court assumes, without deciding, that Plaintiff's sentence of nine months in SHU—or nearly 300 days—implicates a liberty interest.

Plaintiff was thus entitled to "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). Specifically, prison officials must "give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing," and the notice must include "at least some specific facts underlying the accusation." *Sira,* 380 F.3d at 70 (quotation marks omitted). Furthermore, the record must show at least "some evidence" to support a finding of guilt, *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 454 (1985)—a requirement the Second Circuit has interpreted to mean "reliable evidence of the inmate's guilt." *Luna,* 356 F.3d at 488 (quotation marks omitted).

Importantly, however, inmates have no "right to counsel or to confrontation at prison disciplinary hearings." *Sira,* 380 F.3d at 69. Nor is the "right to know evidence supporting prison disciplinary rulings ... absolute." *Id.* at 74. Thus, "when the disclosure of evidence presents [ ] risks [of violence or intimidation], hearing officers may properly decline to inform an inmate of the adverse evidence"—assuming they provide a "reasonable justification" for doing so when challenged. *Id.* at 75. In addition, "in prison administrative proceedings prison officials are generally not required to adhere to rules of evidence or other standards employed by courts of law in an attempt to assure accurate fact-finding." *Ortiz,* 380 F.3d at 660. And the violation by prison officials of state regulations or DOCCS directives "does not

in itself give rise to a due process claim." *O'Diah v. Artus,* 887 F. Supp. 2d 497, 501 (W.D.N.Y. 2012); *see Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights.").

**\*37** Moreover, a court may impose a remedy for an alleged due process violation in a prison disciplinary procedure only if the constitutional error was not harmless, at least in the absence of a pattern of violations. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation." (citations omitted)); *Clark v. Dannheim,* 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing.").

Consistent with the curtailed procedural rights afforded inmates, Defendants' motion for summary judgment is granted as to Plaintiff's Due Process claims. Plaintiff does not contest that he received advanced written notification of the charges against him and a written statement of the disposition against him, including a statement of the evidence on which Bumett, the hearing officer, relied. Furthermore, because prison officials need not adhere to the rules of evidence in conducting inmate disciplinary proceedings, Plaintiff's various evidentiary concerns—including as to how Bumett conducted the disciplinary hearing, as well as the unavailability of color photographs of the contraband substance and the test indicating it was methamphetamine—do not rise to the level of a constitutional violation. *See Ortiz,* 380 F.3d at 660.

Similarly, although Second Circuit precedent provides for inmates "to receive employee assistance when that inmate is charged with an offense warranting SHU confinement," *Sloane v. Borawski,* 64 F. Supp. 3d 473, 485 (W.D.N.Y. 2014) (citing *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993)), the alleged deficiency of Plaintiff's assistant here is not of a constitutional dimension. Plaintiff concedes that he received an assistant, and the record demonstrates that this assistant gathered substantially all of the evidence

requested by Plaintiff, with Plaintiff contesting only whether the assistant gathered *every* document requested. (Schulze Decl. Ex at 13; Ex. F at 6:1-22, 71:1-78:4.) Thus, while "[a]n assistant who does nothing to assist the segregated inmate in the preparation of a defense fails to accord such inmate his limited constitutional due process right of assistance," *Jermosen v. Coughlin,* No. 89-CV-l 140E(M), 1993 WL 328482, at *4 (W.D.N.Y. 1993), *aff'd,* 29 F.3d 620 (2d Cir. 1994), Plaintiff's assistant did far more than nothing, and Plaintiff was not denied his limited right of assistance.

As to the withheld documentary evidence, Plaintiff has not shown he was prejudiced by the fact that Defendants did not provide him with the anonymous note or the State police test of the contraband. Defendant Kelly, who received the anonymous note, testified at the disciplinary hearing, and Plaintiff was provided ample opportunity to question him. (Schulze Decl. Ex. F at 57:23-58:20.) Therefore, even assuming Defendant did not offer a justification for not entering the anonymous note into evidence, Plaintiff has shown no prejudice. It is true that Plaintiff's exhibits appear to demonstrate that the State police performed an independent test of the contraband (Pl.'s Opp. Ex. H); however, Plaintiff has not claimed that the withheld evidence was exculpatory, nor does Burnett's disposition appear to have relied on this evidence. (Schulze Decl. Ex. E at 5.) Thus, even assuming arguendo that Defendants should have turned over this evidence to Plaintiff, the record, which includes the highly inculpatory videotape presented at the disciplinary hearing (Schulze Decl. Ex. I), a transcript of Plaintiff's disciplinary hearing (*id.* Ex. F), and the written disposition against him (*id.* Ex. E at 5), makes clear that there was a sufficiently substantial—and reliable—evidentiary basis on which to find Plaintiff guilty. *See Luna,* 356 F.3d at 488; *Clark,* 590 F. Supp. 2d at 429.

**\*38** As to Plaintiff's argument that Burnett was biased, and of a "predetermined mindset," (Pl.'s Mem. 32), the sufficiency of the evidence "is irrelevant." *Edwards v. Balisok,* 520 U.S. 641, 648 (1997). In prison disciplinary proceedings "it is permissible for the impartiality of [hearing officers] to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir. 1989). Claims of bias can nonetheless survive summary judgment where a plaintiff shows he had "no chance to prevail at the

hearing," *id.,* but Plaintiff has not provided such evidence here. Taken in its entirety, with all inferences drawn in favor of Plaintiff, the record does not permit a finding that Burnett prejudged Plaintiff's guilt, or that Plaintiff had no chance of prevailing at the hearing. The record shows that Burnett safeguarded Plaintiff's procedural rights: for instance, by repeatedly allowing Plaintiff extra time to obtain and review additional evidence and finding in Plaintiff's favor as to two of the charges brought against him. (*See generally* Schulze Decl. Ex. F, Ex. E at 5.)

Because the Court finds that Defendants Fisher and Burnett did not violate Plaintiff's procedural rights, his assertion that he was falsely accused of the conduct underlying his disciplinary hearing also cannot survive summary judgment. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986) ("[A] prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.... [A] prison inmate[ ], has the right to be not deprived of a protected liberty interest without due process of law.").

Defendants' motion for summary judgment is thus granted in full as to Plaintiff's due process claims.

## VI. Plaintiff's Legal Mail Claim
In his fifteenth cause of action, Plaintiff alleges that Lieutenant Hann "knowingly, willingly and intentionally [had] [his] confidential legal letter confiscated and/or lost/destroyed [his] legal letter, interfering with access to [his] attorney, violating attorney, client privile[ge]." (Am. Compl. 16.) [39]

[39]    As part of this cause of action, Plaintiff also alleges that Defendant Hann "discriminated against [him] due to [his] religion," (Am. Compl. 16), but this claim appears to relate to Defendant Harm's purported harassment of Plaintiff due to the manner in which he keeps his hair, and not to Plaintiff's legal mail claim. The Court has considered Defendant Harm's purported discrimination against Plaintiff on the basis of his religion in *infra* Part IV.

### A. The Factual Record
On or about November 27, 2007, a DOCCS officer confiscated a personal letter from Plaintiff, as well as a piece of legal mail concerning a then-pending case to which Plaintiff was a party. (Defs.' R. 56.1 Statement

¶ 73.) Plaintiff was told by the confiscating officer that Lieutenant Hann ordered the confiscation. (*Id.* ¶ 74.) Despite the confiscation of his legal mail, however, Plaintiff was able to address the demands of his ongoing case with his attorney. (*Id.* ¶ 75.) Plaintiff nonetheless insisted that his legal mail be returned, and grieved this incident accordingly. Plaintiff alleges that this legal mail was never returned to him or received by his attorney. (Am. Compl. 18.) [40]

[40] In a letter to DOCCS Commissioner Fisher dated April 21, 2008, Plaintiff alleges that he was "not receiving my mail, my family and lawyer are not receiving my mail. My fiancee sent legal documents transcripts over night mail and verified that the documents arrived at Green Haven. I have not received anything." (Pl.'s Opp. Ex. Fish. #1.) Plaintiff, however, made no such allegations in his Amended Complaint, nor has he otherwise directly asserted that prison officials interfered with his mail for an extended period of time beyond the November 27, 2007 confiscation.

### B. Legal Analysis

Because Plaintiff's claim relates to only one instance of interference with his mail, on November 27, 2007, any allegations that officials tampered with his mail in violation of his constitutional right to the free flow of incoming and outgoing mail are unavailing. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir. 2003) ("[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation.").

**\*39** Plaintiff's arguments are also unavailing as to any claim that Defendant Harm's interference with his mail violated his right of access to the courts. Prisoners do have a right of access to the courts, a right alternately grounded in the "Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection, and Due Process Clauses." *Christopher v. Harbury,* 536 U.S. 403, 414-415 & n.12 (2002) (citations omitted); *see also Morello v. James,* 810 F.2d 344, 346 (2d Cir. 1987). Tampering with prison mail implicates this right where "the tampering unjustifiably chilled the prisoners' right of access to the courts or impaired the legal representation received." *Davis,* 320 F.3d at 351.

To succeed in such a claim, however, Plaintiff must show that "the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Id.* (quotation marks omitted). In particular, Plaintiff needed to demonstrate actual injury and specify which legal matter Defendants' alleged tampering hindered him from pursuing. *See Christopher,* 536 U.S. at 415; *see also Collins v. Goord,* 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008) (explaining that a showing of "actual injury" requires a plaintiff to "demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim"). Because Plaintiff concedes that the alleged confiscation of his legal mail did not prevent him from addressing the requirements of his then-pending case, his claim fails. He has not even attempted to allege actual injury, nor has he provided any information as to the particular legal matter in question. Defendants' motion for summary judgment as to Plaintiff's legal mail claim is thus granted.

### CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is denied in part and granted in part. Defendants' motion for summary judgment is granted as to all of Plaintiff s claims except as to his: (1) deliberate indifference claim against Defendant Bentivegna regarding Plaintiff's requests for pain medication on or about March 3, 2008; (2) Eighth Amendment claim against Defendants Tweed, Sarles, and Ferrick based on Shepherd's allegations of sexual assault; (3) First Amendment retaliation claim against Defendant Sarles regarding a frisk search on January 23, 2007; (4) First Amendment claim against Defendants Towkartz, Swan, Castine, Sample, Alexander, La Ports, Scott, Raetina, Freeman, and Wilson regarding searches in February 2007 and on March 12, 2007, March 6, 2008, March 15, 2008, and August 15, 2008; [41] and (5) First Amendment claim against Defendant Ercole for the denial of two religious meals on significant Rastafarian holidays. Accordingly, the second, third, fourth, fifth, eighth, tenth, twelfth, thirteenth, fourteenth, fifteenth, and sixteenth causes of action are dismissed. This case will proceed against Defendants Tweed, Sarles, Ferrick, Ercole, La Ports, Towkartz, Alexander, Bentivegna, Wilson, Scott, Freeman, Raetina, Swan, Castine, and Sample on the remaining causes of action.

41    Summary judgment is granted, however, as to Plaintiff's claim regarding the February 28, 2008 search.

Because the Defendants withdrew their motion for sanctions seeking to dismiss Plaintiff's complaint with prejudice, the Clerk of the Court is respectfully requested to close the motion pending at Docket Number 175.

A conference is scheduled in this matter for March 2, 2017 at 3:00 p.m.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 666213

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 384066
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Taheen Hayes, Plaintiff,

v.

T. Dahkle, et al., Defendants.

9:16-CV-1368 (TJM/CFH)
|
Signed 01/26/2017
|
Filed 01/27/2017

**Attorneys and Law Firms**

TAHEEN HAYES, 05-A-3850, Clinton Correctional
Facility, P.O. Box 2000, Dannemora, NY 12929, Plaintiff
Pro se.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District
Judge

**I. INTRODUCTION**

 *1 Pro se plaintiff Taheen Hayes ("plaintiff")
commenced this civil rights action asserting claims arising
out of his confinement in the custody of the New
York State Department of Corrections and Community
Supervision ("DOCCS"). Dkt. No. 1 ("Compl."). By
Decision and Order filed on December 15, 2016 (Dkt.
No. 5) (the "December Order"), this Court granted
Plaintiff's IFP application and reviewed the sufficiency
of the complaint in accordance with 28 U.S.C. § 1915(e)
and 28 U.S.C. § 1915A. On the basis of that review,
the Court dismissed the following, without prejudice:
(1) Eighth Amendment claims against defendants
Superintendent Daniel F. Martuscello ("Martuscello"),
Deputy of Security, Raymond Shanley ("Shanley"),
Inmate Counselor J. Iarrusso ("Iarrusso"), Correction
Officer T. Dahkle ("Dahkle"), Correction Officer Jason
A. Meier ("Meier"), Correction Officer Gregory E.
Langtry ("Langtry"), Correction Officer Stephen A.
Bence ("Bence") and Correction Officer E. Coon
("Coon"); (2) supervisory claims against Martuscello
and Shanley; (3) retaliation claim against Dahkle; and

(4) constitutional claims against Iarrusso for failing to
process grievances. Dkt. No. 5 at 20. Plaintiff was given
the opportunity to file an amended complaint to assert any
claim that was dismissed without prejudice. *See id.* at 20,
n. 12. The Court ordered defendant Correction Officer K.
Hoffman ("Hoffman"), Meier, Langtry, Bence, and Coon
to respond to plaintiff's retaliation claims. [1] *See id.* at 20.

[1]    Defendants have not filed an answer.

Presently before the Court is plaintiff's amended
complaint. Dkt. No. 8 ("Am. Compl.").

**II. LEGAL STANDARD**

The legal standard governing the dismissal of a pleading
for failure to state a claim pursuant to 28 U.S.C. §
1915A(b) was discussed at length in the December Order
and it will not be restated in this Decision and Order. *See*
Dkt. No. 5 at 2-4. The Court will construe the allegations
in plaintiff's amended complaint with the utmost liberality.
*See*, *e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972)
(holding that a pro se litigant's complaint is to be held "to
a less stringent standards than formal pleadings drafted by
lawyers.").

**III. SUMMARY OF AMENDED COMPLAINT** [2]

[2]    Plaintiff annexed exhibits to the amended complaint.
Dkt. No. 8-1. To the extent that the exhibits
attached to the amended complaint are relevant to
the incidents in the amended complaint, the Court
will consider the documents. *See Cortec Indus., Inc.
v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.
1991) (holding that the complaint is deemed to
include any written instrument attached to it as an
exhibit or any statements or documents incorporated
in it by reference). In addition, plaintiff's original
complaint included exhibits. Dkt. No. 1-1. Plaintiff
incorporated, by reference, the same exhibits attached
to the original complaint, but failed to actually attach
the exhibits to the amended complaint. "Although it
is well settled that an amended complaint supersedes
a prior complaint in its entirety, it is clear to the
court that plaintiff intended to attach the exhibits to
his amended complaint." *Wellington v. Langendorf*,
No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at
*3 (N.D.N.Y. July 15, 2013). To require plaintiff to
file an amended complaint that includes the original
exhibits is, "an unnecessary procedural hoop that
would waste resources and delay resolution of this

action." *Alexander v. U.S.*, No. 13-CV-678, 2013 WL 4014539, at *4 (N.D. Cal. Aug. 5, 2013). Because plaintiff is a pro se plaintiff, the Court will consider the exhibits and documentation attached to the original complaint as incorporated by reference in the amended complaint.

**\*2** Plaintiff, an inmate currently confined at Clinton Correctional Facility ("Clinton C.F."), asserts claims related to his confinement at Coxsackie Correctional Facility ("Coxsackie C.F."). *See* Am. Compl, *generally.* On March 2, 2016, plaintiff filed a grievance (CX-18859-016), related to his dreadlocks. [3] *See* Dkt. No. 1-1 at 2. On April 15, 2016, at 10:30 a.m., Dahkle ordered plaintiff to step out of his cell, in the D-1 Gallery, for a search. *See* Am. Compl. at 4. Plaintiff complied with Dahkle's order to turn and face the wall for a pat frisk. *See id.* During the pat frisk, Dahkle pressed his genitals against plaintiff's buttocks and ran his hands into the interior portion of plaintiff's buttocks. *See id.* During the cell search, Dahkle asked plaintiff sexually explicit questions related to plaintiff's gender identification including, "do you consider yourself a male or a female?" *See id.* at 4-5. Later that day, plaintiff reported the incident on the PREA hotline. *See* Am. Compl. at 5.

[3]     On March 31, 2016, the grievance was resolved after a hearing. Dkt. No. 1-1 at 2. The record does not contain any information related to the grievance including the substance of the grievance or the identity of the correctional officer(s) involved in the complained of incident(s).

On April 17, 2016, plaintiff filed a grievance (CX-18908-016) charging Dahkle with sexual assault. [4] *See* Am. Compl. at 5; Dkt. No. 1-1 at 2. On April 18, 2016, plaintiff reported the incident to Martuscello while the Superintendent was making rounds in the cafeteria. *See* Am. Compl. at 5. Martuscello took plaintiff's identification card and advised, "someone will be coming to see you soon." *See id.*

[4]     In the amended complaint, plaintiff claims that he filed CX-18908-016 on April 17, 2016. *See* Am. Compl. at 5. Documentation annexed to the original complaint reveals that the grievance was filed on April 19, 2016. *See* Dkt. No. 1-1 at 2.

On May 9, 2016, plaintiff was transferred to C-1 Housing unit. *See* Am. Compl. at 5. Dahkle was working in that

unit and immediately began verbally harassing plaintiff. *See id.* at 5-6. Dahkle made sexually explicit statements, called plaintiff derogatory names, and told plaintiff "do not unpack your [expletive] .. if I have to [expletive] you up myself, you're leaving this block." *See id.* at 6. At approximately 3:15 p.m., plaintiff was summoned to the Captain's office for an interview with Martuscello and Shanley. *See id.* at 6. Plaintiff told defendants about his most recent encounter with Dahkle and expressed his fear of retaliation. *See* Am. Compl. at 6. Martuscello and Shanley "laugh[ed] at [plaintiff]." *See id.* at 6-7.

On May 14, 2016, plaintiff was housed in the A-3 housing unit. *See* Am. Compl. at 7. When plaintiff left his cell for callouts, recreation, or meals, he came into contact with Dahkle, who worked the "3 to 7 pm" shift in A-2. *See id.* Dahkle continued to verbally sexually harass plaintiff in the presence of other inmates and officers. *See id.* Plaintiff wrote to Martuscello, Shanley, and Phyllis Harrison-Ross, M.D. ("Harrison-Ross"), the Commissioner of the New York State Commission of Correction [5]. *See id.*

[5]     Harrison-Ross is not a defendant herein.

On May 15, 2016, Hoffman issued a misbehavior report charging plaintiff with creating a disturbance, failing to follow a direct order, harassment, lying, and threats. *See* Am. Compl. at 7; Dkt. No. 8-1 at 4. Hoffman reported that on May 15, 2016, at approximately 6:31 p.m., he:

> ... heard yelling on the tier. I started to make a round and could overhear inmate Hayes in A-31 cell. Yelling [sic] out his cell window to another inmate saying, "yo all you gotta do is call that PREA Hotline and say the C.O. touched your [expletive] doing a frisk or something, doesn't matter what you say. Just make something up, trust me, it works all the time." I then approached his cell door and gave him a direct order to stop yelling out of his window to which he replied "I wasn't." I then told him that I'd been listening to his conversation and gave him a second direct order to stop yelling, to which he replied "man, [expletive], I will put you [expletive] on paper too." Inmate Hayes then sat on his bed with no further incident. Area supervisor notified.

**\*3** Dkt. No. 8-1 at 4.

On May 16, 2016, plaintiff was transferred to F-3-36 cell and placed in keeplock confinement pending a disciplinary

hearing related to the misbehavior report. *See* Am. Compl. at 8. At approximately 4:30 p.m., Meier came to plaintiff's cell and asked plaintiff why he was in keeplock. *See id.* Plaintiff explained that Hoffman issued a retaliatory misbehavior report. *See id.* Meier called plaintiff a "[expletive] liar" and told him to "lock in." *See id.* At approximately 5:30 p.m., plaintiff was directed to the front of the company for a keeplock admission interview. *See* Am. Compl. at 8. A registered nurse asked plaintiff, in Meier's presence, whether plaintiff was sexually abused at Coxsackie C.F. and plaintiff responded "yes." *See id.* at 9. Meier became agitated and threatened plaintiff while yelling expletives and slurs at plaintiff. *See id.* The nurse asked if any sexual incident occurred within the last forty-eight hours and plaintiff responded, "no." *See id.* The nurse "cleared" plaintiff and left. *See* Am. Compl. at 9.

After the nurse left, Meier opened "the cage" and "stormed in, jumping in [plaintiff's] face." *See* Am. Compl. 9. Meier threatened plaintiff with bodily harm and was so agitated that he spit on plaintiff's face. *See id.* Meier accused plaintiff of "get[ting] C.O.'s fired." *See* Am. Compl. at 9. Plaintiff complied with Meier's order to "lock in." *See id.* at 10. Approximately thirty minutes later, plaintiff kicked his cell door to get the attention of the supervising officer. *See id.* Plaintiff asked to speak to a sergeant but his request was denied. *See id.* As a result of the incident, Meier issued a misbehavior report. *See* Am. Compl. at 10. On May 17, 2016, plaintiff was escorted to the Special Housing Unit ("SHU"). *See id.*

On May 19, 2016, plaintiff received a memorandum from R. Paquette-Monthie ("Paquette-Monthie"), LMSW-Counselor regarding his "concerns." [6] *See* Dkt. No. 8-1 at 13. Paquette-Monthie informed plaintiff that she communicated plaintiff's concerns to the Superintendent and the "SORC." [7] *See id.* Paquette-Monthie told plaintiff that Martuscello was "looking into" the complaints and advised that "it is being handled." *See id.* The counselor urged plaintiff to stop filing tickets and to use his SHU time, away from the offending individual, to "relax" or he will "end up with a lot of SHU time." *See id.*

[6]    Paquette-Monthie is not a defendant herein.

[7]    SORC is an abbreviation for the Supervising Offender Rehabilitation Coordinator. *See* http://www.doccs.ny.gov (last visited Jan. 26, 2017).

On May 23, 2016, while Martuscello and Shanley were making rounds in the SHU, plaintiff expressed his concerns regarding his safety and Meier's threats. *See* Am. Compl. at 10. Defendants "laughed and joked" and told plaintiff to address the issue during his disciplinary hearing. *See id.* at 10-11.

On May 24, 2016, plaintiff attended his Tier III disciplinary hearing related to Meier's misbehavior report. *See* Am. Compl. at 11. Plaintiff was found "not guilty" of threats and violent conduct but guilty of disobeying a direct order and creating a disturbance. *See id.*

**\*4** On May 24, 2016, plaintiff received a letter from Harrison-Ross, dated May 17, 2016, that advised plaintiff that his complaints regarding retaliation at Coxsackie C.F. and accusations that Martuscello and Shanley failed to protect plaintiff, were referred to the Office of Special Investigations for review. *See* Am. Compl. at 11; Dkt. No. 8-1 at 2.

On June 10, 2016, plaintiff was released from the SHU. *See* Am. Compl. at 12. Plaintiff was advised that he would no longer be employed as a messhall worker. *See id.* Plaintiff subsequently filed a grievance (CX-19054-016) for having his program revoked. [8] *See id.*

[8]    This grievance was filed on July 25, 2016. See Dkt. No. 1-1 at 2.

On June 11, 2016, plaintiff was summoned to the Captain's office for an interview with Martuscello and Shanley. *See* Am. Compl. at 13. When plaintiff arrived, Martuscello yelled at plaintiff about his complaints and stated that "anything can happen" to plaintiff. *See id.* Martuscello threatened to return plaintiff to the SHU if he continued to complain. *See id.*

On June 15, 2016, plaintiff filed a formal complaint regarding his meeting with Martuscello and Shanley. *See* Am. Compl. at 13; Dkt. No. 8-1 at 17. On June 20, 2016, plaintiff was transferred to B-2, Division 6 cell. *See* Am. Compl. at 14. Hoffman was waiting for plaintiff in the gallery and threatened plaintiff. *See id.* Hoffman told plaintiff not to get "comfortable" because "you mess with one of us (C.O.'s) you got to deal with all of us." *See id.* On June 17, 2016, plaintiff filed a grievance (CX 18983-016) related to the retaliatory conduct and harassment by

Hoffman and Meier. *See* Am. Compl. at 12; Dkt. No. 1-1 at 2.

On June 24, 2016, plaintiff filed a petition pursuant to New York Civil Service Law § 75 charging Dahkle and Hoffman with, *inter alia*, threats of physical abuse and harassment. *See* Am. Compl. at 14; Dkt. No. 8-1 at 20. Plaintiff served a copy upon the Acting DOCCS Commissioner, the Office of Special Investigation, and Martuscello. *See* Am. Compl. at 14.

On June 29, 2016, plaintiff received a letter from Karen Bellamy ("Bellamy")[9] in response to plaintiff's June 15, 2016 correspondence to Acting DOCCS Commissioner Anthony Annucci. *See* Dkt. No. 8-1 at 16. Plaintiff was advised that his grievance, CX-18983-16, alleging retaliation, was pending with the Superintendent.[10] *See id.* A copy of the letter was sent to Martuscello. *See id.*

[9]    Bellamy is not a defendant herein.

[10]    On August 1, 2016 and August 11, 2016, plaintiff received a second and third letter from Bellamy advising that CX-18983-16 was still pending with the Superintendent. *See* Dkt. No. 8-1 at 10-11. Copies of the aformentioned letters were forwarded to Martuscello. *See id.*

On July 5, 2016, plaintiff received a letter from Deputy Counsel Nancy Heywood regarding his Civil Service petition. *See* Dkt. No. 8-1 at 30. Plaintiff was advised that the New York Civil Service Law did not authorize an inmate to initiate disciplinary proceedings against a DOCCS employee. *See id.* Plaintiff was advised to direct his complaints to the Inmate Grievance Office at his facility. *See id.*

On July 7, 2016, plaintiff was summoned to the Inmate Grievance Office. *See* Am. Compl. at 14. Iarrusso advised that "some higher-up official in Albany" was investigating plaintiff's grievances and complaints against Dahkle. *See id.* Plaintiff discussed the events that had transpired between February 26, 2016 until July 7, 2016. *See id.* Iarrusso advised plaintiff that if he ceased filing complaints, "all of this would go away." *See* Am. Compl. at 15. Thirty minutes later, Hoffman banged on plaintiff's cell door and continued to harass plaintiff for filing grievances. *See id.* He also told plaintiff that "Dahkle said hi." *See id.*

*\*5* On July 12, 2016, plaintiff was summoned to the Inmate Grievance Office for a hearing regarding his complaints about SHU mail. *See* Am. Compl. at 15. The hearing was conducted by Iarrusso and Meier. See Am. Compl. at 15. Plaintiff claimed that his grievances about Martuscello and Shanley had not been filed despite the fact that he wrote the grievances one month prior. *See id.* at 15-16. Iarrusso angrily responded, "I don't care about your grievance" and admitted that he destroyed the grievance. *See id.* at 16.

On July 13, 2016, plaintiff filed a complaint against Iarrusso with Bellamy and requested an investigation into his claims of misconduct and retaliation. *See* Am. Compl. at 16. The complaint was received on July 27, 2016. *See* Dkt. No. 8-1 at 32-34.

On July 18, 2016, plaintiff filed a grievance (CX-19053-016) charging Iarrusso with misconduct and retaliation.[11] *See* Am. Compl. at 16. On August 16, 2016, a hearing was held related to the grievance. *See* Dkt. No. 8-1 at 35. The IGRC issued a response indicating that they were "deadlocked" but the committee noted that Iarrusso admitted that he destroyed plaintiff's grievance and conceded that he made statements to the effect that he would not file grievances against the Superintendent. *See id.* On September 17, 2016, Martuscello issued a decision accepting plaintiff's grievance, "in part." *See id.* at 36.

[11]    Documentation related to this grievance indicates that it was filed on July 25, 2016. See Dkt. No. 8-1 at 36.

On July 30, 2016, plaintiff was escorted to Unit F-3, for keeplock confinement due to another misbehavior report. *See* Am. Compl. at 17. Meier opened the door and called plaintiff a derogatory name. *See id.* Plaintiff was directed to enter the block and go to his cell. *See id.* As plaintiff walked towards his cell, with his hands in his pocket, Meier "bear hugged" him from behind. *See id.* Meier locked plaintiff's arms at his waist, lifted him into the air, and slammed him onto the floor. *See* Am. Compl. at 17. Plaintiff was semiconscious and dazed. *See id.* Meier jumped onto plaintiff's back and repeatedly punched plaintiff, with closed fists, in his back, head, face, and neck. See Am. Compl. at 17. Langtry ran over and repeatedly stomped on plaintiff's head. *See id.* The response team, including Bence and Coon, arrived and plaintiff was beaten, kicked, and punched. *See id.* Plaintiff's hands were cuffed behind his back during

the assault. *See id.* Meier twisted plaintiff's wrists and threatened to break them. *See* Am. Compl. at 18. Plaintiff was lifted in the air, by the handcuffs, and thrown into the wall. *See id.* Plaintiff's face and body "bounced" off of the concrete wall. *See id.* Meier grabbed the back of plaintiff's head, holding tightly to plaintiff's dreadlocks, and slammed plaintiff's face into the wall. *See id.* Meier told plaintiff to stay on the wall. See Am. Compl. at 18. Plaintiff's head was bleeding and "split open." *See id.* Langtry, Coon, and Bence continued to assault plaintiff using their knees to "pound" plaintiff's legs and thighs. *See id.* Defendants also punched plaintiff in his arms, back and ribs. *See id.*

Plaintiff was escorted to the medical unit and transported to Albany Medical Center for treatment. *See* Am. Compl. at 18. On August 9, 2016, Plaintiff filed a grievance (CX-19094-16) related to the incident. *See id*; Dkt. No. 1-1 at 2.

On August 12, 2016, Bellamy acknowledged receipt of a complaint involving the assault. *See* Dkt. No. 8-1 at 41. The complaint was assigned grievance number, CX-19094-16, and plaintiff was advised that the grievance was pending with the Superintendent. *See id.* A copy of Bellamy's letter was sent to Martuscello. *See id.* In a second letter, also dated August 12, 2016, Bellamy advised that CX-19053-16 and CX-19054-16 regarding the grievance process and plaintiff's "program change" were pending for IGRC hearings. *See* Dkt. No. 8-1 at 8.

**\*6** Construed liberally, the amended complaint contains the following: (1) Eighth Amendment claims related to sexual assault and/or abuse against Dahkle; (2) Eighth Amendment excessive force claims against Meier, Langtry, Bence, and Coon; (3) retaliation claims against Dahkle, Hoffman, Meier, Langtry, Bence, Coon, Iarrusso, and Martuscello; (4) claim that Iarrusso violated DOCCS Directives when he discarded plaintiff's grievance; and (5) supervisory claims against Martuscello and Shanley. *See* Am. Compl, *generally.*

## IV. ANALYSIS

### A. Previous Claims
As a result of the review of the original complaint, the Court held that the following claims required a response: (1) retaliation claims against Hoffman related to the misbehavior report; and (2) retaliation claims against

Meier, Langtry, Bence, and Coon related to the use of excessive force. These claims are repeated and realleged in the amended complaint and thus, survive review as well.

### B. Eighth Amendment Claims
The law related to the Eighth Amendment was discussed in the December Order and will not be restated herein. *See* Dkt. No. 5 at 9-13.

### 1. Sexual Harassment/Abuse

In the December Order, the Court dismissed plaintiff's Eighth Amendment claim against Dahkle holding:

> Here, plaintiff complains of one instance of verbal sexual harassment by Dahkle. *See* Compl. at 6. Plaintiff does not provide any specific facts related to the incident and does not contend that he was touched or physically harmed in any manner. As discussed *supra*, allegations of verbal harassment are insufficient to support a 1983 claim.

Dkt. No. 5 at 11.

In the amended complaint, plaintiff asserts new facts related to the April 15, 2016 incident with Dahkle and contends that the sexual assault occurred during a pat frisk. *See* Am. Compl. at 4. "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Crawford v. Cuomo*, 796 F.3d 252, 257–58 (2d Cir. 2015). Here, plaintiff claims that the search was conducted to humiliate and intimidate him. *See* Am. Compl. at 4. Plaintiff alleges that Dahkle questioned plaintiff's "gender identity" and made sexually explicit statements regarding plaintiff's sexual preferences. *See id.* at 4-5.

At this juncture, the Court finds that plaintiff's Eighth Amendment claim against Dahkle survives sua sponte review and requires a responsive pleading. *See Allah v. Morrison*, No. 14-CV-6735, 2016 WL 4017340, at *3-4 (W.D.N.Y. July 22, 2016) (holding that alleged

taunts including, "you know what I want" suggest that the defendant's conduct was "designed to humiliate [the plaintiff], gratify herself, or both."). In so ruling, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Excessive Force

In the December Order, the Court dismissed plaintiff's Eighth Amendment excessive force claims against Meier, Langtry, Bence, and Coon holding:

> Here, plaintiff summarily states that Meier, Langtry, Bence, and Coon "subjected [him] to assault and battery." *See* Compl. at 8. Plaintiff has failed to provide any further facts or information with regard to the use of force. While plaintiff claims that he was hospitalized and received stitches as a result of the altercation, *see* Compl. at 8, the vague allegations in the complaint do not plausibly suggest that defendants attacked plaintiff with malice. *See Green v. McLaughlin*, 480 Fed.Appx. 44, 49 (2d Cir. 2012) (reasoning that while the plaintiff characterized the encounter as an "attack", he failed to allege facts support the inference that the defendants were malicious or sadistic). Consequently, plaintiff's excessive force claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted.

**\*7** Dkt. No. 5 at 12-13.

In the amended complaint, plaintiff identifies the individuals involved in the assaults, the time, date, location of the incidents, and describes the injuries allegedly sustained as a result of the incidents. *See* Am. Compl. at 17-18. Plaintiff also alleges facts suggesting that the use of force was "malicious and sadistic." *See id.* Accordingly, the Court finds that plaintiff's Eighth Amendment claims against Meier, Langtry, Bence, and Coon survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

### C. Retaliation

The law related to First Amendment retaliation claims was discussed in the December Order and will not be restated herein. *See* Dkt. No. 5 at 13-14. In the amended complaint, plaintiff reasserts his original retaliation claims against Dahkle, Hoffman, Meier, Langtry, Bence, and Coon and asserts new retaliation claims against Dahkle, Hoffman, Meier, and Iarrusso.

### 1. Dahkle

In the December Order, the Court dismissed plaintiff's retaliation claims against Dahkle and reasoned:

> Plaintiff claims that Dahkle sexually harassed him in retaliation for plaintiff's grievances against him. *See* Compl. at 6. Verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific. *See Ford v. Palmer*, 539 Fed.Appx. 5 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances). Here, the complaint lacks specific facts related to the context in which the threat was made, the substance of the threat, and how many times plaintiff was threatened. As presently plead, plaintiff has not sufficiently plead that he suffered any adverse action to support a plausible retaliation claim against Dahkle.

Dkt. No. 5 at 14-15.

In the amended complaint, plaintiff alleges that Dahkle sexually assaulted him on April 15, 2016 in retaliation for filing a grievance against him related to plaintiff's dreadlocks. *See* Am. Compl. at 4. As presently plead, the amended complaint does not contain information suggesting that Dahkle was personally involved with plaintiff's March 2016 grievance related to his dreadlocks. The amended complaint lacks facts suggesting that Dahkle was even aware of this grievance. *See Faulk v. Fischer*, 545 Fed.Appx. 56, 59 (2d Cir. 2013) (holding

that the plaintiff failed to produce evidence suggesting that the defendants were "motivated by, or even aware of," his grievance); *see also Davidson v. Talbot*, No. 01-CV-473 (RFT), 2005 WL 928620, at *16 (N.D.N.Y. March 31, 2005) (finding that the plaintiff's allegation that he was attacked for filing grievances failed to allege when the grievances were filed and thus, "th[e] Court had no way of assessing the strength or validity of such claim."); *see Guillory v. Haywood*, No. 13-CV-1564 (MAD/TWD), 2015 WL 268933, at *23 (N.D.N.Y. Jan. 21, 2015) (concluding that the plaintiff failed to allege facts identifying the grievances and lawsuits from which the defendant's awareness could be inferred). As plaintiff has not sufficiently alleged a causal connection between any protected activity and retaliatory conduct, plaintiff has not stated a plausible claim for retaliation against Dahkle in violation of the First Amendment, related to the April 2016 incident, and this claim is dismissed.

**\*8** A different conclusion is reached however, with respect to plaintiff's retaliation claim against Dahkle related to threats. Plaintiff claims that Dahkle threatened him on May 9, 2016 in retaliation for filing a grievance related to the April 15, 2016 incident. *See* Am. Compl. at 5-6. "[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *Barrington v. New York*, 806 F.Supp.2d 730, 746 (S.D.N.Y. 2011) (holding that verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific). Whether threats constitute adverse action in a particular case is dependent upon the specificity of the threat and the context in which it was made. *Compare Hepworth v. Suffolk Cnty.*, No. 02-CV-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate) *with Bartley v. Collins*, No.05-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we are going to get you, you better drop the suit," do not rise to the level of adverse action). At this juncture, the Court finds that plaintiff has sufficiently alleged a retaliation claim against Dahkle, based upon the threats in May 2016, to require a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

**2. Meier, Hoffman, and Martuscello**

Plaintiff alleges that Meier and Hoffman threatened him on May 16, 2016, June 20, 2016, and July 7, 2016 in retaliation for plaintiff's April 19, 2016 grievance against Dahlke. *See* Am. Compl. at 14. For the reasons set forth in Part IV(C)(1), *supra*, plaintiff's retaliation claims against Meier and Hoffman survive initial review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

Plaintiff also claims that during his June 11, 2016 interview, Martuscello threatened him in retaliation for filing grievances and stated, "if [you] continue to complain, anything can happen to [you]." *See* Am. Compl. at 13. Martuscello threatened to return plaintif f to the SHU if he continued to complain. *See* Am. Compl. at 13. Plaintiff's retaliation claim against Martuscello survives initial review and requires a response. *See Hill v. Laird*, No. 06-CV-0126, 2014 W L 1315226, at *8 (E.D.N.Y. Mar. 31, 2014) (holding that the threat to file false disciplinary reports to keep the plaintiff in the SHU, may constitute an adverse action). In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

**3. Iarrusso**

Plaintiff claims that Iarrusso retaliated against him when he discarded his grievance against Martuscello and Shanley. *See* Am. Compl. at 15-16. "[T]he intentional destruction of grievances is sufficient to allege a claim of retaliation." *Brown v. Bascomb*, No. 9:05-CV-1466 (NAM), 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16, 2008) (citing *Soto v. Lacavino*, No. 01-CV-5850, 2003 W L 2128172 at *2 (S.D.N.Y. June 04, 2003)). Accordingly, plaintiff has asserted a potential retaliation claim cognizable under § 1983 against Iarrusso. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

**D. Violation of DOCCS Directive**

A Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations. *See Hyman v. Holder*, No. 96 Civ. 7748, 2001

WL 262665, *6 (S.D.N.Y. Mar. 15, 2001) (holding that the failure to follow a New York State DOCCS Directive or prison regulation does not give rise to a federal constitutional claim). The failure to follow a DOCCS Directive does not give rise to a § 1983 claim. *See Sanders v. Gifford*, No. 11-CV-0326 (LEK/RFT), 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014). This claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [12] *See McAllister v. Call*, No. 10-CV-610 (FJS/CFH), 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 29, 2014) ("A section 1983 claim is not the appropriate forum in which to seek review of a violation of unspecified DOCCS rules, regulations and procedures.").

[12]   The amended complaint also includes a claim that Iarrusso violated his constitutional rights when he discarded plaintiff's grievance. *See* Am. Compl. at 16. In the December Order, the Court dismissed this claim holding that, "[p]laintiff does not have a constitutional right to file a grievance." *See* Dkt. No. 5 at 16.

**E. Supervisory Claims**
 **\*9** The law related to personal involvement and supervisory officials was discussed in the December Order and will not be restated herein. *See* Dkt. No. 5 at 16-17. In the December Order, the Court dismissed plaintiff's supervisory claims against Martuscello and Shanley holding:

> ... plaintiff has failed to establish that Martuscello and Shanley were personally involved in any constitutional deprivation. Plaintiff claims that he "repeatedly notified" Shanley and Martuscello that he was being sexually harassed. *See* Compl. at 8. While plaintiff refers generally to "notifications," plaintiff failed to plead any facts establishing when he notified defendants, where he sent his notification, by what means his notifications were forwarded or what response he received. Without more, the allegations are not enough to allege personal involvement in any constitutional deprivation. *See Bridgewater*, 698 F.Supp.2d at 359;

*Guillory v. Cuomo*, 616 Fed.Appx. 12, 14 (2d Cir. 2015) (summary order).

Dkt. No. 5 at 18-19.

In the amended complaint, plaintiff supports his claim that Martuscello and Shanley were personally involved in the alleged constitutional violations with facts including the dates and times that he spoke to defendants, either during rounds or interviews. *See* Am. Compl. at 5-7; 10-11, 13. Plaintiff also annexed copies of documentation suggesting that Martuscello and Shanley were aware of the alleged unconstitutional conduct. *See* Dkt. No. 8-1 at 13, 28, 36, 41. At this juncture, the Court finds that plaintiff's supervisory claims against Martuscello and Shanley survive sua sponte review and require a response. *See Lewis v. Wallace*, No. 9:11-CV-0867(DNH/DEP), 2013 WL 1566557, at *5 (N.D.N.Y. Feb. 22, 2013) (collecting cases) *report and recommendation adopted*, No. 9:11-CV-0867(DNH/DEP), 2013 WL 1566555 (N.D.N.Y. Apr. 12, 2013) ("[C]ourts in this Circuit have held that personal involvement may be found where a supervisor receives, reviews, and responds to a plaintiff's grievance."). In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

**V. CONCLUSION**
**WHEREFORE**, it is hereby

**ORDERED**, that the amended complaint (Dkt. No. 8), and all exhibits annexed (Dkt. Nos.1-1 and 8-1) thereto is accepted for filing and is deemed the operative pleading; and it is further

**ORDERED** that the Clerk of the Court is directed to create a new docket entry for the amended complaint; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket to include Dahkle, Martuscello, Shanley and Iarrusso as defendants herein; and it is further

**ORDERED** that the following claims are **DISMISSED** pursuant to U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's retaliation claim against Dahkle related to the alleged sexual assault in April 2016; and (2)

plaintiff's claim that Iarrusso violated his constitutional rights when he failed to follow DOCCS Directives; and it is further

**ORDERED**, that the following claims survive this Court's initial review and require a response: (1) Eighth Amendment claims against Dahkle related to the April 15, 2016 incident; (2) Eighth Amendment excessive force claims against Meier, Bence, Coon, and Langtry; (3) First Amendment retaliation claims against Dahkle, Hoffman, Meier, Bence, Coon, Langtry, Iarrusso, and Martuscello; and (4) supervisory claims against Martuscello and Shanley; and it is further

 **\*10 ORDERED**, that a response to the amended complaint be filed by defendants Hoffman, Meier, Bence, and Coon or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that the Clerk shall issue summonses for remaining defendants, Dahkle, Iarrusso, Martuscello, Langtry, and Shanley and forward them, along with copies of the amended complaint, to the United States Marshal for service upon the defendants. The Clerk shall forward a copy of the summonses and amended complaint to the Office of the New York Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the amended complaint be filed by defendants as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in w riting, of any change in his address; their failure to do so will result in the dismissal of his action;** and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

**ORDERED** that the Clerk serve a copy of this Decision and Order on Plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 384066

---

2016 WL 4017340
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Kha'Sun Creator Allah, Plaintiff,

v.

Lynn Morrison, sued in her
individual capacity, Defendant.

14-CV-6735L
|
Signed 07/22/2016

**Attorneys and Law Firms**

Kha'Sun Creator Allah, Moravia, NY, pro se.

Bernard F. Sheehan, NYS Attorney General's Office, Department of Law, Rochester, NY, for Defendant.

DECISION & ORDER

MARIAN W. PAYSON, United States Magistrate Judge

**\*1** Plaintiff Kha'Sun Creator Allah ("Allah") filed this action *pro se* under 42 U.S.C. § 1983, asserting that defendant Lynn Morrison ("Morrison") violated his First Amendment rights by retaliating against him for filing grievances and complaints against her. (Docket # 1). Currently before this Court is Allah's motion for leave to file an amended complaint. (Docket # 16). For the reasons discussed below, Allah's motion is granted.

**FACTUAL BACKGROUND**

Allah's complaint alleges that Morrison, a correctional officer employed at Elmira Correctional Facility, filed three false misbehavior reports against him in retaliation for grievances and complaints that he filed against her between October 13, 2013 and November 8, 2013. (Docket # 1 at ¶¶ 10-33). His complaint also alleges that Morrison harassed him in various ways. (*Id.* at ¶¶ 11-33). Among other allegations, Allah asserts that on October 19, 2013 Morrison stated, "You know what I want," and then "grabbed" Allah's penis. (*Id.* at ¶ 16). The complaint also alleges that on October 20, 2013, Allah asked Morrison to

return electrical power to his cell that Morrison had shut off, and Morrison responded, "Give me what I want and you'll get what you want." (*Id.* at ¶ 17).

On January 14, 2016, Allah filed the pending motion for leave to amend his complaint. (Docket # 16). First, Allah seeks to assert a Fourteenth Amendment retaliation claim based upon the same facts that give rise to the First Amendment retaliation claim asserted in his original complaint. (*Id.* at 8 at ¶¶ 39 and A-1). Second, Allah seeks to add a cause of action for sexual harassment under the Eighth Amendment based upon factual allegations asserted in the original complaint. (*Id.* at 8 at ¶ A-2). Finally, Allah seeks to add Deputy Superintendent of Security P. Piccolo ("Piccolo") and Corrections Sergeant M. Randall ("Randall") as defendants in this action and to assert claims against them for failing to intervene and take corrective action after Allah notified them of Morrison's conduct. (*Id.*).

In her responsive papers, Morrison explicitly states that she does not oppose that portion of Allah's motion that seeks to add claims against Piccolo and Randall. (Docket # 19 at ¶ 8). She does oppose, however, Allah's request to add a cause of action for sexual harassment under the Eighth Amendment, contending that such an amendment would be futile based upon the allegations in the proposed amended complaint. (*Id.* at ¶ 9). Her responsive papers do not address Allah's proposed Fourteenth Amendment claim.

**DISCUSSION**

Rule 15(a) of the Federal Rules of Civil Procedure provides that once the time for amending a pleading as of right has expired, a party may request leave of the court to amend, which shall be "freely give[n] ... when justice so requires." Fed. R. Civ. P. 15(a). If the underlying facts or circumstances relied upon by the party seeking leave to amend may be a proper subject of relief, the party should be afforded the opportunity to test the claim on its merits. *See United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi.*, 889 F.2d 1248, 1254 (2d Cir. 1989). "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.' " *Foman v. Davis*, 371 U.S. 178, 182 (1962).

**\*2** While the court retains discretion to grant or deny leave to amend under Rule 15(a), "[the] outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id.* at 182; *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46 (2d Cir. 1983).

### A. Claims Against Piccolo and Randall

As stated above, Allah seeks to add two defendants, Piccolo and Randall, and to assert claims against them for failing to act after allegedly being notified of Morrison's wrongful conduct. (Docket # 16 at 8 at ¶ A-3). Morrison does not oppose this portion of Allah's motion, and I discern no reason to deny Allah's request to amend his complaint to assert these claims. *See Jumpp v. Terranova*, 2016 WL 2858775, \*2 (D. Conn. 2016) (granting motion to amend to add claim against prison officials who failed to take corrective action after learning of alleged sexual harassment by corrections officer against plaintiff inmate). Accordingly, Allah's motion to amend to add these two defendants and the claims against them is granted. [1]

[1] Because Allah seeks to add two new defendants, his proposed amended complaint must also be evaluated under Rule 20(a) of the Federal Rules of Civil Procedure, which governs joinder of additional parties. Fed. R. Civ. P. 20(a). Morrison has not opposed the addition of Piccolo and Randall to the action under Rule 20(a), and I find that the addition of those two defendants is proper under Rule 20(a).

### B. Fourteenth Amendment Retaliation Claim

As indicated above, Allah also seeks to assert a retaliation claim against Morrison based upon the same conduct alleged in support of his First Amendment claim. (Docket # 16 at 8 at ¶ A-1). According to Allah, Morrison's retaliatory conduct violated not only his First Amendment rights, but also his Fourteenth Amendment rights. (*Id.*) Morrison did not address this proposed claim in her opposition.

An inmate's right to file a grievance against a prison officer is protected by both the First and the Fourteenth Amendments, and conduct undertaken in retaliation for an inmate's grievance is actionable under Section 1983. *See Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 236 (S.D.N.Y. 2005) ("[t]he First and Fourteenth Amendments protect inmates who file a grievance from retaliation by prison officials, and such retaliation is actionable under section 1983"); *Salahuddin v. Mead*, 2002 WL 1968329, \*3 (S.D.N.Y. 2002) ("[f]iling a grievance against a prison officer is protected by the First and Fourteenth Amendments of the U.S. Constitution"). Accordingly, Allah's motion to amend to assert a Fourteenth Amendment retaliation claim is granted.

### C. Eighth Amendment Sexual Harassment Claim

As noted above, Morrison opposes Allah's motion insofar as it seeks to add an Eighth Amendment claim for sexual harassment. (Docket # 19 at ¶ 9). Morrison contends that such an amendment would be futile because Allah's proposed sexual harassment claim, which is allegedly based upon a single instance of Morrison grabbing his genitals, is insufficient as a matter of law. (Docket # 19-1 at 2).

If the amendment proposed by the moving party is futile, "it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d at 131. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)). Rule 8(a) of the Federal Rules of Civil Procedure requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a) (2). The purpose of Rule 8 is to give the defendant fair notice of the claim plaintiff is asserting and the factual basis for the claim. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). To avoid dismissal, the proposed amended claim must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**\*3** The *Twombly* "plausibility standard" applies to complaints brought by *pro se*, as well as represented, plaintiffs. *Sowell v. Chappius*, 695 F. Supp. 2d 16, 18

(W.D.N.Y. 2010). "[A]ll pleadings, *pro se* or otherwise, must contain enough factual allegations to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Sowell v. Chappius,* 695 F. Supp. 2d at 18 (omission in original) (quoting *Boykin v. KeyCorp,* 521 F.3d 202, 214 (2d Cir. 2008)). That said, "[a] document filed *pro se* is 'to be liberally construed' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' " *Erickson v. Pardus,* 551 U.S. at 94 (internal citation omitted), although they still must comply with the pleading requirements of the Federal Rules of Civil Procedure, *White v. Drake,* 2011 WL 4478921, *6 (N.D.N.Y. 2011). Further, although the court is required to "draw the most favorable inferences that [the] complaint supports, [it] cannot invent factual allegations that [the plaintiff] has not pled." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir. 2010).

Morrison relies primarily upon the Second Circuit's decision, *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir. 1997), to oppose the addition of an Eighth Amendment sexual harassment claim. (Docket # 19-1 at 2-4). The Second Circuit, however, recently clarified its *Boddie* decision to make explicitly clear that "a single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct." *Crawford v. Cuomo,* 796 F.3d 252, 257 (2d Cir. 2015). As the Court explained, "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257-58. The Court further explained that even though "[t]he standard set forth in *Boddie* ... remains the same today [,] ... the Eighth Amendment requires courts to 'look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society.' " *Id.* at 259 (quoting *Graham v. Florida,* 560 U.S. 48 (2010)). The Court reasoned that "conduct that might not have been seen to rise to the severity of an Eighth Amendment violation" at the time *Boddie* was decided "may now violate contemporary community standards of decency." *Id.* at 260. Indeed, the Court noted, "the officer's conduct in *Boddie,* would flunk its own test today." *Id.* Inexplicably, defendant's opposition fails to cite *Crawford* or any cases applying *Crawford.*

Judged under the standards enunciated in *Crawford,* and accepting the facts alleged in the proposed amended complaint as true, I find that Allah's allegations are sufficient to state an Eighth Amendment cause of action for sexual harassment. First, Allah alleges that Morrison grabbed his genitals and that his conduct was not incidental to any legitimate duties. According to Allah, Morrison's contact occurred while he was in his cell and not during the course of a justifiable frisk or search of his person; moreover, the other allegations in the complaint suggest that Morrison was motivated by a desire to subject Allah to offensive and repugnant conduct and uncomfortable and disagreeable prison conditions. *See id.* at 258 (defendant violated plaintiff's Eighth Amendment rights by "fondl[ing] and squeeze[ing] [his] penis" in order to "make sure [plaintiff] did not have an erection"); *Goins v. Wosneack,* 2016 WL 1271701, *5 (W.D.N.Y. 2016) ("[u]nder the standard set forth in *Crawford,* [p]laintiff has plausibly stated a claim for a violation of her Eighth Amendment rights" where plaintiff alleged that defendant "intentionally touched her in an intimate area (i.e. by rubbing his penis against her buttocks) with the intent to gratify his own sexual desire and for no legitimate penological purpose"); *Smith v. Roberson,* 2016 WL 1056588, *3 (N.D.N.Y. 2016) (plaintiffs allegations that defendant "chased her, exposed his genitalia to her and threatened her with sexual assault" sufficient to state claim where plaintiff alleged that the "conduct did not serve a legitimate penological purpose"); *Jumpp v. Terranova,* 2016 WL 2858775 at *1-2 ("the complaint alleges sufficient facts to proceed" where plaintiff alleged that defendant on one occasion "slapp[ed] his buttocks and grabb[ed] his penis" without any penological purpose).

**\*4** Moreover, Morrison's alleged taunts to Allah, including the statements, "you know what I want" (Docket # 16 at ¶ 18) and "give me what I want and you'll get what you want" (*Id.* at ¶ 19), suggest that Morrison's conduct was designed to humiliate Allah, gratify herself, or both. *See Crawford,* 796 F.3d at 259 (defendant's "demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' ... 'I'll run my hands up the crack of your ass if I want to,' ... and subsequent taunts about having seen [plaintiff's] penis suggest that [defendant] undertook the search in order to arouse himself, humiliate [plaintiff], or both"); *Jumpp,* 2016 WL 2858775 at *2 ("the alleged repeated comments

and threats suggest that the intent was gratification or humiliation").

In sum, Allah has plausibly alleged that Morrison intentionally grabbed his genitals for no legitimate penological purpose and subjected him to offensive sexual taunts. Such allegations are sufficient to state a claim for sexual harassment in violation of Allah's Eighth Amendment rights. *See Crawford*, 796 F.3d at 257 ("[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment"). Accordingly, I conclude that he should be permitted to amend his complaint to add this claim.

## CONCLUSION

For the reasons stated above, Allah's motion for leave to file an amended complaint **(Docket # 16)** is **GRANTED**. The Clerk of the Court is directed to file Allah's proposed amended complaint (Docket # 16) as the Amended Complaint and to cause the United States Marshal to serve copies of the Summons, Amended Complaint, and this Order upon defendants Piccolo and Randall without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in the plaintiff's favor. Service of the Amended Complaint upon Morrison, who has already appeared in this action, shall be made by the Clerk's mailing of a copy of the Amended Complaint to Morrison's attorney of record. Defendants are directed to answer the Amended Complaint pursuant to 42 U.S.C. § 1997e(g)(2).

**IT IS SO ORDERED**.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4017340

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 667528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jalil ABDUR–RAHEEM, Plaintiff,
v.
T. CAFFERY and Albert Prack, Defendants.

No. 13–CV–6315 (JPO).
|
Signed Feb. 17, 2015.

*OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Jalil Abdur–Raheem ("Abdur–Raheem"), proceeding *pro se* while incarcerated at a correctional facility in New York, alleges that Defendants Terry Caffery ("Caffery") and Albert Prack ("Prack") (collectively, "Defendants") deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. Specifically, Abdur–Raheem alleges violations of the Fourth, Eighth, and Fourteenth Amendments. Defendants move to dismiss the complaint for failure to state a claim. For the reasons that follow, Defendants' motion is granted.

**I. Background**

**A. Factual Background** [1]

[1] The following facts, taken from the complaint and attached exhibits, are assumed true for the purpose of resolving the motion to dismiss. *Goonewardena v. New York*, 475 F.Supp.2d 310, 320 (S.D.N.Y.2007).

In January 2011, Abdur–Raheem was a prisoner at New York State's Green Haven Correctional Facility ("Green Haven"), and worked as a porter in the Family Reunion Program ("FRP"), where his duties included cleaning the FRP trailers. (Dkt. No. 1 ("Compl."), Ex. A ("N.Y.S.Decision").) Defendant Caffery was a Tier III hearing officer at Green Haven. (Compl. at 5.) Defendant Prack was the Director of Special Housing/Inmate Disciplinary Program for the New York State

Department of Corrections and Community Supervision ("DOCCS"). (*Id.* Ex. B.)

On January 27, 2011, Abdur–Raheem cleaned the trailer where one of his own FRP visits was to be held and brought a few personal items into the trailer. (Compl. at 5; N.Y.S. Decision.) Soon thereafter, a corrections officer who worked in the FRP office noticed that two cartridges of film were missing from the office, and, after a search, discovered one cartridge hidden between the mattresses of the bed in the trailer in which Abdur–Raheem was to have his FRP visit. (N.Y.S.Decision.) Abdur–Raheem was immediately placed in the Special Housing Unit, or "SHU." (Compl. at 5.)

Abdur–Raheem was charged in a prison misbehavior report with smuggling, stealing, and violating FRP guidelines. (N.Y.S.Decision.) On February 14, 2011, he was found guilty of the charges following a Tier III disciplinary hearing before Defendant Caffery. (*Id.;* Compl. at 5; Compl. Ex. B.) Caffery sentenced Abdur–Raheem to six months in the S.H.U. The punishment included loss of packages, commissary, and phone privileges for the full six-month period. (Compl. at 5.) It appears from the complaint that Abdur–Raheem may have been released early on April 4, 2011. (*Id.*) In any event, Caffery's determination was affirmed on administrative appeal. (N.Y.S.Decision.)

Abdur–Raheem subsequently initiated a proceeding in New York state court pursuant to CPLR Article 78, contending that his right to call witnesses had been infringed at the Tier III hearing when Caffery failed to make a personal inquiry concerning the reason Abdur–Raheem's witness refused to testify. (N.Y.S.Decision.) The witness, a fellow inmate, was the other porter in the FRP program who had access to the FRP trailers. (*Id.*) He had initially agreed to testify, but later refused. (*Id.*) At the hearing, Caffery informed Abdur–Raheem of the inmate's refusal to testify and indicated that two officers had spoken to the inmate about his refusal. (*Id.*) In addition, Caffery gave Abdur–Raheem a copy of the inmate refusal form, which indicated that the requested witness did not "have knowledge of any photos" and "did not want to be involve[d]." (*Id.*)

**\*2** On September 13, 2012, the Appellate Division, Third Department annulled the disciplinary determination. (*Id.*) [2] The court held that under New York law, Caffery

was required to conduct a "personal inquiry" into the witness's reason for refusing to testify "unless a genuine reason for the refusal [was] apparent from the record and [Caffery] made a sufficient inquiry into the facts surrounding the refusal to ascertain its authenticity." (*Id.*) The court held, first, that the witness's desire not to be involved, as indicated on the inmate refusal form, was not a legitimate basis for an inmate's refusal to testify, and second, that "[e]ven if the refusal form were construed to contain a justifiable reason based upon a lack of knowledge," there was no evidence that Caffery had spoken with the officers who obtained the refusal form to establish this reason as authentic. (*Id.*) Therefore, Caffery's obligation to conduct a personal inquiry was not excused by the refusal form. (*Id.*) The court concluded that Abdur–Raheem "was denied his regulatory right to call witnesses," and the matter was "remitted for a new hearing." (*Id.*)

2 *Abdur–Raheem v. Prack,* 98 A.D.3d 1152 (N.Y.App. Div.3d Dep't 2012).

On September 20, 2012, Prack sent a letter to Abdur–Raheem advising him "on behalf of the Commissioner" that his prison disciplinary determination had been "reviewed and administratively reversed," and that rehearing was "not warranted." (Compl.Ex.B.)

Abdur–Raheem sues Caffery and Prack in their official and individual capacities under 42 U.S.C. § 1983. He alleges that Caffery violated his Fourth, Eighth, and Fourteenth Amendment rights when he failed to personally inquire as to why the witness refused to testify, and that Prack "unconstitutionally left [him] confined to S.H.U. from Jan[uary] 27, 2011, until April 4, 2011." (Compl. at 5.) He seeks damages of $150 for each day in SHU, $.32 per hour for the wages he lost as a result of being held in SHU, and punitive damages of $2,500. (*Id.* at 5–6.) [3] Caffery and Prack move to dismiss the complaint for failure to state a claim.

3 Abdur–Raheem's favorable Article 78 determination does not foreclose this subsequent § 1983 action for damages, since damages are unavailable to compensate a party in an Article 78 proceeding for civil rights violations. *Davidson v. Capuano,* 792 F.2d 275, 278–80 (2d Cir.1986).

**B. Procedural History**

The complaint was filed on July 8, 2013. (Dkt. No. 1.) On September 24, 2013, the Court *sua sponte* dismissed Abdur–Raheem's official-capacity claims against the Defendants on the ground that, as state agents, Caffery and Prack have Eleventh Amendment immunity from suit for damages in their official capacities. [4] (Dkt. No. 7.) On March 12, 2014, Defendants moved to dismiss the complaint. (Dkt. No. 18.) Abdur–Raheem subsequently received two extensions of time to respond to the Motion to Dismiss (Dkt. Nos. 22 & 25), after which he applied for the appointment of counsel (Dkt. No. 29). The Court denied his application, but *sua sponte* granted him a third extension of time within which to respond to the Motion to Dismiss, to December 20, 2014. (Dkt. No. 30.) Abdur–Raheem failed to meet this deadline, and the Court warned him that the Motion would be considered unopposed if he did not deliver his opposition to prison authorities by February 1, 2015. (Dkt. No. 31.) The Motion to Dismiss remains unopposed.

4 Accordingly, this Opinion addresses only the claims against the Defendants in their individual capacities.

**II. Legal Standard**

**\*3** On a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475 (2d Cir.2009) (internal quotation marks omitted). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "This standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010) (quoting *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted)).

In determining whether a plaintiff has pleaded facts sufficient to survive a motion to dismiss, a court will not consider mere conclusory allegations that lack a factual basis. *Hayden v. Paterson,* 594 F.3d 150, 160–61 (2d Cir.2010). A plaintiff's complaint "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to

proceed." *EEOC v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 254 (2d Cir.2014) (quoting *Iqbal,* 556 U.S. at 680) (alterations and internal quotation marks omitted).

In assessing the sufficiency of the complaint, a court may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations and internal quotation marks omitted). "Integral" documents are those "either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). In order for a document to be "integral," however, a plaintiff must actually have relied on its terms and effect in drafting the complaint; mere possession or notice is not enough. *Id.*

Finally, Abdur–Raheem's *pro se* complaint is subject to more lenient standards than a complaint filed by a represented party. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks omitted); *see also* Fed. Rule Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

## III. Discussion

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must " 'show that [an] official, acting under color of state law, caused the deprivation of a federal right.' " *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005) (quoting *Graham,* 473 U.S. at 166 (1985)). There is no dispute here that Caffery and Prack, employees of the DOCCS, were acting under color of state law. The parties dispute the second element, that is, whether Abdur–Raheem has stated a plausible claim that Caffery or Prack deprived him of a right guaranteed by the United States Constitution. Abdur–Raheem alleges violations of his Fourth, Eighth, and Fourteenth Amendment rights.

### A. Fourth Amendment Claim Against Caffery

**\*4** Abdur–Raheem merely lists "4th Amend[ment] violations" in the complaint as part of the list of claims against Caffery, without elaboration. (Compl. at 5.) He states no facts from which the Court can infer the Fourth

Amendment violations to which he refers. Accordingly, this claim is dismissed. [5]

[5]    The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### B. Eighth Amendment Claim Against Caffery

Abdur–Raheem alleges that his Eighth Amendment rights were violated when he was placed in the SHU. (*Id.*) "In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). A prison official has a culpable state of mind if he "participated directly in the alleged event, ... learned of the inmate's complaint and failed to remedy it, ... created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Id.*

Abdur–Raheem has not plausibly pleaded either of these elements. As to his detention in the SHU, he states only that he lost his privileges with respect to receiving packages, the commissary, and phone calls. Even assuming that Abdur–Raheem's SHU confinement lasted for the full six-month period, these allegations are not sufficient to give rise to an Eighth Amendment violation. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 748–49 (S.D.N.Y.2002) (holding that "allegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement," which lasted ten months, were "not violations of the Eighth Amendment"). And he makes no allegation as to Caffery's culpable state of mind in sentencing him to six months in the SHU. Accordingly, Abdur–Raheem's Eighth Amendment claim is dismissed. [6]

6    The Court notes that there is no evidence that Abdur–Raheem exhausted his Eighth Amendment claim as required to bring a prison condition claim under § 1983. *See* 42 U.S.C. § 1997e(a); *Baskerville v. Blot,* 224 F.Supp.2d 723, 729 (S.D.N.Y.2002) (detailing New York state's three-step inmate grievance process available to prisoners to exhaust their administrative remedies). The defense of failure to exhaust, however, is an affirmative defense; a defendant must prove its factual basis. *Jones v. Bock,* 549 U.S. 199, 216 (2007). Caffery has made no effort to do so here.

**C. Fourteenth Amendment Claim against Caffery**

Abdur–Raheem's Fourteenth Amendment claim against Caffery is a procedural due process claim. To state such a claim, Abdur–Raheem must allege that he has a protected liberty interest and that he was deprived of sufficient process to protect that interest. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). Abdur–Raheem argues that Caffery deprived him of due process when he sentenced him to the SHU without inquiring into the requested witness's reason for refusing to testify at the Tier III hearing. (Compl. at 5.)

*Liberty or Property Interest:* A prisoner's liberty interest is implicated by SHU confinement only if the confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998).

**\*5** "Although the Second Circuit has explicitly declined to create a 'bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights,' it has established 'guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed.' " *Zappulla v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at \*6 (S.D.N.Y. Apr. 5, 2013) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). For example, "[w]here the plaintiff was confined for an intermediate duration–between 101 and 305 days–development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64–65 (internal quotation marks omitted). Confinement of 305

days or more has been deemed to be an "atypical and a significant hardship." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)). In contrast, typical punitive segregation conditions imposed for 101 days or fewer "generally do not constitute 'atypical' conditions of confinement." *Id.* (quoting *Sealey v.. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). However, "[i]n the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in [punitive segregation] was exceedingly short—less than ... 30 days ...—and there was no indication that the plaintiff endured unusual ... conditions." *Palmer,* 364 F.3d at 65–66.

It is unclear from the complaint whether Abdur–Raheem spent 67 days or six months (180 days) in the SHU. Either way, he spent more than 30 days in the SHU, and therefore development of a detailed record of the SHU conditions he was subject to is advisable before the Court will dismiss this claim for failure to plead a protected liberty interest. The factual record before the Court is far from detailed; Abdur–Raheem states only that the SHU sanction "included loss of packages, commissary, [and] phone privileges." (Compl. at 5 .) The Court will therefore not dismiss Abdur–Raheem's procedural due process claim on this ground. Rather, the Court assumes without deciding that Abdur–Raheem's SHU confinement implicates a protected liberty interest, and asks whether he was given sufficient process.

*Process:* "A prisoner may not properly be deprived of a cognizable liberty interest without due process of law." *Gaston,* 249 F.3d at 163. Due process requires that a prisoner be provided, at minimum, with "advance written warning of the charges against him, the opportunity to call witnesses, and a written final decision on the hearing describing how the state reached its determination." *Odom v. Kerns,* No. 99 Civ. 10668(KMK)(MHD), 2008 WL 2463890, at \*9 (S.D.N.Y. June 18, 2008) (citing *Wolff v. McDonnell,* 418 U .S. 539, 563–67 (1974)); *see also Ponte v. Real,* 471 U.S. 491, 495 (1985) ("Chief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board."). Abdur–Raheem challenges only the second of these requirements; he alleges that his right to call witnesses was infringed when Caffery failed to make a personal inquiry

into Abdur–Raheem's witness's refusal to testify. (Compl. at 5.)

**\*6** A prisoner does not have an absolute right to call witnesses on his behalf in a prison disciplinary proceeding. An "unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff,* 418 U.S. at 566. Accordingly, "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators.... [W]e must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.* Some legitimate reasons for refusing a prisoner's request to call a witness include "irrelevance, lack of necessity, [and] the hazards presented in individual cases." *Odom,* 2008 WL 2463890, at \*9 (quoting *Wolff,* 418 U.S. at 566) (internal quotation marks omitted).

"Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him. [Therefore,] if a prison official ... reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights." *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Courts in this and neighboring districts have consistently held that a prison hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process. *See Odom,* 2008 WL 2463890, at \*10 ("A witness's refusal to testify is a rational reason for denying Plaintiff's request to call witnesses."); *Jamison v. Fischer,* No. 11 Civ. 4697(RJS), 2013 WL 5231457, at \*3 & n. 4 (S.D.N.Y. July 11, 2013) (holding that a hearing officer could have reasonably concluded that it would be futile to call witnesses where those witnesses submitted witness refusal sheets, and that therefore the fact that these witnesses were not made to testify did not deprive the plaintiff of due process); *Turner v. Grant,* No. 98 Civ. 706A, 2000 WL 362032, at \*5 (W.D.N.Y. Mar. 29, 2000) (holding that a hearing officer did not violate the plaintiff's due process rights in failing to call a witness who refused to testify); *Merced v. Moylan,* No. 9:05 Civ. 1426 (FJS/RFT), 2007 WL 3171800, at \*9 (N.D.N.Y. Oct. 29, 2007) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does

not violate due process because calling a witness who refuses to speak upon questioning would be futile.").

Moreover, "[t]here is no indication in Second Circuit or Supreme Court case law that a hearing officer must make an independent evaluation of the basis for the refusal to testify." *Greene v. Coughlin,* No. 93 Civ. 2805(DLC), 1995 WL 60020, at \*14 (S.D.N.Y. Feb. 10, 1995) (holding that a Tier III hearing officer does not violate a prisoner's due process rights when he fails to investigate the reasons for an inmate refusing to testify); *Jamison,* 2013 WL 5231457, at \*3 (same); *Dumpson v. Rourke,* No. 96 Civ. 621(RSP), 1997 WL 610652, at \*1 (N.D.N.Y. Sept. 28, 2006) (same). While failure to make such an independent evaluation violates state regulations, it does not violate the complaining prisoner's federal constitutional rights. *See Martinez v. Minogue,* No. 9:06 Civ. 546, 2008 WL 4241746, at \*5–6 (N.D.N.Y. Sept. 11, 2008).

**\*7** To be sure, a prison official who refuses to call a requested witness has a constitutional obligation to explain to the prisoner-defendant why the witness was not allowed to testify. *Ponte,* 471 U.S. at 497; *Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). The reasons need not be in writing, and may be provided at the disciplinary hearing itself or by presenting testimony in court when there is a later constitutional challenge to the hearing. *Ponte,* 471 U.S. at 497.

Under this precedent, Caffery did not violate Abdur–Raheem's due process rights when he proceeded without the testimony of Abdur–Raheem's proposed witness. That witness had indicated, by way of an inmate refusal form, that he would not testify. Further, while Caffery may have had an obligation under New York law to further investigate the inmate's refusal to testify, he did not have an obligation under the Due Process Clause to do so. Rather, he was constitutionally required only to explain to Abdur–Raheem why the witness was not called. Caffery fulfilled this obligation when he gave Abdur–Raheem a copy of the inmate refusal form at the Tier III hearing, which indicated that the inmate had refused to testify because he did not have knowledge of the event and did not want to be involved. Accordingly, Abdur–Raheem's Fourteenth Amendment procedural due process claim against Caffery is dismissed.

### D. Claim Against Prack

The complaint also names Prack, who was the Director of the DOCCS Special Housing/Inmate Disciplinary Program when Abdur–Raheem was confined in the SHU. (Compl. at 5; *id.* Ex. B.) The complaint alleges only that Prack left Abdur–Raheem "unconstitutionally ... confined to S.H.U. from Jan[uary] 27, 2011, until April 4, 2011." (*Id.* at 5.) [7] Abdur–Raheem's claim against Prack is best read as stemming from his claims against Caffery: because Caffery unconstitutionally sentenced him to the SHU, Abdur–Raheem alleges, Prack's keeping him there was unconstitutional as well. Accordingly, because Abdur–Raheem has failed to state a claim against Caffery, he has failed to state a claim against Prack. [8]

[7]     Although not pleaded in the complaint, the Defendants state that Prack was responsible for affirming Caffery's decision on administrative appeal, before it was reversed in the Article 78 proceeding. (Dkt. No. 20 at 2.) This is perhaps what Abdur–Raheem intends by his allegation that Prack left him "unconstitutionally ... confined to S.H.U." In any event, whether Prack passively left him in the SHU or affirmed Caffery's holding against him on administrative appeal, Abdur–Raheem has failed to state a claim against Prack.

[8]     Abdur–Raheem's claim against Prack could also be liberally construed as faulting Prack for placing Abdur–Raheem in the SHU on January 27, 2011, 18 days before Abdur–Raheem was given any kind of hearing. This claim fails. Absent any indication that Abdur–Raheem endured unusual prison conditions, 18 days in the SHU is insufficient to allege interference with a liberty interest such that the protections of procedural due process apply. *See Palmer,* 364 F.3d at 6566; *see also Arce v. Walker,* 139 F.3d 329, 335–37 (2d Cir.1998) (18 days in SHU).

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED. The Clerk of Court is directed to close the motion at docket number 18 and to close the case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 667528

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2014 WL 4627120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonard HINTON, Plaintiff,
v.
A. PRACK, et al., Defendants.

No. 9:12−CV−1844 (LEK/RFT).
|
Signed Sept. 10, 2014.
|
Filed Sept. 11, 2014.

**Attorneys and Law Firms**

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Joshua E. Mcmahon, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE KAHN, District Judge.

## I. INTRODUCTION

 **\*1** This *pro se* action under 42 U.S.C. § 1983 comes
before the Court following a Report–Recommendation
filed on August 14, 2014, by United States Magistrate
Judge Randolph F. Treece, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–
Recommendation"). Judge Treece recommends that all
of Plaintiff Leonard Hinton's ("Plaintiff") claims be
dismissed, except that he be awarded nominal damages for
violation of his due process rights by Defendant Uhler.
Report–Rec. at 31–32. Plaintiff timely filed Objections.
Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For
the following reasons, the Report–Recommendation is
adopted in its entirety.

## II. STANDARD OF REVIEW

When a party makes a timely objection to a Report–
Recommendation, it is the duty of the Court to "make a
*de novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." 28 U.S.C. § 636(b). Where, however,
an objecting "party makes only conclusory or general
objections, or simply reiterates his original arguments,
the Court reviews the Report and Recommendation only
for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301,
307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517
F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted);
*see also Brown v. Peters,* No. 95–CV–1641, 1997 WL
599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district]
judge ... may accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge." 28 U.S.C. § 636(b).

## III. DISCUSSION

### A. First Disciplinary Hearing

Plaintiff argues that the evidence presented at his
first disciplinary hearing was not "reliable evidence"
sufficient to support the hearing officer's determination
that Plaintiff was guilty of the alleged conduct. Objs.
at 1. Specifically, Plaintiff argues that the evidence was
insufficient because there was no independent credibility
assessment of, or written statements by, the confidential
informant or alleged victim to corroborate Sergeant
Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail
in his Motion for summary judgment, *see* Dkt. No.
39 at 19–22, and Judge Treece explicitly addressed it
in the Report–Recommendation, Report–Rec. at 12–
15. Because Plaintiff's argument is "a mere reiteration
of an argument made to the magistrate judge," *Dove
v. Smith,* No. 13–CV–1411, 2014 WL 1340061, at *1
(N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews
Plaintiff's objection only for clear error, *see Chylinski v.
Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)).
The Court finds that Judge Treece committed no clear
error in determining that Sergeant Gower's testimony was
sufficiently corroborated by his written report and other
evidence in the record. *See* Report–Rec. at 12–15; *see also
Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at
*10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony
and written report constituted "reliable evidence" under
the "some evidence" standard, and that an independent
assessment of the witnesses' credibility was not required).

**B. Second Disciplinary Hearing**

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified [sic] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the

outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

**C. Third Disciplinary Hearing**

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

**D. Qualified Immunity**

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,
-v-

**A. PRACK,** *Commissioner's Designee,* **D. VENETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

[RANDOLPH F. TREECE](), United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to [42 U.S.C. § 1983](), alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n, & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

### I. STANDARD OF REVIEW

Pursuant to [FED. R. CIV. P. 56(a)](), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *[F.D.I. C. v. Giammettei,](), 34 F.3d 51, 54 (2d Cir.1994)* (quoting *[Celotex Corp. v. Catrett,](), 477 U.S. 317, 323 (1986)*). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *[Glazer v. Formica Corp.,](), 964 F.2d 149, 154 (2d Cir.1992)*.

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. [FED. R. CIV. P. 56(c)](); *see also [Scott v. Coughlin,](), 344 F.3d 282, 287 (2d Cir.2003)* ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *[Rexnord Holdings, Inc. v. Bidermann,](), 21 F.3d 522, 525–26 (2d Cir.1994)*. To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *[Scott v. Coughlin,](), 344 F.3d at 289* (citing *[Flaherty v. Coughlin,](), 713 F.2d 10, 13 (2d Cir.1983)* and *[Colon v. Coughlin,](), 58 F.3d 865, 872 (2d Cir.1995)*).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *[Nora Beverages, Inc. v. Perrier Group of Am., Inc.,](), 164 F.3d 736, 742 (2d Cir.1998)*. "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION

### A. Due Process

**\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty

interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement

may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4– 5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

*1. Liberty Interest*

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest. [1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010; [2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2– 3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue. [3]

[1]    We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three disciplinary hearings at issue. Dkt. No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing *Sims v. Artuz,* 230 F.3d 14, 23– 24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

[2]    A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

[3]    In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding

"that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http:// nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at *18 (S.D .N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that *"Heck [v. Humphrey]* does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence"); N.Y. CORR. LAWW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

### 2. First Disciplinary Hearing

The following facts are undisputed.

On July 25, 2010, Sgt. Gower [4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. *See* Pl.'s App., Sec. I, at Exs. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). *Id.* at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York

State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. *Id.* at Ex. I, Dec., dated Nov. 9, 2012.

[4]    Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. *See* Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. *See* Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. *See, e.g.,* Dkt. No. 44–1, Pl.'s Opp'n at p. 2. [5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

[5]    Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference to the page numbers assigned by Plaintiff.

### a. Notice

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from

a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. *See Sira v. Morton,* 380 F.3d at 70 (quoting *Taylor v. Rodriguez,* 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted). [6]

[6]    In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. *See generally* Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that "the report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton,* 380 F.3d at 71 (citing *Quinones v. Ricks,* 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban,* 2014 WL 2587746, at *6 (W.D.N.Y. June 10, 2014) (reaching similar conclusion).

### b. Opportunity to be Heard

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not possess a constitutional right to confront or cross-examine

witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin,* 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell,* 418 U.S. at 568–69 for the proposition that *"Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer,* 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

> **\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to be involved he claimed he does not

know anything about this incident on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional deficiency in Plaintiff's opportunity to appear, call witnesses, or present rebuttal evidence at the first disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at 564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October 8, 2010, Plaintiff received a written statement as to the evidence relied upon and the reasons for the disciplinary action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence to support Defendant Bullis's disciplinary determination. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges; it is true that he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.,* 472 U.S. at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported by ample reliable evidence, chiefly, the testimony and misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I at Ex. C.

As noted above, the misbehavior report stated, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. At the hearing, Sgt. Gower explained, in sum and substance, that on the morning of July 25, 2010, an unidentified inmate told him that Plaintiff had attempted to solicit sex from inmate Veach. As a result, Sgt. Gower conducted an investigation during which he interviewed Inmate Veach, who reported that "approximately 2 weeks before that he got two packs of tobacco from [Plaintiff] he was unable to pay him so [Plaintiff] had requested he perform sexual acts for approximately ten days to pay him for the tobacco." 1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower that Plaintiff had attempted to pull him into a toilet stall but stopped when Inmate Moody walked into the bathroom area. Gower verified with Inmate Moody that he saw Veach and Hinton in the bathroom at the same time; however, Moody did not see Hinton pulling Veach into the stall. Gower ordered that Veach be examined by medical, and no evidence of sexual misconduct was found. Gower also testified that Veach informed him that Plaintiff and Inmate McGee had set up a three-way call in an attempt to extort fifteen dollars from Inmate Veach's sister for the tobacco. Gower reported that he verified this with inmate McGee who admitted to helping to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims that Plaintiff solicited sex from Inmate Veach would be insufficient to satisfy the "some evidence" standard applicable to prison disciplinary hearings. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing *Sira v. Morton,* 380 F.3d at 78, for the proposition that "if any confidential informant's testimony was based solely on hearsay, a greater inquiry into the reliability of this hearsay information is required."); *Howard v. Wilkerson,* 768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for the proposition that "[s]ince *[Superintendent v.] Hill,* [472 U.S. 445 (1985) ] it has been held that hearsay evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported

by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton,* 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby,* 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly,* 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report was sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence. [7]

[7]     Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " "requirement is sterner than the 'some evidence' standard necessary to afford due process' ").

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing—reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks,* 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying

cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted). [8]

[8]     It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

**\*10** Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this claim be **DISMISSED.**

### *e. Defendant Prack*

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of

such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability"). Furthermore, we also recommend that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### *3. Second Disciplinary Hearing*

The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio. [9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A, Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel

frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

[9]     Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/ Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman [10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

[10]     These individuals are not Defendants in the instant action.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant Haug because he was improperly denied the right to call witnesses on his behalf, and against Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs.' Mem. of Law at pp. 17–19.

### *a. Notice*

It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010.

Accordingly, Plaintiff clearly received constitutionally sufficient notice.

### b. Opportunity to be Heard

According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011 WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Guitierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regulations, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at *10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness, Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers [11] nor the many documents submitted by Defendants indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton

approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.,* Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

11    It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha [d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

### c. Written Decision

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' CrossMotion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### d. Defendent Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED.**

### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commissary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge

Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

### b. Opportunity to be Heard

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel. [12]

[12]    On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from

his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs'. Lt.-Br., dated July 21, 2014, & 56, Pl.'s Reply Lt.-Br., dated July 25, 2014.

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures —Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action. [13] *See Williams v. Pepin,* 2011 WL 7637552, \*6 (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

[13]    Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded

because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton, 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007)* (citing *Powell v. Coughlin, 953 F.2d 744, 750 [2d Cir.1991]* for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

### c. Some Evidence

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with

> [sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

3rd Disciplinary Hr'g Tr. at p. 4.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly, 2012 WL 3776698, at *23; Creech v. Schoellkoph, 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010)* (finding disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff. [14]

[14] Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See* Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; *see also Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)* (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton, 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007)* (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell*" ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this

violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978),* for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at *5 (N.D.N.Y. Aug. 19, 2008) (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d at 126, for the proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that

Judge Feldestein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6.[15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury.[16]

[15]  Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months. Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

[16]  To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29 (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the

evidence relied upon, Plaintiff failed to add any new substantive arguments).

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at \*26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice. Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at \*2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory

official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must

first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at \*28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

1.  **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

2.  **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

1.  **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

2.  **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action; [17] and it is further

17      *See supra* Note 4.

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627120

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Morehouse v. York, N.D.N.Y., January 7, 2016

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,

v.

N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/ATB).
|
Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**ORDER**

Hon. BRENDA K. SANNES, District Judge.

**\*1** Plaintiff Edgardo L. Lopez, a former New York State inmate, commenced this civil rights action under 42 U.S.C. § 1983 raising federal and state claims against New York State Department of Correction officials arising out of plaintiff's confinement at Marcy Correctional Facility. Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a motion for summary judgment which was referred to United States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69, 83. On May 20, 2015, Judge Baxter issued a Report–Recommendation, recommending that defendants' motion for summary judgment be granted, and that plaintiff's First Amendment and Eighth Amendment claims be dismissed without prejudice to refiling and that plaintiff's due process and state law claims be dismissed with prejudice. Dkt. No. 83, p. 24. Judge Baxter advised the parties that:

> Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within

which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation was mailed to Lopez's last known address via certified mail. Dkt. No. 83. Lopez's copy of the Report–Recommendation was returned to the Court marked "Return to sender, unable to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and a request for an extension of time to respond to the Report–Recommendation. Dkt. Nos. 86–87. Lopez noted that he received the Report–Recommendation that day at the public counter in the courthouse. Dkt. No. 87. The Court granted Lopez's request for an extension of time and, in a text order dated June 8, 2015, extended the due date for filing objections to June 22, 2015. The text order was mailed to Lopez's last known address. Lopez's copy of the text order was returned to the Court marked "Return to sender, not deliverable as addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded Lopez of his obligation to notify the Court of any change in address, see Local Rule 10.1(c)(2), and provided Lopez an additional fourteen days to file his current address and any objections to the Report and Recommendation. Dkt. No. 90, pp. 2–4. The Court advised Lopez that if he failed to comply with the Decision and Order, the Court would "consider the Report and Recommendation as unopposed and review for clear error only." Dkt. No. 90, p. 4. The Decision and Order was served on Lopez via certified mail at his last known address. Dkt. No. 90. On July 8, 2015, the Court received an executed return receipt of delivery. Dkt. 91. Lopez has not, to date, filed any objections to the Report–Recommendation.

**\*2** Accordingly, as no objections to the Report–Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report–Recommendation for clear error. *See Glaspie v. N.Y.C. Dep't of Corr.,* No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at \*1, 2010 U.S. Dist. LEXIS 131629, at \*2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections to report and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.' ") (quoting *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005)). Having reviewed the Report and Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions. (Amended Compl ., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state law tort claims in connection with the alleged assault. (*Id.* ¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1]. Defendants did not submit a reply.

[1]    Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process that he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

### *DISCUSSION*

**I. Summary Judgment**

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for

summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).*

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord, 467 F.3d at 273.* In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. ., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Salahuddin, 467 F.3d at 272.*

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York, 426 F.3d 549, 554–55 (2d Cir.2005)* ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

**II. Exhaustion of Administrative Remedies**

**\*4** Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions [2]. (Id. ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff had completed the administrative grievance process for these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

[2]     Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

**A. Legal Standards**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord, 380 F.3d 670, 675–76 (2d Cir.2004)* (citing *Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)* (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*5** At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops

them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some discussion. [4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

3    *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

4    See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at \* 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

**B. Application**

Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt. No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B)). On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt. No. 69–3, Ex. 3; Dkt No. 73–2, Pl's Ex. 3(C)). On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D)).

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.) Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating to his assault and retaliation claims prior to commencing this federal litigation [5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8.)

[5]    Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter, 534 U.S. at 532.* Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8.) If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as

required by the PLRA." *Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.). [6]

[6]    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at \*19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, \*2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP") and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B.).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at \*8–9 (S.D.N.Y. Mar. 28, 2013) (the plaintiff's claim that he was deterred from pursuing grievances by threats from

a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

 *7 During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies *before* filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." *Id.,* 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of

a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.*

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff had exhausted his administrative remedies as to the due process issue. *See Chavis v. Goord,* No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. *See* Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a) (1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."); *see also Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due

process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. *See, e.g., Murray v. Fischer,* No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at *2–3) (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); *Emory v. New York,* No. 11–CV–1774, 2013 WL 1881009, at *3 (E.D.N.Y. May 6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their "voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at *4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

### B. Legal Standards

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ....,

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*9** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

### C. Application

Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

**1. Adequacy of Assistance at the Hearing**

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee assistant, who is not named as a defendant, refused to help plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance

when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

**2. Use of OMH Information**

**\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-

clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

### 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition, defendant Cavaleri noted the consistent testimony of seven witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at \*1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7].

[7] The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at \*11–18 (S .D.N.Y. Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at \*4–7 (N.D.N.Y. Jan.25, 2011) (Rep't–Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

## III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt No. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in

any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/RFT), 2014 WL 1292281, \*16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at \*4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct by a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–

CV–595, 2014 WL 3809129, \*5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at \*3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of instructions.' " *Id.,* 2014 WL 3809129, \*6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4394604

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie Cole, Plaintiff,

v.

New York State Department of Corrections and
Community Supervision, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)
|
Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**
N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-
A-9212, Five Points Correctional Facility, Caller Box 119,
Romulus, NY 14541.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
615 Erie Boulevard West, Suite 102, OF COUNSEL:
KEVIN M. HAYDEN, ESQ., Ass't Attorney General,
Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** *Pro se* plaintiff Ronnie Cole has commenced this
action asserting civil rights claims arising out of his
confinement in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS") pursuant to 42 U.S.C. § 1983. Plaintiff's
claims, which are multi-faceted, arise out of events
occurring at two separate DOCCS facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For
the reasons set forth below, I recommend that defendants'
motion for summary judgment be granted in part, but
otherwise denied.

I. BACKGROUND[1]

[1] The record herein contains few undisputed facts.
Plaintiff and defendants disagree on many of
the events that transpired and provide conflicting
accounts of the circumstances surrounding the
relevant incidents. In light of the procedural posture
of the case, the following recitation is derived from
the record now before the court, with all inferences
drawn and ambiguities resolved in the plaintiff's
party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d
Cir. 2003). To the extent that plaintiff's deposition
testimony is at odds with his memorandum of law
or submissions in his statement of facts, the court
will follow the rule that "a party may not create an
issue of fact by submitting an affidavit in opposition
to a summary judgment motion that, by omission or
addition, contradicts the affiant's previous deposition
testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d
Cir. 1997).

Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1.[2] Plaintiff
is serving a sentence for robbery, possession of stolen
property, criminal possession of a weapon, and promoting
prison contraband. Dkt. No. 45-15 at 1. Plaintiff's claims,
however, arise out of his previous confinement at the
Walsh Regional Medical Unit ("Walsh") and the Upstate
Correctional Facility ("Upstate").[3] *Id.* at 2.

[2] Citations to page numbers refer to the pagination
generated by CM/ECF, not the page numbers
generated by the parties.

[3] Upstate is a maximum security prison comprised
exclusively of special housing unit ("SHU") cells in
which inmates are confined for twenty-three hours
each day, primarily for disciplinary reasons. *Samuels
v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at \*4
n.11 (S.D.N.Y. Sept. 12, 2002).

A. Use of Force Incidents at Walsh
On October 29, 2013, defendant Corrections Officer
Anthony M. Durante entered plaintiff's room to conduct
a strip frisk of plaintiff and a search of his area. Dkt.
No. 29-1 at 15.[4] At the time, plaintiff was in his
pajamas and seated in his wheelchair. Dkt. No. 45-3 at

27. Plaintiff maintains that defendant Sergeant John A. Wagner followed Durante into plaintiff's room in the E-Wing and blocked the door. [5] *Id.* Plaintiff asserts that he attempted to comply with Durante's orders and began to unbutton his shirt. *Id.* at 29. Plaintiff claims that Durante said "Happy Anniversary," and struck plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff maintains that defendant Stephen M. LoRusso entered the room and joined defendants Durante and Wagner as they repeatedly hit, kicked, and punched plaintiff in the head, face, and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and LoRusso then pulled plaintiff out of his wheelchair, lifted him overhead, and "slammed" him into the floor causing plaintiff to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were applied and the assault terminated when the medical staff and other officers entered the room. Dkt. No. 45-3 at 57-59.

[4]    The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

[5]    Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

**\*2** Defendant Durante, by contrast, has executed a sworn affidavit in which he denies having assaulted the plaintiff. [6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims that plaintiff became agitated during the search and began swinging his closed fists at Durante. *Id.* Plaintiff struck Durante on the right side of his head and Durante responded by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell backwards into a locker. *Id.* Durante avers that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

[6]    That affidavit, which is included with defendants' motion, was given by defendant Durante in

connection with a matter brought by the plaintiff in the New York Court of Claims.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present. [7] *Id.* at 126.

[7]    Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

### B. Facts Related to Plaintiff's Medical Treatment at Walsh [8]

[8]    In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. *Id.* at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked.

Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. *Id.* at 74-85. Plaintiff maintains that he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

[9]    The record does not indicate what prescribed medications were administered.

**\*3** The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

## C. Facts Related to Medical Treatment at Upstate

Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a "one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. *Id.* at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. *Id.* at 14.

### 1. Medications and Supplies

**\*4** From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace.

Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa (an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. *Id.* at 64, 69.

10    On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. *Id.* Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." *Id.* at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." *Id.* Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." *Id.* The nurse called the pharmacy technician to request a clear catheter, and was advised that one

would need to be located. *Id.* Plaintiff refused the catheter change and said he would wait for a new one to arrive. *Id.* The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. *Id.* Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

**\*5** On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges. [11] Dkt. No. 45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges. [12] Id. at 41-42. Cole was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. Id. at 40.

[11]   The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; see also Hynes v. Squillace, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Hynes, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Id. Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. Id.

[12]   Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

Plaintiff appealed the disciplinary determination on November 20, 2013. Id. at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf, requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. Id. at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

**\*6** On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. Id. Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

### II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 et seq., and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. See generally Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. See generally Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than de minimis injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether

defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[.]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

13      All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit.[14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

14      Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 &18.

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia,*

*Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross*, 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, that no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross*, the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno*, ___ F.3d ____, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams*, plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at *2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having

received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams*, 2016 WL 3729383, at \*5-6. Although not the centerpiece of its decision in *Williams*, the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at \*7.

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at \*4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw*, No. 09-CV-1354, 2011 WL 4345299, at \*5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

### 1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical

restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

15     The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

**\*10** Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Ross*, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension". *Brooks v. Rock*, No. 11-CV-1171 (GLS/ ATB), 2014 WL 1292232, at \*11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill*, 380 F.3d at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

### C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis.* Dkt. No. 45-16 at 15-16.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness.[16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

[16]  This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of

'contemporary standards of decency.' +" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' +"). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' +" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12** In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner

reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh. [17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

[17] The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2.

Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

### D. Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven

by evidence establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

### E. Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

### 1. Legal Standard Governing Deliberate Medical Indifference Claims

While the Eighth Amendment " *+*'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d

59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

**\*14** A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes

chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

**\*15** It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998)

(citation omitted). Accordingly, mere disagreement with prison officials regarding a course of treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

## 2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent*, 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni*, No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge*, No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

## a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his

hearing aids.[18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

18    Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

**\*16** While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. See Johnson v. Woods, No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at \*13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. See, e.g., Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); Morris v. Hoke, No. 87-CV-7812, 1992 WL 310792, at \*2 (S.D.N.Y. Oct. 21, 1992) ("[T]he

[plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cost of the needed repair. Id. The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. Id. at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. See Alster v. Goord, 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); see also Fate v. Goord, 2012 WL 3104884, at \*7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. See Savage v. Brue, No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at \*12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D.

Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison*, 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

**\*17** In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted, and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally* Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2 at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at \*5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly*, No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at \*5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

**\*18** As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth

Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights.[19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

[19]     Defendants have not submitted any argument in response to this claim.

In the prison context, it is will established that the alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate

post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings.[20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

[20]     Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ – ____, *post.*

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

**\*19** As to the first element, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the

allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [21] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

[21]     In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' +" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' +" Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were extraordinary, [22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' +" and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

[22]     Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

**\*20** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

### b. November 2013 Hearing

#### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin,* 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne,* 155 F. 3d at 28. That determination was ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing. [23] *Id.* Under these circumstances, the Second Circuit concluded that it was unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

[23]   That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne,* in which it stated:

It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he

was released from SHU thirteen days after the six –month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

*Horne*, 155 F. 3d at 31, n. 4.

**\*21** In this matter, as in *Horne*, the record establishes that plaintiff was confined in the SHU as a result of penalties imposed following the November 2013 hearing, and remained in SHU confinement until and after the second hearing commenced on March 20, 2014, at which he was again found guilty. Accordingly, based upon the Second Circuit's decision in *Horne*, it is unnecessary to determine whether plaintiff was afforded due process in connection with his first hearing, and his claims against defendant Corey are subject to dismissal on this basis.

ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing was not rendered a nullity, for purposes of the plaintiff's procedural due process claims, I will address his substantive arguments. In connection with the first hearing, plaintiff claims that defendant Corey precluded him from questioning witnesses and improperly removed him from the first hearing. Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues that Hearing Officer Corey's failure to call an inmate, nurses, and Imam Muhammad violated his Fourteenth Amendment rights. *Id.* Plaintiff claims that Muhammad was present in his room after the assault, and would have offered testimony concerning his injuries. Dkt. No. 45-3 at 109-110.

aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support of his procedural due process claim with regard to the first hearing is a deprivation of his right to call witnesses. While the Fourteenth Amendment guarantees an inmate's right to call witnesses and present evidence in his defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky*, 487 F.Supp.2d 340, 342 (W.D.N.Y. 2007) (citing *Wolff*, 418 U.S. at 566, 94 S.Ct.

at 2979). "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). "Prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position." *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff to call defendants Peterson and Judway as witnesses. Dkt. No. 45-9 at 42. On November 20, 2013, defendant Corey completed the required Form 2176 with an explanation of his decision not to call RN Hart, RN Schram, and Imam Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation. [24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing." *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

[24]   Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

**\*22** Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff*, 418 U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at

*13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. See Vogelfang v. Capra, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); Clark v. Dannheim, No. 02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); Mims v. Ufland, No. 07 CIV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in Wolff affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. Johnson v. Doling, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' +" Id. (citing, inter alia Wolff, 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "belligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." Id. at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, see Ponte, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

*23 "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 132 S.Ct. 2088, 2093 (2012); see also Pearson v. Callahan, 555 U.S. 223, 231 (2009); Sudler v. City of N.Y., 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. Sudler, 689 F.3d at 174 (citing Saucier v. Katz, 533 U.S. 194, 206 (2001), abrogated on other grounds by (Pearson, 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." Pearson, 555 U.S. at 231 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the

inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' +" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky*, No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips*, No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly, I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the

government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

**\*25** With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's

actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at \*8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and

excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No. 16 ¶¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

25      The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' " [26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

26      In their motion, defendants do not dispute that plaintiff suffered adverse actions.

**\*26** Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante, which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus

element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at \*6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

### 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I*. For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at \*7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at \*7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more, is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp.3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

3. Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

**\*27** I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy.[27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I*. These defendants were not named as defendants in *Cole I*, and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of

any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

[27]     The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

I. Personal Involvement/Supervisory Liability
Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration

Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28** It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information

indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal

involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.


### 3. Defendant Prack

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").


### 4. Defendants Danforth and Sharma

**\*29** Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.


### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.


### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the

plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See* Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); Barnes v. Henderson, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

### K. ADA Claims [28]

[28] Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

**\*30** Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See* Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. Henrietta D., 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of

architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In Cole v. Goord, et. al., No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("Cole II"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See* Cole v. Goord, 2009 WL 2601369, at \*8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick [ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also* Fall v. New York State United Teachers, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. Proctor v. LeClaire, 715 F.3d 402, 414 (2d Cir. 2013); McKithen v. Brown, 481 F.3d 89, 105 (2d Cir. 2007), *cert. denied*, 552 U.S. 1179, 128

S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

> **\*31** (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

> the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented – that is,

whether his hearing loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also* Ierardi v. Sysco, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Couglin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.).[29]

[29] To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied

to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also* May v. Donneli, No. 06-CV-0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

**\*33** To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment,

I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante. [30]

[30] As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

**\*34** Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court

discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. §

636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

**All Citations**

Slip Copy, 2016 WL 5394752

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 667531
United States District Court,
N.D. New York.

Kelly SEALE and David Seale, Plaintiffs,
v.
MADISON CNTY.; Allen Riley, Individually
and in his Official Capacity as Madison Cnty.
Sheriff; Matthew Episcopo, Individually and in his
Official Capacity as Captain of the Madison Cnty.
Sheriff's Ofc.; Doug Bailey, Individually and in
his Official Capacity as Former Undersheriff for
Madison Cnty.; and Ryan Aylward, Individually
and in his Official Capacity as Coordinator of
Labor Relations for Madison Cnty., Defendants.

No. 5:11–CV–0278 (GTS/ATB).
|
Signed Feb. 17, 2015.

**Attorneys and Law Firms**

O'Hara, O'Connell & Ciotoli, Stephen Ciotoli, Esq., of
Counsel, Fayetteville, NY, for Plaintiffs.

The Law Firm of Frank W. Miller, Charles C. Spagnoli,
Esq., Frank W. Miller, Esq., Bryan N. Georgiady, Esq.,
of Counsel, East Syracuse, NY, for Defendants.

*DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this employment
discrimination action filed by Kelly Seale and David Seale
("Plaintiffs") against the above-captioned government
entity and four named individuals ("Defendants"), is
Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 34.) For the reasons set forth
below, Defendants' motion for summary judgment is
granted.

# I. RELEVANT BACKGROUND

### A. Procedural History
Because this Decision and Order is intended primarily for
the review of the parties, the Court will not recite this

action's procedural history, including Defendants' motion
for judgment on the pleadings, which was granted in
part and denied in part. *See Seale v. Madison Cnty., 929
F.Supp.2d 51 (N.D.N.Y.2013).*

### B. Plaintiffs' Claims
The following claims survived Defendants' motion for
judgment on the pleadings: (1) a hostile work environment
claim by Plaintiff Kelly Seale ("Kelly Seale") against
Defendant, Madison County ("the County") pursuant to
Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e *et seq.* ("Title VII") and the New
York Human Rights Law, N.Y. EXEC. LAW § 296
("NYHRL"); (2) a hostile work environment claim
by Kelly Seale against Defendant, Matthew Episcopo
("Episcopo") pursuant to 42 U.S.C. § 1983 ("Section
1983"); (3) a retaliation claim by Kelly Seale against
the County pursuant to Title VII; (4) a retaliation
claim by Kelly Seale against the County as well as
Defendants, Episcopo, Allen Riley ("Riley") and Ryan
Aylward ("Aylward") pursuant to NYHRL; (5) a First
Amendment retaliation claim by Kelly Seale against the
County, Riley, Episcopo and Aylward; and (6) a First
Amendment retaliation claim by Plaintiff, David Seale
("David Seale") against the County, Riley, Episcopo,
Aylward and Defendant, Doug Baily ("Bailey").

### C. Undisputed Material Facts [1]

[1]    Defendants ask the Court to strike Plaintiffs' response
to Defendants' Statement of Material Facts and
to deem Defendants' Statement of Material Facts
admitted due to Plaintiffs' pervasive violations of
Local Rule 7.1. Moreover, Defendants ask the Court
to award them their costs and fees associated with
the preparation of their request, including a 41–
page appendix detailing all of the improprieties in
Plaintiffs' Response. (*See* Dkt. No. 43.) Defendants'
request is granted in part and denied in part. To
be sure, Plaintiffs' response to Defendants' Statement
of Material Facts is replete with violations of Local
Rule 7.1. However, rather than strike Plaintiffs'
entire response, the Court will deem admitted those
Statements of Fact that Plaintiffs deny without record
citations, which support their denial or where their
purported denial is merely argument unrelated to the
Statement of Fact, so long as the Statement of Fact
itself is supported by the record. In addition, the
Court denies Defendants' request for an award of
fees and costs. Finally, Plaintiffs' counsel is strongly

cautioned to carefully adhere to this Court's Local
Rule 7.1 in the future.

Unless otherwise followed by citations to the record, the
following material facts have been asserted and supported
by Defendants in their Local Rule 7.1 Statement of
Undisputed Material Facts, and either admitted or denied
without a supporting record citation by Plaintiffs in their
Local Rule 7.1 Response (*compare* Dkt. No. 34–1 [Defs.'
Rule 7.1 Statement] with Dkt. No. 38 [Pls.' Rule 7.1
Response] ), or have been asserted and supported by
Plaintiffs in their Local Rule 7.1 Statement of Additional
Undisputed Material Facts, to which Defendants have
failed to respond (*see* Dkt. No. 38 at 70–77 [Pls.' Rule 7.1
Statement] ).

Kelly Seale is a former employee of the County. She
was employed as the Community Services Aide at the
County Sheriff's Office from January 2, 2008 until she
resigned effective May 31, 2010. Kelly Seale was a part-
time employee and was not entitled to vacation time, sick
leave or other compensated leave. Kelly Seale's husband,
David Seale, is currently employed by the County in the
Sheriff's Office. David Seale began his employment as a
Deputy in the Sheriff's Office in 1998. According to Sheriff
Riley, David Seale was promoted to Sergeant effective
August 9, 2014. (*See* Dkt. No. 41–2 at ¶ 4 [Reply Aff. of
Allen Riley, Aug. 22, 2014].)

**\*2** Defendant Riley is the current Sheriff of the County.
He was elected to that position in November 2009 and
assumed office in January 2010. Defendant Bailey was
employed as Undersheriff of the County from 1991 until
he retired on December 1, 2010. From September 2009,
when former Sheriff Ronald Cary ("Cary") resigned, until
Sheriff Riley took office, Bailey performed the duties of
Sheriff on an interim basis.

Defendant Aylward is currently employed as the Director
of Labor Relations in the County's Personnel and Civil
Service Department. He has held that position since
Spring, 2010. Prior to Spring, 2010, he was employed as
the County's Coordinator of Labor Relations.

Defendant Episcopo was formerly a Captain in the
Sheriff's Office. He held that position from 2005 until
he retired in May, 2011. According to Sheriff Riley
and Undersheriff Bailey, Episcopo did not have the
ability to hire, fire, promote, demote, make any decision
substantially changing the salary or benefits of, or make

any decision substantially reassigning the duties of any
other employee of the Sheriff's Office, including Kelly
Seale. (Dkt. No. 34–3 at ¶ 4 [Riley Aff., June 25, 2014];
Dkt. No. 34–5 at ¶ 2 [Bailey Aff., July 1, 2014].) Kelly
Seale testified that she did not have any information,
nor was she told, that Episcopo could have hired, fired,
promoted, denied a promotion to, or reassigned her. (Dkt.
No. 34–19 at 82:21–84:7 [Kelly Seale Dep., Oct. 30, 2013].)
Plaintiff David Seale testified that Episcopo was involved
in the firing of several corrections officers and deputy
sheriffs throughout the years, meaning that Episcopo
made recommendations to the Sheriff and Undersheriff,
who usually followed his recommendations, although the
Sheriff had the ultimate authority to make that decision.
(Dkt. No. 37–3 at 130:11–131:8 [David Seale Dep., Oct.
31, 2013].) Bailey testified that during his twenty years
as Undersheriff, he never saw a recommendation for
termination or suspension, but saw recommendations for
additional training. (Dkt. No. 37–6 at 15:1–24 [Bailey
Dep., Apr. 9, 2014].)

At all relevant times, the County had in place a policy
proscribing sexual harassment in the workplace and
providing a procedure by which employees may report
alleged sexual harassment. (Dkt. No. 34–32 [Ex. S to
Spagnoli Aff., July 1, 2014]; Dkt. No. 34–33 [Ex. T to
Spagnoli Aff.].) The County provided regular training
and instruction on its sexual harassment policy to its
employees, including Episcopo and Kelly Seale. (Dkt. No.
34–21 [Episcopo Dep., Apr. 7, 2014, 36:20–37:4 that he
attended annual training]; Dkt. No. 34–18 [Kelly Seale 50–
h Dep., June 24, 2010, 58:7–60:9 that she attended training
and was told how to file a complaint].)

Kelly Seale claims that she "was subjected to repeated
instances of sexual harassment, intimidation, humiliation,
and discrimination by Defendant Episcopo" from
"shortly after the beginning of her employment in January
2008 until January 2010." (Dkt. No. 1 at ¶ 27 [Compl.].)
However, it is undisputed that prior to November 5, 2009,
Kelly Seale did not state or report to any employee of
the County, including her husband, that she was being
sexually harassed by Episcopo.[2]

2      Plaintiffs state, without citation to the record for
       support, that Kelly Seale did not initially report her
       claim of sexual harassment because she was afraid
       that she would be the victim of retaliation.

**\*3** From January 2, 2008 until November 5, 2009, Kelly Seale worked in an alcove outside the office of Episcopo in the County's Public Safety Building ("PSB").

On May 19, 2008, Episcopo placed a radio on a cabinet outside of his office and turned it on with the volume set at a high level. He told Kelly Seale it was to ensure that she could not hear conversations inside his office. He asked her if that was ok, and she did not object. Subsequently, Kelly Seale complained to then Sheriff Cary, after which Episcopo removed the radio, stating to Kelly Seale, "your radio privileges have been revoked." [3]

[3] According to Plaintiffs' response to Defendants' Statement of Material Fact, Paragraph 19, this "was the first act of harassment by Captain Episcopo." (Dkt. No. 38 at ¶ 19 [Pls.' Response to Defs.' Statement of Material Facts].) This incident is also the first that Kelly Seale recorded on a Madison County Workplace Violence Incident Report form, which she did not share with anyone until after November 5, 2009. (Dkt. No. 37–8 [Exs. 8E–8L to Ciotoli Aff.].)

In September 2008, after David Seale was taken out of work again by his doctor, Episcopo failed to timely turn in Kelly Seale's time sheet record. As a result, Kelly Seale did not receive her paycheck on schedule. According to Kelly Seale, the prior general practice had been that she filled out her time sheets and put them in Episcopo's mail slot, after which he would sign them and pass them on to payroll. (Dkt No. 37–8 [Ex. 8–F to Ciotoli Aff.].)

On October 20, 2008, Episcopo was in his office with his door shut speaking to a deputy, who had apparently returned to work while still using crutches after having been out on worker's compensation. In a loud tone of voice that Kelly Seale could hear, Episcopo stated, "This department is made up of a bunch of fucking cry-babies that can't do their jobs ... [this deputy] came back early on crutches and others are still milking comp and crying that their arms hurt. If I had my way, a lot of people wouldn't have their fucking jobs and we all know who I am talking about." At that time, David Seale was out on worker's compensation for a shoulder injury. (Dkt No. 37–8 [Ex. 8–G to Ciotoli Aff.].)

On December 10, 2008, Kelly Seale discovered a pornographic snowman cartoon, lying face down on her desktop keyboard. The cartoon depicted three snowmen masturbating while they stare at a large breasted snow woman. Kelly Seale was sick and upset and went home early because she thought someone was making fun of her. She thought Episcopo left the cartoon because she always catches him staring at her breasts when he's around her. Kelly Seale was afraid to tell anyone about the cartoon because she thought no one would believe her word over Episcopo's. (Dkt No. 37–8 [Ex. 8–H to Ciotoli Aff.].) David Seale testified that at some point between 2001 and 2005, the snowman cartoon was posted on a bulletin board when he worked in investigations. It was the same cartoon that Episcopo had previously sent to David Seale and others in an email, but David Seale agreed that he does not have any information that Episcopo is the one who posted the cartoon on the bulletin board. (Dkt. No. 37–3 at 51:4–54:5 [David Seale Dep., Oct. 31, 2013].) At her deposition, Kelly Seale agreed that anyone who was in the PSB around the point in time that she discovered the snowman cartoon on her desk could have left it there and that she has no firsthand knowledge that it was Episcopo who did so. (Dkt. No. 37–17 at 73:1–8 [Kelly Seale 50–H Dep., June 24, 2010].)

**\*4** On July 13, 2009, the day after Kelly Seale returned from a week's vacation, Episcopo entered his office with a deputy after first seeing Kelly Seale, and began singing in a loud voice, "The bitch is back, the bitch is back, spread her legs and eat her for a snack." Episcopo and the deputy then began saying, in a loud manner, "Red rocket. Red rocket." [4]

[4] Apparently, according to Plaintiffs' Complaint, the reference to "Red rocket" has to do with an episode of the animated television show, *South Park,* when one of the characters masturbates a dog in order to "milk it." (Dkt. No. 1 [Compl.].) In fact, the Complaint includes the allegation that, during the same exchange Kelly Seale overheard on July 13, 2009, Episcopo and the deputy were talking about the episode, including the aforementioned description of the origin of "Red rocket." *Id.,* ¶ 30(e). Plaintiffs' Statement of Material Fact, Paragraph 110, includes the same allegation as in the Complaint, but presented as fact, citing Kelly Seale's deposition testimony, wherein she admits that "They said 'Red rocket' and that's all." (Dkt. No. 38 at ¶ 110 [Pls.' Statement of Material Facts]; Dkt. No. 37–17 at 79:17–81:16 [Kelly Seale's 50h Dep., June 24, 2010].) Plaintiffs also include this inaccurate representation of fact in their

opposition memorandum of law. (Dkt. No. 38–1 at 6, 9 [Pls.' Mem. of Law].)

On September 24, 2009, James Zophy ("Zophy") announced his intention to run for the office of County Sheriff in the 2009 election. At some point thereafter, David Seale placed a sign supporting Zophy's candidacy on the lawn of his home. Prior to that time, David Seale had not expressed his support for Zophy's candidacy. Kelly Seale was neutral with respect to Zophy's candidacy and did not personally express support for Zophy in his bid for County Sheriff.

On November 3, 2009, Riley won the election for Sheriff against Zophy.

On the day before the election, Episcopo went out of his way to talk to other employees and inform them that they should help themselves to snacks in the break room, but did not extend the same invitation to Kelly Seale. (Dkt. No. 37–8 [Ex. 8–J to Ciotoli Aff.] .)

On the day after the election, Episcopo was in his office speaking loudly about Zophy to a lieutenant. Episcopo stated that he was so happy "that fucking cock sucking Zophy didn't get elected" and "I know I'm saying this loud enough so that whoever is sitting outside my door listening knows that changes are coming and they won't like it." Episcopo further stated that he was going to get rid of "those Zophy supporters one by one." (Dkt No 37–8 [Ex. 8–K to Ciotoli Aff.].) Thereafter, Kelly Seale told Kathy Chaires, the confidential secretary to the Sheriff, about Episcopo's comments. Kelly Seale did not tell Ms. Chaires anything about sexual harassment. That same day, after Kelly Seale was no longer at work, Ms. Chaires relayed to Bailey Kelly Seales' allegations regarding the comments made by Episcopo.

On November 5, 2009, Bailey spoke to Episcopo about what had been reported the previous day. Episcopo testified that he believed Bailey further told him to stay away from Kelly Seale. (Dkt No 34–21 at 94:3–9 [Episcopo Dep., Apr. 7, 2014].) Bailey denies telling Episcopo to stay away from Kelly Seale, but rather, he informed Episcopo that Kelly Seale was upset by the comments and that it did not matter which candidate won the election. (Dkt. No. 34–22 at 45:24–46:15 [Bailey Dep., Apr. 9, 2014].) Shortly after Bailey spoke to Episcopo, Episcopo returned to his office, followed by Ms. Chaires. As he entered his office, Episcopo stated, "it's a glorious

morning, it's such a nice day, you can't wipe the smile off my face!" and then, as Ms. Chaires was leaving his office, he said "I love it!" over and over again. (Dkt No. 37–8 [Ex. 8–L to Ciotoli Aff.].)

At some time later in the day on November 5 or on November 6, 2009, Kelly Seale became aware that Ms. Chaires informed Bailey of her complaint about Episcopo. Bailey requested that Kelly Seale speak to him regarding her concerns, which she did. During that conversation, Kelly Seale reported for the first time that Episcopo was sexually harassing her. When Bailey realized that Kelly Seale was claiming sexual harassment, he informed her that the matter would be referred to the County's Personnel Department. After speaking with Kelly Seale, Bailey notified the County's Personnel Department of her complaint of sexual harassment. A few days later, representatives of the Personnel Department interviewed Kelly Seale to obtain her complaint.

**\*5** At the County's request, its outside counsel engaged Public Sector Human Resource Consultants ("PSHRC"), an independent consulting firm, to conduct an impartial investigation into Kelly Seale's claims of sexual harassment. PSHRC consultant Nanette Hatch conducted the investigation. She had never spoken to Episcopo prior to the investigation. She interviewed Episcopo, Kelly Seale, David Seale, Ms. Chaires, and other employees. Ms. Hatch chose who to interview based on her own judgment, expertise, and evaluation of the evidence and witnesses. Ms. Hatch rendered a report that expressed her conclusion that there was no unlawful hostile environment created by Episcopo.

After the investigation was completed, Episcopo was removed from Kelly Seale's chain of command. Also, at some point after Kelly Seale's complaint was made and the investigation completed, some of Kelly Seale's duties having to do with the website were taken away from her. Episcopo did not take those duties from her.

Beginning November 5, 2009 until approximately January 11, 2010, Kelly Seale worked from home. On January 7, 2010, Aylward advised Kelly Seale that her complaint was unsubstantiated, but that to improve the work environment she would be allowed to report directly to Sheriff Riley rather and Episcopo and her work location would be changed.

Effective approximately January 11, 2010, Kelly Seale's assigned work location was changed from outside Episcopo's office to an office in the County Office Building ("COB"). Kelly Seale worked in that location until she resigned on May 31, 2010. During this time, Kelly Seale's time records reflect that on several occasions she worked before and after normal work hours and on weekends. Kelly Seale did not have access to the COB on nights and weekends because she was not allowed to have a key to the building. (Dkt. No. 37–5 at 49:21–50:17, 51:352:25 [Dep. of Allen Riley, Apr. 10, 2014].) David Seale testified to one instance when Kelly Seale was unable to get into the COB after hours to obtain her laptop and other materials and it created a problem for her. (Dkt. No. 34–20 at 178 [David Seale Dep., Oct. 31, 2013].) Kelly Seale testified that she was able to perform her job duties from home but that "it was harder." (Dkt. No. 34–19 at 90:6–8 [Kelly Seale Dep., Pct. 30, 2013].) Both Riley and Bailey were not aware that Kelly Seale contended she needed access to her work location during non-work hours.

Riley made the decision to change Kelly Seale's work location following the recommendation of Aylward, in order to allow her to avoid contact with Episcopo. At the time Riley made this decision, he had no information that Kelly Seale had made allegations that Episcopo made comments directed against her and David Seale on the premise that they were supporters of Zophy's candidacy. Aylward's sole involvement in the change of Kelly Seale's work location was to recommend that her work location be changed to avoid friction between her and Episcopo; to obtain information regarding other potential work locations; and to inform Riley that there was work space available in the County Office Building.

 **\*6** Riley advised Bailey of the locations he reviewed as potential work locations for Kelly Seale and Bailey advised Riley of the unavailability of at least one potential location, but Bailey had no other involvement in the change of Kelly Seale's work location, and he was not involved in the actual decision to change her work location. Moreover, Episcopo had no involvement in the change in Kelly Seale's work location.

The space in the COB was selected after a search indicated other possible locations were unavailable for various reasons, including space in the Department of Social Services building and the Public Health building. Riley testified that there was a photo room in the PSB, although

it was "filled with all kind of stuff" at the time, but has since been converted into an office. (Dkt. No. 34–24 at 57:9–23 [Riley Dep., Apr. 10, 2014].) Kelly Seale testified that she had previously asked Sheriff Cary for the photo room to be her office since it was just a storage closet at the time, and that after her move to the COB, the photo room was made into an office for the SWAT team, although she does not know when the preparations for that office began. (Dkt. No. 37–2 at 90:12–21, 94:21–96:4 [Kelly Seale Dep., Oct. 30, 2013].) Kelly Seale also testified that she asked Riley to be moved into the Department of Social Services building and that she told him several times she did not want to move to the COB. (*Id.,* at 96:10–100:24.)

The COB was located in the same complex as the PSB where Kelly Seale previously worked, and is about two to three hundred yards from Kelly Seale's home. Other employees of the Sheriff's Office worked in the COB, although not on the basement floor where Kelly Seale's office was located.

Prior to May, 2010, Kelly Seale was assigned for her use a Chevy Tahoe owned by the County, which bore side markings identifying it as an official police vehicle. Beginning May, 2010, Kelly Seale was assigned for her use instead a green van owned by the County, which did not bear side markings identifying it as a police vehicle. Riley made the decision to change the vehicle assigned to Kelly Seale because he was concerned that a civilian employee should not be driving a marked police vehicle. While he discussed his concerns, with Bailey, Riley made the decision to change Kelly Seale's vehicle assignment. Episcopo's sole involvement in the change of Kelly Seale's vehicle assignment was to identify, at Riley's command, other vehicles in the Sheriff's Office fleet that were unmarked and would permit Kelly Seale to perform her duties. Episcopo notified Riley that the green van was the only unmarked vehicle in the Sheriff's Office fleet at that time that would permit Kelly Seale to perform her duties. Bailey and Aylward had no involvement in changing Kelly Seale's vehicle assignment.

Deputy Jay Pokorny used the green van for evidence transport before, during, and after the period in which Kelly Seale used it. He did not experience any mechanical problems with the van or find it to be dirty or to smell bad. (Dkt. No. 34–9 at ¶ 6 [Aff. of Jay Pokorny, June 19, 2014].) Neither Riley or Bailey had any information that the green van had any mechanical problems. Kelly

Seale testified that the one time she used the green van, she experienced problems with the brakes where she had to keep pumping them. (Dkt. No. 37–2 at 89:6–20 [Kelly Seale Dep., Oct. 30, 2013].) In her response to Defendants' interrogatory asking for a description of any and all mechanical breakdowns of the green van that occurred during the time it was assigned to her, Kelly Seale stated "there would be motor pool and maintenance records regarding its history and breakdowns in Defendants' possession, which would have included prior problems with brakes, transmission, engine, battery and it would shake (*sic* ). When Kelly Seale used this vehicle it was dirty, unclean, it smelled and it was rusty." (Dkt. No. 37–9 at ¶ 10 and Dkt. No. 37–16 at ¶ 3 [Pls.' Resp. to First Set of Interrogs. for Aylward].)

**\*7** Since Kelly Seale's work station was relocated, she saw Episcopo on less than five occasions, at which times he did not say or do anything to her that was unprofessional. (Dkt. No. 34–18 at 128:10–18 [Kelly Seale 50–H Dep., June 24, 2010].)

Other than being required to attend the County's regular sexual harassment training, Episcopo was not disciplined or punished as a result of Kelly Seale's allegations against him.

In or about early November 2009, after Kelly Seale filed her complaint against Episcopo, David Seale requested to exercise the "vacation buyback" option provided by the collective bargaining agreement covering his position. At that time, David Seale had been out on leave since March 29, 2009 and was receiving his full salary according to the provisions of New York General Municipal Law § 207–c ("Section 207–c").

Prior to receiving David Seale's request, Bailey had not previously been involved in any Section 207–c vacation buyback issues. Bailey discussed David Seale's request with Aylward. Bailey and Aylward determined that under the collective bargaining agreement, David Seale was not eligible to exercise the vacation buyback option because he had been absent on leave receiving benefits pursuant to Section 207–c for more than three months. Bailey notified David Seale that his request was denied because his extended leave rendered him ineligible to exercise the vacation buyback option, and that to exercise the vacation buyback option, he would need to return to active duty. According to David Seale, he had exercised his vacation

buyback option without issue when he was out of work in the previous year. (Dkt. No. 34–20 at 75:10–4–17 [David Seale Dep., Oct. 31, 2013].) Aylward confirmed that the first time he was asked to check on the appropriateness of David Seale's request for vacation buyback was after Kelly Seale had filed her complaint against Episcopo, although he clarified that the request was denied because David Seale was on 207–c leave at the time and not because of Kelly Seale's complaint against Episcopo. (Dkt. No. 37–7 at 69:13–70:8 [Dep. of Ryan D. Aylward, Apr. 9, 2014].)

David Seale returned to active duty on December 21, 2009. Thereafter, he successfully exercised his vacation buyback option for 2009. Episcopo and Riley had no involvement in the temporary denial of David Seale's request to exercise the vacation buyback option.

David Seale took worker's compensation again beginning in March or April, 2010. On April 19, 2010, Riley sent a letter to David Seale instructing him that while he remained on worker's compensation leave receiving his salary under Section 207–c, he must communicate to his supervisor when he planned to leave his residence during work hours. David Seale was the only County employee ever to receive such an order.

Prior to his election as Sheriff, Riley was a New York State Trooper. He observed that when a New York State Trooper was on sick leave, the officer was required to account to his or her supervisors for his or her whereabouts during work hours, and to communicate to them when he or she planned to leave his or her residence during work hours. Riley also obtained an opinion from Town of Greenburgh Police Chief John Kapica, which analyzed issues relating to Section 207–c leave and concluded that the heads of police departments could require employees on leave receiving Section 207–c benefits to account for their whereabouts during scheduled work shift hours.

**\*8** Riley discussed the issue with Aylward before sending the April 19, 2010 letter. (Dkt. No. 37–8, Ex. 8–S to Ciotoli Aff. [April 8, 2010 email from Aylward to Riley stating "The letter looks good to me" and cautioning that Kapica's summary of benefits under Section 207–c "is not a legal opinion" and that "we need to be prepared for a few bumps down the road. If you are ok with this, then I think that you should proceed with the letter."].)

However, Episcopo and Bailey had no involvement in Riley's decision to issue the April 19, 2010 letter.

After a union attorney objected, Aylward advised Riley to rescind the April 19, 2010 letter to avoid even the appearance that the County was retaliating against David Seale. On May 6, 2010, Riley sent a letter to David Seale rescinding the instructions in his April 19, 2010 letter. During the seventeen days that the instructions in the April 19, 2010 were in effect, David Seale was never denied a request to leave his home.

On April 29, 2010, David Seale requested to switch shifts with another officer. At the time of the request, David Seale was still on Section 207–c leave and was anticipated to return to active duty in May, 2010. Riley denied the request because he was concerned that such rescheduling matters were subject to bidding and posting under the applicable collective bargaining agreement. Episcopo and Bailey had no involvement in Riley's decision to deny David Seale's request to switch shifts. Aylward testified that he does not recall whether he was involved in that decision. On May 11,2010, at Aylward's suggestion, in order to avoid even the appearance of retaliation, Riley rescinded the denial and approved David Seale's request to change shifts. When David Seale returned to active duty in May 2010, he immediately started the transition to the shift he had requested.

According to David Seale, when he returned to work prior to December 28, 2009 in order to obtain his vacation buyback, the County worker's compensation insurer, Public Employers Risk Management Association ("PERMA"), denied his request for reimbursement for further physical therapy. The denial of physical therapy was by PERMA, the County's third-party worker's compensation administrator. Riley, Bailey, Episcopo and Aylward each averred or testified that they had no involvement in the denial of David Seale's request for physical therapy reimbursement through PERMA. However, David Seale contends, through his response to Defendants' interrogatories, that whenever an issue came up in the past regarding authorization of payment for his physical therapy, Sheriff Cary would take care of it. But when Riley took over, these issues with the denial payment for physical therapy would not be taken care of. (Dkt. No. 37–14 at ¶ 2 [Pls.' Response to Defs.' Interrogs.])

On July 14, 2008, David Seale claimed that the patrol car he used had been vandalized by someone who had slashed his tire. The alleged vandalism was investigated on or about July 14, 2008. The report concluded that a nail had gone up through the tread of the tire and damaged the sidewall of the tire. The incident was found to be accidental, not vandalism. David Seale alleges that he found the patrol car he customarily used "vandalized" in miscellaneous ways when he returned to active duty in May 2010. David Seale testified that he has no information that Riley, Bailey, or Aylward were involved. According to David Seale's response to Defendants' interrogatories, he "does not know who performed these acts of vandalism, but right after Kelly Seale made her complaint against Episcopo, these acts of vandalism started to occur to his patrol car, where before, there had never been any such acts of vandalism [.]" (Dkt. No. 37–13 at ¶ 5 [Pls.' Response to Defs.' Interrogs.].) Episcopo avers that he was not involved in any such "vandalism" of David Seale's patrol car.

**\*9** David Seale testified that in 2008, Episcopo directed a sergeant to write him up for his use of sick time in conjunction with his pass days. As a result, David Seale received a written counseling and was directed to obtain a doctor's note when he wished to use sick leave for a period of one year. (Dkt. No. 34–20 at 69:1–70:4 [David Seale Dep., Oct. 31, 2013].)

In January 2014, David Seale submitted a bid for a sergeant position, but he was not invited to interview for that position. Thereafter, the position was offered to and accepted by another deputy, Julie Netzband. Riley testified that he had previously interviewed Deputy Netzband and that she was his first choice for the sergeant position. According to Riley's testimony, New York Civil Service law permits him to choose anyone of the top three candidates. (Dkt. No. 37–5 at 90:1–8 [Riley Dep., Apr. 10, 2014].)

**D. Parties' Briefing on Defendants' Motion**

**1. Defendants' Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants assert the following six arguments: (1) Kelly Seale's Title VII hostile work environment claim fails because she cannot show that the County was negligent; (2) Kelly Seale's Title VII and NYHRL claims fail because the County has established the elements of

the *Faragher/Ellerth* affirmative defense; (3) Kelly's Seale's NYHRL hostile work environment claim fails because she cannot show that the County condoned or acquiesced in the alleged harassment; (4) Kelly Seale's Section 1983 hostile work environment claim fails because she cannot show that Episcopo acted under color of law; (5) Kelly Seale's First Amendment retaliation claim fails because (a) she admitted that she did not express support for Mr. Zophy, (b) she cannot show that the actions taken were sufficiently adverse to be actionable, and (c) there were legitimate reasons for the change in her work location and vehicle, which she cannot show were pretextual; and (6) David Seale's First Amendment retaliation claim fails because he cannot show that any of the actions taken were actionable. (*See generally* Dkt. No. 34–12 [Defs.' Mem. of Law].)

### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in response to Defendants' motion, Plaintiffs assert the following three arguments: (1) Kelly Seale has stated a proper hostile work environment claim under Title VII and the NYHRL because (a) all of the elements of a hostile work environment claim are satisfied, (b) Episcopo was Kelly Seale's supervisor and the *Faragher/Ellerth* defense does not bar her action, (c) the County condoned and acquiesced in the discriminatory and harassing conduct, (d) Episcopo can also be held individually liable for his discriminatory actions under the NYHRL, and (e) Kelly Seale has stated a proper Section 1983 claim against Episcopo, who was acting under color of state law; (2) Kelly Seale has properly stated a Title VII retaliation claim because (a) she participated in a protected activity, (b) Defendants took tangible adverse employment action against her, (c) the timing between the protected activity and retaliatory actions is enough to create an arguable causal link, and (d) she has presented evidence proving the existence of pretext; and (3) David Seale has properly stated a First Amendment retaliation claim because (a) he engaged in the type of speech protected by the First Amendment, (b) Defendants took adverse employment actions against him, and (c) his speech was a motivating factor for Defendants' retaliatory actions. (*See generally* Dkt. No. 38–1[Pls.' Opp'n Mem. of Law.)

### 3. Defendants' Reply Memorandum of Law

**\*10** Generally, in reply to Plaintiffs' response, Defendants assert the following five arguments: (1)

Episcopo was not a supervisor and Kelly Seale's hostile work environment claims fail; (2) Kelly Seale's NYHRL claim fails because she cannot show condonation; (3) Episcopo did not act under color of law; (4) Kelly Seale's retaliation claims fail; and (5) David Seale's retaliation claim fails. (*See generally* Dkt. No. 41 [Defs.' Reply Mem. of Law.)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted). *See also Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under

the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

 **\*11** Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [5] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y. Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

[5]  *See, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b]

[3]; *Devito v. Smithkline Beecham Corp.,* 02–CV–0745, 2004 WL 3691343, at \*3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**B. Legal Standards Governing Plaintiff's Claims**

**1. Hostile Work Environment**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," *inter alia,* "such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

In order to establish a claim for a hostile work environment under Title VII, a plaintiff must prove that the underlying harassment is "sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295). [6] Further, the plaintiff must prove that the hostile or abusive treatment was because of his or her membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175. The types of workplace conduct that may be actionable as a claim for hostile work environment based on sex "include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (citing 29 C.F.R. § 1604.11(a) (1985)).

[6]  "Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 264 n. 1 (2d. Cir.2001) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d

*Cir.1995), abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226 n. 2 (2d Cir.2008). Accordingly, a court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold v. Baccarat, Inc.,* 174 F.3d 264 n. 1 (2d Cir.199).

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

**\*12** Moreover, in order to establish her claim for hostile work environment, a plaintiff need not show that her "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York*

*City Dept. of Educ.,* No. 11–CV–3582, 2012 WL 3150388, at \*8 (E.D.N.Y. Aug.2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)).

In addition to establishing that she was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to her employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at \*4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold,* 239 F.3d at 245). An employer's liability for such conduct depends on whether the harasser is a coworker or supervisor. *See Vance v. Ball State Univ.,* —— U.S. ——, ——, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013).

The actions of a plaintiff's coworkers will be imputed to the employer only if the employer was negligent. *See Vance,* —— U.S. at ——, 133 S.Ct. at 2439. In other words, where the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it[,]" the harasser's conduct will be imputed to it. *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at \*10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, an employer is strictly liable for the actions of a plaintiff's supervisor [7] "unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at \*4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Where an employer "maintains a policy against sexual harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at \*3 (S.D.N .Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the

second prong of its defense. *See Joyner,* 2012 WL 4833368, at \*3 (citing *Leopold,* 239 F.3d at 246).

[7]  The Supreme Court has recently held that an employee is a supervisor for purposes of vicarious liability under Title VII if he or she is empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 133 S.Ct. at 2439, 2443 (quotation and citation omitted).

#### 2. Retaliation–Title VII

**\*13** To establish a claim of retaliation under Title VII, a plaintiff must prove "(1) participation in a protected activity; (2) the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 33 (2d Cir.2013) (citing *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir.2010) (internal quotation marks omitted)).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). [8] Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

[8]  Superceded by regulation on other grounds as noted in *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir.2013).

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 68, 126 S.Ct. at 2415. "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000); *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at \*4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 343 (S.D.N.Y.2009) (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

**\*14** In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII and the NYHRL are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at \*19 (S.D .N.Y. Oct. 28, 2013) (citing *Fincher v. Depository*

*Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010)); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at *9 (S.D.N .Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23 (2d Cir. Oct.18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* —— U.S. ——, ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at *19. *See* also Puglisi, 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at *11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* 973 F.Supp.2d. 386, 408 (S.D.N.Y.2013).

### 3. First Amendment Retaliation–42 U.S.C. § 1983

In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must prove "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

**\*15** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may prove the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Cebal los,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must prove that (1) she engaged in "constitutionally protected speech" because she spoke as a citizen on a matter of public concern; (2) she suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 917 F.Supp.2d at 204 (quoting *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The support of a candidate for public office can reasonably be considered a matter of public concern. *See Kelly v. Huntington Union Free Sch. Dist.,* 675 F.Supp.2d 283, 294 (E.D.N.Y.2009) (citing *Connick,* 461 U.S. at 149, 103

S.Ct. 1684, 75 L.Ed.2d 708 (holding that plaintiff's speech about whether government employees were pressured to participate in political campaign touched on a matter of public concern)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) *(abrogated on other grounds by, White,* 548 U.S. at 67)).

**\*16** Regarding the third element of a retaliation claim under the First Amendment, a plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action. *See Cobb v. Pozzi,* 363 F.3d 89, 108 (2d Cir.2004) (internal citation omitted). Since a direct showing requires plaintiff to provide "tangible proof" of retaliatory animus, "conclusory assertions of retaliatory motive" are insufficient. *Id.*

Once a plaintiff establishes a prima facie case of First Amendment retaliation, a government defendant may still prevail on a motion for summary judgment where it can establish "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.' " *Smith v. County of Suffolk,* ––– F.3d ––––, ––––, 2015 WL 161701, at \*3 (2d Cir.2015) (citing *Morris,* 196 F.3d at 110 (2d Cir.1999) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *abrogated on other grounds by, White,* 548 U.S. at 67, 126 S.Ct. 2405, 165 L.Ed.2d 345)).

## III. ANALYSIS

### A. Kelly Seale's Hostile Work Environment Claims

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Kelly Seale's hostile work environment claims against the County and Episcopo for the following reasons.

First, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's Title VII hostile work environment claims against the County. As indicated in Part II .B.1. of this Decision and Order, where the alleged harasser is a co-worker, an employer will be liable on a hostile work environment claim where it was negligent, i.e., where it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. On the other hand, where the alleged harasser is a supervisor, the employer is strictly liable unless it can show that is exercised reasonable care to prevent and correct the harassment and that the plaintiff acted unreasonably in failing to take advantage of preventive or corrective opportunities provided by the employer. Here, it is clear that Episcopo is not a supervisor for purposes of imputing liability to the County on Kelly Seale's hostile work environment claim. Moreover, even if he were a supervisor, the County has established its affirmative defense to Kelly's Seale's claim. Finally, having concluded that Episcopo was Kelly Seale's co-worker, the County cannot be deemed negligent based on the uncontroverted evidence that no one at the County knew of the harassment until after the fact and, once learning of Kelly Seale's complaint, immediately took steps to prevent any further harassment.

The Supreme Court defines a "supervisor" for purposes of an employer's vicarious liability under Title VII as an employee who is empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance,* 133 S.Ct. at 2439, 2443 (quotation and citation omitted). Defendants have identified undisputed record evidence that Episcopo did not have the ability to effect a significant change in Kelly Seale's employment status. For example, both Riley and Bailey testified that Episcopo did not have the ability to hire, fire, promote, demote, make any decision substantially changing the salary or benefits of, or substantially reassigning the duties of Kelly Seale. The only record evidence to the contrary is

David Seale's conclusory testimony that Episcopo made recommendations of termination to the Sheriff, who usually followed those recommendations. As indicated in Point II.A. of this Decision and Order, a non-moving party may not rely on conclusory allegations to defeat a motion for summary judgment.

**\*17** Also, Plaintiffs make much of the several references throughout the record that Episcopo was in Kelly Seale's chain of command and that he signed her time sheets, effecting her pay. To be sure, the only evidence in the record regarding Kelly Seale's pay is that Episcopo would occasionally receive her time records and would then sign them and pass them on to payroll and that on one occasion he did not timely pass along her time sheet to payroll. This incident, resulting in a one-time delay in Kelly Seale receiving a paycheck, does not rise to the level of a substantial change in salary. Moreover, the mere ability to direct or assign work does not amount to a "tangible employment action." *Wiercinski v. Mangia 57, Inc. .,* ——— F.Supp.2d ———, ———, 2014 WL 1672381, at \*17 (E.D.N.Y.2014) (citation omitted).

However, even assuming Episcopo was Kelly Seale's supervisor, the County has identified undisputed evidence that during the time of the events underlying this action, it had a sexual harassment policy in the workplace and provided a procedure by which employees could complaint of such harassment. In addition, the record is clear that Kelly Seale was aware of the policy and procedures for making a complaint but that prior to November 5, 2009, she never complained to anyone at the County, including David Seale, about the harassment, which she claims began as early as May 2008. The record is also clear that Kelly Seale experienced no harassment from Episcopo after she complained to Bailey on November 5, 2009. As indicated in Part II.B.1. of this Decision and Order, where, as here, an employer maintains a policy against sexual harassment and provides a process through which employees can complain about violations of the policy; where, as here, the plaintiff employee fails to take advantage of that system until more than a year after the alleged harassment began; [9] and where, as here, the offensive conduct ceased once the plaintiff reported it, an employer will have established its affirmative defense to a claim of strict liability for the harassing behavior of its supervisor-employee.

[9] Plaintiffs' frequent unsupported assertions throughout its Response to Defendants' Statement of Material Facts that Kelly Seale did not timely report the harassment because she was afraid of retaliation fails to create a question of material fact for two reasons. First, in violation of this Court's Local Rules and caselaw, Plaintiffs fail to cite to any evidence in the record supporting this assertion. Second, Plaintiffs fail to cite any record evidence supporting the basis for Kelly Seale's asserted fear of retaliation. *See Leopold,* 239 F.3d at 246 ("A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.").

Finally, given that Episcopo was Kelly Seale's co-worker, Defendants have identified undisputed record evidence that the County provided a reasonable avenue for complaint, of which Kelly Seale was aware, and that it did not learn of the harassment until November 5, 2009, after which time Kelly Seale admits, she experienced no further harassment by Episcopo.

For these reasons, Defendants' motion for summary judgment on Kelly Seale's Title VII and NYHRL hostile work environment claims is granted. [10]

[10] As indicated in Part II.B.1. of this Decision and Order, this Court's ruling regarding Kelly Seale's Title VII claim applies with equal force to her tandem claim under the NYHRL. Nonetheless the Court briefly addresses the parties' arguments that there is a different standard regarding employer liability the under the NYHRL. To be sure, New York courts have held that "[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *Doe v. State,* 89 A.D.3d 787, 933 N.Y.S.2d 688, 690 (2011)). "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *Div. of Human Rights v. St. Elizabeth's Hosp.,* 487 N.E.2d 268, 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411 (1985); *see also Selmanovic v. NYSE Grp., Inc.,* No. 06–CV–3046, 2007 WL 4563431, at \*4 (S.D.N.Y. Dec. 21, 2007) (same). Alternatively, an employer's "calculated inaction in response to discriminatory

conduct, may as readily as affirmative conduct, indicate condonation ." *Guzman v. Macy's Retail Holdings, Inc.,* No. 09–CV–4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010)* (quoting *Melendez v. Int'l Serv. Sys., Inc.,* No. 97–CV–8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr.6, 1999))*. Here, again, the record contains undisputed evidence that, once aware of Kelly Seale's allegations of harassment, it took action to investigate and prevent further harassment. Moreover, the evidence is clear that no further harassment took place after the County learned of Kelly Seale's complaint. Accordingly, on this alternative basis, Defendants' motion for summary judgment is granted regarding Kelly Seale's NYHRL hostile work environment claim against the County.

Second, Plaintiffs' Section 1983 claim of hostile work environment against Episcopo must be dismissed because the record contains undisputed evidence that the alleged incidents of harassment are not severe or pervasive as a matter of law.

Here, Kelly Seale identifies the following incidents in support of her hostile work environment claim: (1) in May 2008, Episcopo placed a radio, at a loud volume, outside of his office so that Plaintiff could not hear what was being said in his office, and later, after Kelly Seale complained, Episcopo removed the radio, telling Kelly Seale, "your radio privileges have been revoked," (2) in September 2008, Episcopo failed to timely pass Kelly Seale's timesheet to payroll, resulting in her paycheck being late, (3) in October 2008, Episcopo loudly stated from inside his office that "this department is made up of a bunch of fucking cry babies that can't do their jobs" and referenced others "milking comp and crying that their arms hurt," (4) on December 10, 2008, a pornographic snowman cartoon appeared on Kelly Seale's desk, (5) in July 2009, after Kelly Seale returned from vacation, Episcopo loudly sang "the bitch is back" song and stated "red rocket" from inside his office, (6) on November 2, 2009, Episcopo invited everyone in the office except Kelly Seale to help themselves to snacks in the break room, and (7) on November 4, 2009, Episcopo loudly stated from his office that he was happy Zophy lost the election and that he was going to get rid of "those Zophy supporters one by one."

**\*18** As indicated in Part II.B.1. of this Decision and Order, in order to be considered actionable conduct for purposes of a hostile work environment claim based

on sex, the treatment must be because of the plaintiff's membership in a protected class, such as unwelcome sexual advances, requests for sexual favors, or, as is relevant here, other conduct of a sexual nature. The only incidents of conduct here that comport with the definition of actionable conduct are the December 2008 snowman cartoon incident and the July 2009 "bitch is back" incident. The remaining asserted incidents of conduct, while seemingly offensive or rude, are not actionable because they are not predicated on Kelly Seale's sex. *See Matthews v. Corning Inc.,* —— F.Supp.3d ——, ——, 2014 WL 7499457, at *14 (W.D.N.Y.2014)* (failure to connect any gender based comment to other allegations of unfair treatment and crass and offensive remarks that are not predicated on plaintiff's protected class are not actionable) (citations omitted).

Regarding the actionable conduct, the Court notes that there is a lack of record evidence that it was Episcopo who placed the pornographic snowman cartoon on Kelly Seale's desk. Kelly Seale testified that anyone who had access to the hallway where her work station was located could have placed the cartoon on her desk and she has no firsthand knowledge that it was Episcopo who did so. David Seale's testimony that, several years prior to December 2008, he and others received the exact same snowman cartoon from Episcopo via email, does not constitute evidence upon which a reasonable jury could conclude that Episcopo placed the cartoon on Kelly Seale's desk in December 2008.

However, even assuming there was evidence that it was Episcopo who placed the cartoon on Kelly's desk, that incident, coupled with the July 2009 "bitch is back"/"red rocket" [11] incident, do not rise to the requisite severe or pervasive conduct to prevail on a hostile work environment claim. *See, e.g., Monclova v. City of New York,* No. 12–CV–3187, 2014 WL 4828813, at *11 (E.D.N.Y. Sept. 29, 2014)* (citing *Godineaux v. Laguardia Airport Marriott Hotel,* 460 F.Supp.2d 413, 422–23 (E.D.N.Y.2006))* (holding that defendant's sexual comment and gestures in front of plaintiff, defendant's promise that defendant would "give Plaintiff stock tips if Plaintiff would sleep with him," and defendant's attempt to kiss plaintiff "did not rise to the level" of a hostile work environment); *DeSimone v. JP Morgan/Chase Bank,* No. 02–CV–7039, 2004 WL 2978011, at *6 (S.D.N.Y. Dec.22, 2004)* (granting defendant's motion for summary judgment on plaintiff's hostile work environment claim

where, over a six-week period, plaintiff's supervisor "asked her out for drinks and dinner repeatedly, despite being rejected each time," "leered and stared at [plaintiff's] body during their encounters in the office," and made derogatory comments about other female employees); *Spina v. Our Lady of Mercy Med. Ctr.,* No. 97–CV–4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct.23, 2002) (holding that defendants' actions were not sufficiently severe to create a hostile work environment where plaintiff's supervisor called her a "bitch," complimented her hair and eyes, and told her she "looked good in tight pants")).

[11]   To be sure, the phrase, "red rocket" alone is insufficiently actionable, given that Kelly Seale testified that, as of July 2009, she did not understand its origin, and that Episcopo and the deputy he was conversing with merely said "red rocket" without any further discussion of its context.

**\*19** Moreover, the Court of Appeals for the Second Circuit has found far more inappropriate conduct not to be sufficiently severe or pervasive to create a hostile work environment. *See Monclova,* 2014 WL 4828813, at *11 (citing *Cristofaro v. Lake Shore Cent. Sch. Dist.,* 473 F. App'x 28, 30 (2d Cir.2012)). In *Cristofaro,* the Court of Appeals found that the record indicated "only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment" where over a seven year period, an employee's supervisor "occasionally commented on [plaintiff's] physical appearance," "participated in a bet with three other male employees as to whether [the supervisor] would be able to engage [plaintiff] in sexually explicit conversation," engaged "in conversation unrelated to work once a month for three-and-half years," and "briefly made contact with the side of [plaintiff's] body," among other actions. *See Cristofaro,* 473 F. App'x at 30 (citing *Alfano v. Costello,* 294 F.3d 365, 379–80 (2d Cir.2002)). Here, at best, Kelly Seale experienced two incidents of inappropriate sexual conduct in the workplace that occurred seven months apart, neither of which was physically threatening. Based on the totality of evidence, no reasonable jury could conclude that Kelly Seale was subjected to a hostile work environment. *See Alfano,* 294 F.3d at 378–80 (five incidents, spanning more than four years, including a graphic cartoon and several sexually humiliating events

witnessed by others did not rise to the requisite level of severe or pervasive conduct for a reasonable jury to conclude that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule and insult") (citation omitted). For these reasons, Defendants' motion for summary judgment dismissing Kelly Seale's Section 1983 hostile work environment claim against Episcopo is granted.

### B. Kelly Seale's Retaliation Claims

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Kelly Seale's Title VII and First Amendment retaliation claims.

First, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's Title VII retaliation claim. Kelly Seale claims that Defendants retaliated against her for her complaint of sexual harassment against Episcopo by changing her office location and changing her vehicle assignment. Neither action is adverse for purposes of a Title VII retaliation claim.

To be sure, the Court denied Defendants' motion for judgment on the pleadings regarding this claim "in an abundance of caution" due to Kelly Seale's allegation that the change in office location resulted in a drastic change in the flexibility of her work schedule. *Seale,* 929 F.Supp. at 76–77. In support, the Court relied on *Lundy v. Town of Brighton,* 732 F.Supp.2d 263, 276 (W.D.N.Y.2010) (citing *Washington v. Illinois Dep't of Revenue,* 420 F.3d 658 (7th Cir.2005)). In *Lundy,* the plaintiff police officer alleged that she was having mental health issues and needed to seek treatment, which prevented her from participating in a training schedule mandated by her employer. There, the court observed that "[t]hough a simple change in work schedule will not ordinarily rise to the level of a materially adverse action, when viewed in the context of the difficulties that plaintiff was experiencing at the time and the other surrounding circumstances, the schedule changes could reasonably be found to constitute adverse actions." *Lundy,* 732 F.Supp.2d at 276. The Seventh Circuit Court of Appeals in *Washington,* relied on by the court in *Lundy,* found that a change in work schedule requiring the mother of a disabled child to arrive at work two hours earlier is materially adverse for her, even though it would not have been for 99 percent of the staff. *See Washington,* 420 F.3d at 662.

**\*20** Here, after discovery, there are no facts in the record to support the conclusion that the change in Kelly Seale's office location was adverse to her. To the contrary, David Seale testified that, other than when one of their kids was sick, there was nothing that Kelly Seale needed to be doing at home or elsewhere during the hours of 9 a.m. and 3:30 p.m. (Dkt. No. 37–3 at 174:8175:5.) Plaintiffs have failed to identify any record evidence of extenuating circumstances that would render Kelly Seale's change in office location, and consequent change in schedule flexibility, materially adverse.

Regarding Plaintiff's change in vehicle assignment, the record is devoid of facts upon which a reasonable jury could rely to conclude that such employment action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 68, 126 S.Ct. at 2415. Here, Kelly Seale testified that the green van she was assigned to use, which she drove on only one occasion, was dirty, smelly, and that the brakes did not work well, requiring her to keep pumping them and to push the brake pedal all the way to the floor to get the vehicle to stop. Even assuming a jury were to credit this testimony, it does not rise to the level of adverse action required to prevail on a Title VII retaliation claim. The Court of Appeals for the Second Circuit, in an ADEA retaliation case applying the same standard as applied in Title VII cases pursuant to *Burlington Northern & Santa Fe Railway,* affirmed a lower court's holding that the plaintiff failed to assert an adverse employment action based on the denial or substantial delay of his ability to have necessary mechanical repairs and maintenance performed on his work vehicle. *See Witkowich v. Holder,* No. 05–CV–7756, 2010 WL 1328364, at \*8 (S.D.N .Y. Mar. 21, 2010), *aff'd,* 424 F. App'x 20 (2d Cir.2011).

In addition, the record contains no direct evidence that the decisions to change Kelly Seale's work location or to reassign her vehicle were motivated by retaliation for her complaint of sexual harassment. Rather, the only evidence of retaliatory motive is the temporal proximity between Kelly Seale's November 2009 complaint and her January 2010 office relocation and May 2010 vehicle reassignment. Even assuming that evidence is enough to establish causation, Defendants have met their burden to identify uncontroverted record evidence of legitimate, non-retaliatory reasons for the decision to relocate Kelly Seale's office and the decision to reassign her vehicle. The record shows that Kelly Seale's office was moved to the COB in order to reduce friction between her and Episcopo and that there were safety concerns motivating Riley's decision to reassign Kelly Seale, a civilian employee, to an unmarked vehicle.

For these reasons, Defendants' motion for summary judgment is granted regarding Kelly Seale's Title VII retaliation claim.

Second, Defendants have met their burden to show the absence of a material issue of fact regarding Kelly Seale's First Amendment retaliation claim. Plaintiffs have failed to oppose Defendants' motion regarding this claim. As indicated in Part II.A. of this Decision and Order, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a modest burden. *See* N.D.N.Y. L.R. 7.1(b)(3).

**\*21** Defendants argue both that the record fails to support Kelly Seale's assertion that her support of Zophy was a motivating factor in Defendants' retaliation or that she suffered an adverse action for purposes of a First Amendment retaliation claim. Defendants are correct.

Regarding causation, Kelly Seale testified that she was neutral regarding Zophy's candidacy and did not express support for his bid for County Sheriff. Accordingly, the record does not support Kelly Seale's claim that she engaged in constitutionally protected speech, which is the first element of her First Amendment retaliation claim.

Further, the record does not reflect any evidence that Kelly Seale suffered an adverse action that would warrant relief on this claim. As indicated above in Part II.B.3., in the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Zelnik,* 464 F.3d at 225. This standard is broader than the standard of what constitutes an adverse action on a gender discrimination claim, but is similar to the standard for the same element of a Title VII retaliation claim, which is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461

F.3d 199, 207 (2d Cir.2006) (quoting *White,* 548 U.S. at 68, 126 S.Ct. at 2415). "The list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying." *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir.2012) (citation omitted). Here, the record is devoid of any factual basis for Kelly Seale's assertion that she suffered adverse action warranting relief on her First Amendment retaliation claim for the same reasons that such assertion fails regarding her Title VII retaliation claim, as previously articulated.

For these reasons, Defendants' motion for summary judgment is granted regarding Kelly Seale's retaliation claims under both Title VII and the First Amendment.

### C. David Seale's First Amendment Retaliation Claim
After carefully considering the matter, the Court grants Defendants' motion for summary judgment on David Seale's First Amendment retaliation claim.

Defendants have met their burden to show the absence of a material issue of fact regarding David Seale's First Amendment retaliation claim. David Seale claims that Defendants engaged in several separate adverse actions in retaliation for his support of Zophy in the 2009 election for County Sheriff. For the following reasons, these alleged adverse actions are not actionable grounds to support David Seale's First Amendment retaliation claim and/or the record is devoid of facts upon which a reasonable juror could find that Defendants' actions were motivated by the protected speech.

**\*22** First, David Seale contends that he was retaliated against for his support of Zophy in when, in 2008, he received a written counseling, at the direction of Episcopo, for his use of sick days in conjunction with his pass days. Also, David Seale contends that one of the tires on his patrol car was slashed by Episcopo in July 2008 in retaliation for his support of Zophy. "[I]t is obvious that protected activity must precede any purported retaliation to [establish] a First Amendment retaliation claim." *Rankel v. Town of Somers,* 999 F.Supp.2d 527, 542 (S.D.N.Y. Feb.25, 2014) (citing *Parkash v. Town of Se.,* No. 10–CV–8098, 2011 WL 5142669, at \*7 (S.D.N.Y. Sept.30, 2011), *aff'd,* 468 F. App'x 80 (2d Cir.2012)). Here,

David Seale publicly supported Zophy in the Fall of 2009. Accordingly, no reasonable jury could find that the 2008 incidents of alleged adverse actions were retaliatory.

Next, David Seale contends, for the first time in his memorandum of law in opposition to Defendants' motion for summary judgment, that Riley's failure to interview him for a sergeant position in January 2014 was motivated by David Seale's support of Zophy in the 2009 election. The Court need not, and does not, consider a claim presented for the first time in an opposition to a summary judgment motion. *See Weber v. City of New York,* 973 F.Supp.2d 227, 275, n. 26 (E.D.N.Y.2013) (citing *Lyman v. CSX Transp., Inc.,* 364 F. App'x 699, 701 (2d Cir.2010)). Nonetheless, even if the Court were to consider this new ground, David Seale's retaliation claim cannot survive on this basis because the record is devoid of any evidence, either direct or temporal, that Riley was motivated by retaliation and the evidence that has been submitted supports the conclusion that Riley would have offered the position to another candidate even in the absence of David Seale's support for Zophy.

In addition, David Seale's contention that his patrol vehicle was vandalized in various ways when he returned to active duty in May 2010 cannot form the basis for his retaliation claim because there is no admissible evidence that any of the Defendants were involved in any such vandalism. The record regarding the May 2010 vandalism includes David Seale's testimony that he has no information that Riley, Bailey or Aylward were involved and Episcopo's affidavit stating that he was not involved. David Seale's interrogatory response that he does not know who performed the acts of vandalism, but that they started to occur shortly after Kelly Seale filed her complaint against Episcopo when there had never been any such acts of vandalism before is not direct or circumstantial evidence that Episcopo was involved in the May 2010 vandalism, and even if it were evidence of his involvement, the assertion is that he engaged in the alleged adverse action in retaliation for Kelly Seale's complaint against him, not David Seale's support of Zophy. [12] For these reasons, the alleged May 2010 vandalism may not form the basis for David Seale's First Amendment retaliation claim.

[12]     Despite the multiple references in Plaintiffs' opposition papers to retaliatory acts against David Seale that were motivated by Kelly Seale's harassment

complaint against Episcopo, the Court has previously dismissed, as a matter of law, David Seale's retaliation claim on that basis. *See Seale,* 929 F.Supp.3d at 78–79 (citing *Thompson v. North Am. Stainless, LP,* 562 U.S. 170, 131 S.Ct. 863, 870, 178 L.Ed.2d 694 (2011)) (dismissing David Seale's Title VII claims, including his claim for retaliation, based on lack of subject matter jurisdiction due to his failure to file a charge with the Equal Employment Opportunity Commission).

**\*23** David Seale's contention that the December 2009 denial of reimbursement for physical therapy is retaliatory also fails as a basis for his First Amendment retaliation claim because the record does not contain any evidence that any of the Defendants were involved in that decision. In fact, Riley, Bailey, Episcopo and Aylward each averred or testified that they had no involvement in the denial of David Seale's physical therapy reimbursement. David Seale himself testified that it was PERMA who denied his request, not the County. David Seale's conslusory assertion, by interrogatory response, that, in the past, Sheriff Cary would intervene on his behalf with PERMA to take care of the issues with the denial of payment for physical therapy, but that, once Riley became Sheriff, he would not take care of these issues, is not evidence that Riley denied the reimbursement in the first instance. Accordingly, the December 2009 denial of reimbursement for physical therapy by PERMA cannot form the basis of David Seale's retaliation claim against Defendants.

The remaining alleged acts of retaliation include the November 2009 denial of vacation buyback benefits by Bailey, the April 19, 2010 directive from Riley that, while out on worker's compensation and Section 207–c leave, David Seale must communicate with his supervisor when he planned to leave his residence during work hours, and the April 29, 2010 denial by Riley of David Seale's requested shift change. To be sure, David Seale returned to work the following month, avoiding any loss of buyback benefits, and each of the April 2010 actions were rescinded, with minimal or no harm to David Seale.

The Court of Appeals has held that actions which are *de minimus* in nature may not be considered adverse for purposes of a First Amendment retaliation claim. *See Zelnik,* 464 F.3d at 227–228 (finding that the denial of emeritus status for a professor is not an adverse action where the benefits of such status carried little or no value and was merely honorific). Also, while a combination of seemingly minor incidents may form the basis of adverse

action once they reach a "critical mass" and "create a working environment unreasonably inferior to what would be considered normal for that position," that is not the case here. *Cf. Shanks v. Vill. of Catskill Bd. of Trs.,* 653 F.Supp. 158, 166 (N.D.N.Y.2009) (quoting *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002)) (finding a workplace environment that included "a sustained, systematic course of verbal harassment, threats, ostracism and generally demeaning behavior in order to drive [plaintiff] out of the Company" as well as the assignment of menial tasks, harassment outside plaintiff's home with obscene gestures, verbal insults, threats and the honking of horns to be considered a critical mass of incidents that create an adverse action for purposes of a First Amendment retaliation claim). Here, David Seale suffered no loss of income or employment benefit and the effects of each decision lasted less than a month before it was rectified or reversed. On this record, no reasonable juror could conclude that a person of ordinary firmness would be deterred by this alleged conduct from exercising his right to free speech.

**\*24** Moreover, the record is devoid of any direct evidence that any of the Defendants involved in these three alleged adverse actions were motivated by David Seale's support of Zophy in the 2009 election. While there is an indirect inference of retaliatory animus based on temporal proximity between David Seale's support of Zophy and the denial of his vacation buyback benefits, the April 2010 actions are too remote, especially given the lack of direct evidence of animus. The Supreme Court has observed that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 27374, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing decisions that hold three and four month intervening periods te be too attenuated to support inference of causality).

Therefore, for the foregoing reasons, Defendants' motion for summary judgment on David Seale's First Amendment retaliation claim is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' letter motion to strike Plaintiffs' response to Defendants' Statement of Material

Facts and to award Defendants attorney's fees for their preparation of the letter motion (Dkt. No. 43) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED;** and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED.** The Clerk of the Court is directed to enter judgment and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 667531, 2015 Fair Empl.Prac.Cas. (BNA) 176,803

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.   20

2017 WL 519246
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth J. Phelan, Plaintiff,

v.

R. Thomas et al., Defendants.

9:10-cv-11 (GLS/DJS)
|
9:10-cv-12 (GLS/DJS)
|
Signed 02/08/2017

**Attorneys and Law Firms**

Michael W. Macomber, Tully, Rinckey Law Firm,
Albany, NY, for Plaintiff.

Kenneth J. Phelan, Attica, NY, pro se.

Joshua E. McMahon, Joshua L. Farrell, New York State
Attorney General, Albany, NY, for Defendants.

## MEMORANDUM-DECISION AND ORDER

Gary L. Sharpe, Senior District Judge

### I. Introduction

**\*1** Plaintiff Kenneth J. Phelan commenced this action
and another, which was subsequently consolidated,
against numerous defendants. (Dkt. Nos. 1, 67; Dkt.
No. 1, 9:10-cv-12.) Phelan thereafter filed a consolidated
amended complaint, which serves as the operative
pleading. (Am. Compl., Dkt. No. 88.) Pending is
defendants' motion for summary judgment. (Dkt. No.
131.) For the reasons that follow, the motion is granted
and the amended complaint is dismissed.

### II. Background

#### A. Facts [1]

[1]     Unless otherwise noted, the facts are not in dispute.

General familiarity with the facts is presumed from the
court's prior Memorandum-Decision and Order. (Dkt.
No. 110 at 2-9.) As relevant here, Phelan, an inmate in the
custody of the New York Department of Corrections and
Community Supervision (DOCCS), was housed at Mt.
McGregor Correctional Facility during the period of time
pertinent to this case. (Defs.' Statement of Material Facts
(SMF) ¶ 1, Dkt. No. 131, Attach. 1.) Defendants Richard
Thomas, David Hirsch, Marina Scott, and Jonathan
Michael were all employed as corrections officers at Mt.
McGregor during the time in question. [2] (*Id.* ¶¶ 2-5.)

[2]     The Clerk is directed to amend the caption to reflect
the proper spelling of Hirsch and Michael. (Dkt. No.
131, Attach. 7; Dkt. No. 131, Attach. 10.)

#### 1. April 2, 2009 Incidents

While the parties disagree as to exactly why or how,
Phelan was found by Scott in Building 10, which
included the Grievance Office, on April 2, 2009. (*Id.* ¶¶
34-37.) According to defendants, Scott observed Phelan
in Building 10; he told her that "he wanted to go to the
Grievance Office, which was closed at that time." (*Id.*
¶ 36.) Defendants claim that Scott instructed Phelan to
leave the building, which he eventually did. (*Id.*) Scott
issued a misbehavior report charging Phelan with three
rule violations. (*Id.* ¶ 38.) Presumably before issuing the
misbehavior report, Scott spoke with Hirsch to ask if
he had given Phelan permission to go to Building 10;
Hirsch denied that he had done so then and at a later
disciplinary hearing. (*Id.* ¶¶ 39, 41.) Scott also testified
at the disciplinary hearing and "affirmed the accuracy of
the misbehavior report" filed by Scott. (*Id.* ¶ 40.) Phelan
later admitted his guilt to the charges contained in the
misbehavior report issued by Scott. (*Id.* ¶ 42.)

After his return to the building in which he was housed,
Thomas and Hirsch performed a cell search of Phelan's
living quarters while "Phelan remained outside." (*Id.* ¶¶
11, 14; Dkt. No. 141 at 33.) Phelan contends that his
clothing and legal papers were thrown on the floor and
"stomped on," (Dkt. No. 141 at 152), but he admits that
none of "his property was destroyed or taken during the ...
search," (Defs.' SMF ¶ 17). Phelan also claims that he "was
threatened during the search that any further attempt
at filing a grievance would be met with further scrutiny
and retaliatory treatment." (Dkt. No. 141 at 152-53.)
The search yielded "a sheet of paper with what appeared
to be gang references, another sheet with derogatory

references to CO Thomas, a handkerchief marked 'IB 9,' and a quantity of butter and sugar that should have been consumed in the mess hall." (Defs.' SMF ¶ 19.) As a result of Phelan's possession of those items, Thomas charged him with rule violations in a misbehavior report to which Phelan ultimately pleaded guilty. (*Id.* ¶¶ 20, 27, 28.)

### 2. April 14, 2009 Incident

**\*2** Phelan claims that, on April 14, 2009, "Michael struck him with 'an open' hand[ ] 'two or three times,' " that his head was " 'sore' " as a consequence, and that the incident aggravated his traumatic brain injury (TBI). (*Id.* ¶¶ 50, 52, 53.) Michael has no recollection of ever interacting with Pehlan at Mt. McGregor. (*Id.* ¶¶ 55, 58.) In any event, Phelan suffered no "bruising, edema, or physical injury as a result" of the alleged used of force by Michael, and no medical diagnosis supports Phelan's claims that his TBI was aggravated by Michael's open-handed strikes (*Id.* ¶¶ 51, 53.)

### 3. Americans with Disabilities Act Claim

Generically, Phelan alleges that certain defendants, including those discussed above and defendant Dr. Peter Millson, a Mental Health Director employed by DOCCS at a particular facility, prevented him from receiving mental health treatment. (Am. Compl. ¶¶ 115-22; Dkt. No. 131, Attach. 11 ¶ 1.) Phelan claims that defendants called him a "retard" when they denied him treatment, access to the law library, and prevented him from filing grievances. (Am. Compl. ¶ 118.) As the court has previously noted, Phelan's ADA Title II claim can be categorized as among those seeking redress for irrational disability discrimination. (Dkt. No. 110 at 24 n.14.)

### B. Procedural History

After Phelan filed his consolidated amended complaint, (Dkt. No. 88), defendants moved to dismiss. (Dkt. No. 102.) The court granted in part and denied in part the motion, leaving only a handful of claims remaining: (1) First Amendment retaliation against Hirsh and Thomas, relating to their cell search on April 2, 2009; (2) First Amendment retaliation against Thomas and Scott, relating to misbehavior reports issued pursuant to the April 2, 2009 cell search; (3) Eighth Amendment excessive force against Michael, relating to striking Phelan in the head several times; and (4) Title II of the ADA against all defendants in their official capacities. Following

discovery, (Dkt. No. 128), the instant motion was filed, (Dkt. No. 131.)

### III. **Standard of Review**

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 Fed.Appx. 500 (2d Cir. 2012).

### IV. **Discussion**

Defendants seek dismissal of the claims that survived their earlier-filed motion to dismiss for a litany of reasons, some of which the court need not reach.[3] (Dkt. No. 131, Attach. 13.) With respect to Phelan's First Amendment retaliation claims against Thomas and Hirsch for the April 2, 2009 cell search, defendants assert that, even if the search was in retaliation for protected activity, because no property was taken or destroyed, summary judgment must be entered in defendants' favor. (*Id.* at 4-5.) The retaliation claim against Thomas and Scott is infirm, argues defendants, because the misbehavior reports were justified by Phelan's conduct apart from any retaliatory animus, and the reports would have been issued even if there was no retaliatory motive. (*Id.* at 5-8.) As to Phelan's Eighth Amendment claim, defendants contend that the use of force was *de minimis.* (*Id.* at 9-10.) Lastly, defendants assert that they are entitled to summary judgment on the ADA claims because Phelan has failed to demonstrate that he was denied any programs or services because of disability and because sovereign immunity shields them from liability. (*Id.* at 13-17.)

[3]     For example, in light of the court's resolution of the issues discussed below, it need not reach defendants' arguments about qualified immunity or Phelan's failure to exhaust his administrative remedies. (Dkt. No. 131, Attach. 13 at 8-9, 17-19.)

**\*3** In response to defendants' arguments, Phelan asserts that the cell search—in particular its timing and manner coupled with comments made by Scott, Hirsch, and Thomas—"would deter a similarly situated individual of ordinary firmness from exercising his constitutional

rights." (Dkt. No. 141 at 10.) Phelan further contends that issues of fact as to whether he was given permission by Hirsch to go to the library, and whether Phelan's conduct involved "danger to life, health, security or property" exist and preclude summary judgment on the false misbehavior report claim. (*Id.* at 10-11.) His admission of guilt to the misbehavior reports should not be considered, argues Phelan, because he had no counsel during the disciplinary proceedings and suffers from, among other things, a TBI. (*Id.* at 11.) Although it is not entirely clear why it is relevant, Phelan also alleges that he may have been misclassified and entitled to mental health treatment at the outset of his imprisonment. (*Id.* at 11-12.) The Eighth Amendment claim is not subject to summary judgment, according to Phelan, because the facts tend to show a wanton state of mind by Michael and the absence of a lasting injury is not fatal to his claim. (*Id.* at 12-14.) Phelan also argues against entry of summary judgment on his ADA claim. (*Id.* at 14-24.)

## A. First Amendment Retaliation Claims

As should be clear from the foregoing, two of Phelan's claims of retaliation survived defendants' motion to dismiss. For essentially the reasons argued by defendants, and as explained below, their motion for summary judgment is granted as to these claims.

### 1. Cell Search

To make out a claim of retaliation, the plaintiff must show, among other things, that adverse action was taken by the defendants in connection with the plaintiff's protected speech. *See Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015). Adverse action, as it relates to a retaliatory cell search, requires more than a search alone. *See Stewart v. Richardson*, No. 15 CV 9034, 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016). Indeed, the plaintiff must demonstrate a search and "other wrongful conduct," such as the destruction or confiscation of property, that evinces the requisite deterrent of a similarly situated inmate of ordinary firmness from exercising his or her constitutional rights. *Id.*; *see Guillory v. Haywood*, No. 9:13-cv-01564, 2015 WL 268933, at *21 (N.D.N.Y. Jan. 21, 2015).

Here, Phelan readily admits that none of his property was taken or destroyed. (Defs.' SMF ¶ 17.) He contends, however, that the "search coupled with the timing and manner it was conducted and the harassing comments [4] and threats made by ... Scott, Hirsch and Thomas would

deter a similarly situated individual of ordinary firmness from exercising his constitutional right." (Dkt. No. 141 at 10.) What is most notably absent from Phelan's legal argument is any citation to authority that supports the notion that a search coupled with statements can amount to adverse action. The claim that survived summary judgment was for retaliation based on the cell search, (Am. Compl. ¶ 104), yet Phelan now attempts to expand upon that claim by suggesting that he was verbally threatened too. The court cannot permit Phelan to move the target at this late juncture nor are the non-specific statements actionable in any event. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *Lunney v. Brureton*, No. 04 CIV. 2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007). In any event, as a matter of law, Phelan cannot demonstrate adverse action in connection with the cell search because he has only shown that a search occurred and, at most, the corrections officers involved in the search were discourteous to him and made non-specific threats. Accordingly, defendants are entitled to summary judgment on Phelan's First Amendment retaliation claim based on the cell search.

[4]     Phelan alleges in a declaration prepared in connection with the summary judgment motion that Thomas said "This is how we deal with grievances retard. Next time, it will be worse." (Dkt. No. 141 at 33.)

### 2. Misbehavior Reports

"The Second Circuit has held that, '[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred.' " *Lunney*, 2007 WL 1544629, at *22 (quoting *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)). Assuming that a defendant's actions were retaliatory, that defendant may be entitled to summary judgment nonetheless provided he demonstrates that he would have " 'taken exactly the same action absent the improper motive.' " *Id.* (quoting *Scott*, 344 F.3d at 288).

**\*4** Here, Phelan argues that issues of fact preclude summary judgment. (Dkt. No. 141 at 10-11.) Phelan's arguments are not persuasive in light of his admission to facts that demonstrate that the reports were issued for legitimate reasons, including his admission to the disciplinary charges themselves. [5] (Defs.' SMF ¶¶ 20-21, 26-28, 40-42.) The attempt by Phelan to manufacture

issues of fact to preclude summary judgment is unavailing because the undisputed facts amply demonstrate that the misbehavior reports would have been issued even if there was no retaliatory motivation by Scott or Thomas. Accordingly, defendants are entitled to summary judgment on the retaliation claims based on the misbehavior reports.

[5]     It should be noted that Phelan's contention that an issue of fact exists regarding whether he was given permission by Hirsch to go to Building 10, (Dkt. No. 141 at 10), is irrelevant to the question of whether Scott's misbehavior report would have been issued absent any retaliatory motivation. Phelan admits that Hirsch told Scott that Phelan was not given permission to go to Building 10. (Defs.' SMF ¶ 39.) Even if Hirsch lied to Scott, it only strengthens the notion that Scott did not issue the misbehavior report for a retaliatory reason. In addition, Phelan fails to address the specifics of the misbehavior report issued by Thomas and whether that report would have been issued in the absence of retaliatory motive, assuming there was such motive. As explained above, the arguments advanced by Phelan are inconsistent with his admission of facts that establish defendants' dual motivation.

## B. Excessive Force Claim

Claims of excessive force in violation of the Eighth Amendment, have two components—"one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). To satisfy the first component, the plaintiff must show "that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Id.* (internal quotation marks and citation omitted). Wantoness "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson v. McMillan*, 503 U.S. 1, 7 (1992)). The objective inquiry, on the other hand, focuses on "the nature of the force—specifically, whether it was nontrivial and 'was applied ... maliciously and sadistically to cause harm.' " *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (quoting *Hudson*, 503 U.S. at 7). Thus, the severity of the injuries ultimately inflicted is not dispositive. *See id.* At the same time, "*de minimis* uses of forces are ' necessarily exclude[d] from

constitutional recognition.' " *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Wilkins*, 559 U.S. at 37).

Here, Phelan seemingly concedes that he suffered no "lasting physical injury," (Dkt. No. 141 at 13); indeed the record is devoid of any competent evidence to demonstrate that Phelan suffered anything other than some soreness. (Defs.' SMF ¶¶ 51-53.) He instead focuses on the circumstances under which Michael allegedly slapped him with an open hand "two or three" times. (*Id.* at 14.) The conduct alleged here—two or three open-handed slaps that caused no lasting injury—falls short of the objective component of an Eighth Amendment excessive force claim. *See Wright*, 554 F.3d at 269; *Jones v. Goord*, No. 05-CV-0182A, 2008 WL 904895, at *4 (W.D.N.Y. Mar. 31, 2008) (finding an open-handed slap to be "considered a *de minimis* use of force, especially in light of" the lack of any lasting injury); *see also Hogan v. Fischer*, No. 09-CV-6225, 2012 WL 4845609, at *5 (W.D.N.Y. Oct. 10, 2012) (citing *Jones* favorably and reaching the same conclusion in case where "a 'light slap' " was alleged), *vacated in part on other grounds*, 738 F.3d 509 (2d Cir. 2013). Accordingly, defendants are entitled to summary judgment on Phelan's excessive force claim.

## C. ADA Title II Claim

 **\*5** Defendants argue that Phelan's ADA claim is both without merit and, in any event, barred by sovereign immunity. (Dkt. No. 131, Attach. 13 at 10-17.) The sovereign immunity issue was discussed at length in the court's prior Memorandum-Decision and Order. (Dkt. No. 110 at 17-25.) What was said there need not be said again here. In the end, the court denied defendants' motion to dismiss on immunity grounds because, understandably, defendants did not address the tripartite test set forth in *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). (*Id.* at 23-25.) Because of its global impact on Phelan's ADA Title II claim, it is most expeditious to consider whether Congress validly abrogated sovereign immunity when it enacted Title II. For the reasons discussed below, defendants are immune from Phelan's ADA claim.

As the court previously explained in conjunction with its detailed analysis of the immunity issue:

> to determine whether abrogation under section five of the Fourteenth Amendment is valid, a court must consider the tripartite test

established in *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Under *Boerne*, the court must determine: (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations. *See id.*; *Goonewardena[ v. New York]*, 475 F. Supp. 2d [310,] 322-23 [ (S.D.N.Y. 2007) ].

(Dkt. No. 110 at 23-24.) Now having had the opportunity to focus arguments on the *Boerne* test, defendants concede for purposes of their motion that "steps one and two of the ... analysis are satisfied" and focus their arguments on the third prong. (Dkt. No. 131, Attach. 13 at 16-17.) The court is not entirely sure what defendants mean by saying that the first two steps are satisfied; indeed, the third prong of the *Boerne* tripartite is dependent on the other two and some discussion of all three prongs would have been helpful to the court. In any case, citing a handful of out-of-Circuit cases, some of which the court previously identified, (Dkt. No. 110 at 24 n.14), *see Wilke v. Cole*, No. 12-CV-1231-JPS, 2014 WL 7237019 (E.D. Wis. Dec. 17, 2014), *aff'd*, 630 Fed.Appx. 615 (7th Cir. 2015); *Belk v. Smith*, No. 1:10CV724, 2013 WL 5430426 (M.D.N.C. Sept. 27, 2013); *Hale v. Mississippi*, No. 2:06cv245-MTP, 2007 WL 3357562, at *1 (S.D. Miss. Nov. 9, 2007), *aff'd sub nom. Hale v. King*, 624 F.3d 178 (5th Cir. 2010), *opinion withdrawn, superseded on reh'g, vacated, and remanded* 642 F.3d 492 (5th Cir. 2011); *Chase v. Baskerville*, 508 F. Supp. 2d 492 (E.D. Va. 2007), *aff'd*, 305 Fed.Appx. 135 (4th Cir. 2008), defendants assert, in essence, that Title II of the ADA is incongruent and not proportional "to the claims [Phelan] has alleged." (*Id.* at 16.) Phelan, who appears to concede that his ADA claims are only asserted against Scott, Hirsch, and defendant P. Millson, relies exclusively on *Roberts v. New York State Department of Correctional Services*, 63 F. Supp. 2d 272 (W.D.N.Y. 1999), a case in which the court determined that Title I of the ADA was congruent and proportional to the history and pattern of constitutional violations Congress sought to protect, and

argues that Congress's abrogation of the state's Eleventh Amendment immunity was valid. (Dkt. No. 141 at 18-19, 22.)

The court rejects Phelan's reliance on *Roberts* and adopts the logic and reasoning of the authority relied upon by defendants. As the court found in *Wilke*, because "Title II indiscriminately 'prohibits far more state conduct and in many more areas of prison administration than conceivably necessary to enforce' any relevant constitutional rights," the third prong of the *Boerne* test is not met. 2014 WL 7237019, at *7; *see Belk*, 2013 WL 5430426, at *6-*9 (same); *Chase*, 508 F. Supp. 2d at 506. As a consequence, abrogation is valid only for conduct that actually violates the Fourteenth Amendment. *See Wilke*, 2014 WL 7237019, at *7 (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)). As explained above, Phelan has not demonstrated an independent violation of his constitutional rights. As such, defendants—all of whom are sued in their official capacities and shielded by immunity to the same extent as the State of New York, (Dkt. No. 110 at 14 n.7)—are immune from the ADA claims.

## V. **Conclusion**

*6 **WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Clerk is directed to amend the caption to reflect the proper spelling of Hirsch and Michael; and it is further

**ORDERED** that defendants' motion for summary judgement (Dkt. No. 131) is **GRANTED** and Phelan's amended complaint (Dkt. No. 88) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 519246

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7441708
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Al-Fatah S. Stewart, Plaintiff,

v.

Lt. Richardson; Sgt. Laconey; C.O. Holzapfel; C.O.
C. Perry; C.O. Geneves; Sgt. Wyman; Lt. Maxwell;
C.O. Vanderkooy; Deputy Superintendent of
Administration Gail Williams; Imam Encarnation,
Media Review; Dr. Woods, Education Supervisor,
Media Review; Hendrickson, Media Review;
C.O. Sandell; C.O. Santana; Captain Sipple;
Guidance Counselor Dewitt; all individually
and in their own official capacity, Defendants.

15 CV 9034 (VB)
|
Signed 12/27/2016

Attorneys and Law Firms

Al-Fatah Stewart, Fallburg, NY, pro se.

Mary Kim, New York State Office of the Attorney
General, New York, NY, for Defendants.

## OPINION AND ORDER

Briccetti, United States District Judge:

 **\*1** Plaintiff Al-Fatah S. Stewart, an inmate proceeding
pro se and in forma pauperis, brings this action
under 42 U.S.C. § 1983, claiming defendants committed
various violations of federal law against him while
he was incarcerated at Sullivan Correctional Facility
("Sullivan"). Plaintiff sued defendants Lieutenant
Richardson; Sergeant Laconey; Corrections Officer
Holzapfel; Corrections Officer C. Perry; Corrections
Officer Geneves; Sergeant Wyman; Lieutenant Maxwell;
Corrections Officer Vanderkooy; Deputy Superintendent
of Administration Gail Williams; Imam Encarnation,
Media Review; Dr. Woods, Education Supervisor, Media
Review; Hendrickson, Media Review; Corrections Officer
Sandell; Corrections Officer Santana; Captain Sipple; and
Guidance Counselor Dewitt, all of whom were employed
at Sullivan.

Plaintiff asserts claims for retaliation for engaging in
constitutionally protected conduct, violations of his
religious rights, conspiracy to violate his constitutional
rights, denial of his access to the courts, and infliction of
cruel and unusual punishment.

Now pending is defendants' motion to dismiss pursuant to
Rule 12(b)(6). (Doc. #47).

For the reasons set forth below, the motion is DENIED as
to (i) all retaliation claims, (ii) the First Amendment claim
against Imam Encarnation, (iii) the First Amendment
claim against Lt. Maxwell for holding plaintiff's bible; (iv)
the claim of denial of access to the courts for confiscating
plaintiff's legal work; and (v) the claim of cruel and
unusual punishment against Dewitt.

The motion is GRANTED as to (i) the First
Amendment claims against Capt. Sipple, Dr. Woods,
and Hendrickson, (ii) the First Amendment claim against
Lt. Maxwell for general responsibility for violations,
(iii) the equal protection claim against Lt. Maxwell
and C.O. Vanderkooy, (iv) the claims for violations of
Religious Land Use and Institutionalized Persons Act
("RLUIPA"), (v) the conspiracy claim, (vi) the claim
for denial of access to the courts for not receiving legal
envelopes, and (vii) the claims for cruel and unusual
punishment against all defendants except Dewitt.

Furthermore, plaintiff is granted leave to amend his
complaint only as to: (i) the First Amendment claim
against Capt. Sipple, (ii) the First Amendment claim
against Lt. Maxwell for general responsibility for
violations, (iii) the claim for denial of access to the courts
for not receiving legal envelopes, (iv) the claims for cruel
and unusual punishment, and (v) the claims defendants
did not move to dismiss.

The Court has subject matter jurisdiction pursuant to 28
U.S.C. § 1331.

## BACKGROUND

In deciding the pending motion, the Court accepts as true
all well-pleaded factual allegations in the complaint and
plaintiff's other court filings, and draws all reasonable
inferences in plaintiff's favor.

Plaintiff alleges that, at some point in 2015, he mailed a letter to every person on a list of New York public servants he found in Sullivan's law library. In this letter, plaintiff sought to solicit help to investigate his allegedly wrongful conviction. Melissa Abt, an employee at Otisville Correctional Facility and the wife of Lt. Richardson's friend, was one recipient of this letter.

 **\*2** Plaintiff contends Lt. Richardson began a campaign to retaliate against him for sending the letter to Ms. Abt. On August 6, 2015, Lt. Richardson allegedly directed Sgt. Laconey to search plaintiff's cell to inquire as to why plaintiff sent the letter to Ms. Abt. Plaintiff states Lt. Richardson directed Sgt. Laconey and C.O. Holzapfel "to tear plaintiff's cell apart." (Compl. at 4). Plaintiff also alleges Sgt. Laconey and C.O. Holzapfel confiscated "legal work, three active claims, a[n] active [New York State Criminal Procedure Law § 440] motion, complaints ... [of] sexual harassment, [and] sixty six photos of loved ones," and that they "threw numerous other items of Plaintiff's away without giving Plaintiff the opportunity to choose whether to donate or send these items home." (Compl. at 4).

Plaintiff allegedly complained to the area sergeant on duty, Sgt. Wyman, that the search was against prison policy. Sgt. Wyman responded, "why are you wasting time talking to me when you should be cleaning that mess up." (Compl. at 3). Sgt. Wyman did not investigate plaintiff's complaint. Plaintiff allegedly filed complaints with non-defendant prison officials, which were dismissed as without merit.

On August 8, 2015, at the direction of Lt. Richardson, C.O. Holzapfel allegedly ordered plaintiff to bring all of his property to the "draft room just so C.O. Holzapfel could destroy more of [plaintiff's] property." (Compl. at 4). On August 12, 2015, Lt. Maxwell ordered C.O. Vanderkooy to search plaintiff's cell. "C.O. Vanderkooy confiscated Plaintiff's Bible (The Complete Book Of Witchcraft, By Raymond Buckland) that possessed photographs of [plaintiff's] deceased loved ones, spells written by family members and other items of religious sentimental value[, which was] sent to Plaintiff by his mother." (Compl. at 3–4). C.O. Vanderkooy allegedly acted "out of pure hatred for Plaintiff's religious belief (Wicca) and in an effort to try to get Plaintiff to snap." (Compl. at 3).

Plaintiff alleges his bible was repeatedly transferred among various persons and places, including Lt. Maxwell, Capt. Sipple, and "media review." Plaintiff was required to mail his bible home because it was unauthorized literature that served no penological interest. In response, plaintiff filed a series of complaints and grievances to various entities at and outside Sullivan.

Plaintiff states that on September 9, 2015, in retaliation for plaintiff filing these complaints and grievances, Lt. Richardson instructed Sgt. Laconey, C.O. Santana, C.O. Sandell, and C.O. Perry to plant a sharpened toothbrush in the vent of plaintiff's cell to "set up" plaintiff. As punishment for possessing a weapon, plaintiff was held in the Special Housing Unit ("SHU") for forty-four days. Plaintiff complained to Dewitt and asked Dewitt to inform plaintiff's family because plaintiff felt he was in life-threatening danger.

Plaintiff alleges a litany of poor conditions while housed in SHU. He was denied sufficient food to eat and envelopes to send his legal mail. He was subjected to bright lights from 6:00 a.m. to 7:30 p.m., and a high-beam flashlight was shone in his eyes every thirty minutes while he slept. He was "intentionally housed between a serial rapist sexual deviant ... and another inmate who is a deaf mute psychopath who throws feces and urine, kicks the gates[,] walls[,] and toilet all day and all night, [and] tosses food and feces on the gallery." (Compl. at 7). Moreover, he "was forced to sleep on the floor because the bed in plaintiff's cell is connected to the bed in this [inmate's] cell and this inmate jumped on his bed all day and night." (Compl. at 7). Finally, he was separated from his mother by Plexiglas during a visit on October 10, 2015. Plaintiff's treatment in SHU allegedly caused him to lose eight pounds and to suffer severe mental, physical, and psychological harm.

### DISCUSSION

I. Legal Standard

 **\*3** In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" outlined by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must liberally construe submissions [1] of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

---

[1]   "Although the Court is typically confined to the allegations contained within the four corners of the complaint, when analyzing the sufficiency of a pro se pleading, a court may consider factual allegations contained in a pro se litigant's opposition papers and other court filings." Rodriguez v. Rodriguez, 2013 WL 4779639, at *1 (S.D.N.Y. July 8, 2013) (citation and internal quotations marks omitted). Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

II. Retaliation for Engaging in Protected Conduct

Plaintiff claims various defendants illegally retaliated against him for sending the letter to Ms. Abt and for filing complaints and grievances. Plaintiff alleges two general forms of retaliation, and defendants lodge separate arguments against each form. Accordingly, the Court will address each separately.

First, plaintiff claims Lt. Richardson, Sgt. Laconey, C.O. Santana, C.O. Sandell, and C.O. Perry planted a weapon in plaintiff's cell to justify mistreating him under the guise of punishment for possessing a weapon, and that C.O. Geneves falsified logs as a part of this effort.

Second, plaintiff claims Lt. Richardson, Sgt. Laconey, and C.O. Holzapfel retaliated against him by searching his cell and confiscating his personal property.

To state a First Amendment retaliation claim, plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks omitted). Regarding this second element, " 'only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.' " Nelson v. McGrain, 596 Fed.Appx. 37, 38 (2d Cir. 2015), (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)).

A. Planting a Weapon and Falsifying Logs
*4   Plaintiff alleges that on September 9, 2015, Lt. Richardson instructed Sgt. Laconey, C.O. Santana, C.O. Sandell, and C.O. Perry to plant a sharpened toothbrush in plaintiff's cell. He also alleges C.O. Geneves falsified logs related to this incident. He alleges they did this to retaliate against him for sending the letter to Ms. Abt and for filing various complaints and grievances.

Defendants argue the claims against C.O. Geneves must be dismissed because plaintiff does not allege animus on the part of C.O. Geneves, and because plaintiff does not allege any detrimental consequence of the falsified log entry.

The Court disagrees with both arguments.

First, defendants assert no authority for the proposition that animus is a required element for a retaliation claim and, as stated above, it is not.

Second, plaintiff does allege a detrimental consequence: he was held in SHU for forty-four days before he received a hearing in which the reviewer determined the evidence supporting the weapon-possession charge was insufficient. Defendants argue that because plaintiff eventually received a hearing and the charge was dismissed, he suffered no adverse consequence. Defendants rely on two non-precedential cases, both of which are factually inapposite: Johnson v. Barney, 360 Fed.Appx. 199, 201 (2d Cir. 2010) (summary order), and JCG v. Ercole, 2014 WL 1630815, at *34 [2] (S.D.N.Y. Apr. 24, 2014) report and recommendation adopted, 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

[2]   Defendants cite to page "*123." This document does not include a page *123, but language defendants quote appears on page *34.

In Johnson v. Barney, the court assumed the parties familiarity with the underlying facts, and there is no indication from that opinion, or the underlying opinions [3] the decision reviews, indicating the plaintiff was subjected to any adverse consequence as a result of the allegedly falsified complaint against him. 360 Fed.Appx. at 201. In JCG v. Ercole, the fabricated allegations were made by other inmates rather than prison employees, and the plaintiff was not bringing a claim of retaliation for engaging in protected conduct.

[3]   Johnson v. Barney, 2007 WL 2597666, (S.D.N.Y. Aug. 30, 2007), aff'd, 360 Fed.Appx. 199; Johnson v. Barney, 2006 WL 3714442, at *1 (S.D.N.Y. Dec. 13, 2006), adhered to on denial of reconsideration, 2007 WL 900977 (S.D.N.Y. Mar. 22, 2007), and aff'd, 360 Fed.Appx. 199.

Defendants' inapposite dicta from non-precedential cases do not persuade the Court.

Next, defendants argue this claim must be dismissed because "plaintiff does not allege who these complaints and grievances were against, when and to whom he sent them, and why these Defendants retaliated against him for these unspecified complaints and grievances." (Doc. #48 at 16). Defendants argue that plaintiff's allegations are conclusory and therefore insufficient.

The Court disagrees.

The Court is aware of no requirement that plaintiff specifically allege the objects and recipients of complaints, when plaintiff sent them, or the reason defendants retaliated. However, the Court need not determine whether such a requirement exists, because plaintiff does allege these facts.

For example, plaintiff alleges that, on August 6, 2015, Sgt. Laconey questioned him about his letter to Ms. Abt, and that, in retaliation for that letter, Sgt. Laconey and C.O. Holzapfel destroyed his cell and took his legal documents and other property. Following these allegations, plaintiff specifically states: "Plaintiff filed complaints to DSA Williams, DSP Smith-Roberts, Office of Special Investigation, Commissioner Anthony Annucci, grievances to Inmate Grievance resolution committee, and an institutional Claim." (Compl. at 4).

**\*5** Moreover, plaintiff attaches as exhibits to his complaint many of his complaints and grievances. These attached documents are very detailed and contain specific allegations, dates, recipients, and other pertinent information to substantiate plaintiff's claims.

Because the factual basis for defendants' argument is unsupported, the Court need not address the merits of defendants' legal argument for dismissal.

Accordingly, plaintiff has sufficiently alleged retaliation, and therefore defendants' motion to dismiss this claim is denied.

B. Cell Searches and Destruction of Property

Plaintiff alleges Lt. Richardson, Sgt. Laconey, and C.O. Holzapfel searched his cell and confiscated and destroyed his personal property in retaliation for his having sent the letter to Ms. Abt, and for filing various grievances and complaints.

Defendants argue these allegations fail to state a claim because, as a matter of law, cell searches are not an adverse action for the purposes of a First Amendment retaliation claim, and destruction of personal property claims must be pursued in state court. In so doing, the defendants separate the allegations into individual harms and argue each, in isolation, is insufficient to state a claim.

Defendants provide no authority to support their argument that the Court can or should analyze each type of harm separately. Indeed, the case defendants cite for the proposition that plaintiff has no right to be free from retaliatory cell searches—Rodriguez v. McClenning, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005)—demonstrates the opposite approach. In Rodriguez, the court noted that a cell search alone is not actionable, but then combined the search with other wrongful conduct and held such allegations state a claim. Id. at 239–240 ("At the same time [that Rodriguez cannot state a claim based only on retaliatory cell searches], Rodriguez can assert a retaliation claim for McClenning's conduct in conjunction with the cell search."); see also, Guillory v. Haywood, 2015 WL 268933, at *21 (N.D.N.Y. Jan. 21, 2015) ("Even though district courts have found that cell searches alone are not actionable under § 1983, even if retaliatory, allegations that a defendant confiscated personal property ... during the course of a cell search have been found sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights.").

Considered collectively, as they ought to be, plaintiff's allegations of retaliatory cell searches and destruction of his property are sufficient to state a claim.

Accordingly, defendants' motion to dismiss plaintiff's retaliation claim based on cell searches and property destruction is denied.

## III. Religious Rights

Plaintiff claims defendants, in confiscating his religious material, violated his rights secured by the free exercise clause of the First Amendment, and thus he is entitled to damages under Section 1983 and RLUIPA. [4] Specifically, plaintiff alleges Lt. Maxwell sent C.O. Vanderkooy to plaintiff's cell to confiscate plaintiff's religious material, including his bible and family-made items of religious and sentimental value.

[4]     Based on these same underlying allegations, plaintiff asserts a claim under the Religious Freedom Restoration Act. Defendants do not move to dismiss this claim, so the Court need not address it.

### A. First Amendment

*6 Plaintiff brings a Section 1983 claim for these alleged deprivations of his religious rights, arguing defendants' conduct violated the First Amendment.

Defendants argue this claim must be dismissed for two reasons. First, defendants argue plaintiff fails to satisfy an initial requirement to a First Amendment religious rights claim; namely, that plaintiff "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing Ford v. McGinnis, 352 F.3d 582, 591 (2d Cir. 2003)). Second, defendants argue plaintiff fails to allege the specific involvement of Imam Encarnation, Dr. Woods, Hendrickson, Lt. Maxwell, and Capt. Sipple.

#### i. Substantial Burden

Despite defendants' assertions to the contrary, plaintiff did allege defendants' conduct substantially burdened his religious practice. For example, plaintiff alleges: "I cannot perform certain daily prayers and rituals [without] my religious book which lays these prayers and rituals out for me in [prescribed] detail that must be adhered to." (Doc. #2-1 at 11).

Defendants' argument that depriving plaintiff of his Wiccan bible, which includes other personal religious materials, is not a substantial burden because the prison library contains a copy of the Wiccan bible, also fails because it is based on a misunderstanding of the basis for plaintiff's substantial-burden allegation. Plaintiff alleges a published copy of his bible alone cannot replace the religious value of his bible, which includes his own religious items. His personal bible allegedly contained supplemental religious materials, including "spells written by family members and other items of religious sentimental value." (Compl. at 5). Moreover, plaintiff attaches a declaration stating that ancestry is very important in the Wiccan faith, and that Wiccan bibles are passed down through families. Accordingly, plaintiff's specific bible "contains a 'wealth of religious material' with 'direct religious ancestry' which cannot simply be replaced." (Doc. #2-3 at 8).

Accordingly, plaintiff has sufficiently alleged he suffered a substantial burden for this claim.

ii. Personal Involvement

Defendants argue plaintiff has failed to allege certain defendants were personally involved in the acts of which plaintiff complains.

Plaintiff alleges Imam Encarnation threw away his religious material. This is a clear allegation of Imam Encarnation's personal involvement, and therefore defendants' his motion to dismiss this claim is denied.

Plaintiff alleges Capt. Sipple "is responsible" for violating plaintiff's unstated constitutional rights and for covering up violations committed by others. Plaintiff argues an attached "correspondence to a prison administrator clearly establishes a basis for personal liability under § 1983" (Doc. #49 at 5), but that correspondence is illegible. Thus, the Court is left with plaintiff's conclusory statements of liability; plaintiff does not allege Capt. Sipple performed any specific act that deprived plaintiff of his religious materials or burdened plaintiff in the practice of his religion. However, the allegations suggest plaintiff may be able to plead Capt. Sipple's individual involvement. Accordingly, the Court grants defendants' motion to dismiss, but grants plaintiff leave to amend his complaint regarding this claim against Capt. Sipple.

**\*7** Plaintiff's only allegation with respect to defendants Dr. Woods and Hendrickson is that they failed to explain to plaintiff why various actions were taken with regard to plaintiff's bible. Plaintiff provides no basis to conclude that either defendant had an obligation to provide such explanations. More importantly, plaintiff does not explain how these alleged failures substantially burdened his religious practices. Accordingly, plaintiff's claim against Dr. Woods and Hendrickson is dismissed.

With respect to Lt. Maxwell, defendants argue plaintiff's allegations are conclusory.

The Court disagrees in part and agrees in part.

Plaintiff alleges Lt. Maxwell held his bible for a month and required plaintiff to send his bible home or it would be destroyed as unauthorized literature, despite plaintiff's allegations that it was not unauthorized. Plaintiff also alleges Lt. Maxwell is "responsible for the

taking, discriminating and violati[ng plaintiff's] religious rights." (Doc. #49 at 3).

With respect to the allegations Lt. Maxwell held plaintiff's bible, the Court disagrees with defendants that plaintiff's allegations are conclusory. Plaintiff alleges specific and individualized actions that if true, as the Court has already explained, substantially burdened his religious practices.

However, the Court agrees with Lt. Maxwell the allegations that he "is responsible for" various conduct is conclusory. Plaintiff fails to allege sufficient facts to show any basis for such responsibility. Moreover, plaintiff's voluminous supporting documentation, much of which is illegible or otherwise incomprehensible, fails to cure the deficiencies in plaintiff's pleadings and briefing. It is not enough to assert Lt. Maxwell is responsible; plaintiff must allege specific facts which support a legal claim of responsibility.

Accordingly, this First Amendment claim against Lt. Maxwell is dismissed. However, because plaintiff's allegations suggest a valid claim may exist, plaintiff is granted leave to amend.

B. Equal Protection

Plaintiff alleges that on August 12, 2015, Lt. Maxwell sent C.O. Vanderkooy to plaintiff's cell, and "out of pure hatred for Plaintiff's religious belief (Wicca) ... C.O. Vanderkooy confiscated Plaintiff's Bible." (Compl. at 4).

Defendants frame this as a retaliation claim and argue it must be dismissed because plaintiff's allegations are conclusory, especially in light of the heightened judicial skepticism towards retaliation claims.

The Court disagrees with defendants that plaintiff's complaint is best understood to assert a claim of retaliation. Rather, plaintiff's allegations more properly sound in a claim of religious discrimination in violation of plaintiff's constitutional right to Equal Protection. Plaintiff alleges defendants Lt. Maxwell and C.O. Vanderkooy harmed him because of his religious beliefs.

"[T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as ... religion." Lopez v. Cipolini, 136 F. Supp. 3d 570,

590 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting Bizzaro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005)). Thus, "to state an equal protection claim, a plaintiff must allege that he was intentionally treated differently from other similarly-situated individuals, either because of his membership in a protected class, or without any rational basis." Washington v. Afify, 968 F. Supp. 2d 532, 540–41 (W.D.N.Y. 2013) (citing Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)).

**\*8** However, even properly understood as an Equal Protection claim, defendants are correct that plaintiff's allegations are conclusory. Plaintiff fails to allege facts in a non-conclusory manner that the disparate treatment he received was because of his religion. For example, plaintiff alleges defendants acted out of "pure hatred" for plaintiff's religious beliefs, but provides no factual allegations to support that conclusion. That is, plaintiff does not allege facts to demonstrate a basis for his conclusion that defendants acted out of pure hatred for his religious beliefs.

Accordingly, this claim is dismissed.

### C. RLUIPA
Plaintiff claims defendants' actions entitle him to damages under RLUIPA. 42 U.S.C. § 2000cc. However, "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." Holland v. Goord, 758 F.3d 215, 224 (2d Cir. 2014).

Accordingly, plaintiff's RLUIPA claims are dismissed.

### IV. Conspiracy
Plaintiff claims all defendants conspired to deprive him of his constitutional rights and that all wrongful conduct was committed in furtherance of this conspiracy in violation of 42 U.S.C. §§ 1983 and 1985(3).

Defendants argue the intracorporate conspiracy doctrine bars this claim.

The Court agrees.

The intracorporate conspiracy doctrine generally provides "that two or more employees of a corporate entity are generally legally incapable of conspiring with each other with respect to matters within the scope of their employment." Scott v. Goord, 2004 WL 2403853, at \*13 (S.D.N.Y. Oct. 27, 2004).

All defendants were, at the time of the alleged conspiracy, employees of the New York State Department of Corrections and Community Supervision, and there is no allegation to suggest any defendant acted beyond the scope of employment.

Accordingly, plaintiff's conspiracy claim must be dismissed.

### V. Denial of Access to the Courts
Plaintiff alleges various defendants denied him access to the courts, which violated his First Amendment rights. Plaintiff's allegations fall into two general categories: (i) defendants confiscated his legal documents, and (ii) he was denied access to envelopes to send his legal mail while in SHU. The Court addresses each category separately.

#### A. Confiscation of Legal Documents
Plaintiff claims Lt. Richardson, Sgt. Laconey, and C.O. Holzapfel violated his First Amendment right of access to the courts by taking his legal work. Defendants argue this claim must be dismissed for failure to allege any actual harm.

The Court disagrees.

Plaintiff alleges Lt. Richardson ordered Sgt. Laconey and C.O. Holzapfel "to tear plaintiff's cell apart," where Sgt. Laconey and C.O. Holzapfel confiscated "legal work, three active claims, a[n] active [New York State Criminal Procedure Law § 440] motion, [and] complaints ... [of] sexual harassment." (Compl. at 4). Moreover, in an attached exhibit to plaintiff's complaint, titled "First initial complaint to office of special investigation (8/6/15)," plaintiff states: "I cannot litigate my appeal in the Court of appeals, litigate my three claims in the Court of Claims, or properly defend [myself] in my sexual assault suit against an officer ... without my deposition transcripts." (Doc. #2 at 19).

Plaintiff alleges various important legal documents were taken from him, and that the lack of these documents prevented him from litigating his cases. These allegations are sufficient to state a claim for denial of access to

the courts. See Morello v. James, 810 F.2d 344 (2d Cir. 1987) (reversing grant of motion to dismiss where plaintiff alleged that corrections officers took legal work-product, preventing plaintiff from "perfecting his appeal," and holding that defendants infringed on plaintiff's access to the courts by "depriving him of his pro se work product.").

**\*9** Accordingly, defendants' motion to dismiss this claim is denied.

B. Denial of Envelopes for Legal Mail in SHU

Plaintiff claims he was denied access to the courts because he was denied envelopes to send legal mail while he was held in SHU for forty-four days.

Defendants argue that this claim must be dismissed because plaintiff fails to allege individual involvement.

The Court agrees.

Plaintiff does not allege whether and from whom he requested such envelopes or who is responsible for this denial. As previously stated, a plaintiff bringing a Section 1983 claim "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

There is no allegation of personal involvement related to the denial of access to envelopes. Accordingly, this claim must be dismissed. However, plaintiff is granted leave to amend his complaint with respect to this claim.

VI. Cruel and Unusual Punishment

Plaintiff claims his conditions of confinement during his forty-four days in SHU violated his Eighth Amendment right to be free from cruel and unusual punishment. [5]

[5] Plaintiff also asserts Eighth Amendment cruel and unusual punishment claims based on repeated cell searches when he was not held in SHU. Defendants did not move to dismiss this claim, and thus the Court need not address it here.

Defendants argue plaintiff failed to allege personal involvement of any defendant.

In his opposition to defendants' motion to dismiss, plaintiff alleges the personal involvement of Dewitt with respect to his time in SHU. Specifically, plaintiff alleges he expressed various concerns to Dewitt while in SHU, but Dewitt failed to act.

Defendants do not address these allegations, nor do they argue that such allegations against Dewitt are insufficient to state a claim.

Accordingly, with respect to Dewitt, the motion is denied.

With respect to all other defendants, none of whom is mentioned in relation to this claim, the motion is granted. Plaintiff is granted leave to amend his complaint to allege the individual involvement of specific defendants.

VII. Leave to Amend

Plaintiff is granted leave to amend only as to the following claims that are dismissed with leave to amend: (i) the First Amendment claim against Capt. Sipple, (ii) the First Amendment claim against Lt. Maxwell for general responsibility for violations, (iii) the claim for denial of access to the courts for not receiving legal envelopes, and (iv) the claims for cruel and unusual punishment.

Plaintiff is not granted leave to amend as to the following claims, which are dismissed with prejudice: (i) the First Amendment claim against Dr. Woods and Hendrickson, (ii) the Equal Protection claim against Lt. Maxwell and C.O. Vanderkooy, (iii) the RLUIPA claims, and (iv) the conspiracy claim.

Plaintiff is reminded that any factual allegation in the amended complaint must be true to the best of his knowledge, information, and belief. See Fed. R. Civ. P. 11(b)(3). In the amended complaint, plaintiff shall clearly set forth the facts that give rise to each of his claims, including the dates, times, and places of the alleged underlying acts, and shall clearly identify each individual who committed each alleged wrongful act. See Lee v. Graziano, 2013 WL 4426447, at \*8 (N.D.N.Y. Aug. 15, 2013).

**\*10 The amended complaint will completely replace the existing complaint. Therefore, plaintiff must include in the amended complaint all information necessary for any of the claims that have not been dismissed in this Opinion and**

**Order, as well as for the claims that have been dismissed but as to which the Court has granted leave to amend.**

VIII. <u>Remaining Issue</u>

Throughout this case, plaintiff has submitted many letters and documents, either to Judge Briccetti or Magistrate Judge Lisa M. Smith (sometimes to both). On May 2, 2016, in response to these repeated filings, the Court ordered the plaintiff as follows:

<u>After</u> defendants' motion to dismiss is filed, plaintiff may submit an opposition to the motion.... Plaintiff's opposition should <u>only</u> address the arguments defendants make in support of their motion to dismiss. Plaintiff may file only <u>one</u> opposition to the motion. After plaintiff has filed his <u>one</u> opposition, he will not have an opportunity to affect the Court's decision on defendants' motion to dismiss, and should not attempt to do so until the Court issues an Opinion and Order deciding the motion.

<u>All other correspondence</u> from plaintiff, including (i) attempts to prove his case before the motion to dismiss has been resolved; (ii) grievances about the current conditions of his incarceration; and (iii) requests for the Court to grant plaintiff any sort of preliminary relief, <u>have not and will not be considered by the Court.</u> The Court will <u>not</u> construe these letters as part of plaintiff's allegations in the complaint for the purposes of the motion to dismiss. Nor will the Court construe any letters <u>after</u> plaintiff opposes the motion to dismiss when it decides whether to grant or deny the motion.

<u>In short, these letters do not help plaintiff's case at all.</u> Plaintiff should restrict his correspondence <u>only</u> to his opposition to the motion to dismiss.

(Doc. #43 at 2).

Despite this Court order, plaintiff has continued to submit further letters and documentation. (Docs. ##50, 55, 56, 60, 64). In addition, third-parties have submitted additional letters and documentation. (Docs. ##57, 63).

In response to these filings, the Court directed defense counsel to look into the allegations contained therein and respond to the Court. (Doc. #60). Defense counsel informed the Court that the Office of Special Investigations of the New York State Department of Corrections and Community Supervision is conducting an investigation with respect to at least some of these allegations. (Doc. #61).

Finally, the Court is aware that plaintiff is represented by counsel who has filed a case in state court regarding these issues. On December 13, 2016, defendants removed that case to this Court, and on December 19, 2016, the removed case was assigned to Judge Briccetti as related to the present matter. <u>Stewart v. New York DOCCS</u>, No. 16-cv-9513 (filed Dec. 13, 2016).

Accordingly, the allegations raised in these later letters will be addressed in due course in the context of the recently-removed case.

**CONCLUSION**

**\*11** The motion is DENIED as to (i) all retaliation claims, (ii) the First Amendment claim against Imam Encarnation, (iii) the First Amendment claim against Lt. Maxwell for holding plaintiff's bible; (iv) the claim of denial of access to the courts for confiscating plaintiff's legal work; and (v) the claim of cruel and unusual punishment against Dewitt.

The motion is GRANTED as to (i) the First Amendment claims against Cpt. Sipple, Dr. Woods, and Hendrickson, (ii) the First Amendment claim against Lt. Maxwell for general responsibility for violations, (iii) the equal protection claim against Lt. Maxwell and C.O. Vanderkooy, (iv) the RLUIPA claims, (v) the conspiracy claim, (vi) the claim for denial of access to the courts for not receiving legal envelopes, and (vii) the claims for cruel and unusual punishment.

Plaintiff is granted leave to amend only with respect to the following claims: (i) the First Amendment claim against Capt. Sipple, (ii) the First Amendment claim against Lt. Maxwell for general responsibility for violations, (iii) the claim for denial of access to the courts for not receiving legal envelopes, and (iv) the claims for cruel and unusual punishment.

**Plaintiff's amended complaint shall be filed by no later than January 31, 2017, in accordance with Part VII above. Plaintiff is directed to utilize the amended complaint form attached to this Opinion and Order.**

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore <u>in</u> <u>forma</u> <u>pauperis</u> status is denied for the purpose of an appeal. <u>See</u> Coppedge v United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion. (Doc. #47).

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 7441708

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4365274
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
|
Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The
Capitol, Gregory J. Rodriguez, AAG, of Counsel,
Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 *1 Plaintiff, an inmate currently in the custody of
the New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced this
civil rights action, pursuant to 42 U.S.C. § 1983, on May
31, 2011. See Dkt. No. 1. The remaining claims are that
Defendants violated Plaintiff's constitutional rights under
the First Amendment's Free Exercise Clause, as well as his
rights under the Religious Land Use and Institutionalized
Person's Act ("RLUIPA"), and subsequently retaliated
against him for attempting to exercise these rights by
destroying Plaintiff's mail and thus denying him access to
the courts. See Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July
23, 2014, Magistrate Judge Baxter recommended that the
Court grant Defendants' motion for summary judgment
and dismiss Plaintiff's complaint in its entirety. See
Dkt. No. 210. Specifically, Magistrate Judge Baxter
first found that in relation to the December 7, 2010
incident, Defendant Ready acted within the bounds of his
employment and according to the documentation before

him and thus, his inadvertent denial that caused Plaintiff
to miss one religious service did not substantially burden
Plaintiff's free exercise of his religion. See id. at 14. With
regards to the March 20, 2011 incident, Magistrate Judge
Baxter found that Defendant Ellis was not responsible for
the shortened duration of the Purim celebration, and that
while the delay may have been an inconvenience, Plaintiff
was still able to participate in the service, thus satisfying
the requirements of the First Amendment and RLUIPA.
See id. at 19–20. Magistrate Judge Baxter also found that
neither Defendant Ellis, nor Defendant Ready engaged in
the conduct mentioned above as a way to retaliate against
Plaintiff for any grievances that he had previously filed
either against them or any other correctional officer. See
id. at 39–40. Moreover, Magistrate Judge Baxter found
that Defendant Kupiec did not interfere with Plaintiff's
mail as a means to either retaliate against him or to deny
him access to the courts. See id. 35–36. Finally, Magistrate
Judge Baxter found that Plaintiff failed to establish that
he suffered an adverse action as a result of Defendant
Kupiec's alleged conduct. On August 4, 2014, the Court
received objections to the Report–Recommendation from
Plaintiff. See Dkt. No. 211.

**II. DISCUSSION**

**A. Plaintiff's objections**
In his objection to Magistrate Judge Baxter's Report–
Recommendation, Plaintiff states that he objects to
the Report in its entirety. See id. Plaintiff relays his
astonishment at Magistrate Judge Baxter's choice to
"excuse Def[endant] Kupiec's conduct" and at his finding
that Plaintiff's position is "unfounded." See id. Plaintiff
further objects to Magistrate Judge Baxter's Report on
the grounds that he looked outside the pleadings and
"only to the Defendants Affidavits" when making his
determination to grant Defendants' motion for summary
judgment. See id.

**B. Standard of review**
 *2 A court may grant a motion for summary judgment
only if it determines that there is no genuine issue of
material fact to be tried and that the facts as to which
there is no such issue warrant judgment for the movant as
a matter of law. See Chambers v. TRM Copy Ctrs. Corp.,
43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When
analyzing a summary judgment motion, the court "cannot

try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

## C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1; *see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment

was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." Dkt. No. 202–6 at Exhibit "A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision." *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

### I. *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact.[1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

[1]    Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge

D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

 **\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl. ¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56*; *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006)*. "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)*. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994)*.

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*. If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,*

467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### IV. *Religion Claims*

#### A. Legal Standards

**1. First Amendment**

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of

exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at \*4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

**2. Religious Land Use and Institutionalized Persons Act**

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of achieving that interest. *Id .* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some

inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex'* "). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

### B. Application

#### 1. December 7, 2010 Incident:

Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings. [2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

[2] Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the

motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name

is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

[3]     Father Weber is not a defendant in this action.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily

callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50). [4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not

have that list in front of him,[5] and he would not even
have been aware that the list existed because it was
not delivered to the program area. This one, clearly
inadvertent incident, does not rise to the level of a
constitutional violation committed by defendant Ready.[6]

[4]    Unless otherwise specified, the pages associated with
       a docket number will be the pages assigned to the
       document by the court's electronic filing system. (CM/
       ECF).

[5]    Plaintiff was deposed on October 8, 2013, and a
       copy of his deposition transcript has been included
       in defendants' summary judgment motion. (Dkt. No.
       202–2). During his deposition, plaintiff testified that
       defendant Ready "had the call-out on his desk." (Dkt.
       No. 202–2 at 22). While defendant Ready may have
       had a call-out or call-outs on his desk, he did not have
       one with the plaintiff's name on it.

[6]    Plaintiff has also alleged a retaliation claim based on
       this incident, and the court will discuss that claim
       below.

In his response to defendants' motion for summary
judgment, plaintiff states that the defendants are lying,
and that the call-out was delivered to *"all"* program areas.
(Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states
that he reaches this sweeping *conclusion* because "[t]he
location where the Jewish Services [are] held (Building
# 101) is *a Program Area,*" and security staff in that
area must have had the call-out because they would not
have let the thirteen other Jewish inmates in the building.
(*Id.*) (emphasis added). If one program area had the call-
out, then all the program "areas" must have had the
call-out. However, plaintiff's argument misses the point.
Defendant Ready was not in Building # 101. He was in
Unit 7–2 in Building 7,[7] and the fact that the building
in which the religious services actually held had the
call-out,[8] does not "prove" or even raise a question of
fact regarding whether the call-out had been sent to the
other program areas, in the face of Father Weber's sworn
statement that he did not send the call-out to the program
areas. Although plaintiff states that Building # 101 is "a"
program area, it is not "the" Program Building.[9]

[7]    (Ready Decl. ¶¶ 5).

[8]    This court makes no such finding.

[9]    Plaintiff's own exhibits confirm this finding. (Pl.'s
       Ex. G) (Dkt. No. 205–3 at 26). In his grievance
       documents, plaintiff states that "I signed out of Mr.
       Gruen's class and informed him that I had a call-out
       per DSP Phillips to *report to Bldg # 101* to attend
       Jewish Services. I subsequently attempted to sign out
       @ the 7–2 security desk whereby Correctional Officer
       Ready ... asked me where I was going." (*Id.*) Clearly,
       Building # 101 is not the same as Building # 7. Thus,
       whether an officer in Building # 101 has a document
       does not prove that someone in Building # 7 was given
       the same document.

In my prior report, I recommended denying defendants'
motion to dismiss on the pleadings, notwithstanding case
law holding that missing one religious service does not
constitute a substantial burden on the inmate's right to
the free exercise of his religion under either under the
First Amendment or under RLUIPA. (Dkt. No. 148 at
13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190,
1999 WL 825622, at * 15 (S.D.N.Y. Oct. 15, 1999)).
In granting *summary judgment,* the court in *Troy* stated
that "courts in the Second Circuit have held that an
inmate's right to practice his religion is not substantially
burdened if an inmate missed one religious service for
*a valid reason." Id.* (emphasis added). I did not rely on
*Troy* in my prior report, because the defendants in this
case brought a motion for judgment on the pleadings, and
this court was bound by the facts as stated in plaintiff's
complaint. Now that defendants have moved for summary
judgment, the court may consider material outside the
complaint, such as sworn declarations, in determining
that, while plaintiff missed one religious service through
the actions of defendant Ready, this inadvertent denial
did not substantially burden the plaintiff's free exercise of
his religion. In denying plaintiff the opportunity to attend
his call-out, defendant Ready acted according to the
documentation before him. Even if a mistake were made, it
was the lack of proper documentation that caused plaintiff
to miss his service.[10] Neither the First Amendment, nor
RLUIPA was violated by defendant Ready.

[10]   To the extent that the failure to provide the
       appropriate call-out sheet was negligent or simply
       a mistake, defendant Ready was not responsible
       for that omission, and in any event, negligence is
       not actionable under section 1983. *Riehl v. Martin,*
       No. 13–CV–439, 2014 WL 1289601 at *8 n. 14
       (N.D.N.Y. March 31, 2014). In his response to the
       motion for summary judgment, plaintiff asks why,
       even if defendant Ready did not have the call-out,

"did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLIUPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

## 2. The March 20, 2011 Incident

**\*10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

[11]   Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at MidState with some members of the Lubavitch organization. (*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was

making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id.*)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (*Id.* ¶ 11).

**\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011. [12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

[12]  The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

Defendants have also submitted the declaration of Rabbi Theodore Max, [13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

[13]  Rabbi Max is not a defendant in this action.

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12**  During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not arrived— plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that **he** was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service. [14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at \* 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No.

98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

14    In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing to do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

## V. *Mail/Access to Courts/Retaliation*

### A. Legal Standards

#### 1. Mail

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

*13   Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's

correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail.' *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail." *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

### 2. Access to Courts

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

'Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

### 3. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ...

a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at \*3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at \*3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

### B. Application

#### 1. Defendant Kupiec

##### a. Relevant Facts—Interference/Retaliation

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [15] began to lose and/ or destroy plaintiff's packages that were received in the mail room. [16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never

recovered, but he did "receive the Paralegal Course from the school on the said date in question." [17] (*Id.* & Ex. M).

[15]     Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

[16]     The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

[17]     The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II)(A)(2) (citing 7 NYCRR § 721.2).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the plaintiff) files a grievance against the defendant's [sic] —retaliation takes place." (*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [18] (*Id.*)

18    The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [19]

19    A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.,* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13–16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

*16    Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [20]

Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

[20]    A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail. [21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope. [22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

[21]    A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department"

at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

[22]    The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

**b. Discussion**

**\*17**   These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food. [23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

[23]    Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery. [24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed. [25] The incident in which defendant Kupiec sent plaintiff

documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail. [26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

[24]    Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

[25]    To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

[26]    Plaintiff's response makes much of the fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011. [27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's

deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir.2005)* (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States, 953 F.Supp.2d 353, 361 (N.D.N.Y.2013)* (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

[27]    (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him. [28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

[28]    It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The

connection between defendant Kupiec and defendant Ready is non-existent.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at \*2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N. Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.* [29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law, [30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room. [31] This action would not deter a similarly situated inmate

from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights. [32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

[29] Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

[30] *Gill, supra.*

[31] Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was ***not*** a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

[32] Even if the court were considering the test score incident, the court would find no adverse action

because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

### b. Access to Courts

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action. [33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

[33]   Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" ***would have*** stricken his "motion" [34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

[34]   It is not clear what "motion" would have been stricken.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice

was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

### 2. Defendants Ready and Ellis

**\*20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston. [35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

[35]   CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken." [36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident. [37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

36    The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

37    In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting

his rights. [38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates. [39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

38    In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

39    During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

## VII. *Personal Involvement*

### A. Legal Standards

**\*21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory

official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F .3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

**B. Application**

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants. (*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her "office" became aware of plaintiff's September 9,

2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id* . at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)." (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case. [40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response. [41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

[40]  Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

[41]  Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." [42] (*Id.* ¶ 9).

> 42    The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

> The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary." (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011." (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have." (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the

staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4365274

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3531464
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Roberto CIAPRAZI, Plaintiff,

v.

Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS/.
|
Dec. 22, 2005.

**Attorneys and Law Firms**

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

*MEMORANDUM-DECISION AND ORDER*

SHARPE, J.

### I. *Introduction*

**\*1** Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety. [1]

[1]  The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

### II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

### III. *Discussion* [2]

[2]  The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

### A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge." *Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

### B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Report-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.* [3]

3   Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

### C. *Objections*

#### 1. *First Amendment Claim*
First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

#### 2. *Eighth Amendment*
**\*2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

#### 3. *Human Rights Claims*
Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICCPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

#### 4. *Personal Involvement*
Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

### IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against

the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

**\*3** Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial of defendants' motion seeking dismissal of plaintiff's claims against them.

I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred to the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that

date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occurring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10). [1] Defendants' Motion (Dkt. No. 39) Exh. A.

[1] Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152. [2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

[2] The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and

can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

**\*4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/ Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

[3]   Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

On August 20, 1999, plaintiff was transferred into the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial

of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction

and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

[4]   There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure

to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

[5]   In his papers in opposition to defendants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents

of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.[6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find

in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

[6]     A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

### B. *Plaintiff's First Amendment Retaliation Claim*

**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central

to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse

action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

[7] Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal

position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions.[8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

[8]    The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in temporal proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick or Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick." *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick." *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the requisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing.[9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

[9]     Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

## C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment.[10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

[10]     That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

**\*10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, defendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement.[11]

[11] In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at \*8-\*9 (W.D.N.Y. June 10, 1996) (Tier III regulations pass constitutional muster).

### D. *Plaintiff's Procedural Due Process Claim*
In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

**\*11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

#### 1. *Liberty Interest*
Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty

interest in prisoners remaining free from segregation, including for disciplinary reasons, arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin.* Atypicality in a *Sandin* inquiry normally presents a question of law. [12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. [13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

[12]  In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

[13]  While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

**\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

### 2. Due Process

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in

some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also* Eng v. Coughlin, 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report. [14]

[14]    Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding

in light of his submissions, I find that this standard has been met.

**\*13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report. [15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

[15]    Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See* Hinebaugh v. Wiley, 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. Eng, 858 F.2d at 897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he

identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

### F. *Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts. [16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

[16] Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

### G. *United Nations Resolutions*

**\*15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights,

privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. Standt v. City of New York, 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, see Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not. [17] See, e.g., Poindexter v. Nash, 333 F.3d 372, 379 (2d Cir.2003); Murray v. Warden, FCI Raybrook, No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing U.S. ex rel. Perez v. Warden, FMC Rochester, 286 F.3d 1059, 1063 (8th Cir.2002) and Reaves v. Warden, No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-

binding." Flores v. Southern Peru Copper Corp., 343 F.3d 140, 167-68 (2d Cir.2003).

[17]     Even in one of the cases relied heavily upon by the plaintiff, Maria v. McElroy, 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has been effectively overruled on other grounds, see Restrepo v. McElroy, 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

### H. Personal Involvement
Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (citing Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991) and McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no respondeat superior liability under section 1983. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003); Wright, 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices

occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

IV. *SUMMARY AND RECOMMENDATION*

**\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3531464

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works. 16

2015 WL 268933
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,
v.
Nancy HAYWOOD; Maureen Boll; Timothy
Maher; Michael Graziano; J. Dobbs; Potter; Sgt.
Donovan; and Goppert, Captain, Defendants.

No. 9:13–cv–01564 (MAD/TWD).
|
Signed Jan. 21, 2015.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York, State Attorney General, Albany
Office, Laura A. Sprague, AAG, of Counsel, Albany, NY,
for Defendants.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Kevin M. Hayden, Esq., of Counsel,
Albany NY, for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, an inmate in the custody of the New
York State Department of Corrections and Community
Supervision, commenced this action *pro se* under 42
U.S.C. § 1983. *See* Dkt. No. 24. Upon initial review,
Plaintiff's complaint was liberally construed to assert the
following causes of action: (1) denial of access to the courts
in violation of the First Amendment and in retaliation
for his litigation and complaints; (2) interference with
Plaintiff's outgoing legal mail in violation of the First
Amendment and in retaliation for his litigation and
complaints; (3) search of his cell and confiscation of his
property in retaliation for his litigation and complaints;
and (4) denial of equal protection in violation of the
Fourteenth Amendment. *See* Dkt. No. 11 at 6. The Court
dismissed Plaintiff's claims for money damages brought
against Defendants in their official capacities and also
dismissed Plaintiff's equal protection claim as conclusory.

*See id.* Thereafter, Plaintiff was granted leave to amend
his complaint to substitute Defendants Donovan and
Goppert for Defendants John Doe Number 1 and John
Doe Number 2. *See* Dkt. No. 23.

On April 30, 2014, Defendants filed a motion to dismiss.
*See* Dkt. No. 37. In a December 11, 2014 Order
and Report–Recommendation, Magistrate Judge Dancks
recommended that the Court grant in part and deny in
part Defendants' motion. *See* Dkt. No. 48. Specifically,
Magistrate Judge Dancks recommended that the Court
dismiss the following claims: (1) First Amendment denial
of access to courts, interference with legal mail, improper
opening of legal mail, and retaliation claims against
Defendants Maher, Dobbs, and Goppert for failure to
exhaust; (2) First Amendment denial of access to courts
claim against Defendants Potter and Graziano for failure
to state a claim; (3) First Amendment retaliation claim
against Defendant Potter arising out of the destruction
of the microwave oven in Plaintiff's housing unit; (4)
First Amendment claim for retaliation against Defendant
Graziano for failure to state a claim; (5) supervisory
liability claim against Defendant Graziano for failure
to state a claim; (6) supervisory liability claims against
Defendant Haywood for failure to state a claim; (7)
supervisory liability claims against Defendant Boll for
generally failing to remedy wrongs, creating and allowing
to continue customs and policies under which under which
constitutional practices occur, and failure to supervise
and monitor subordinates for failure to state a claim;
(8) supervisory liability claim against Defendant Boll in
connection with Plaintiff's denial of access to court claims
against Defendants Potter and Graziano relating to the
May 6, 2013, law library incident for failure to state a
claim; (9) supervisory liability claim against Defendant
Boll with regard to Plaintiff's denial of access to court,
interference with legal mail, and improper opening of
legal mail claims against Defendants Maher, Dobbs,
and Goppert in connection with the amended complaint
withheld from mailing to the court, for failure to state
a claim; and (10) retaliation claims against Defendants
Haywood and Boll for failure to state a claim. *See* Dkt.
No. 48 at 42–43. Further, the report recommended that
the Court deny Defendants' motion as to the following
claims: (1) Plaintiff's retaliation claim against Defendant
Potter arising out of the May 6, 2013, law library
incident; (2) Plaintiff's retaliation claim against Defendant
Donovan with regard to taking Plaintiff's legal papers
and kosher food; and (3) Plaintiff's supervisory liability

claim against Defendant Boll with regard to Plaintiff's retaliation claim against Defendant Potter regarding the May 6, 2013, law library incident. *See id.* Finally, Magistrate Judge Dancks recommended that the Court grant Plaintiff leave to amend with regard to all of the claims dismissed without prejudice for failure to exhaust his administrative remedies. *See id.* Neither party objected to the Order and Report–Recommendation. [1]

[1]      On January 9, 2015, the Court received a submission entitled "Plaintiff's Letter Motion to Correct the Record and Response to Magistrate Judge Dancks' December 11, 2014 Report and Recommendation ." Dkt. No. 49. In the submission, Plaintiff states that he is "not filing any objections to [the Order and Report–Recommendation]," but then states that he finds it necessary to "clarify a few facts in the interest of justice." *Id.* at 2–3. The Court has reviewed this document and has taken into consideration the clarifications that Plaintiff has provided.

**\*2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure). *See* Dkt. No. 42.

When considering a Rule 12(b)(6) motion, the court accepts the material facts alleged in the complaint as true, drawing all inferences in favor of the non-moving party. *See, e.g., Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003) (citing *Patel v. Contemporary Classics of Beverley Hills,* 259 F.3d 123, 126 (2d Cir.2001)). The court is not bound, however, to accept as true legal conclusions with the appearance of factual statements. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The moving party has the heavy burden of showing that the plaintiff is not "entitled to offer evidence in support [his] claims." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). Thus, the court should only dismiss a 12(b) (6) motion where the plaintiff provides no "plausible" basis to support his claims. *See Twombly,* 550 U.S. at 556–57. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

**\*3** When a party proceeds *pro se,* the court must liberally construe his pleadings, holding them to a standard less stringent than formal pleadings drafted by lawyers. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). If a *pro se* plaintiff's complaint alleges civil rights violations, the court must construe his pleadings with "particular generosity." *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (quoting *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). Further, when a *pro se* plaintiff faces a motion to dismiss, the court may consider "materials outside the complaint to the extent they are consistent with the allegations in the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004).

Having reviewed the thorough and well-reasoned Order and Report–Recommendation and the parties submissions, the Court finds that Magistrate Judge

Dancks correctly determined that the Court should grant in part and deny in part Defendants' motion to dismiss the amended complaint. Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Dancks' Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 37) is **GRANTED in part and DENIED in part** as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

Plaintiff, Patrick Guillory, an inmate presently confined in Clinton Correctional Facility ("Clinton"), has commenced this *pro se* action civil rights action under 42 U.S.C. § 1983 against Defendants Nancy Haywood ("Haywood"), an attorney in the Department of Corrections and Community Supervision ("DOCCS"); Maureen Boll ("Boll"), DOCCS Deputy Commissioner and Counsel; Timothy Maher ("Maher"), Deputy Superintendent of Programs at Greene Correctional Facility ("Greene"); Michael Graziano ("Graziano"), Deputy Superintendent of Administration at Greene; J. Dobbs ("Dobbs"), a corrections counselor at Greene; Rowland Potter ("Potter"), incorrectly sued as "Roland Potter," a corrections officer at Greene; Sergeant Donovan ("Donovan"), a corrections sergeant at Greene; and Captain Goppert ("Goppert"), a corrections captain at Greene. (Dkt. No. 24.)

Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Amended Complaint (Dkt. No. 24) for failure to state a claim, failure to exhaust, and on the grounds that two of Plaintiff's retaliation claims are duplicative of a claim pending in a separate action. (Dkt.Nos.37, 37–5.) Plaintiff has opposed Defendants' motion (Dkt. No. 41), and Defendants have filed a reply (Dkt. No. 42.) For reasons

explained below, the Court recommends that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND [1]

[1]  The Background is taken from the allegations in Plaintiff's Amended Complaint, along with documents the Court may properly consider on a Rule 12(b)(6) motion to dismiss.

#### A. May 6, 2013, Library Call–Out

**\*4** On May 6, 2013, Plaintiff's name was on the law library call-out list for 1:00 p.m. (Dkt. No. 24 at ¶¶ 6–7.) Plaintiff had signed up for copying and notary service so that he could comply with the mailbox rule with regard to a May 7, 2013, court imposed deadline for filing a supplemental brief in an Article 78 proceeding entitled *Guillory v. Fischer,* Case No. 516282, that had been transferred to the New York State Supreme Court, Appellate Division Third Department ("Third Department"). [2] *Id.* at ¶¶ 6, 9, 21 and p. 39.

[2]  The sole respondent in the Article 78 proceeding was former DOCCS Commissioner, Brian Fischer. *See Guillory v. Fischer,* 111 A.D.3d 1005, 974 N.Y.S.2d 196 (3d Dep't 2013); *see also* Dkt. No. 37–4.

At approximately 12:05 pm on May 6th, Defendant Potter sent Plaintiff to the package room to pick up kosher food from his parents, and Plaintiff reported back to his housing unit at 12:35 pm. *Id.* at ¶ 8. At approximately 1:03 pm, the phone in Plaintiff's housing unit rang and Plaintiff heard Potter tell Kim Ann Johnson ("Johnson"), the law library officer, "Guillory is in the package room." *Id.* at ¶ 9. At the time, Plaintiff was standing twenty feet away from Potter and walked up to him and asked if the call was from the law library. *Id.* Potter denied Plaintiff's request for a pass to the law library despite his name being on the library call-out list. *Id.* Potter denied the request even after Plaintiff showed him the filing deadline for the supplemental brief. *Id.*

Defendant Graziano arrived to conduct an inspection of the housing unit to ensure compliance with DOCCS regulations at around 1:20 pm. *Id.* at ¶ 10. When Graziano and Potter passed near Plaintiff's cube, Plaintiff told Graziano that he was on the law library call-out list; that Johnson had called for him to report to the library; and that Potter had refused to permit him to report to the library. *Id.* Potter

stood behind Graziano shaking his fist at Plaintiff while Plaintiff spoke with Graziano. *Id.* at ¶ 11. When Graziano asked Potter if what Plaintiff had told him was true, Potter responded that Plaintiff could go to the law library the next day. *Id.* at ¶ 12. Graziano told Plaintiff he would look into the matter but according to Plaintiff "did nothing but brush [him] off." *Id.* at ¶¶ 12, 17.

Plaintiff claims he missed the court imposed deadline because he was not allowed to go to the law library on May 6, 2013. *Id.* at ¶ 17. He alleges in his Amended Complaint that Potter did not want him to the go to the law library because Plaintiff had a lawsuit pending against him. *Id.*

### B. Refusal to Send Out Plaintiff's Amended Complaint

Pursuant to an April 17, 2013, Order issued by the Hon. Randolph F. Treece, M.J., in *Guillory v. Weber,* No. 9:12–CV–00280 (LEK/RFT) (N.D.N.Y.) ("*Weber*"), Plaintiff was given a deadline of April 30, 2013, to file an amended complaint. (Dkt. No. 24 at ¶ 3 and p. 35.) Plaintiff gave his very large amended complaint to the law library officer on April 25, 2013, so that the officer could type a letter memorandum to the mail room indicating that the amended complaint had to be sent out forthwith. *Id.* at ¶ 4. The letter memorandum was taped to the top of the bulk legal mail and sent to the mail room by the law library officer. *Id.* at ¶ 4.

**\*5** On May 7, 2013, Plaintiff's corrections counselor, Defendant Dobbs, called Plaintiff to his office regarding Defendant Maher's refusal to send out the amended complaint in *Weber* that was supposed to be mailed on April 25, 2013. *Id.* at ¶ 22. Plaintiff learned that the amended complaint had sat in the Greene administrative office from April 25, 2013, to May 7, 2013, despite the court imposed deadline, and that it had been opened and read by the security staff. *Id.* at ¶ 23. Maher gave the opened amended complaint to Dobbs to be returned to Plaintiff when they met on May 7, 2013. *Id.* at ¶¶ 23–24. The amended complaint was never received by the court. *Id.* at ¶ 33.

Plaintiff sent a letter to Maher on May 7, 2013, demanding to know why his legal mail had not been sent out. *Id.* at ¶ 24. Maher responded by letter memorandum of May 8, 2013, informing Plaintiff his legal mail had been under investigation by security staff. *Id.* at ¶ 25 and p. 41. According to Maher, the Business Office had received seven envelopes that were taped shut with

"Legal" stamped on them and an authorized advance request form for $168.40 dated April 25, 2013, with Plaintiff's name and din number. *Id.* at p. 43. There was a second advance request for postage. *Id.* The format of the letter from the law library accompanying the envelopes and authorized advance request forms was different than those previously seen by Maher. *Id.* In addition, the letter was dated Sunday, April 25, 2013, although April 25th was a Thursday, the signature was not legible, and it did not match law library officer Johnson's signature. *Id.*

Maher consulted with Superintendent Brandon Smith who recommended a security investigation. *Id.* The envelopes were forwarded to Defendant Goppert for investigation, and Maher contacted Library Services Central Office and was referred to Counsels Office. *Id.* Goppert returned the envelopes the following day, and they were given to Dobbs to return to Plaintiff. *Id.*

Plaintiff filed a grievance against Maher, Dobbs, and the security staff regarding the opening and destruction of his legal mail. *Id.* at ¶ 41 and pp. 53–59.

### C. Retaliation by Donovan and Potter for Plaintiff's Parent's Complaint Call to Defendant Boll, and Plaintiff's Filing of Grievances Against Potter

The late afternoon of May 9, 2013, Plaintiff's parents called Defendant Boll to report that Plaintiff was being harassed by Potter and that the facility had sat on his legal mail for two weeks, knowing that he had a court imposed deadline. (Dkt. No. 24 at ¶ 28.) The next day, Plaintiff's cell was searched by Corrections Officer J. Manchester on the direct order of Defendant Donovan. *Id.* at ¶ 29. Donovan took half of Plaintiff's kosher food and half of his legal mail. [3] *Id.* Plaintiff later received a contraband slip that said "no contraband found no property damaged." *Id.* Donovan told Plaintiff if he received any complaints about the search and had to come back to Plaintiff's unit, "we will take a trip to the Special Housing Unit ("SHU")." *Id.* Plaintiff has alleged that Donovan took his legal mail and kosher food in retaliation for his parents contacting DOCCS and previous grievances filed against Potter. *Id.*

[3]   In Paragraph 29 of his Amended Complaint, Plaintiff has alleged that Donovan took half of his legal mail and half of his kosher food on May 10, 2013. (Dkt. No. 24. at ¶ 29.) In Paragraph 32, Plaintiff has alleged

that on May 10, 2013, Donovan took all of his legal mail and kosher food. *Id.* at ¶ 32.

**\*6** On May 18, 2013, Potter intentionally destroyed the microwave in Plaintiff's housing unit. *Id.* at ¶ 35. While looking directly at Plaintiff and another inmate whose family had contacted Defendants Boll and Haywood, Potter said: "This is what inmates get when they call DOCCS on me!! Make another phone call and I will destroy the T.V. and Hot–Pot!" *Id.* A few minutes later, Potter called his supervisor and told him that the microwave had slipped out of his hands while he was doing a search. *Id.* at ¶ 36. Shortly thereafter, when he let Plaintiff out to report to the law library, Potter allegedly said "I have not forgot about what you did, you will be out of this jail soon when my buddies set your ass up, you bitch!" *Id.* at ¶ 37.

### D. Boll and Haywood

According to Plaintiff, after his parents called the DOCCS Office of Counsel and spoke to Boll, (Dkt. No. 24 at ¶ 28), Boll "apparently ordered more retaliation which is the custom, policy and procedure of [Boll and Defendant Haywood], resulting in Donovan's theft of his legal papers and kosher food and Potter's destruction of the microwave and threats to destroy the T.V. and hot-pot on May 18, 2013." *Id.* at ¶¶ 29, 35.

Plaintiff filed an Article 78 proceeding against Boll and Acting DOCCS Commissioner Anthony Annucci on or about May 18, 2013, in New York State Supreme Court, Greene County, regarding their refusal to address and investigate the withholding and confiscation and destruction of Plaintiff's legal mail and kosher food simply because his parents had contacted Boll. *Id.* at ¶ 38 and pp. 47–49. In his May 19, 2013, letter memorandum to Boll and Annucci regarding the Article 78 proceeding, Plaintiff accused Boll and Annucci of advising facilities to retaliate against inmates whose parents call DOCCS Office of Counsel to complain. *Id.* at p. 49.

In a July 2, 2013, letter from Boll to Plaintiff in response to his June 11, 2013, correspondence concerning his legal mail being destroyed, Boll informed Plaintiff that a letter written to Office of Counsel does not replace the formal or informal channels of problem resolution at Greene and recommended that Plaintiff use the grievance procedure set forth in DOCCS Directive 4040 for his complaints. *Id.* at pp. 68–69. Boll also informed Plaintiff that the Office

of Counsel had investigated his complaints and found no evidence that his mail was being destroyed or that he had been denied access to the law library. Boll elaborated on the findings of the investigation. *Id.*

Plaintiff contends that DOCCS counsel Defendant Haywood conducted an investigation into the actions of Defendants Dobbs, Maher, and Goppert with regard to Plaintiff missing his court deadline. *Id.* at ¶ 42. According to Plaintiff, Haywood admitted to conducting an investigation regarding his letters to her office and responded in a May 22, 2013, letter memorandum asserting that she would not comment on his concerns. *Id.* at ¶ 56. It is unclear whether Haywood's investigation is the investigation referenced in Boll's July 2, 2013, letter.

**\*7** Plaintiff claims that Boll and Haywood are in the habit of using threats and retaliation to frighten inmates whose parents call the Office of Counsel to report prison staff misconduct. *Id.* at ¶ 67. Plaintiff likens Boll and Haywood to "high ranking gang-bangers who put out hits upon prisoners who piss them off," and claims "these reckless defendants have a 100 man 'hit squad' who can retaliated (sic) in a matter of hours." *Id.*

## II. PROCEDURAL HISTORY

Plaintiff commenced this lawsuit in the United States District Court, Western District of New York on June 6, 2013. (Dkt. No. 1.) The action was transferred to the Northern District of New York by order of the Hon. William M. Skretny, Chief District Court Judge in the Western District of New York, on December 13, 2013. (Dkt. No. 8 .)

Plaintiff's application to proceed *in forma pauperis* was granted on February 10, 2014, by the Hon. Mae A. D'Agostino, D.J. (Dkt. No. 11 at 2.) Upon initial review under 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff's Complaint, liberally construed, was found to have asserted claims for: (1) denial of access to the courts in violation of his First Amendment rights and in retaliation for his litigation and complaints; (2) interference with Plaintiff's outgoing legal mail in violation of his First Amendment rights and in retaliation for his litigation and complaints; (3) search of his cell and confiscation of his property in retaliation for his litigation and complaints; and (4) denial of equal protection in violation of his Fourteenth Amendment rights. *Id.* at 6.

Plaintiff's claims for money damages against the Defendants in their official capacities were dismissed with prejudice on initial review by Judge D'Agostino. *Id.* at 8. Plaintiff's equal protection claim was dismissed without prejudice because the claim was entirely conclusory. *Id.* The remainder of Plaintiff's claims against Defendants in their individual capacities survived initial review and were found to require a response. *Id.* at 9.

Plaintiff thereafter moved for leave to file an amended complaint substituting Defendants Donovan and Goppert for Defendants John Doe Number 1 and John Doe Number 2. (Dkt. Nos. 17; 17–1 at 1.) Plaintiff's motion to amend was granted, and Donovan and Goppert were added as party defendants. (Dkt. No. 23 at 3.) Defendants thereafter filed the motion to dismiss now before the Court for review and recommendation. (Dkt. No. 37.)

### III. LEGAL STANDARD GOVERNING RULE 12(b) (6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b) (6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not shown that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*8** A complaint may be dismissed pursuant to Rule 12(b) (6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a) (2) "does not require detailed factual

allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir.2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the Plaintiff's complaint." *Robles v. Bleau,* No. 07–CV–0464, 2008 WL 4693153, at \*6 and n. 41, 2008 U.S. Dist. LEXIS 110029, at \*26–27 and n. 41 (N.D.N.Y. Oct. 22, 2008)[4] (collecting cases); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (where a *pro se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint."), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004); *see also Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (in reviewing district court's dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's affidavit submitted in opposition to motion to dismiss). The Court has taken judicial notice of papers filed in other litigation involving Plaintiff and has considered

documents in Plaintiff's submissions in opposition to the extent they are consistent with the allegations in Plaintiff's Amended Complaint.

4     The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's note: Copies of unpublished decisions deleted for Westlaw purposes.]

**\*9** Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## IV. ANALYSIS

### A. Failure to Exhaust with Regard to Claims Against Defendants Maher, Dobbs, and Goppert

Plaintiff claims that Defendants Maher, Dobbs, and Goppert violated his First, Fifth, Sixth, and Fourteenth Amendment rights by: (1) refusing to send out his amended complaint in *Guillory v. Weber,* thereby denying him access to court; (2) interference with his outgoing legal mail; (3) improperly reading his legal mail; and (4) doing the foregoing in retaliation for grievances and lawsuits filed by him. (Dkt. No. 24 at ¶¶ 48–53, 62.) Defendants seek dismissal of the claims on the grounds that at the time this lawsuit was commenced, Plaintiff had not completed exhaustion of his administrative remedies. (Dkt. No. 37–5 at 9–10.) Plaintiff asserts that he had exhausted his administrative remedies before commencing the action because the Central Office Review Committee ("CORC") failed to decide his appeal in a timely manner. (Dkt. No. 41 at 12–15.) Plaintiff further asserts that because his grievance had been administratively exhausted by the

time he filed his Amended Complaint, his commencement of the lawsuit prior the exhaustion of his administrative remedies should be excused. *Id.* at 12.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

A plaintiff's failure to exhaust administrative remedies is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Thus, a prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable civil rights claim. *Jones,* 549 U.S. at 211–17. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim.[5] *Id.* at 215–16.

5     "If nonexhaustion is clear from the face of the complaint (and incorporated documents) a motion to dismiss pursuant to Rule 12(b) (6) for failure to exhaust should be granted." *Fuentes v. Furco,* No. 13–CV–6846, 2014 WL 4792110, at *1, 2014 U.S. Dist. LEXIS 136261, at *2 (S.D.N.Y. Sept.25, 2014) (Nathan, D.J.) (quoting *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)).

**\*10** In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones,* 549 U.S. at 218 (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id* . at 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3) (ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Receiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001), overruled on other grounds by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

Here, Plaintiff filed his original Complaint on June 6, 2013. (Dkt. No. 1.) Plaintiff filed his Amended Complaint on March 27, 2014. (Dkt. No. 24.) Papers related to Plaintiff's grievance against Maher, Dobbs, and unnamed security personnel, are annexed as an exhibit to Plaintiff's

Amended Complaint. (Dkt. No. 24, Exh. G. at 53–59.) Plaintiff's Grievance No. GNE–7816–13 naming Maher, Dobbs and security staff involved in holding his legal mail is dated May 20, 2013. *Id.* at 53. The IGRC denied Plaintiff's grievance on June 10, 2013. *Id.* at 55. Plaintiff appealed to the Superintendent on June 11, 2013, *id.,* and the appeal was denied on June 18, 2013. [6] *Id.* at 56. By the time Plaintiff appealed to CORC on June 19, 2013, he had already commenced this action. *Id.* In fact, according to the grievance papers annexed to Plaintiff's Amended Complaint, he commenced this action before the IGRC had denied the grievance. *Id.* at 55. Therefore, the fact that CORC did not decide the appeal until October 16, 2013, *id.* at 57, well beyond the thirty days provided for in § 701.5(d)(3)(ii), does not excuse Plaintiff's failure to exhaust prior to commencement of this action.

[6]      The Superintendent's determination is erroneously dated June 18, 2014. (Dkt. No. 24 at 56.) It is clear given Plaintiff's June 19, 2013 appeal to CORC that the Superintendent's determination was made on June 18, 2013. *Id.*

**\*11** As noted above, Plaintiff has argued in his opposition that since CORC has now rendered a disposition unfavorable to him, he has properly exhausted. (Dkt. No. 41 at 12.) However, the Second Circuit has held that "[s]ubsequent exhaustion after suit is filed ... is insufficient." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), overruled on other grounds, *Nussle* 534 U.S. at 523. While this may not be the most efficient outcome, as noted in *Mendez v. Artuz:*

> [T]he Court of Appeals has ruled that from the broader perspective of Congress and appellate judges, the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted.

No. 01 CIV. 4157(GEL), 2002 WL 313796, at \*2, 2002 U.S. Dist. LEXIS 3263, at \*4–5 (S.D.N.Y. Feb 27, 2002) (holding that prisoner failed to exhaust administrative

remedies when he commenced civil rights action before receiving decision from CORC) (citing *Neal,* 267 F.3d at 123). Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D.N.Y.2010) (citing *Neal,* 267 F.3d at 122).

Plaintiff's failure to exhaust does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[7] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, the court should "inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

[7]    The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U .S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec.13, 2011). The grievance system was also clearly available to Plaintiff, who was in the process of utilizing the IGP at the time he filed his original Complaint. (Dkt. No. 24 at 53–59.)

**\*12** Second, Defendants are not estopped from asserting this defense, inasmuch as Plaintiff has pleaded no facts indicating Defendants interfered in any way with the grievance process that was ultimately completed. (Dkt. No. 24.)

Third, there are no 'special circumstances' here to excuse Plaintiff's failure to exhaust, because:

> Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." Generally, the 'special circumstances' doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process.

*Ford v. Smith,* No. 9:12 CV 1109 (TJM/TWD), 2014 WL 652933, at *3, 2014 U.S. Dist. LEXIS 20581, at *8–9 (N.D.N.Y. Jan.16, 2014) (citations omitted). While Plaintiff has argued that his administrative remedies were exhausted because his CORC appeal was not decided for four months, that argument does not support a finding of special circumstances, particularly when Plaintiff commenced the action before CORC even received the appeal. Furthermore, although regulations require CORC to respond within thirty days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense. *Id.*

In sum, Plaintiff had not yet exhausted all administrative remedies with regard to his claims against Maher, Dobbs, and Goppert at the time he filed this suit, and the Second Circuit's three-part inquiry reveals no justification for his failure to exhaust. Therefore, the Court recommends that Plaintiff's claims against Defendants' Maher, Dobbs, and Goppert be dismissed without prejudice for failure to exhaust administrative remedies.[8]

[8]    In addition to seeking dismissal for failure to exhaust, Goppert asks that the Amended Complaint be dismissed as against him on the grounds that there are no factual allegations suggesting his involvement in the decision to hold or investigate Plaintiff's mail and no involvement by him in denying Plaintiff access to court. (Dkt. No. 37–5 at 20.) The same could be said of Dobbs, who is alleged to have done nothing more than meet with Plaintiff to return his legal mail after the investigation at Maher's direction. Because the Court is recommending dismissal for failure to exhaust, it makes no determination as to whether Plaintiff has stated a claim against Goppert or Dobbs

but does note that in the event Plaintiff amends to reassert his claims against Goppert and Dobbs as they are alleged in the Amended Complaint, the Court will almost certainly recommend dismissal for failure to state a claim.

### B. Plaintiff's First Amendment Claims for Denial of Access to Court Against Defendants Potter and Graziano

Plaintiff claims that Defendants Potter and Graziano, prevented him from mailing a supplemental brief in an Article 78 proceeding transferred to the Third Department in a timely manner by refusing to allow him to go to the law library for necessary copying and notary services. (Dkt. No. 24 at ¶¶ 6, 9, 21 and p. 39.)

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that the defendant acted deliberately and maliciously. *Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011) (Baxter, M.J.). Plaintiff's Amended Complaint, liberally construed, satisfies that requirement.

*\*13* However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Rosario v. Fischer,* No. 11 Civ 4771, 2012 WL 4044901, at *7, 2012 U.S. Dist. LEXIS 133502, at *19–20 (S.D.N.Y. Aug.28, 2012) ("To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the

court to determine whether the claim had an arguable basis in either law or fact."). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

The only "actual injury" alleged by Plaintiff as a result of Potter and Graziano's alleged refusal to allow him to go to the law library on May 6, 2013, is that he was unable to file his supplemental brief by the deadline imposed by the Third Department. (Dkt. No. 24 at ¶ 44.) Plaintiff's Amended Complaint includes no description of the claim(s) asserted in the Article 78 proceeding, and includes no facts suggesting that the claim(s) were found on "more than hope." *Christopher,* 536 U.S. at 416. Plaintiff has done nothing more than allege in conclusory fashion that his claim was non-frivolous and that it was frustrated by his inability to mail his supplemental brief in a timely manner. *Id.* A missed deadline, without showing the frustration of a non-frivolous claim as a result, is insufficient to demonstrate actual injury. *See Cisnevas–Garcia v. Shipman,* No. 9:10–CV–179 (FJS/RFT), 2010 WL 5094637, at *1, 2010 U.S. Dist. LEXIS 129657, at *4 (N.D.N.Y. Dec.8, 2010).

In light of the foregoing, the Court recommends that Plaintiff's claims for denial of access to court against Potter and Graziano be dismissed for failure to state a claim. The fact that Plaintiff had already submitted a lengthy legal brief to the Third Department in the Article 78 proceeding (Dkt. No. 39), and the Third Department's confirmation of the DOCCS administrative determination being challenged based upon the evidence in the Article 78 record, *see Guillory v. Fischer,* 111 A.D.3d 1005, 974 N.Y.S.2d 196, render it highly unlikely that given the opportunity to replead Plaintiff will be able to state a denial of access to court claim against Potter and Graziano. Nonetheless, in light of Plaintiff's *pro se* status, the Court recommends that the dismissal be without prejudice, and that Plaintiff be given the opportunity to amend.

### C. Argument for Dismissal of Plaintiff's Law Library Retaliation Claims Against Defendants Potter and Graziano as Duplicative

*\*14* Defendants Potter and Graziano seek dismissal of Plaintiff's retaliation claim arising out of their refusal to allow him to go to the law library on May 6, 2013, on the grounds that the claim is identical to one asserted against

Potter in *Guillory v. Morris, et al.,* 13–CV–0378 (NAM/TWD) (*"Morris"* ), presently pending in the Northern District of New York. (Dkt. No. 37–5.)

On September 4, 2013, this Court issued a Text Order in *Morris* allowing Plaintiff to supplement his complaint with a document entitled "Supplemental Harassment by Correction Officer Potter," which asserted claims against Potter for denial of access to court and retaliation arising out of Potter's refusal to allow Plaintiff to go to the law library on May 6, 2013. (*Morris,* Dkt. No. 6.) Pursuant to the Text Order the supplement was added to Plaintiff's complaint and the supplemented pleading was docketed as an amended complaint." (*Morris,* Dkt. No. 15.)

Plaintiff's supplemental claim against Potter was identified as one for denial of access to court and dismissed without prejudice for failure to state a claim in the September 13, 2013, Decision and Order of the Hon. Norman A. Mordue on initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A. (Dkt. No. 16.) Plaintiff has not filed an amended complaint since the issuance of that Decision and Order. Defendant Potter's Rule 12(b)(6) motion to dismiss Plaintiff's retaliation claims against him was denied by Judge Mordue based upon the recommendation of this Court. (Dkt.Nos.68, 75.)

It is well-settled that a district court, as "part of its general power to administer its docket," has discretion to "stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). In *Colorado River,* the Supreme Court noted that since "[t]he complex problems that can arise from the multiple federal filings do not lend themselves to a rigid test," *id.,* "no precise rule has evolved" that governs the exercise of that discretion. *Colorado River,* 424 U.S. at 817. Rather, a district court must "consider the equities of the situation when exercising its discretion," *Curtis,* 226 F.3d at 138, "giving regard to conservation of judicial resources and comprehensive disposition of litigation ...." *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952).

The Second Circuit has endorsed the principle "that [w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance

of convenience ... or ... special circumstances ... giving priority to the second." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989). The Court finds that at this point in the litigation, there are special circumstances that militate against dismissing the law library retaliation claims against Potter and Graziano in this case on the grounds that there are competing lawsuits.

**\*15** The retaliation claim in *Morris* is asserted only against Potter. Graziano is not a defendant in *Morris* but is already before the Court as a party defendant in this action. Because the retaliation claims against Potter and Graziano arise out of the same facts and litigation of the claims would likely involve much of the same evidence, conservation of judicial resources and comprehensive disposition of litigation favors retaining Plaintiff's law library related retaliation claims against both Potter and Graziano in this action.[9]

> [9]  For reasons discussed below, the Court is recommending dismissal without prejudice of Plaintiff's retaliation claim against Graziano for failure to state a claim. If the recommendation is accepted by the District Court, the possibility that Plaintiff will be able successfully amend his claim against Graziano cannot be completely ruled out at present.

Conservation of judicial resources and comprehensive disposition of litigation also favor litigation of Plaintiff's law library retaliation claims and denial of access to court claims against Potter and Graziano in the same lawsuit, since both claims arise out of a common nucleus of facts. There is no denial of access to court claim pending against Potter in *Morris* in light of the dismissal of the claim without prejudice on initial review (*Morris,* Dkt. No. 16), and Plaintiff's failure to amend his complaint in an attempt to state a claim. Although the Court is recommending dismissal of Plaintiff's denial of access to court claim against Potter and Graziano for failure to state a claim in this case, the recommendation is that the dismissal be without prejudice. Therefore, the possibility that Plaintiff will be able to amend his denial of access to court claim cannot be ruled out by the Court at this point.

For the foregoing reasons, the Court recommends that Potter and Graziano's motion to dismiss Plaintiff's law library related retaliation claims on the grounds that a duplicative action is pending be denied without prejudice.[10]

10    Presumably, Potter is free to move to dismiss Plaintiff's retaliation claim in *Morris* on the grounds that the same claim has been asserted in this action.

### D. Plaintiff's Retaliation Claims Against Potter

Plaintiff claims that Potter refused to allow him to go to the law library on May 6, 2013, in retaliation for grievances and lawsuits filed by Plaintiff. (Dkt. No. 24 at ¶¶ 17, 60.) Plaintiff also claims that Potter destroyed the microwave in his housing unit in retaliation for his parents' call to Boll. *Id.* at ¶¶ 28, 35, 61. Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak, 389 F.3d 379, 380–81 (2d Cir.2004)*. Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak, 389 F.3d at 381–83*. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such claims with particular care. *See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)*.

As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

**\*16** *Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001)* (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)*.

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was

"protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Pidlypchak, 389 F.3d at 380* (citing *Dawes, 239 F.3d at 492*).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak, 389 F.3d at 381, 383* (quoting *Davis v. Goord, 320 F.3d 346, 353 (2d Cir.2003)*). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes, 239 F.3d at 493*. In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002)* (citing *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)*). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon, 58 F.3d at 872–73*). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

#### 1. The Law Library Incident

In paragraph 17 of his Amended Complaint, Plaintiff has alleged that "Defendant Potter does not enjoy me going to the law library at all since he found out about the litigation that is pending before this Court (which he is also a Defendant in *Guillory v. Cheryl Morris,* 9:13 cv 00378)." (Dkt. No. 24 at ¶ 17.) The original complaint in *Morris* was filed on April 4, 2013. (*Morris,* Dkt. No. 1.) Although Potter was named as a John Doe in Plaintiff's

original complaint, it can be inferred from the allegations asserted against defendant Doe, *i.e.,* forcing Plaintiff to have his side locks cut off, *id.* at ¶ 13, that Potter may very well have been recognized as Doe and made aware that the suit had been commenced prior to May 15, 2013, when the complaint was supplemented to substitute his name for John Doe.[11] (*Morris,* Dkt. No. 6.) Plaintiff has also alleged that the retaliation was for his filing a grievance against Potter on April 10, 2013. *Id.* at ¶ 32.

[11]      Plaintiff has also alleged that Potter refused to allow him to go to the law library in retaliation for informing Graziano about the refusal. *Id.* at 60. Since Plaintiff did not tell Graziano until after Potter had refused to allow him to go to the law library, the facts do not support a retaliation claim based upon Plaintiff's disclosure to Graziano. Furthermore, Plaintiff's conclusory assertion that Potter was retaliating against him for bringing lawsuits against the facility does not support a retaliation claim. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (Claims of retaliation must be "supported by specific and detailed factual allegations" and not stated "in wholly conclusory terms.") (quoting *Flaherty,* 713 F.2d at 13).

**\*17** The filing of lawsuits is protected conduct for purposes of First Amendment claims. *See Colon,* 58 F.3d at 872 ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for redress of grievances.") Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter "a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383. In addition, the temporal connection between Plaintiff's pending lawsuit against Potter and the April 10, 2013, grievance against Potter, and Potter's refusal to allow Plaintiff to go to the law library, is "sufficient to support an inference that the protected conduct played a substantial part in the adverse action," *see Baskerville,* 224 F.Supp.2d at 732, for purposes of surviving a Rule 12(b)(6) motion.

Therefore, the Court recommends that Potter's motion to dismiss Plaintiff's retaliation claim arising out of his refusal to allow Plaintiff to go to the law library be denied.

2. *The Microwave Incident*

In addition to the specific arguments made by Defendants for dismissal of Plaintiff's retaliation claims against Potter and Graziano for not allowing him to go to the law library and the allegedly retaliatory cell search by Donovan, *id.* at 8–10, the Defendants have made a general argument for dismissal of all other retaliation claims that might be asserted in Plaintiff's Amended Complaint. (Dkt. No. 37–5 at 13–15.) Defendants have not identified the specific retaliation claims the argument is intended to address, the defendants involved in each retaliation claim, or specific facts relating to the retaliation claims they seek to have dismissed. *Id.* They have simply argued in conclusory terms that Plaintiff's Amended Complaint fails to include any non-conclusory allegations supporting retaliation and does not allege facts establishing that the Defendants were aware of Plaintiff's grievances and lawsuits at the time of the claimed retaliation, thereby leaving the Court to guess as to particular retaliation claims on which dismissal is sought.[12] *Id.* at 14–15.

[12]      Defendants' reliance upon a general argument for dismissal of Plaintiff's unspecified retaliation claims is to some degree understandable given the random, disorganized, and largely conclusory nature of much of Plaintiff's Amended Complaint.

Presumably, one of the claims intended to fall within the retaliation argument is Plaintiff's retaliation claim involving Potter's alleged destruction of the microwave in Plaintiff's housing unit, which occurred nine days after Plaintiff's parents called Boll to complain that Plaintiff was being harassed by Potter. (Dkt. No. 24 at ¶¶ 28, 35, 61.) Plaintiff claims that Potter destroyed the microwave while staring at Plaintiff and another inmate whose parents had called DOCCS Office of Counsel, and saying "this is what inmates get when they call DOCCS on me!!" *Id.* at ¶¶ 35. Plaintiff contends that the microwave destruction was in retaliation for the call to Boll and Plaintiff's grievances against Potter, one of which was filed on April 10, 2013. *Id,* at ¶ 32.

**\*18** The filing of a grievance has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right to file grievances is a constitutionally protected activity for retaliation purposes). Inmate's verbal complaints to corrections officers and prison officials have also been found to constitute activity protected by the First Amendment. *See, e.g., Monko v. Cusak,* No. 9:11–CV–1218 (GTS/TWD),

2013 WL 5441724, *10, 2013 U.S. Dist. LEXIS 142053, at *23 (N.D.N.Y. Sept.27, 2013); *Brewer v. Kamas,* 533 F.Supp.2d 318, 329 (W.D.N.Y.2008); *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS at 29745 at *46 (N.D.N.Y. April 24, 2006), *aff'd,* 219 F. App'x 110 (2d Cir.2007).

Plaintiff's parents' call to Boll might arguably be construed as Plaintiff's own conduct for First Amendment protection purposes, since the call was made on Plaintiff's behalf, and it can be inferred at his direction. Defendants do not appear to have argued otherwise in seeking dismissal of Plaintiff's retaliation claims. Moreover, for purposes of this motion, the temporal proximity of the call to Boll and the destruction of the microwave, and Potter's alleged comment connecting the destruction to the call makes a plausible showing of causal connection for purposes of this motion. However, the Court finds that the destruction of the housing unit's microwave does not constitute adverse action "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights" for purposes of stating a retaliation claim. *Pidlypchak,* 389 F.3d at 381, 383. Rather, as pleaded by Plaintiff, the destruction of the microwave was *de minimis.*

Plaintiff has alleged that corrections officers like to destroy microwaves because inmates use them to heat chicken purchased from the commissary. *Id.* at ¶ 38. However, Plaintiff's Amended Complaint contains no factual allegations regarding his personal use of the housing unit microwave or the impact of its destruction on him that would suggest the impact was more than *de minimis.* Furthermore, the Amended Complaint is devoid of allegations regarding the period of time the housing unit was without a microwave, although given Plaintiff's allegation that Potter contacted administration about the broken microwave and indicated he had dropped it, one could infer that it was likely replaced. *Id.* at ¶ 36.

Given Plaintiff's failure to make a plausible showing that the destruction of the microwave constituted adverse action for purposes of his retaliation claim against Potter, the Court recommends that the claim be dismissed for failure to state a claim. The Court further recommends that Plaintiff be granted leave to amend his claim in the unlikely event he can plead facts showing the impact of the destruction of the microwave was sufficiently severe so as to deter a "similarly situated individual

of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383.

### E. Claims Against Graziano

#### 1. *Retaliation*

**\*19** According to Plaintiff, he made Graziano aware of his court imposed deadline and of Potter's refusal to allow him to go to the law library when he came to Plaintiff's housing unit in the early afternoon of May 6, 2013. (Dkt. No. 24 at ¶ 10.) Graziano did not intervene on Plaintiff's behalf but did tell him he would look into it. *Id.* at ¶ 11. Plaintiff claims that instead, Graziano brushed him off. *Id.* at ¶ 17.

Plaintiff has not identified any First Amendment protected conduct engaged in by him for which Graziano might retaliate. Nor are there any other allegations in the Amended Complaint that make a plausible showing that Graziano's failure to intervene on Plaintiff's behalf and alleged failure to look into the law library matter were in retaliation for Plaintiff's First Amendment protected conduct. Therefore, the Court recommends dismissal of Plaintiff's retaliation claim against Graziano for failure to state a claim and further recommends that in light of Plaintiff's *pro se* status he be granted leave to amend.

#### 2. *Supervisory Liability*

Plaintiff has alleged that Graziano knew Potter was violating his constitutional rights and did nothing about it. *Id.* at ¶ 64. Plaintiff describes Graziano's conduct as "the same type of liability that is addressed when a supervisor knew of the subordinate's past misconduct (prior grievances against Defendant Potter, beat ups by Defendant Potter, Set-ups by Defendant Potter), [and] failed to set up policies that help guide subordinate's conduct so that the violations of constitutional rights does (sic) not continue to occur, failed to inform and train staff (Defendants Potter, Goppert, Donovan, Defendant Dobbs and Maher) on policies designed to avoid the deprivations of constitutional rights; and failed to supervise the said defendants to ensure that they follow policies that are created to protect the said constitutional rights." *Id.*

Those factual allegations suggest an attempt by Plaintiff to assert a claim against Graziano for supervisory liability. The law is clear that "personal involvement

of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."* ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*20** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [13]

[13] The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013).

The only factual allegations showing direct participation by Graziano in the violation of Plaintiff's constitutional rights are those related to Plaintiff's denial of access to court claim against him, which the Court has

recommended be dismissed for failure to state a claim. Vague and conclusory claims that Graziano, as a supervisory official, has failed to provide proper training and supervision or created a policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon. See Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (same).

Given the conclusory nature of Plaintiff's supervisory liability claim against Graziano, the Court recommends dismissal for failure to state a claim, with leave to amend granted in deference to Plaintiff's *pro se* status.

**F. Retaliation Claim Against Donovan**

According to Plaintiff, the day after Plaintiffs' parents called Boll to complain about Potter and the holding of his legal mail, Defendant Donovan directed a corrections officer to conduct a search of Plaintiff's cell and took either half or all of Plaintiff's legal documents and food. (Dkt. No. 24 at ¶¶ 29, 32.) Plaintiff claims that the cell search and taking of his property were in retaliation for the call to Boll as well as Plaintiff's filing of grievances against Potter. *Id.* at ¶ 32. In his opposition to Defendants' motion to dismiss, Plaintiff has clarified that he is not asserting a property deprivation claim under the Fourth or Fourteenth Amendments, but rather is specifically asserting a retaliation claim, and the Court has taken Plaintiff at his word. [14] (Dkt. No. 41 at 17.)

[14] The Second Circuit has, in any event, held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of post-deprivation remedies" in the New York Court of Claims." *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996).

As noted above, an inmate's verbal complaints to corrections officers and prison officials have been found to constitute activity protected by the First Amendment. Although Plaintiff has not alleged facts showing that

Donovan was aware of his parents' call to Boll, given that the search and confiscation of Plaintiff's property took place only one day after his parents' telephone call to Boll, the Court finds that Plaintiff has made a sufficient showing that there may have been a causal connection for purposes of this motion to dismiss.

**\*21**  As to the adverse action requirement, the Supreme Court has held that "prisoners have no legitimate expectation of privacy." *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). As a result, many of the district courts in the Second Circuit have found that cell searches, even if conducted for retaliatory reasons, cannot constitute an adverse action for purposes of a retaliation claim. *See, e.g., Yolfelfang v. Capra,* 889 F.Supp.2d 489, 509 (S.D.N.Y.2012) ("inmate has no right to be free from searches of any kind, including those alleged to be retaliatory.") (quoting *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005)) (internal quotation marks omitted). Even though district courts have found that cell searches alone are not actionable under § 1983, even if retaliatory, allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search have been found sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights. *See, e.g., Amaker v. Fischer,* No. 10–CV–0977A, 2014 WL 4772202, at \*10, 2014 U.S. Dist. LEXIS 136117, at \*22 (W.D.N.Y. Sept.27, 2014); *Phelan v. Hersh,* No. 10–CV–0011 (GLS/RFT), 2011 WL 6031940, at \*6, 2011 U.S. Dist. LEXIS 4252 (N.D.N.Y. Sept.13, 2011).

Based upon the foregoing, the Court finds that Plaintiff's allegations that Donovan confiscated his legal documents and kosher food during a cell search in retaliation for Plaintiff's parents' complaints to Boll the day before states a plausible claim for retaliation and recommends denial of Donovan's motion to dismiss Plaintiff's retaliation claim against him.

### G. Supervisory Liability Claims Against Boll and Haywood

Defendants Boll and Haywood seek dismissal of Plaintiff's Amended Complaint on the grounds that he has failed to allege facts showing the personal involvement necessary for supervisory liability. (Dkt. 37–5 at 12–16.) Plaintiff has alleged that Boll and Haywood, "after learning of the violations of [his] constitutional rights failed to remedy the wrong (Supra at 28); created a custom and policy under

which [his] constitutional rights were violated (Supra at 29–30, 35, 38, 42–43); and, was (sic) grossly negligent in that they failed to adequately supervise the subordinates whom (sic) also violated my said rights." [15] (Dkt. No. 24 at ¶ 54.) According to Plaintiff, Boll and Haywood learned of the violation of his constitutional rights through several letters written to their office, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55.

[15]  Paragraph 8 of Plaintiff's Amended Complaint, cited in Plaintiff's supervisory liability claim, references his parents' telephone call to Boll on May 9, 2013. *Id.* at ¶ 28. Paragraph 29 (Paragraph 30 is void) deals with the cell search and Donovan taking Plaintiff's legal mail and kosher food. *Id.* at ¶¶ 29–30. Paragraph 35 contains allegations regarding the destruction of the microwave by Potter. *Id.* at ¶ 35. Paragraph 38 references Plaintiff's Article 78 proceeding against Boll for failing to stop the unspecified reckless retaliation, despite knowledge of the facts; refusal to address the destruction of Plaintiff's legal papers and confiscation of his kosher food in retaliation for his parent's contacting Boll; and destruction of the microwave by Potter. *Id.* at ¶ 38. Paragraphs 42 and 43 allege Haywood's refusal to comment on the findings of her investigation of Dobbs, Maher, and Goppert regarding Plaintiff's missed court deadline, and refusal to do anything after learning of the retaliation by Maher, Dobbs, Goppert, and Donovan. *Id.* at ¶¶ 42–43.

"[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citation and internal quotation marks omitted). Conclusory allegations that a supervisory official was aware of alleged constitutional violations and failed to remedy them fail to state a claim for supervisory liability. [16] *See Carter v. Artuz,* No. 95CIV2362CSHKNF, 95CIV4785CSHKNF, 1999 WL 350868, at \*4, 1999 U.S. Dist. LEXIS 8338, at \*11 (S.D.N.Y. June 1, 1999). Furthermore, Plaintiff's wholly conclusory claims that Boll and Haywood, as a supervisory officials, created a custom and policy under which Plaintiff's constitutional rights were violated, are legally insufficient to state a claim under any of the categories identified in *Colon. See Koehl v. Bernstein,* No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at \*19, 2011 U.S. Dist. LEXIS 64466, at \*56 (S.D.N.Y. June 17, 2011)

("While personal involvement of a supervisor may be established by showing that [she or] he created a policy or custom under which the violation occurred ..., conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement.") (internal citations omitted). Likewise, conclusory allegations that a supervisory official has failed to train or properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement for a supervisory liability claim. *See Pettus,* 554 F.3d at 300; *Bridgewater,* 832 F.Supp. at 348; *White,* 2010 WL 624081, at \*6.

16      District courts in the Second Circuit have held that supervisory liability for failure to remedy constitutional violations after learning of them applies only to ongoing violations, not those which can no longer be remedied. *See, e.g., Bridgewater,* 832 F.Supp.2d at 348 (citing *Odom v. Calero,* No. 06 Civ. 15527(LAK)(GWG), 2008 WL 2735868, at \*7, 2008 U.S. Dist. LEXIS 52408, at \*18 (S.D.N.Y. July 10, 2008)).

### 1. *Haywood*

**\*22** In addition to the conclusory assertions that fail to state a claim, Plaintiff has alleged that Haywood conducted an investigation into the actions of Dobbs, Maher, and Goppert in withholding his amended complaint from the mail and: (1) stated in a letter to Plaintiff (not included as an exhibit to the Amended Complaint) that she would not comment on Plaintiff's concerns; (2) and when Plaintiff returned Haywood's letter with a demand that she amend it consistent with his demand that an additional investigation be conducted, she refused to accede to the demand. *Id.* at ¶¶ 42–43, 56. Plaintiff also claims that Haywood failed to act on Maher, Dobbs, and Goppert's retaliatory conduct in withholding his mail when she learned of it. *Id.* at ¶¶ 42–43.

Plaintiff has acknowledged that Haywood conducted an investigation of Maher, Dobbs, and Goppert's conduct with regard to the missed filing deadline. *Id.* at ¶ 42. However, his Amended Complaint does not include allegations showing the facts and circumstances surrounding the investigation by Haywood, i.e., whether it was undertaken in response to his direct complaints to her or as a part of her designated duties in the Office of Counsel. Although Plaintiff has included numerous exhibits as a part of his Amended Complaint, he has

neither included the letter from Haywood in which she allegedly refused to comment on his complaint, nor has he alleged any specific detail as to its content.

Plaintiff has not alleged facts showing that there was any action Haywood could have taken to remedy the missed filing deadline for the amended complaint by the time she became aware of it. *See Bridgewater,* 832 F.Supp.2d at 348. Plaintiff has not alleged that he attempted to remedy his inability to file the amended complaint in a timely manner by seeking an extension with the district court on the grounds that his amended complaint had been held for a security review. *See Waters v. Sunshine,* No. 07 Civ. 4753(DLI)(LB), 2009 WL 750217, at \*6, 2009 U.S. Dist. LEXIS 22445, at \*16–19 (E.D.N.Y. Mar. 19, 2009) (plaintiff has not suffered a constitutional deprivation of access to court if he has other avenues available to bring his claims before the court).

Furthermore, a complaint that fails to state a claim for the underlying unlawful conduct also fails to state a claim against supervisory officials with respect thereto. *Delaney v. Zaki,* No. 9:13–CV–0648 (DNH/TWD), 2014 WL 4966914, at \*8, 2014 U.S. Dist. LEXIS 137611, at \*17 (N.D.N.Y. Sept.2, 2014) (citing *Alston v. Bendheim,* 672 F.Supp.2d 378, 388–89 (S.D.N.Y.2009); *Clarke v. Sweeney,* 312 F.Supp.2d 277, 298 (D.Conn.2004) ("As there was no underlying deprivation of constitutional rights, accordingly, there can be no supervisory liability ....").

Plaintiff has failed to state a claim for denial of access to court against Maher, Dobbs, and Goppert and, therefore, has failed to state a supervisory liability claim in connection therewith. Plaintiff has failed to alleged facts plausibly showing that his underlying claim for denial of access to court in the federal court action was non-frivolous in nature. His only claimed injury is his inability to file the amended complaint in a timely manner. *See Lewis,* 518 U.S. at 348–349. Furthermore, Plaintiff has failed to describe the underlying claims in his Amended Complaint well enough for the court to determine whether they have any arguable basis in fact or law. *See Christopher,* 536 U.S. at 415–16. In fact, he has not described the claims at all.

**\*23** Plaintiff has likewise failed to state a claim against Maher, Dobbs, and Goppert for interference with legal mail in that as with his claim for denial of access

to court, he has failed to allege "actual injury" to a non-frivolous claim. *See Davis,* 320 F.3d at 351 (to state a claim for denial of access to court based upon interference with legal mail, a plaintiff must allege that the interference hindered efforts to pursue a legal claim, i.e., caused actual injury such as the dismissal of an otherwise meritorious claim). While Plaintiff contends that Maher, Dobbs, and Goppert violated his constitutional rights by opening his legal mail outside of his presence, an isolated instance of mail tampering is generally insufficient to establish a constitutional violation. *See Davis,* 320 F.3d at 351. Rather, an inmate must show that prison officials "regularly and unjustifiably interfered with incoming mail." *Id.* (citation and internal quotation marks omitted).

Nor has Plaintiff stated a claim for retaliation against Maher, Dobbs, and Goppert. Plaintiff has alleged in conclusory fashion that the failure to send out his amended complaint was in retaliation for unspecified grievances and lawsuits he had filed against the facility. *Id.* at ¶ 62. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13. Therefore, Plaintiff cannot be found to have stated a supervisory liability claim against Haywood for failure to take action with respect to Maher, Dobbs, and Goppert's alleged retaliation. *See Delaney,* 2014 WL 4966914, at *8.

Given the conclusory nature of Plaintiff's failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Haywood, the Court recommends that those supervisory claims be dismissed without prejudice. In addition, given Plaintiff's failure to state claims against Haywood for allegedly refusing to accede to his demand for an additional investigation of the withholding of his amended complaint, and failing to take action with respect to Maher, Dobbs, and Goppert's allegedly retaliatory conduct, the Court recommends that Plaintiff's those claims against Haywood be dismissed without prejudice.

### 2. *Boll*

Plaintiff has alleged generally that Boll learned of the violation of his constitutional rights through several letters written to the Office of Counsel, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55. However, the only communications specifically identified

by Plaintiff are the phone call from Plaintiff's parents on May 9, 2013, and a June 11, 2013, letter from Plaintiff regarding the withholding of his amended complaint from the mail, to which Boll responded on July 2, 2013 (Dkt. No. 24 at 68). Furthermore, Plaintiff has failed to allege facts identifying the grievances, and lawsuits from which Boll allegedly learned of the violations of his constitutional rights and facts from which her awareness can be inferred. [17]

[17]     Plaintiff's parents' call to Boll occurred prior to Donovan's alleged taking of Plaintiff's legal papers and kosher food (May 10, 2013) and Potter's alleged breaking of the microwave (May 18, 2013). (Dkt. No. 24 at ¶¶ 29, 35.) Therefore, the call cannot be found to have placed Boll on notice of those incidents.

**\*24** Plaintiff has alleged that the subject matter of his parents' May 9, 2013, telephone call with Boll included harassment by Potter and the withholding of his amended complaint by Maher, Dobbs and Goppert. *Id.* at ¶ 28. Plaintiff has failed to describe the specific harassing conduct by Potter that was complained of by his parents in their call with Boll. [18] However, given the temporal proximity between Potter's refusal on May 6, 2013, to allow Plaintiff to go to the law library for copying and notary services necessary to mail out his brief in a timely manner, the Court can infer that incident was raised in the May 9, 2013, telephone conversation. *Id.* at ¶¶ 6–7, 28.

[18]     It is well-established that verbal harassment alone is insufficient to support a constitutional claim. *See Feldman v. Lyons,* 852 F.Supp.2d 274, 280 (N.D.N.Y.2012).

Even if complaints were made to Boll concerning the May 6, 2013, law library incident and the withholding of the amended complaint, Plaintiff has failed to state a supervisory liability claim against her with respect to his denial of access to court claim. As with his claim regarding the amended complaint withheld from mailing, [19] the only injury alleged by Plaintiff with regard to the May 6, 2013, law library incident was his failure file his supplemental brief in a timely manner. Furthermore, as noted above, Plaintiff's Amended Complaint does not describe the underlying claims in his Article 78 proceeding as required to state a claim for denial of access to court and interference with legal mail. *See Christopher,* 536 U.S. at 415–16; *Davis,* 320 F.3d at 351. Therefore, the Court finds that Plaintiff has failed to state a supervisory liability

claim against Boll with regard to his denial of access to court arising out of the May 6, 2013, law library incident and the withholding of his amended complaint from the mail.

19    The Court's analysis of Plaintiff's supervisory liability claim against Haywood relating to the withholding of Plaintiff's amended complaint from the mail applies to the same claim against Boll.

The Court has concluded that Plaintiff has stated a claim for retaliation against Potter with regard to the May 6, 2013, law library incident. In addition, the Court has inferred that the May 6, 2013, incident was raised by Plaintiff's parents in their May 9, 2013, telephone conversation with Boll. It also appears, given Boll's reference in her July 2, 2013, to a claim by Plaintiff in his June 11, 2013, letter to Boll concerning denial of access to the law library, that Boll had been made aware of and investigated the incident and found Plaintiff had not been denied access to the law library. (Dkt. No. 254 at 68.) Reading the allegations in the Amended Complaint liberally, as it must do, and construing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has stated a supervisory liability claim against Boll with regard to Plaintiff's retaliation claim against Potter in connection with the May 6, 2013, law library incident.

In light of the foregoing, the Court recommends that Plaintiff's conclusory failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Boll, as well as supervisory liability claims with regard to Plaintiff's denial of access to court, interference with mail, and improper opening of mail claims be dismissed without prejudice. The Court recommends that Boll's motion to dismiss be denied as to Plaintiff's supervisory liability claim against her with respect to Potter's alleged retaliation in connection with the May 6, 2013, law library incident.

### H. Retaliation Claims Against Boll and Haywood

**\*25** Plaintiff has alleged in wholly conclusory terms that Boll and Haywood had a custom, policy and practice of ordering retaliation against inmates whose parents called the DOCCS Office of Counsel on behalf of their children. (Dkt. No. 24 at ¶ 29.) Wholly conclusory claims of retaliation "can be dismissed on the pleadings alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Therefore, the Court recommends that

Plaintiff's retaliation claims against Boll and Haywood be dismissed without prejudice.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) (Dkt. No. 37) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED,** that Defendant Potter and Graziano's motion to dismiss Plaintiff's retaliation claims against them arising out of the May 6, 2013, law library incident, on the grounds that the claim is duplicative of a claim being asserted against Potter in *Guillory v. Morris,* 9:13–CV–0378 (NAM/TWD) (N.D.N.Y.) be denied without prejudice; and it is further

**RECOMMENDED,** that Plaintiff's Amended Complaint **BE DISMISSED WITHOUT PREJUDICE** as to the following claims: (1) First Amendment denial of access to courts, interference with legal mail, improper opening of legal mail, and retaliation claims against Defendants Maher, Dobbs, and Goppert for failure to exhaust; (2) First Amendment denial of access to courts claim against Defendants Potter and Graziano for failure to state a claim; (3) First Amendment retaliation claim against Defendant Potter arising out of the destruction of the microwave oven in Plaintiff's housing unit; (4) First Amendment claim for retaliation against Defendant Graziano for failure to state a claim; (5) supervisory liability claim against Defendant Graziano for failure to state a claim; (6) supervisory liability claims against Defendant Haywood for failure to state a claim; (7) supervisory liability claims against Defendant Boll for generally failing to remedy wrongs, creating and allowing to continue customs and policies under which under which constitutional practices occur, and failure to supervise and monitor subordinates for failure to state a claim; (8) supervisory liability claim against Defendant Boll in connection with Plaintiff's denial of access to court claims against Defendants Potter and Graziano relating to the May 6, 2013, law library incident for failure to state a claim; (9) supervisory liability claim against Defendant Boll with regard to Plaintiff's denial of access to court, interference with legal mail, and improper opening of legal mail claims against Defendants Maher, Dobbs, and Goppert in connection with the amended complaint withheld from mailing to the court, for failure to state a

claim; and (10) retaliation claims against Haywood and Boll for failure to state a claim; and it is further

**RECOMMENDED,** that Plaintiff be granted leave to amend with regard to all of the claims dismissed without prejudice for failure to exhaust administrative remedies and/or for failure to state a claim; and it is further

**\*26 RECOMMENDED,** that Defendants' motion to dismiss for failure to state a claim be denied as to the following claims: (1) Plaintiff's retaliation claim against Defendant Potter arising out of the May 6, 2013, law library incident; (2) Plaintiff's retaliation claim against Defendant Donovan with regard to taking Plaintiff's legal papers and kosher food; and (3) Plaintiff's supervisory liability claim against Defendant Boll with regard to Plaintiff's retaliation claim against Potter with regard to the May 6, 2013, law library incident; and it is hereby

**ORDERED,** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Dec. 11, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 268933

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1007780
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary ETHIER, Plaintiff,
v.
CITY OF COHOES, New York, James Ward,
Patrick Abrams, and Jeffrey Guzy, Defendants.

No. 1:02-CV-1584.
|
April 18, 2006.

**Attorneys and Law Firms**

David Brickman, Office of David Brickman, Albany, NY,
for Plaintiff.

Gregg T. Johnson, Jacinda Hall Conboy, Girvin, Ferlazzo
Law Firm, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** Plaintiff Gary Ethier commenced the instant action
against Defendants claiming violations of his civil rights
in connection with his employment as a police officer for
the City of Cohoes, New York. Presently before the Court
is Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its
entirety.

## I. FACTS

Plaintiff was a police officer with the City of Cohoes, New
York. During his first few years with the Cohoes Police
Department ("CPD") (1991-1993), Plaintiff was trained
and/or supervised by Defendants James Ward ("Ward")
and Patrick Abrams ("Abrams"). On August 21, 1995,
Plaintiff drove his police vehicle onto a curb and sidewalk,
nearly striking a pedestrian with the vehicle. As a result
of this incident, Plaintiff was the subject of an internal
investigation by the CPD. Plaintiff ultimately pleaded
guilty to violating Cohoes Police Department General
Order 0012-95 entitled "Rules of Conduct" and agreed to
undergo a psychological evaluation, undertake remedial

instruction on the operation of a police vehicle, and take
any tests deemed necessary by the psychologist.

On February 24, 1997, Plaintiff arrested Patrick
O'Donnell. After the arrest, but before Plaintiff
transported O'Donnell to the police station, O'Donnell
suffered injuries to his head and face. There also was
damage to the rear window of a police vehicle. As a result
of this incident, Plaintiff was the subject of an internal
investigation.

On January 8, 1998, while Plaintiff was in pursuit of
Richard Maynard, Mr. Maynard's body struck the ground
and/or a retaining wall on multiple occasions before
Plaintiff placed Maynard under arrest, causing Maynard
to suffer injury to his face. As a result of this incident,
Plaintiff was the subject of an internal investigation.
This investigation resulted in Plaintiff's pleading guilty
in April 1998 to violating Cohoes Police Department
General Order 92-5 ("Off Duty Arrests"). As a result of
this guilty plea, Plaintiff agreed that he would receive
a letter of reprimand and thirty day suspension without
pay, which suspension was to be held in abeyance for
one year unless Plaintiff was found guilty of violating
Cohoes Police Department General Order 92-5 or 0019-48
("Physical Force") as a result of the January 8, 1998
incident involving the arrest of Maynard.

On September 25, 1998, Plaintiff placed John Gaston
upon or against a police vehicle while attempting to
arrest him. During the course of the arrest, Gaston
suffered injury to his face and body and there was damage
to the police vehicle, including a dented fender and
cracked windshield. This incident resulted in an internal
investigation.

In 1998, there were discussions in the CPD regarding
Plaintiff's participation in the D.A.R.E. program with
the Cohoes City School District. School District officials
advised Defendants that if Plaintiff was permitted to
participate in the D.A.R.E. program, the school would
drop the program. [1]

[1]     Although Plaintiff denies this allegation, he fails to
        point to any record evidence tending to suggest that it
        is not true. Accordingly, this fact is deemed admitted.
        N.D.N.Y.L.R. 7.1(a)(3).

**\*2** On February 3, 1999, Plaintiff effected a traffic stop
of Eric Sawyer. Plaintiff kicked and struck Sawyer before

restraining Sawyer, causing injury to Sawyer's face. This conduct resulted in another internal investigation.

On February 16, 1999, Plaintiff physically restrained Eugene Aquilina and pushed Nicole Brown while attempting to arrest Aquilina. Brown lodged a civil complaint against Plaintiff alleging excessive force and misconduct. This incident also was the subject of an internal investigation.

On March 5, 1999, Plaintiff physically restrained and maced Kyle Durocher while attempting to arrest him. Durocher filed a civil complaint against Plaintiff alleging excessive force and misconduct. This incident was the subject of an internal investigation.

On March 12, 1999, Plaintiff stopped a vehicle suspected of violating the New York State Vehicle and Traffic Law. According to Plaintiff, he smelled alcohol and believed the driver to be driving under the influence of alcohol. The driver of the vehicle was Defendant City of Cohoes Corporate Counsel, John Doherty. Plaintiff contends that he administered sobriety tests and an alco-sensor test to Doherty, all of which he failed. Plaintiff further contends that Sergeant Kubik, who was at the scene, spoke with Defendant Ward who advised that Plaintiff was to bring Doherty to the police station where he was to be released to someone who had not been drinking. When Plaintiff returned to the police station with Doherty, a taxi was called for Doherty and he was released. Plaintiff was neither reprimanded nor charged with respect to his conduct on March 12, 1999.

On March 17, 1999, Plaintiff was involved in a heated verbal exchange with CPD Detective Thomas Ross and his spouse at Mac's Tavern and Restaurant. By memorandum dated March 26, 1999, Plaintiff was advised that an internal investigation was being conducted with respect to the March 17 incident.

A meeting was conducted with CPD Chief Heslin, Defendant Ward, Lieutenant Ross, and Plaintiff concerning the March 17, 1999 incident. During the meeting, Plaintiff made a remark concerning Ross' wife, after which Ward ended the meeting and escorted Plaintiff out of the CPD. [2]

[2]  Plaintiff denied this assertion, which is contained in Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement

of material facts. The denial is not supported by a citation to the record as required by that rule. Accordingly, Defendants' assertion (and all other assertions to which Plaintiff asserted a blanket denial with no citation to the record) is deemed admitted. *See* n. 1 *supra.*

On or about March 22, 1999, Ward assigned Plaintiff to formal training. The formal training consisted of Plaintiff's being assigned to Sergeant Kubik when Kubik was working. When Kubik was not working, Plaintiff was to perform inside duties and not leave the police station without a supervisor. Plaintiff also was prohibited from assuming the duties of a tour supervisor. It was also ordered that Plaintiff would not be counted as manpower so, if the need arose, the CPD may have to call for overtime.

In April 1999, Plaintiff was directed to submit to a mental health evaluation. On April 22, 1999, Kubik prepared a memorandum indicating that Plaintiff had met the training objectives set forth on March 22, 1999. On April 28, 1999, Plaintiff was assigned to a two-man unit. Plaintiff continued to be prohibited from acting as a tour supervisor.

**\*3** On October 20, 1999, Plaintiff returned to unrestricted duty. Plaintiff consented to the withdrawal of all contractual grievances he and/or his union filed on his behalf between March 17, 1999 and October 20, 1999. On November 14, 1999, Plaintiff violated CPD Order 0057-95 by leaving his post without proper notification.

On March 24, 2000, Plaintiff entered a dwelling occupied by Hani Khalil. Plaintiff used physical force to arrest Khalil. Khalil lodged complaints against Plaintiff alleging an unlawful search, the use of excessive force, and misconduct. This resulted in an internal investigation.

On May 8, 2000, Plaintiff was issued a Notice of Discipline. Plaintiff requested an arbitration hearing concerning the Notice of Discipline. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the arbitrator found Plaintiff guilty of various charges against him. Plaintiff was found guilty of violating CPD Order 12-95 (Rules of Conduct), 19-94 (Use of Force), 15-95 (Prisoners Detained in Cellblock), [3] 57-95 (Patrol Zones), and 98-95 (Constitutional Guarantees). In all, Plaintiff was found guilty of eight out of twenty-one charges. The arbitrator imposed a penalty of two

months suspension without pay. There was no appeal of the arbitrator's decision.

3    Plaintiff required Khalil to remove his pants while in the cell block without any reason to believe that such action was necessary.

On May 18, 2001, Plaintiff was again charged with misconduct. It was alleged that Plaintiff gave false testimony. Specifically, there was an allegation that Plaintiff was present during the arrest of Bret Woodworth, who claimed that the CPD used excessive force against him. At Woodworth's trial, Plaintiff denied remembering arresting Woodworth. Defendant Guzy, on the other hand, testified that Plaintiff was present during the arrest, raising a conflicting account of the incident. It was Plaintiff's position that he was outside during the arrest and, therefore, not present. At a subsequent administrative hearing, Guzy admitted that Plaintiff was not, in fact, involved in Woodworth's arrest. Defendants sought to terminate Plaintiff's employment if he was found guilty of the charges. These charges resulted in no guilty findings and Plaintiff was reinstated with all of his pay and benefits.

Plaintiff's police vehicle sustained damage on January 23, 2003. Plaintiff failed to timely report this damage. This was the subject of an internal investigation. On March 18, 2003, Plaintiff accepted the finding that he violated the CPD rules for failure to report damage to his vehicle. Plaintiff also accepted the disciplinary action of two week suspension without pay and forfeiture of two weeks accrued vacation.

Effective April 20, 2003, Plaintiff was appointed to a position of police officer with the Rennselaer Police Department. On April 21, 2003, Plaintiff voluntarily signed a letter of resignation and sent it to the CPD.

Based on the foregoing, Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, and Fourteenth Amendment rights. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

**\*4** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see*

*Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998). With this standard in mind, the Court will address Defendants' motion.

## III. DISCUSSION

### a. *Due Process*

Defendants move to dismiss the "stigma plus" due process claims on the grounds that: (1) Plaintiff's employment was not terminated and, thus, he was not deprived of a property interest; and (2) he was afforded due process of law with respect to the charges against him. Plaintiff has failed to respond to this portion of Defendants' motion, thereby indicating his consent to the dismissal of this claim. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its entitlement to the relief requested therein, the non-moving party's failure to file or

service any papers as this Rule requires shall be deemed as consent to the granting ... of the motion.")

With respect to the charges filed against Plaintiff, the uncontroverted evidence is that he was afforded all process due. Specifically, Plaintiff was given notice of the charges against him and was afforded the opportunity of a full pre-deprivation hearing at which time he could be represented by counsel, presented with the evidence against him, and present his own evidence. In several instances Plaintiff did not avail himself of this opportunity, *see* Def.'s Rule 7.1(a)(3) stmt. at ¶¶ 33, 66, thereby waiving his due process claims. *Morrisroe v. Safir,* 1998 WL 709822, at *2 (S.D.N.Y.1998). In another instance, a full hearing was held at which several charges were upheld against Plaintiff. *Id.* at ¶¶ 42, 44, 52. Plaintiff declined to appeal the decision. *Id.* at ¶ 54. Plaintiff again invoked this procedure with respect to the perjury charges. After a full hearing, Plaintiff was acquitted of the charges. *Id.* at ¶¶ 62, 63, 64. It is, thus, evident that Plaintiff was afforded all process that was due. *See Patterson v. City of Utica,* 370 F.3d 322, 329 (2d Cir.2004).

**\*5** To the extent Plaintiff asserts a stigma-plus claim, that claim, too, must fail. "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.... Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 329.

Here, Plaintiff fails to identify any such interest. Plaintiff was not terminated from his employment with the CPD. Plaintiff does not point to any other actions undertaken by Defendant that amount to a loss of a sufficient tangible interest to sustain a stigma-plus claim. Assuming Plaintiff can identify other tangible interests, he fails to point to any false statements made public by Defendants for which he was not afforded a name clearing hearing. Although Plaintiff was the subject of several charges that resulted in his being suspended without pay for sixty days, Plaintiff was afforded a full hearing after which he was found not guilty of some of the charges against him and found guilty on eight of the charges. With respect to other charges or disciplinary actions against Plaintiff, he either withdrew his grievances or consented to

the findings against him. *See.* Def's Rule 7.1(a)(3) stmnt. at ¶¶ 10, 33, 66. Thus, any employment decisions (such as his suspension) were based on charges found to be true and for which he was afforded the opportunity of a hearing. With respect to the perjury allegations, Plaintiff was afforded a full administrative hearing and exonerated of the charges. No employment action was taken against him on account of any alleged perjury. Accordingly, Plaintiff's due process claims must be dismissed. *Id.*

### b. First Amendment

Plaintiff also claims that he was retaliated against for engaging in protected speech. Plaintiff contends that his desire to arrest Corporation Counsel Doherty constituted speech on a matter of public concern and that Defendants retaliated against Plaintiff for engaging in such protected speech. Although Plaintiff cites many cases for the proposition that speech directed at the integrity of government entities constitutes protected speech (a proposition with which this Court does not disagree), the fundamental problem with Plaintiff's claim is there is no evidence that he engaged in protected speech or that Defendants were aware of any such speech.

While the determination of whether speech is protected "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganin,* 342 F.3d 105, 112 (2d Cir.2003). Whether speech is protected depends on its context, form and content. *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). Speech by a public employee is on a matter of public concern, and protected by the First Amendment, if it relates "to any matter of political, social, or other concern to the community." *Id.* at 146. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." *Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 402 (S.D.N.Y.2004). Speech that arises in the usual course of a public official's duties is generally not protected. *See Cahill v. O'Donnell,* 75 F.Supp.2d 264, 273 (S.D .N.Y.1999)("A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern."). Speech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern. *Cahill,* 75 F.Supp.2d at 272 (internal office affairs are not matters of public concern.). As the Supreme Court has stated:

"To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Connick,* 461 U.S. at 147-49. On the other hand, a claim of systemic or endemic problems in a public department might rise to the level of protected public speech. *See Collins v. Christopher,* 48 F.Supp.2d 397, 408 (S.D.N.Y.1999)(collecting cases),

*6 The uncontroverted evidence before the Court is that on March 12, 1999, Plaintiff pulled over a car that was being driven by Corporation Counsel Doherty. Plaintiff smelled alcohol emanating from the driver and, therefore, instructed the driver to exit the vehicle to perform sobriety tests. According to Plaintiff, Doherty failed the tests. Based upon Sergeant Kubiks' direction (Kubik having received orders from Defendant Abrams), Plaintiff did not arrest Doherty and, instead, drove him to the police station where he was then released. There is no evidence in the record that Plaintiff expressed his desire to arrest Doherty, that he disagreed with Abrams' order not to arrest Doherty, that Plaintiff otherwise spoke out on the issue of letting Doherty go, that Plaintiff was raising concern about the covering up of the criminal acts of political figures, or was otherwise raising concern about endemic issues within the police department. The mere acts of performing his duties as a police officer by pulling Doherty over, administering sobriety tests, taking him to the police station, and letting him go were all within the course of Plaintiff's employment as a police officer and, therefore, not protected speech. *See Kelly,* 344 F.Supp.2d at 403 (finding that a police officer's investigations into illegal firearms which involved the mayor's son and the child of another police officer were not protected speech because they arose during a normal police investigation).

In support of his claim, Plaintiff cites to his Exhibit B which is a memorandum dated March 16, 1999 written from Plaintiff to Ward. That memorandum, however, does not evidence Plaintiff's having engaged in protected speech. A review of the memorandum reveals that it is Plaintiff's fact based recount to Abrams of the events of March 12, 1999. Nowhere in that memorandum does Plaintiff indicate that he wanted to arrest Doherty, that he thought Doherty should be arrested, that he disagreed about the decision to let Doherty go, that he was complaining about pervasive problems within the police department, or that he was discussing any problem within

the CPD. In his memorandum of law, Plaintiff contends that he insisted that Doherty be arrested. Plaintiff points to no evidence to back this up.[4] Plaintiff does not even submit an affidavit stating that he intended his memorandum to be a report of wrongdoing within the CPD or to otherwise constitute speech on a matter of public concern. *See Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) ("Not only must the speech be related to matters of public interest, but the purpose of the expression must be to present such issues as matters of 'public' concern.") (holding that a police report prepared by a police officer concerning his investigation into a traffic accident did not constitute protected speech).[5]

[4] The Court declines to scour the record in an attempt to find triable issues of fact. *See Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted)

[5] Moreover, there is evidence suggesting that Plaintiff's actions were motivated purely by his own personal self-interest. It appears that, at the time of the March 12 incident, Plaintiff was seeking to have a clause inserted into the relevant collective bargaining agreement ("CBA") whereby the municipality would indemnify officers for punitive damages awarded against them. Doherty opposed having such a clause in the CBA. There is testimony that Plaintiff had expressed a desire to "get back" at Doherty for his position on the issue.

Even if Plaintiff subjectively believed that he was engaging in protected speech, Abrams would not reasonably have understood Plaintiff's memorandum as complaining about government integrity or concealing the drunk driving of a political figure. There is no indication that there was endemic problems concerning the covering up by the CPD of the criminal activities by politicians or other systemic problems in the CPD. The only reasonable conclusion is that Plaintiff was speaking as a public employee and not as a public citizen. Accordingly, the Court finds that Plaintiff did not engage in protected speech. Plaintiff's First Amendment claims must, therefore, be dismissed.

*7 Even assuming, *arguendo,* that Plaintiff did engage in protected speech, there is insufficient evidence of

a nexus between any such speech and any alleged adverse employment action. The Court recognizes the close temporal proximity between the March 12, 1999 arrest of Doherty and Plaintiff's being subjected to a change in his work duties commencing on March 22, 1999. The Court further recognizes that a close temporal relationship between the protected activity and the adverse employment action can give rise to an inference of causation. In this case, however, to hold that the temporal relationship is sufficient would be to ignore the overwhelming uncontroverted evidence of Plaintiff's misconduct leading up to the March 26, 1999 letter changing Plaintiff's duties (the "March 26 letter") and the lack of any evidence tending to suggest that the Doherty incident had anything to do with Plaintiff's discipline. *See Simpson v. New York State Dept. of Civil Services,* 2006 WL 93011 (2d Cir. Jan. 9, 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir.1998) for the proposition that a "strong temporal connection between the plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to pretext.") (emphasis in original); *Colon v. Coughlin,* 58 F.3d at 872-873; *Ayers v. Stewart,* 101 F.3d 687, 1996 WL 346049, at *1 (2d Cir.1996) (unreported decision); *Richter v. Monroe County Dept. of Social Serv.,* No. 01 Civ. 6409, 2005 WL 351052, at *14 (W.D.N.Y. Feb. 11, 2005) ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her termination."); *Ziemba v. Thomas,* 390 F.Supp.2d 136, 157 (D.Conn.2005).

It is undisputed that Plaintiff had a lengthy history of misconduct, including the use of excessive force, going back to at least as far as 1995. In the first three months of 1999 alone, he was the subject of three complaints of the excessive use of force-one on February 3, 1999, another on February 16, 1999, and another on March 5, 1999. On March 17, 1999, after the March 12 Doherty incident involving Doherty and before the issuance of the March 26 letter, Plaintiff admits he was involved in a heated exchange with Detective Ross and his spouse. There is further evidence that, during a meeting later that day, Plaintiff insulted Detective Ross's wife, which caused Ward to end the meeting and escort Plaintiff out of the police station. On March 26, 1999, Plaintiff was ordered to undergo additional training, to be supervised by Kubik, and disqualified from being a tour supervisor.

**\*8** This history of misconduct gave Defendants ample reason to require Plaintiff to undergo additional training and to require that Plaintiff be under the supervision of Kubik. Moreover, the terms of the March 26 letter clearly relate to Plaintiff's prior incidents of misconduct. Part of that training included reviewing with Plaintiff department policies on the rules of conduct and the use of force. Directive 1 and 3 of the March 26 letter obviously related to the incident between Plaintiff and Detective Ross. Specifically, those directives prohibited Plaintiff from entering the restaurant at which the incident occurred, prohibited Plaintiff from communicating with persons involved in the incident, and required Plaintiff to report any contact with any persons involved in the incident. Nothing about the March 26 letter tends to suggest that it was issued on account of the March 12 incident involving Doherty. Other than the previously discussed memorandum from Plaintiff to Ward, there is no evidence in the record that Plaintiff ever spoke to Ward or anybody else about the Doherty incident, or that any of the Defendants discussed the Doherty incident with Plaintiff or amongst themselves. In fact, Plaintiff specifically admitted that he never received a written reprimand concerning his conduct on March 12, 1999, nor did Plaintiff receive any disciplinary charges which referred to his conduct on March 12, 1999. Def.'s Rule 7.1(a)(3) stmnt. at ¶ 25. It, therefore, cannot be said that a fair minded trier of fact could reasonably conclude that the March 12 Doherty incident was a motivating factor in the March 26, 1999 change in Plaintiff's duties.

On March 15, 1999, Plaintiff made a request to Abrams to switch one of his days with Abrams. Abrams is purported to have responded "start acting like a cop and I'll treat you like one." Even assuming Abrams' refusal to switch days with Plaintiff was on account of protected speech, the refusal to switch a day of work is not an adverse employment action. Moreover, the evidence before the Court is that, although Abrams initially denied Plaintiff's request, he ultimately granted it.

Further, any claim that the March 12, 1999 incident caused the March 26, 1999 change in duties is time-

barred. Plaintiff's Complaint was filed on December 23, 2002, which is more than three years after Plaintiff was returned to full active duty in October 1999 and long after the issuance of the March 26, 1999 letter. The same reasoning would apply to any other claimed adverse employment actions that occurred prior to December 23, 1999, including Plaintiff's claim that he was illegally subjected to a mental health evaluation in March 1999, or that his request to switch certain days off was denied. These allegations are time-barred.

With respect to any other alleged employment actions identified by Plaintiff (a verbal counseling in March 2000, the March 2000 investigation into the Khalil incident, and any subsequent incidents), they all occurred long after the March 12, 1999 and, thus, no inferences of causation may be drawn between the timing of the March 12, 1999 Doherty incident and these other alleged adverse employment actions. Plaintiff has failed to point to sufficient other circumstantial evidence from which a fair-minded trier of fact could reasonably conclude that these other incidents in 2000 and later were on account of the March 12, 1999 Doherty incident.[6] Defendants did not take any employment actions against Plaintiff except as imposed by an independent arbitrator and/or as consented to by Plaintiff. Accordingly, no fair-minded

trier of fact could reasonably conclude that Plaintiff was subjected to adverse employment action on account of the March 12, 1999 Doherty incident.

[6] Plaintiff alleges that Sergeant Meeker stated "But it's Gary Ethier, and when it comes to Gary Ethier you know that there is special circumstances that we have to follow." This statement attributed to Sergeant Meeker does not come from an affidavit of Sergeant Meeker or deposition testimony from Sergeant Meeker. In fact, Plaintiff claims this statement to have made, but provides no citation in the record to support it. This statement is hearsay and will not be considered in connection with the pending motion.

## IV. CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY. Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2006 WL 1007780

2005 WL 3333465
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Darryl L. FREEMAN, Plaintiff,

v.

Glenn S. GOORD, Commissioner of the
Dep't of Correctional Services of the
State of New York, et al., Defendants.

No. 02 Civ. 9033(PKC).
|
Dec. 7, 2005.

*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Darryl L. Freeman, an inmate in the custody of the Department of Correctional Services of the State of New York ("DOCS"), brought this action pursuant to 42 U.S.C. § 1983, alleging constitutional violations by DOCS administration and staff. He alleges, *inter alia*, that defendants retaliated against him for previously filing a Section 1983 action (which has since been dismissed), and violated his First, Eighth and Fourteenth Amendment rights. Defendants Goord, Roy, Mazzuca, Ercole and Armstrong have moved for summary judgment on plaintiff's remaining claims.

For the reasons explained below, defendants' motion is granted.

*Procedural History*

Freeman filed his Amended Complaint ("AC") on January 14, 2003, naming as defendants 16 individuals, including four John Does. [1] Defendants moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6). By Order dated September 8, 2004, I dismissed, with plaintiff's consent, all claims against defendants Block, Johnson, Smith and Travis. Plaintiff also represented that he did not seek to assert an Eighth Amendment claim based upon deliberate indifference to serious medical care, so, to the extent the AC asserted such a claim, it was voluntarily dismissed. *See Freeman v. Goord,* 2004 WL

2002927 at *1-*2 (S.D.N.Y. Sept. 8, 2004) ("*Freeman I*"). I also dismissed any purported claim against defendant Beasor, as the AC did not adequately allege his personal involvement in any constitutional deprivation. *Id.* at *6. Additionally, I dismissed claims against all defendants in their official capacities as barred by the Eleventh Amendment. *Id.* at *7.

[1]    In my prior opinion on defendants' motion to dismiss, I observed that 14 defendants, including two Does, were named. Two Does, while not appearing in the caption of the AC, were, in fact, named as defendants in the body of the complaint, but never served. Plaintiff has failed, at the summary judgment stage, to come forward with the identity of the Doe defendants or explain his failure to do so. The claims against the Doe defendants are dismissed.

Defendants moved to dismiss plaintiff's retaliatory urinalysis claim on the ground of lack of exhaustion, and premised their motion on materials outside the pleadings. I converted that branch of defendants' motion into one for summary judgment, limited to the exhaustion issue, and afforded plaintiff an opportunity to submit evidence in opposition to summary judgment. *Id.* at *2-*4. After considering plaintiff's supplemental submission, I granted defendants' motion on exhaustion grounds, and dismissed plaintiff's claim based upon a retaliatory urinalysis. *See Freeman v. Goord,* 2004 WL 2709849 (S.D.N.Y. Nov. 23, 2004) ("*Freeman II*" ).

Familiarity with the decisions in *Freeman I* and *Freeman II* is assumed. I will set forth the facts relevant to the remaining claims, accepting plaintiff's version of the facts as true together with such other facts as are undisputed, and drawing all reasonable inferences in favor of the plaintiff.

*Background*

On August 16, 1999, plaintiff filed a complaint in this district seeking damages under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment. The action was premised on alleged deliberate indifference to a serious medical condition. Plaintiff named as defendants several individuals who were then employed by DOCS at Fishkill Correctional Facility, where plaintiff was then housed. Defendant Goord, who was then, as he is now, DOCS Commissioner, was also named in plaintiff's prior suit, and is the only defendant here who was also a defendant in the

1999 action. Magistrate Judge Peck, to whom the case was assigned on consent, dismissed plaintiff's 1999 complaint at the summary judgment stage. *See Freeman v. Strack, No. 99 Civ. 9878(AJP), 2000 WL 1459782 (S.D.N.Y. Sept. 29, 2000).* No appeal was taken.

**\*2** On January 1, 2000, plaintiff was escorted from his housing unit at Fishkill to the gym area and was administered the urinalysis discussed in *Freeman II.* When he was returned to his cell, he observed the cell being searched by defendant Armstrong and another unidentified corrections officer. (Freeman Aff. ¶¶ 3-4) Later that evening, plaintiff spoke with a Sergeant Spaulding (not a defendant in this suit), and complained that the searching officers failed to leave a "cube search slip," failed to sign the unit log book indicating that they had conducted the search, and failed to leave the cell in the condition it had been in prior to the search. (*Id.* ¶ 4)

The next afternoon, January 2, 2000, while plaintiff was doing research in the law library, he was told to gather his papers and was escorted to the mess hall, where he was frisked, handcuffed and then taken to the facility's Special Housing Unit ("SHU"). He remained in the SHU until about 7:30 p.m., when he was transported from Fishkill to Downstate Correctional Facility. (*Id.* ¶¶ 5-6) Plaintiff claims to have been housed under SHU status, which is more restrictive than being housed with the general population of a correctional facility, for his entire stay at Downstate, a period of eight days. (*Id.* ¶¶ 6-7)[2] On January 7, 2000, plaintiff's security classification was changed from medium to maximum. (Ercole Decl. ¶ 20, Ex. B) Plaintiff was then transferred from Downstate to Attica Correctional Facility, departing Downstate on January 10 and arriving at Attica on January 11, 2000. (Freeman Decl. ¶ 7; Olmstead Decl. ¶ 5)

[2]     Although not material to the disposition of this motion, defendants contend that plaintiff was in the SHU for only five of those days, and was thereafter treated as a general population inmate. (Olmstead Decl. ¶¶ 4-5)

On January 25, 2000, plaintiff's wife wrote a letter to defendant Goord, inquiring as to why plaintiff had been transferred to Attica. (Roy Decl. ¶ 6) Goord forwarded the letter to defendant Roy for a response. Roy wrote back to Mrs. Freeman on February 16, 2000, and informed her

that plaintiff's transfer to Attica was a result of "negative behavior."[3] (*Id.* ¶ 6, Ex. A)

[3]     The letters also mention plaintiff's temporary housing at Sing Sing Correctional Facility for purposes of a deposition. Plaintiff has not raised any claims related to his time at Sing Sing.

On August 7, 2000, plaintiff wrote a letter to Goord, complaining of his transfer to Attica and the change in his security classification. In that letter, plaintiff asserted that the transfer was "based on unsubstantiated allegations that were arbitrarily and capriciously enforced without the customary and regulatory benefit of presenting such allegation for disciplinary determination." Specifically, plaintiff wrote that he was "never issued a misbehavior report, [he] never had a hearing, neither was [he] ever informed why [he] was transferred from a medium correctional facility back to a maximum correctional facility." He wrote that other inmates accused of taking part in the same alleged strike or demonstration in which the administration had accused him of being involved had been issued misbehavior reports and thus had been afforded hearings on the alleged misbehavior. Plaintiff asserted that his transfer was "for retaliatory purposes; retaliatory because I chose to exercise my first amendment right to be free from cruel and unusual punishment." He requested that he be redesignated as a medium security inmate and moved to a facility closer to New York City. (Roy Decl. ¶ 7; AC Ex. 12) Defendant Roy was assigned to respond to this letter as well, and, on August 29, 2000, wrote back to plaintiff, informing him that a request for reduced security placement had already been received but, based on information received from the Office of Classification and Movement, had been denied after review and consideration. Roy suggested that plaintiff seek the assistance of his assigned counselor for future transfer requests. (AC Ex. 13)

**\*3** On December 19, 2000, plaintiff again wrote to Goord, complaining that his transfer and change in classification were ordered despite the fact that he had not received a misbehavior report or been afforded a hearing. He also noted that requests for a change back to medium security had been submitted in March and June 2000, but denied. He requested a change in his security classification back to medium and a transfer to a medium security facility. (AC Ex. 15) Roy was once again assigned to respond to plaintiff's letter and, in a letter dated January 16, 2001, again suggested that plaintiff seek the assistance

of his assigned counselor at his next quarterly review for matters regarding transfer requests. (Roy Decl. ¶ 12, Ex. C)

On February 8, 2001, plaintiff wrote a letter to defendant Mazzuca, with copies to defendants Goord and Ercole among others, in which he described his prior section 1983 suit and described the circumstances surrounding the January 1, 2000 urinalysis and cell search and plaintiff's subsequent transfer to Downstate and then Attica. He alleged in the letter that these actions were taken in retaliation for his prior lawsuit, and demanded that any reference to the reason for his transfer be excised from his records prior to his June 2001 parole hearing and that he be transferred back to Fishkill. (AC Ex. 17) Plaintiff received no response to this letter. (AC ¶ 41)

*Summary Judgment Standard*
Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation and quotation marks omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. Fed.R.Civ.P. 56(e). A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, in order to survive summary judgment, plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911 (1998). In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

**\*4** Courts review *pro se* pleadings carefully and liberally and interpret such pleadings "to raise the strongest arguments that they suggest." *See e.g., Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citations omitted). This is especially true in the summary judgment context, where a *pro se* plaintiff's claims are subject to a final dismissal. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.") (citation omitted). Plaintiff's *pro se* status, while implicating a more liberal interpretation of his pleadings, does not excuse him from the burden of coming forward with "concrete evidence from which a reasonable juror could return a verdict" in his favor. *LaGrande v. Key Bank Nat'l Ass'n,* 393 F.Supp.2d 213, 219 (S.D.N.Y.2005) (citation and internal quotation marks omitted); *see also Miller v. New York City Health & Hosp. Corp.,* No. 00 Civ. 140(PKC), 2004 WL 1907310 at \*9 (S.D.N.Y. Aug. 25, 2004). In reviewing a motion for summary judgment, the court may conduct a search of the record, and grant or deny summary judgment as the record indicates. *See* Fed.R.Civ.P. 56(c); *New England Health Care Employees Union, District 1199, SEIU AFL-CIO v. Mount Sinai Hosp.,* 65 F.3d 1024, 1030 (2d Cir.1995); *Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York,* 269 F.Supp.2d 424, 446 (S.D.N.Y.2003).

*Retaliation Claims*
In order to recover for alleged retaliation under section 1983, a plaintiff must establish the following three elements: (1) that the speech or conduct at issue is protected under the First Amendment; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the adverse action and the protected speech or conduct. *See Scott v.*

*Coughlin;* 344 F.3d 282, 287 (2d Cir.2003). Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment if they can demonstrate that they would have taken the same action against the plaintiff absent any retaliatory motivation. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999) (*per curiam* ). Courts employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose." *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)), *cert. denied,* 525 U.S. 907 (1998). Thus, " '[t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." ' *Hynes,* 143 F.3d at 657 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)).

**\*5** Courts have also taken note of the "ease with which claims of retaliation may be fabricated," and thus "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citation omitted) (affirming in part and vacating in part grant of summary judgment); *see also Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (affirming grant of 12(b)(6) motion), *overruled in part on other grounds by Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

Filing lawsuits related to prison conditions is protected conduct. "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon,* 58 F.3d at 872. Thus, plaintiff has satisfied the first prong of the retaliation inquiry. As regards adverse actions taken against him, he complains that his cell was searched, he was transferred out of Fishkill (briefly to Downstate and then to Attica), and his security classification was changed from medium to maximum. He also complains that, as a result of the allegedly false accusations that he was involved in planning the strike, he was denied parole.

It is on the third prong of the retaliation inquiry that plaintiff's claims fail. Beyond the conclusory assertions of a causal connection between plaintiff's prior lawsuit and the actions described above, plaintiff has proffered no evidence that the prior suit played any role in defendants' decisions to take the actions described above. [4]

[4]  Defendants would in any event be entitled to summary judgment on the retaliatory cell search claim. The Supreme Court has held that an inmate has no legitimate expectation of privacy in his cell and thus, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Plamer,* 468 U.S. 517, 525-26 (1984). District courts within this circuit have interpreted *Hudson* to mean that inmates have "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 2005 WL 937483 at *6 (S.D . N.Y. Apr. 22, 2005) (collecting cases). As the only allegations against defendant Armstrong relate to the allegedly retaliatory cell search, she too is entitled to summary judgment. Plaintiff contends that his claim against defendant Armstrong is based on her "ransack[ing]" of his cell. (Freeman Dep. at 137) However, he admits that none of his property was damaged during the search. (*Id.* at 68-69) While plaintiff contends that the conduct of the search was in violation of a DOCS directive requiring that corrections officers, to the extent possible, leave a cell in the condition it was in prior to the search, even were that true, it would not rise to the level of a Due Process violation. *See Hudson,* 468 U.S. at 539-40 (deprivation of prisoner's property does not violate Due Process if adequate post-deprivation remedies are available); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (New York provides adequate state court post-deprivation remedies for an inmate's loss of property).

Defendants, in support of their motion, have come forward with evidence of non-retaliatory motivations for the actions of which plaintiff complains. "[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted...." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Defendant Ercole-who admittedly ordered both the search of plaintiff's cell and his temporary transfer from Fishkill to Downstate-

describes in his detailed affidavit the circumstances that led to the search and the transfer out of Fishkill. Briefly, the search was ordered as part of the response to a potential inmate strike planned at Fishkill. Prison officials had learned that inmates were planning to take advantage of the anticipated "Y2K" crisis which was widely expected to occur as a result of computer malfunctions attributable to the change in date from 1999 to 2000. *See, e.g.,* 15 U.S.C. § 6601 *et. seq.* (describing "Y2K" problem and promulgating rules governing civil litigation arising from problem). Specifically, officials learned that inmates planned to refuse to work or attend programs, and planned to "use force and/or intimidation against both staff and other inmates to accomplish these objectives." (Ercole Decl. ¶ 10)

**\*6** When prison officials heard about the planned strike, they launched an investigation under the supervision of an executive committee, of which Ercole and defendant Mazzuca were part. (Ercole Decl. ¶¶ 5-9) Based on the investigation, it was concluded that plaintiff was one of over 30 inmates who were suspected of being involved in the planned strike, and, as such, needed to be separated from other inmates. (*Id.* ¶ 15) The recommendation that plaintiff be separated from the other inmates was based on credible information, and that recommendation was approved by the executive committee after review of that information. (*Id.*) Ercole states that the search was necessary to gather potential evidence related to the strike, and to ensure safety and security at the facility, and the temporary transfer of inmates implicated in the strike was necessary to prevent the strike from taking place. (*Id.* ¶¶ 17-18) The DOCS records regarding plaintiff's transfer support the assertion that the basis for the transfer was separation from the Fishkill population to prevent the planned inmate strike. (Ercole Decl. Ex. C)

Ercole and Mazzuca have denied any motive related to plaintiff's prior lawsuit. Though plaintiff claims to have put both of these defendants on notice of his prior lawsuit, and attached to the AC typewritten memos to each of them dated "September 1999" in which he described the basis for the prior suit (AC Exs. 1 & 2), Ercole and Mazzuca have both stated that they have no recollection of receiving such memos. (*See* Ercole Decl. ¶ 22; Mazzuca Decl. ¶ 22) Mazzuca states that no evidence that such a memo was received could be found in the records kept by his office, though receipt of such a document would normally be recorded. (Mazzuca Decl. ¶ 22) Both Ercole

and Mazzuca state that plaintiff's prior suit had no bearing on their decisions regarding the search of plaintiff's cell or the transfer from Fishkill to Downstate, and that such decisions were motivated solely by concerns uncovered during the investigation of the strike. (Ercole Decl. ¶¶ 24, 26; Mazzuca Decl. ¶ 24)

Mazzuca and Ercole each state in their declarations that they played no role in the change in plaintiff's security classification from medium to maximum, nor the decision to transfer him to Attica after such change in classification, and that such decisions are made by the "Central Office in consultation with the Office of Classification and Movement." (Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21) While plaintiff named as a defendant a John Doe "Classification and Movement Analyst," he has failed, after the completion of discovery, to identify the actual individual. In any event, as with the other alleged retaliatory actions, plaintiff has failed to come forth with any evidence of a causal connection between the classification change or transfer to Attica and his prior section 1983 suit. Mazzuca and Ercole have similarly stated that they had no role in plaintiff's temporary assignment to the SHU while housed at Downstate, and plaintiff has failed to show any causal connection between his SHU assignment and his prior suit. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20)

**\*7** Here, plaintiff has failed entirely to come forth with any evidence that the alleged adverse actions were motivated in "substantial part" by his filing of the prior civil rights action. *Scott,* 344 F.3d at 287. In his affidavit opposing defendants' motion, plaintiff makes the conclusory statement that "[t]he adverse action taken against plaintiff by William Mazzuca, Fishkill's Acting Superintendent and Robert Ercole, Fishkill's Deputy Superintendent of Security was retaliatory." (Freeman Aff. ¶ 9) Conclusory allegations of retaliatory motivation are, of course, insufficient to withstand a motion for summary judgment. *See, e.g., Scott,* 344 F.3d at 287.

Plaintiff points as well to the period of just over four months that elapsed between the filing of his earlier action and the cell search and transfer out of Fishkill (with an attendant brief confinement in the SHU). (Freeman Aff. ¶ 15) Temporal proximity may serve as circumstantial evidence of retaliation. *See* Colon, 58 F.3d at 872. When the alleged retaliatory conduct takes place within a few days of the protected conduct, the temporal proximity

alone may be sufficient to infer a causal connection. *See, e.g .*, *Jordan v. Garvin,* No. 01 Civ. 4393(LTS) (GWG), 2004 WL 302361 at *6 (S.D.N.Y. Feb. 17, 2004) (citation omitted) (two days). A time lapse of over four months, however, standing alone, is insufficient to justify an inference of causal connection. *See, e.g., Cobian v. New York City,* No. 99 Civ 10533(KMW)(AJP), 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases), *aff'd,* 23 Fed. Appx. 82 (2d Cir.2001). Even where the time between the protected activity and the alleged retaliatory action is as short as eleven days, summary judgment may be appropriate if the plaintiff fails to come forth with any evidence of retaliatory animus. *See Brown v. Coughlin,* 965 F.Supp. 401, 406 (W.D.N.Y.1997). Viewed in the light most favorable to plaintiff, the four month time period, standing alone and without any evidence of retaliatory animus, would not be sufficient to permit a reasonable jury to find in plaintiff's favor.

Finally, plaintiff asserts that he was "never charged with violating any rules or regulations" such that the search and transfer could be otherwise justified. (*Id.* ¶ 10, 15) However, as discussed above, defendants submitted affidavits and documentary evidence sufficient to demonstrate the reasons for the actions they took with regard to the search and the transfer out of Fishkill. Plaintiff has failed to adduce any evidence at all to dispute those reasons.

Along with his opposition papers, plaintiff includes the affidavits of two other inmates, Abdullah Y. Salahuddin and Michael Washington. Salahuddin merely states that he considers plaintiff to be "an open, honest and helpful educator and leader," and that he has "never known [plaintiff] to advocate anything negative or subversive." Salahuddin further states his "belief that [plaintiff] was falsely accused of negative behavior by Fishkill's Administration after he sought legal redress against them for violating his civil rights." He claims that similar retaliatory action was taken against him in response to his having taken "legal action," and that it is the "unwritten policy of Fishkill to get rid of any inmate that seeks legal redress against them whenever they violate a prisoners [sic] rights." Washington similarly attests to plaintiff's good character and states that plaintiff had, in November 1999, complained that he was being harassed and "felt that he was going to be set up because of his pending legal action against certain employee's [sic] at Fishkill." Washington also states that other unidentified inmates

had expressed to him their beliefs that plaintiff was "set up." Neither of these declarations constitutes admissible evidence bearing on the question of the required causal connection between plaintiff's prior section 1983 suit and the alleged retaliatory actions at issue here. *Cf. Colon,* 58 F.3d at 873 (defendant's alleged admission of the existence of a retaliatory scheme may constitute direct evidence of retaliation).

**\*8** Even if plaintiff had proffered some evidence of retaliatory motivation, defendants have shown that they would have taken the same actions against plaintiff on the valid basis resulting from their investigation of the potential Y2K strike at Fishkill. *See Davidson,* 193 F.3d at 149. Plaintiff was one of over 30 inmates who were subjected to cell searches and were transferred out of Fishkill as a result of the strike investigation. (Ercole Decl. ¶¶ 15, 17-18) Both the search and the temporary transfer were justified by the information uncovered during the strike investigation, which revealed that plaintiff was suspected of involvement in a potentially dangerous disruption of the prison's administration. In the face of such undisputed evidence, no reasonable jury could find in plaintiff's favor. Defendants are entitled to summary judgment on plaintiff's retaliation claims.

### Due Process Claims

Plaintiff claims that his temporary confinement in the SHU at Downstate violated his constitutional right to Due Process under the Fourteenth Amendment. Inmates alleging Due Process violations resulting from prison discipline must establish that they have a protected liberty interest in being free from the punishment in question. *See Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). While New York state law does create a liberty interest in not being confined to the SHU, *see Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999)), such an interest is only implicated in the Due Process context by a particular punishment when such punishment " 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer,* 364 F.3d at 64 (quoting *Sandin,* 515 U.S. at 484) (brackets in original). "In other words, actions under the Due Process Clause are reserved for prisoners enduring a hardship that is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison." *Welch,* 196 F.3d at 392.

The Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate Due Process rights." *Palmer,* 364 F.3d at 64 (citations omitted). However, the Second Circuit has affirmed grants of summary judgment where the period of confinement is "exceedingly short"-shorter than the 30 days at issue in *Sandin* itself-and there is no indication that the conditions of confinement differed substantially from those normally endured by SHU inmates. *Palmer,* 364 F.3d at 65-66 (citing *Hynes,* 143 F.3d at 658-59; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); and *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)).

Here, there is some dispute about the length of plaintiff's confinement in SHU conditions. Plaintiff claims to have been housed in SHU status for the entire period of his confinement at Downstate, a total of eight days. (Freeman Dep. 88-89, 14-45) Defendants contend that plaintiff was treated as an SHU inmate for five days, and then as a general population inmate for several days preceding his transfer to Attica. (Olmstead Decl. ¶¶ 4-5 and Ex. A)

**\*9** However, accepting plaintiff's version of the facts, as I must in the context of this motion, his eight-day confinement to SHU does not implicate a liberty interest. The Second Circuit recently observed that even a period of 101 days in "normal" SHU conditions is insufficient to constitute "atypical" treatment under *Sandin:* "To be sure, with respect to 'normal' SHU confinement, we have held that a 101-day confinement does not meet the *Sandin* standard of atypicality." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)), *cert. denied,* 125 S.Ct. 1398 (2005). Such "normal" SHU conditions include confinement to a cell for up to 23 hours daily, one hour of daily exercise and two showers per week. *Ortiz,* 380 F.3d at 655. Here, plaintiff admits that he was given his one hour of daily exercise while housed in the SHU. (AC ¶ 22) The only alleged difference between the "normal" SHU conditions described in *Ortiz* and plaintiff's SHU stay is his assertion that he was not permitted to shower at all during his stay at Downstate. (*Id.*) While defendants dispute this assertion (*see* Olmstead Decl. ¶ 4 and Ex. A), I accept plaintiff's version as true on this motion; even so, that one fact would not render an eight-day stay in SHU "substantially more grave" than normal conditions of confinement. *Welch,* 196 F.3d at 392; *see also Frazier,* 81 F.3d at 317 (affirming

dismissal of Due Process claims where plaintiff failed to show that conditions of 12-day SHU confinement were "dramatically different" from conditions in general population).

In any event, plaintiff's Due Process claims related to his brief stay in the SHU are appropriately disposed of on summary judgment because plaintiff cannot show that any of the named defendants were personally involved in the decision to confine him to the SHU at Downstate. To succeed on a section 1983 claim against state officials in their personal capacities, a plaintiff must demonstrate "personal involvement of defendants in alleged constitutional deprivations...." *Colon,* 58 F.3d at 873 (citation omitted). Here, plaintiff alleges in his complaint that defendants Mazzuca and Ercole were responsible for his being placed in SHU upon his arrival at Downstate. (AC ¶ 15) However, both defendants have denied in their respective declarations that they directed or requested that he be so placed, and stated that they had no involvement whatsoever in determining the conditions of his confinement at Downstate. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20) Plaintiff has failed to come forth with any evidence to the contrary, and has failed to name as defendants any Downstate personnel. Defendants are entitled to summary judgment on plaintiff's Due Process claim related to his SHU status at Downstate. [5]

[5]     To the extent plaintiff asserts a Due Process claim based on his SHU confinement at Fishkill, the four hours he spent in SHU prior to his departure from Fishkill is insufficient to implicate a liberty interest under the principles discussed above.

To the extent that plaintiff claims that his transfer out of Fishkill constituted a Due Process violation, defendants are entitled to summary judgment. Prison officials are vested with broad discretion to transfer inmates, and such transfers between facilities do not generally implicate Due Process rights. *See Meachum v. Fano,* 427 U.S. 215, 225 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."); *see also McKune v. Lile,* 536 U.S. 24, 39 (2002); *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.), *cert. denied,* 487 U.S. 1220 (1988). This is so even when a prisoner is transferred for disciplinary reasons, unless a state law imposes restrictions or conditions on transfers. *See Montanye v. Haymes,* 427 U.S. 236, 242 (1976). New

York law does not place any such restrictions on transfers, and vests the DOCS Commissioner with discretion to order such transfers. *See id.;* N.Y. CORR. LAWW § 23.1; *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989). Thus, plaintiff's transfer out of Fishkill does not implicate a liberty interest upon which he may base a Due Process claim.

**\*10** To the extent plaintiff's Due Process claim is based on the change in his security classification from medium to maximum, defendants are also entitled to summary judgment. Plaintiff's contentions regarding his security classification do not differ in any relevant manner from his contentions regarding transfer. Security classifications, like transfer decisions, are committed to the discretion of the DOCS commissioner. *See* N.Y. CORR. LAWW § 137.1 ("The commissioner shall establish program and classification procedures...."). Plaintiff essentially complains that he has been transferred to a less favorable and more restrictive institution. As discussed above, plaintiff has no liberty interest in being housed in the facility of his choice. *See Meachum,* 427 U.S. at 225; *Montanye,* 427 U.S. at 242. Defendants are entitled to summary judgment on plaintiff's Due Process claim to the extent it is based on his change in security classification.

Defendants would be so entitled even if a liberty interest were somehow to be implicated. As discussed above, defendants Mazzuca and Ercole stated in their declarations that they played no role whatsoever in the change in security classification (*see* Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21), and plaintiff failed to name, and thus, failed to serve, the John Doe defendant he described in the AC as a "Classification and Movement Analyst." Plaintiff also alleges that defendants Goord and Roy were informed of his allegedly improper change in security classification. Defendant Goord is entitled to summary judgment based on lack of personal involvement. "Personal involvement of a supervisory official may be established 'by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing

to act on information indicating that unconstitutional acts were occurring." ' *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (quoting *Colon,* 58 F.3d at 873) (alterations in original). Liability may not be based on a theory of *respondeat superior. See Hayut v. State University of New York,* 352 F.3d 733, 753 (2d Cir.2003). Merely occupying a high position in the prison hierarchy does not render a defendant liable for a constitutional violation without a showing of personal involvement. *See Colon,* 58 F.3d at 874.

Goord's alleged liability is tied solely to his receipt of the three letters discussed earlier, two from plaintiff and one from plaintiff's wife. Goord states in his declaration that, with regard to the thousands of letters received by his office each year from or about inmates, they are opened by his secretaries, and referred to another DOCS staff member as appropriate. (Goord Decl. ¶ 4) Goord states that there is no indication in his office files that he was ever personally made aware of plaintiff's situation, and he does not recall being made aware. (*Id.* ¶ 6) That Goord's office received the letters and referred them for an appropriate response does not constitute the requisite personal involvement. *See, e .g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Johnson v. Wright,* 234 F.Supp.2d 352, 363-64 (S.D.N.Y.2002) (allegation that Goord received letters to which other defendants responded insufficient to show personal involvement).

**\*11** While defendant Roy did, in fact, respond to plaintiff's letters, his responses provide no evidence in support of plaintiff's claims. In response to plaintiff's August 7, 2000 letter (AC Ex. 12), Roy contacted the Office of Classification and Movement ("OCM"), which had also been forwarded a copy of the letter. Based on information provided by that office, Roy informed plaintiff in an August 29, 2000 letter (AC Ex. 13) that his request for reduced classification had been denied. This decision was made by the Office of the Inspector General and the Deputy Commissioner for Correctional Facilities, after review of a recommendation by OCM. (Roy Decl. ¶ 7) Roy informed plaintiff that the proper method for requesting transfers and changes in security classification was through his assigned corrections counselor. (AC Ex. 13) Similarly, in response to plaintiff's December 19, 2000 letter (AC Ex. 15), Roy contacted OCM to ensure that proper procedures had been followed with regard to plaintiff's requested transfer to a medium security facility, and again informed plaintiff, by letter dated January 16,

2001 (AC Ex. 16), that he should seek the assistance of his counselor in making future transfer requests. (Roy Decl. ¶ 12)

DOCS procedure for evaluating requests for reduced security classification dictates that inmates are subject to quarterly reviews. As part of the review process, an inmate's counselor may make a recommendation for change in classification to the OCM. (Roy Decl. ¶¶ 8-9) Requests that come directly from inmates are not considered. (*Id.* ¶ 10) Roy did not ignore plaintiff's letters. But neither did he act with indifference or disregard plaintiff's rights. Roy's responses to plaintiff's letters were proper and could not, in any event, be said to constitute personal involvement in a constitutional violation.

Viewed in a light most favorable to plaintiff, no reasonable jury could find in his favor on his Due Process claims. Defendants are entitled to summary judgment on these claims.

*Qualified Immunity*
Defendants have also raised the defense of qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609 (1999) (internal quotation marks and citation omitted). The doctrine applies to prison officials in civil rights actions brought by inmates. *See, e.g., Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). A right is clearly established if (1) the underlying law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit recognizes that right, and (3) a reasonable defendant would understand that his conduct was unlawful. *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003).

**\*12** "The first step is to determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992) (citing *Siegert v. Gilley,* 500 U.S. 226 (1991)). As discussed above, plaintiff has failed to raise a disputed issue of material fact as to the existence of a violation of any

constitutional right. Thus, I need not reach the remainder of the qualified immunity inquiry as to, for example, whether the right was "clearly established" or whether reasonable prison officials could have disagreed about the lawfulness of the alleged violations. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341 (1986).

*Injunctive Relief*
In addition to damages, plaintiff has also requested injunctive relief. Specifically, plaintiff seeks a judicial order requiring removal from his prison records of references to "negative behavior," a "Code 04 transfer," or "involvement in any demonstration." (AC ¶ V.3) He also seeks a new parole hearing, "minus the false information that was in his prison folders, and the stigma of going before the parole board from a disciplinary maximum security prison, and involvement in a demonstration." (AC ¶ V.4) Finally, he seeks a reduction in his security classification back to medium security, and a transfer to a medium security facility. (AC ¶ V.5)

The Prison Litigation Reform Act ("PLRA") addresses an inmate's request for prospective injunctive relief:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). Under § 3626(g)(7), "prospective relief" is defined to include "all relief other than compensatory money damages." Thus, the court may only grant injunctive relief to the extent necessary to correct a violation of plaintiff's First or Fourteenth Amendment rights. However, as discussed above, plaintiff has failed to demonstrate any constitutional violation based on the cell search, transfer, or change in security classification.

To the extent plaintiff claims his Due Process rights were violated by his denial of parole, they fail as well. Plaintiff has no liberty interest in an initial release to parole. *See Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001) ("The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release.... Accordingly, plaintiffs have no liberty interest in parole and the protections of the Due Process Clause are inapplicable."). Nor does the inclusion of allegedly false information in plaintiff's file implicate a liberty interest for Due Process purposes. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988). "If there is no claim of retaliation or a constitutionally flawed disciplinary hearing, an 'inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Flemings v. Kinney,* No. 02 Civ. 9989(DC), 2004 WL 1672448 at *4 (S.D.N.Y. July 27, 2004) (quoting *Rideout,* 808 F.2d at 951) (additional citation omitted). Here, the Court has granted defendants summary judgment on plaintiff's retaliation claims. While plaintiff contends that the allegedly false information in his file resulted in the denial of parole, he does not allege that his June 2001 or June 2003 parole hearings were marked by any lack of procedural Due Process. (AC ¶ 38 (2001); Freeman Aff. Ex. B (2003)). In short, plaintiff has demonstrated no constitutional violation on which the Court could base an injunction.

*Alleged Failure to Provide Discovery*

**\*13** In opposition to defendants' motion, plaintiff contends-for the first time-that defendants failed to adequately respond to certain of his discovery requests. (*See* Freeman Aff. ¶ 21) Fed.R.Civ.P. 56(f) provides that, when a party opposing summary judgment makes a showing that he cannot present facts essential to justify his opposition, a court may order a continuance for the purpose of allowing further discovery. In support of his assertion, plaintiff attaches a copy of his undated request for the production of documents, and defendants' response, dated May 19, 2005. (Freeman Aff. Ex. C)

Defendants' responses, on their face, appear to be appropriate. Plaintiff asserts no basis for his belief that defendants have in their possession, custody or control documents responsive to Request No. 6 (requesting documents related to "[t]he Authority that approved the Transfer Order on Sunday January 2, 2000, and based on what available evidence") which were not, in fact, produced. While defendants objected in part to Request No. 12 (requesting documents related to "[t]he evidence that was ascertained to substantiate the extreme measures taken by Fishkill's Administration under the authority of the Department of Correctional Services (D.O.C.S.)"), they also referred plaintiff to the documents produced in response to the arguably similar Request No. 6. In response to Request No. 13 (requesting documents related to "[t]he unusual incident report"), defendants objected to the request as unclear in that it did not specify what "unusual incident report" was being referenced, but also stated that they were not in possession of "any unusual incident report related to plaintiff's movement to Downstate Correctional Facility in January, 2000." Request No. 14 read as follows: "What steps did the approving Authority take to be in compliance with NYCRR Title 7 procedures that regulate how actions are conducted in conjunction with State Law." The Court agrees with defendants that the request does not make clear what documents plaintiff sought.

This case was referred to Magistrate Judge James C. Francis IV for general pretrial supervision, including all discovery matters, on February 20, 2003. Plaintiff included in his papers in opposition to summary judgment a letter to defendants' counsel dated June 20, 2005, in which he complains about defendants' responses to his document requests, which letter purports, on its face, to have been copied to Magistrate Judge Francis. (Freeman Aff. Ex. C) There is no indication in the record that plaintiff ever sought a ruling from Magistrate Judge Francis on any of the alleged shortcomings in defendants' discovery responses. Plaintiff has failed to make the showing required under Rule 56(f) that he cannot present facts essential to justify his opposition to summary judgment because of a lack of discovery. "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.), *cert. denied,* 540 U.S. 823 (2003) (citations and internal quotation marks omitted). Plaintiff's argument provides no basis on which to deny summary judgment.

*Conclusion*

 **\*14**  For the reasons set forth above, defendants' motion for summary judgment is GRANTED.[6] The Clerk is directed to enter a judgment in favor of defendants.

---

[6]   Though the motion was nominally brought only on behalf of defendants Goord, Roy, Mazzuca, Ercole and Armstrong, summary judgment is granted to all named defendants. Defendant Conklin was never served with the AC. Defendant Zehr was served, and failed to answer or otherwise appear in this action.

However, the sole allegation in the complaint relating to Zehr is that, on January 2, 2000, he "escort[ed] plaintiff from the law library area to the Messhall [sic] area." (AC ¶ 11) Plaintiff does not explain how this allegation is sufficient to implicate Zehr's involvement in any alleged constitutional violation, and the Court cannot conceive of how it might.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3333465

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:03-CV-1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Stephen M. Kerwin, Esq., Assistant
Attorney General, of Counsel, for Defendants.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner
civil rights action are Defendants' motion for summary
judgment (Dkt. No. 80), and United States Magistrate
Judge David E. Peebles's Report-Recommendation
recommending that Defendants' motion be granted and
Plaintiff's Complaint be dismissed in its entirety (Dkt. No.
85). Plaintiff has timely filed Objections to the Report-
Recommendation. (Dkt. No. 86.) For the reasons set
forth below, the Report-Recommendation is accepted and
adopted in its entirety, Defendants' motion is granted and
Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

On November 21, 2003, Plaintiff filed this action against
twenty-two (22) individuals currently and/or formerly
employed by the New York State Department of
Correctional Services, at various correctional facilities.
Generally, in his Complaint, Plaintiff alleges that his
rights under the First and Eighth Amendments were
violated when (1) certain Defendants had him transferred
in retaliation for grievances that he had filed, (2) certain
Defendants issued false misbehavior reports against him
in retaliation for grievances that he had filed, and (3)

certain Defendants deprived him of the opportunity to
engage in outdoor exercise on two separate occasions. (*See
generally* Dkt. No. 1.) [1]

[1]    On September 30, 2005, all of the Defendants except
       one filed their Answer to Plaintiff's Complaint. (Dkt.
       No. 58.) On November 28, 2005, Defendant Smith
       filed her answer to the Complaint. (Dkt. No. 59.)

On September 29, 2006, District Judge Lawrence E. Kahn
issued a Memorandum Decision and Order dismissing
(1) Plaintiff's claims for equitable relief due to Plaintiff's
release from incarceration, which mooted this claim,
and (2) Plaintiff's claims against the CORC and all of
the individual defendants in their official capacities on
Eleventh Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion
for summary judgment seeking dismissal of all of
Plaintiff's claims against them. (Dkt. No. 80.) Generally,
Defendants' motion is premised on the following three
grounds: (1) certain of Plaintiff's claims are procedurally
barred based upon his failure to exhaust available
administrative remedies with regard to those claims (2) no
reasonable factfinder could conclude that the issuance of
misbehavior reports or the transfer to different facilities
were *caused* by Plaintiff's filing of grievances; and (3)
no reasonable factfinder could conclude that Plaintiff
was subjected to cruel and unusual punishment based
on being denied certain exercise opportunities. (*Id.*) On
February 1, 2008, Plaintiff filed a response in opposition
to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles
issued a Report-Recommendation recommending that
Defendants' motion be granted, because (1) certain of
Plaintiff's claims were not properly exhausted, and (2)
no reasonable factfinder could rule in Plaintiff's favor on
any of his claims. (Dkt. No. 85.) Familiarity with the
grounds of the Report-Recommendation is assumed in
this Decision and Order. On March 20, 2009, Plaintiff filed
his Objections to the Report-Recommendation. (Dkt. No.
86.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report-
### Recommendation

**\*2** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1) (C). [2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

[2] On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

[3] *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert.*

*denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.* [4] (This is because the Court extends special solicitude to the *pro se* litigant,

in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [7] - even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

[4]  *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

[5]  *Krug v. County of Rennselaer,* 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se* Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

[6]  *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("*[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

[7]  Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

[8]  *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01-CV-0284, Decision and Order, at 7

(N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at \*12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at \*1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at \*2-3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at \*2-3; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at \*3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at \*3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at \*3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at \*1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at \*1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

## III. ANALYSIS

After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report-Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report-Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court. [9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough

for Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

9   The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report-Recommendation. (Dkt. No. 85, at 8-14.) Accordingly, the Court will not repeat this thorough analysis.

10  *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96-2013, 1996 WL 346049, at \*1 [2d Cir.1999] ).

**\*4** Furthermore, as explained in Magistrate Judge Peebles' Report-Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34-35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require

prison officials to meet all of the recreational standards that have been recommended by penologists.").[11]

[11]     *See also Sostre v. McGinnis,* 442 F.2d 178, 187-92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

In his Objections to the Report-Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report-Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.)[12]

[12]     In addition, in his Objections to the Report-Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement.[13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process,[14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements.[15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were

unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

[13]     "Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04-CV-0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

[14]     "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

[15]     *See, e.g., Carini v. Austin,* 06-CV-5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

**\*5** Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01-CV-0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report-Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

[16]   To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings." *Chaney,* 2008 WL 5423419 at *7 (citing *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 85) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED* in its entirety.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected to by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

[1]   In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

**\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid-State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid-2003. [2]

[2]    Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

## II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the "CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official

capacities. [3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

[3]    Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [4] *See also* Fed.R.Civ.P. 72(b).

[4]    This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted

when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary

judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Failure to Exhaust Remedies*

**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit.[5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly

to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).

5  In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense," an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. [6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id. §§* 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id .* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432

(W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

6  The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46 and pp. 109-111. [7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, *see* Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, *see* Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

7  In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80-5) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's

claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis. [8]

[8]  In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11-12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 54 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendents of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6-7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

> it appears that these decisions have ***not*** been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the ***Second*** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05-CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

## C. Retaliation

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt

following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on

the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged, and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle

applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at \*10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

*1. False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13-29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
| --- | --- | --- | --- |
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor". [9] | Dismissed (no hearing held) |
| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |

[9] While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance

in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19-21, 24-25, 59-61 and 116-18.

[10] While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against

defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20-21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

| | | | |
|---|---|---|---|
| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist behavior" (neither dates nor specifics provided) | Acquitted on all counts |
| 3/3/03 | Touroi | [Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 | [1]Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |

11    Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

| | | | |
|---|---|---|---|
| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in | Guilty (all counts); hearing result |

| | | |
|---|---|---|
| | CORC decision dated 6/4/03 | subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/Inmate Disciplinary Program |

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. B. The allegedly retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation.[12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal

in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

12    No explanation is offered for the failure to include an affidavit for that defendant.

### 2. *Prison Transfer Claim*

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons.[13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

13    It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen,* No. 03-CV-6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80-8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp-David. *Id.* It therefore could be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based upon Judge Larimer's determination and the resulting judgment. *See Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552-53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| Date of Transfer | Transferee Facility |
|---|---|
| 5/7/01 | Mohawk Correctional Facility |
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

**\*13** Complaint (Dkt. No. 1) ¶¶ 7-10, 32-46; Knapp-David Aff. (Dkt. No. 80-22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.* Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim of unlawful retaliation under the First Amendment is established. *Meriwhether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492-93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp-David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35-42, 45 and pp. 18-19, 79-81, 88-89, 91-92, 94-95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances

and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp-David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp-David Decl. (Dkt. No. 80-22) ¶¶ 2-7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp-David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions." [14] *Id.* ¶ 3. In that declaration defendant Knapp-David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id* . Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp-David is entitled to dismissal on this basis. *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).*

[14]  In her declaration, Knapp-David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp-David Decl. (Dkt. No. 80-22) ¶ 9. Knapp-David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp-David Decl. (Dkt. No. 80-22) ¶ 9 and Exh. B.

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming

retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted. [15]

[15]  In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80-8) ¶¶ 5, 9-11.

### D. *Cruel and Unusual Punishment*

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S-Blocks and at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47-48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official

"knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer*); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971) (en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-cell activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

**\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

### 1. *"S" Block Confinement*
While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47-48; Prack Aff. (Dkt. No. 80-30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod

security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80-30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson,* 757 F.2d at 35) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise-with no access to indoor exercise area); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876-877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

### 2. *Denial of Exercise While at Ogdensburg*
The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson,* 757 F.2d at 35. The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128-131 (S.D.N.Y.1997) (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630-31(2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period

of approximately twenty-two days does not violate the Eighth Amendment).

**\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80-26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants toward his safety and well being. *Hathaway v. Coughlin, 99 F.3d 550, 554 (2d Cir.1996)* (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994).*

## IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 890658

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 502762
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Robert CRUMP, Plaintiff,
v.
Ekpe D. EKPE, et al., Defendants.

No. 9:07-CV-1331 (LEK/DEP).
|
Feb. 8, 2010.

**Attorneys and Law Firms**

Robert Crump, Middletown, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Susan C. Von Reusner, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on January 19, 2010, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 30).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 30) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 28) be **GRANTED,** and that Plaintiffs complaint in this action be **DISMISSED** in all respects; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Robert Crump, a prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 complaining of the deprivation of his civil rights arising out of events that occurred while he was imprisoned, additionally asserting various pendent state common law claims and asking that the court exercise supplemental jurisdiction over those causes of action. Plaintiff's complaint, which is comprehensive, comprised of one hundred and fifty six paragraphs and including thirty separate causes of action, centers upon a series of events including two separate, brief periods of disciplinary special housing unit ("SHU") confinement and what he characterizes as ongoing harassment on the part of various corrections officers. Plaintiff's complaint seeks recovery of compensatory and punitive damages totaling $86.4 million.

Currently pending before the court is a motion brought by the defendants for summary judgment dismissing the plaintiff's complaint. In their motion, defendants argue that plaintiff's claims should be dismissed for a variety of reasons, including procedurally based upon plaintiff's failure to exhaust his administrative remedies with respect to certain claims, and substantively because he has failed to state viable due process and retaliation claims, adding that his damage claims are barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified immunity. Having carefully considered the record now before the court, I recommend

that defendants' motion, which plaintiff has not opposed, be granted, and that his complaint be dismissed in its entirety.

## I. BACKGROUND [1]

[1] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

**\*2** At the times relevant to the complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS") and was designated to Riverview Correctional Facility ("Riverview"), located in Ogdensburg, New York. [2] *See* Complaint (Dkt. No. 1) ¶ 33. Plaintiff's complaint arises out of two separate incidents that occurred while he was confined to Riverview, the first resulting in his confinement for three days in the facility SHU and the second leading to thirty days of keeplock confinement which, he claims, evolved in retaliation for his having filed a grievance complaining about the procedure for inmate assignments to messhall duty. [3], [4]

[2] Plaintiff was released on parole on January 11, 2008. *See* Dkt. No. 5; *see also,* Reusner Aff. Exh. B (Dkt. No. 28-10).

[3] A Special Housing unit is defined by regulations promulgated by the DOCS as "single- or double-occupancy cells grouped so as to provide separation from the general population [which] may be used to house inmates confined to such units pursuant to Part 301 ...." 7 N.Y.C.R.R. § 300.2(b). Inmates may be admitted to SHU for various reasons, not limited to disciplinary action. 7 N.Y.C.R.R. § 301.1 Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

[4] Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from

others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.* Keeplock is a less severe penalty than SHU; for example keeplocked inmates have access to their personal property, while SHU inmates do not. *Grant v. Riley,* No. 89 CIV. 0359, 1996 WL 727441, at *1 n. 1 (S.D.N.Y. Dec.17, 1996). In addition, keeplocked inmates are afforded more liberal visitation rights. *Id.*

According to the plaintiff, the genesis of his difficulties was a handwritten grievance filed with the Riverview Inmate Grievance Resolution Committee ("IGRC") on February 13, 2006. Complaint (Dkt. No. 1) ¶ 20. Labeling his grievance as "Inmates In Messhall w/o Medical Screening", Crump complained that inmates were being assigned to messhall program jobs without adequate physical examination or testing for communicable diseases, and that there were one or more inmates with hepatitis C working in the messhall. *Id.* Exhs. B & C; *see also* Affirmation of Susan C. von Reusner ("Reusner Aff.") (Dkt. No. 28-8) Exh. C (Dkt.28-11) p. 3. The IGRC subsequently investigated Crump's grievance, which was stamped received on February 13, 2006 and assigned grievance number RV-8195-06, and prepared a report noting that all inmates are screened upon arrival at Riverview, there is no requirement that inmates assigned to the messhall undergo any medical testing, "[b]oth HIV and hepatitis C are blood born/body fluid carried diseases", and universal precautions are to be used by all who work in those areas. *Id.* at p. 5. Notwithstanding these observations, the IGRC agreed that every inmate assigned to the messhall program should be medically cleared at the

time of assignment. *Id.* at p. 4; *see also* Complaint (Dkt. No. 1) Exh. A.

On February 28, 2006, upon review of the IGRC's recommendation, defendant Ekpe D. Ekpe, the superintendent at Riverview, denied Crump's grievance, finding that existing medical review procedures conducted upon an inmate's arrival at the facility and the sick-call process provide sufficient medical screening of inmates assigned to work in the messhall. Reusner Aff. Exh. C (Dkt. No. 28-1) p. 1. Plaintiff does not allege that he appealed the superintendent's determination, and it thus appears that he took no further action regarding this grievance.

Plaintiff maintains that on the morning of March 2, 2006, in retaliation for filing that grievance, Superintendent Ekpe and defendant Sergeant Reneiri appeared at the "F-1" Housing Unit, where plaintiff was then designated, called plaintiff to the officer's observatory station, and demanded that plaintiff follow them to the messhall and identify any inmate working there who was infected with HIV or hepatitis C. Complaint (Dkt. No. 1) ¶¶ 37-38. When plaintiff refused to comply and attempted to explain his grievance, the superintendent became angry, began yelling at plaintiff and berating him, and commanded that Sergeant Reneiri and Corrections Officer ("C.O.") Wilkens "get him out of here." *Id.* at ¶¶ 39-41.

**\*3** Plaintiff was taken to the facility SHU, where he was processed and strip searched, and confined for a period of seventy-two hours. Complaint (Dkt. No. 1) ¶¶ 42-47, 52; *see also* Declaration of Ekpe D. Ekpe ("Ekpe Decl.") (Dkt. No. 28-5) ¶ 8. Plaintiff asserts that while in the SHU he was interviewed by a facility supervisor, who told Crump that he had been sent to SHU "in order to make sure that he was not 'starting trouble in their jail' ". Complaint (Dkt. No. 1) ¶ 51. Defendants maintain that plaintiff's confinement to SHU was spawned by the superintendent's concern for safety and order at the facility pending an investigation of allegations that Crump was spreading rumors among the inmates that workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Ekpe Decl. (Dkt. No. 28-5) ¶ 8. Although plaintiff asserts that his assignment to SHU was retaliatory, he admittedly did not grieve his three-day SHU confinement. Declaration of Kristina Monnet ("Monnet Decl.") (Dkt.28-6) ¶ 8; *see also* Crump

Deposition Transcript ("Crump Tr.") (Dkt. No. 28-24) pp. 13, 15, 24, 91-93.

When released from SHU confinement three days later, plaintiff collected the personal belongings that had been taken from him upon his transfer into the unit and discovered that a property inventory form, No. 1-64, had not been completed when they were confiscated. Complaint (Dkt. No. 1) ¶ 52. When he returned to the F-1 unit and the cubicle to which he had previously been assigned and unpacked his personal property, Crump found that many of his belongings were missing, damaged, or destroyed. *Id.* ¶¶ 52-54.

Following his release from SHU confinement, Crump claims to have suffered harassment and threats from unnamed corrections officers who were encouraging plaintiff to file a grievance or civil complaint against Superintendent Ekpe because Ekpe "had no right to do what he did" to Crump. Crump Tr. (Dkt. No. 28-24) pp. 12-15, 18, 24; *see also* Complaint (Dkt. No. 1) ¶¶ 58-59. According to plaintiff, the superintendent is the only "black African-American" at Riverview, and his subordinate corrections officers are trying to get him out of that facility so that they can control it. Crump Tr. (Dkt. No. 28-24) pp. 12-15. Because Crump was trying to maintain good behavior so that he would be released from the prison, he did not file a grievance or complaint against Ekpe. *Id.* As a result, plaintiff was subjected to continued harassment by corrections officers at the facility. *Id.*

On March 11, 2006 Crump was involved in an incident in which inmates were "horse playing" in the bathroom. Complaint (Dkt. No. 1) ¶¶ 60-63; *see also* Crump Tr. (Dkt. No. 28-24) pp. 23-24. According to prison officials, while standing near the entrance to the bathroom plaintiff shouted out a warning to the inmates inside that a corrections officer was approaching. Reusner Aff. Exh. G (Dkt. No. 28-15). When defendant Sears, who responded to the incident, ordered Crump to produce his identification, he became loud and belligerent, arguing that he had not done anything. *Id.* After he disobeyed several orders to return to his cube, C.O. Sears placed plaintiff on "full bed status" and completed a misbehavior report citing Crump for three misconduct charges, including verbal interference, creating a disturbance, and disobeying a direct order. *Id.*

**\*4** A Tier II disciplinary hearing was conducted by defendant Lieutenant McNally on March 15, 2006 to address the charges contained in the misbehavior report. [5] *See* Reusner Aff. Ex. H (Dkt. No. 28-16). At the commencement of the hearing Crump was advised of and stated that he understood the charges against him, and he pleaded guilty to refusing a direct order, but denied having created a disturbance or having interfered with a corrections employee. *Id.* at pp. 1-2. During the hearing plaintiff testified and was permitted to call two inmate witnesses, both of whom testified that Crump had been standing outside of the bathroom watching television at the time of the horseplaying incident but did not shout out that a corrections officer was coming. *See generally id.* At the close of the hearing, plaintiff stated that he had no procedural objections to the conduct of the hearing. *See* Reusner Aff. Ex. H (Dkt. No. 28-16) at p. 7. Based upon the misbehavior report written by Corrections Officer Sears and his finding that the inmate witnesses lacked credibility, defendant McNally found the plaintiff guilty of all three charges and imposed a penalty of thirty days of keeplock confinement, with a concomitant loss of package, commissary and telephone privileges. [6] *Id.* Plaintiff appealed the disciplinary finding, and the superintendent affirmed Lieutenant McNally's determination on March 27, 2006. Reusner Aff. Exh. J. (Dkt. No. 28-18).

[5] The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions and can result in minor punishments, such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

[6] The record is not entirely clear as to whether plaintiff was confined to SHU or keeplock for that thirty-day period. Plaintiff alleges in his complaint and testified at his deposition that he served the time in the facility SHU. Complaint (Dkt. No. 1) ¶ 66; *see also* Crump Tr. (Dkt. No. 28-24) pp. 25-26. The transcript of the disciplinary hearing, Dkt. No. 28-16, and disciplinary record, Dkt. No. 28-17, in contrast, reflect that plaintiff was confined to keeplock. In their statement of undisputed facts, filed in accordance with Local Rule 7.1(a)(3), submitted in support of their motion, defendants assert that plaintiff was sentenced to thirty days of keeplock confinement. Dkt. No. 28-2 at ¶ 28. Since it appears plaintiff was assigned to a cubicle while at Riverview, *see* Complaint (Dkt. No. 1) ¶ 53, rather than a cell, an arrangement which would more easily lend itself to a keeplock confinement, and drawing all inferences in plaintiff's favor, I have assumed that plaintiff served his thirty day keeplock confinement at the facility SHU.

While in keeplock, plaintiff sent a letter to Superintendent Epke, stamped received on March 22, 2006, complaining of unspecified threats and fear of reprisals from unidentified corrections officers. Reusner Aff. Ex. K. (Dkt. No. 28-19) Sergeant Willett, who is not a named defendant, was assigned to investigate plaintiff's complaint to the superintendent. Complaint (Dkt. No. 1) ¶ 74. As part of his investigation, Sergeant Willett prepared a report of his interview of the plaintiff, dated April 5, 2006. Reusner Aff. Exh. L (Dkt. No. 28-20). In it, Sergeant Willet reported that Crump indicated he felt the need for "protection from the superintendent because the superintendent runs the place and all the correction officers are now head hunting him for every rule violation they can get." *Id.* Plaintiff denies making this statement, but claims that Willet changed plaintiff's story and insisted that Crump's complaints were not with the corrections officers, but with the superintendent for putting him in SHU confinement without reason. Complaint (Dkt. No. 1) ¶ 74. By memorandum dated April 19, 2006, Captain Kanaly advised plaintiff that his complaint of threats had been investigated, and it was determined that there was no threat to Crump's safety at Riverview. Reusner Aff. Exh. L (Dkt. No. 28-20) at p. 2 (unnumbered).

The following day plaintiff filed another grievance, this time identified by him as "Code 1-Forced Into Messhall." Reusner Aff. Exh. M (Dkt. No. 28-21). Plaintiff's grievance, designated as number RV-8291-06, complained of his mandatory assignment to messhall duty, unspecified harassment and threats, loss of personal property, and that he was "being targeted for tickets and being found guilty ... when another inmate has claimed in great respect and honesty that I Crump didn't do that charge but that he did it." *Id.* In response to that grievance Superintendent Ekpe 1) advised Crump to follow appropriate claims procedures with regard to alleged, missing items; 2) advised that it appeared there were no longer any disciplinary actions pending;

3) stated that effective May 8, 2006 plaintiff would be programed as a Phase II Program Aid and A-2 Porter; and 4) noted that a sergeant had been assigned to conduct an investigation regarding plaintiff's complaint, and that based upon the investigation it was determined that no further action was necessary and that plaintiff's complaints had been adequately addressed. Reusner Aff. Exh. N (Dkt. No. 28-22). On plaintiff's appeal to the DOCS Central Office Review Committee ("CORC"), by decision dated July 5, 2006 the CORC upheld the superintendent's determination, noting that Crump was then assigned as a program aide in the mornings and a porter in the evening, and also advising Crump that his disciplinary sanction could be appealed in accordance with the DOCS regulations as set forth in 7 N.Y.C.R.R. Part 5. *Id.* Exh. O (Dkt. No. 28-23).

## II. *PROCEDURAL HISTORY*

**\*5** Plaintiff commenced this action on December 21, 2007. Dkt. No. 1. Named as defendants in plaintiff's complaint are Epke D. Epke, the superintendent of Riverview; Deputy Superintendent Hessel; Lieutenant McNally; Sergeant Reneiri; three John Doe corrections officers; and Corrections Officer Sears. *Id.* While plaintiff's claims appear to center upon his first grievance and the retaliation that he allegedly suffered as a direct result of its filing, his complaint includes thirty separate causes of action including for violations of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, alleging claims of retaliation, deprivation of liberty and property without due process, and cruel and unusual punishment, all relating to his confinement to SHU and keeplock. Additionally, plaintiff alleges common law claims of negligence as well as violations of the New York Correction Law and the DOCS regulations.

On April 3, 2009, following the completion of pretrial discovery in the case, defendants filed a motion for the entry of summary judgment dismissing plaintiff's claims as a matter of law. Dkt. No. 28. In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) he failed to exhaust his administrative remedies with respect to claims relating to his seventy-two hour confinement in SHU; 2) he has failed to state viable due process and retaliation claims; and 3) recovery is barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified

immunity.[7] Despite passage of the deadline for doing so, plaintiff has failed to submit papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

[7]  Defendants also correctly assert that the claims against the unnamed John Doe defendants must be dismissed as a result of plaintiff's failure to identify and timely serve these defendants. Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal where a summons and complaint is not served within 120 days after filing of the complaint, absent a showing of good cause. Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan.11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman, 881 F.Supp. 806, 809 (N.D.N.Y.1995)* (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel); *see also, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.Supp. 1279, 1282 (S.D.N.Y.1989)* (citation omitted) (court lacks jurisdiction until defendants properly served with summons and complaint). Inasmuch as plaintiff has failed to identify and take steps to obtain jurisdiction over the John Doe defendants, I recommend dismissal of his claims against them.

## III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendants' Motion*
Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's

failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n, 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997)* (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian, 980 F.Supp. 106, 106-07 (N.D.N.Y.1997)* (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

**\*6** It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. [8] *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). [9]

[8]  Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

[9]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Based upon plaintiff failure to oppose defendants' motion I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538

(1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*7** When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Remedies*

As a threshold, procedural basis for dismissal of his claims related to this incident, in their motion defendants contend that plaintiff's failure to file and pursue to completion, a grievance against Superintendent Ekpe, Sergeant Reneiri, and Deputy Hessel relating to his SHU confinement for seventy-two hours before filing suit, precludes him from asserting any claims arising out of that incident.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [10]

10      While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance protocol in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004)) (emphasis omitted).

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. [11] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. 7 N.Y.C.R.R. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. 7 N.Y.C.R.R. § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206

*F.Supp.2d 431, 432 (W.D.N.Y.2002)* (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

11    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

While plaintiff has alleged in his complaint that he filed a grievance in March of 2006 regarding his later keeplock confinement and that he has fully exhausted his administrative remedies with respect to the claims now raised, *see* Complaint (Dkt. No. 1) ¶¶ 19, 24, the record discloses that although clearly familiar with the IGP, he did not file any grievance related to his confinement in SHU, which began on March 2, 2006. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 28-2) ¶ 14. The record establishes that plaintiff filed only two grievances relevant to this action. The first, number RV-8195-06 and dated February 13, 2006, is the grievance complaining of the medical screening procedure for assigning inmates to messhall duty, a grievance which plaintiff claims spawned his three-day confinement to SHU. Reusner Aff. Exh. C (Dkt. No. 28-11). The second grievance, number RV-8291-06 and dated April 20, 2006, raises a variety of complaints but lacks any reference to the superintendent's order on March 2, 2006 that he be taken to the SHU for a seventy-two hour period to allow for investigation of the allegation that he was spreading dangerous rumors, the procedures which followed for escorting and admitting plaintiff into the SHU, or the conditions within the SHU during that seventy-two hour period. Reusner Aff. Exh. M (Dkt. No. 28-21). Indeed, during his deposition plaintiff admitted that he never made any complaint regarding this confinement, explaining that at the time he was trying to get out of Riverview. Crump Tr. (Dkt. No. 28-24) pp. 15, 93.

**\*9**   Accordingly, while plaintiff's claims related to his later, Tier II disciplinary proceeding were properly exhausted, all those relating to and/or arising out of his three-day confinement to SHU are subject to dismissal for failure to exhaust available administrative remedies.[12]

12    Twenty-one of plaintiff's thirty causes of action, including claims against Epke, Reneiri, Hessel and two John Does, relate to the March 2 through 5, 2006 SHU confinement. Additionally, in that section of the complaint identified by plaintiff as "legal claim" he alleges violation of the Fourth Amendment right to

be free from illegal searches and seizures. Complaint (Dkt. No. 1) ¶ 149. The only allegations in the complaint relating to search and seizure are those asserting that when taken to SHU on March 2, 2006 plaintiff was subjected to a strip search and a visual body cavity search and that his personal property was taken at the time of his admission to SHU. *See id.* at ¶ 46. Accordingly, to the extent that this alleged constitutional violation relates to this search and/or confiscation of his personal property occurring at the time of his admission to SHU on March 2, 2006, it should be dismissed in light of plaintiff's failure to exhaust his administrative remedies with respect to that claim.

### D. *Retaliation*

As was previously noted, in his complaint Crump alleges that his constitutional rights under the First Amendment were violated when, after he pursued his grievance regarding the medical screening procedures for assigning inmates to work in the messhall, he was subjected to harassment and threats, and disciplinary charges were lodged against him. Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of this cause of action as legally deficient as a matter of law.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, sub. nom Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in

other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492. If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing a plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

### 1. Confinement to SHU from March 2 Through 5, 2006

**\*10** Plaintiff first asserts that Epke's order on March 2, 2006 to subject Crump to SHU confinement was motivated by the filing of his first grievance. The only factual allegation against Sergeant Reneiri in this regard is that following Epke's order, he handcuffed and escorted plaintiff to SHU.

It is well recognized that the filing of a grievance is protected conduct, and can thus satisfy the first prong of a retaliation claim. *Graham,* 89 F.3d at 80. Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct. Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action, in the form of confinement to SHU, and he has therefore also established the adverse action element of his retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004).

Plaintiff's claim fails, however, because he has failed to provide anything but conclusory allegations that the grievance was a substantial or motivating factor behind Epke's actions. To the contrary, Superintendent Epke explains that following his denial of plaintiff's grievance on February 28, 2006, there were allegations that plaintiff was spreading rumors among the other inmates that the workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Epke Decl. (Dkt. No. 28-5) ¶ 8. Legitimately concerned that if those reports proved true plaintiff's unchecked rumors would disturb the prison environment by discouraging inmates from eating in the messhall, Superintendent Epke determined that is was necessary that plaintiff be removed from the general population while the allegations against him could be investigated. *Id.* Accordingly, plaintiff was held in SHU for only seventy-two hours and thereafter released to his previous housing unit and cubicle. Based upon these facts, no reasonable factfinder could conclude that plaintiff's grievance was the motivating factor for his placement in SHU.

With respect to plaintiff's claim against Sergeant Reneiri for his involvement, plaintiff has failed to allege any facts suggesting that he did anything but comply with a direct order issued by the superintendent which, even plaintiff acknowledged, defendant Reneiri was required to do. Crump. Tr. (Dkt. No. 28-25) p. 64. Accordingly, there is nothing but a conclusory allegation that Sergeant Reneiri acted in retaliation, to support plaintiff's retaliation claim against him, and no basis exists for a finding that his actions were taken for any other reason than a direct order from his superintendent.

As noted by defendants, the Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80,86 (2d Cir.1995)). Accordingly, even if plaintiff had established that the filing of his first grievance was a motivating factor in the superintendent's decision to send him to SHU, the court further finds the defendants have established that in light of plaintiff's alleged dissemination of rumors, the same action would have been taken regardless of the filing of that grievance in order to allow for an investigation and maintain order in the facility. For these reasons, I conclude that defendants are entitled to summary judgment on this portion of plaintiff's retaliation claims.

### 2. False Misbehavior Report

**\*11** Plaintiff's retaliation claims against C.O. Sears and Lieutenant McNally are premised upon issuance of the March 11, 2006 misbehavior report and the subsequent disciplinary hearing. As defendants point out, plaintiff's theory in this regard is inconsistent, if not contradictory. Plaintiff appears to allege that defendant Sears' actions were in retaliation for *not* filing a grievance or civil complaint against the superintendent for sending Crump to the SHU. *See* Complaint (Dkt. No. 1) ¶¶ 59-64, 141; *see also* Crump Tr. (Dkt. No. 28-24) pp. 102-104. With regard to defendant McNally, plaintiff alleges in his complaint that he imposed disciplinary sanctions based upon Sears' false misbehavior report, in retaliation for Crump's filing of the first grievance (*see id.* at ¶ 145), but later testified at his deposition that "Lieutenant McNally and Sears are the ones that retaliated against me for not filing the grievance, a complaint [against Epke]" (Crump Tr. (Dkt. No. 28-24) p. 104). Putting aside these contradictions, and assuming without deciding that plaintiff has alleged that he engaged in constitutionally protected conduct giving rise the alleged retaliation by defendants Sears and McNally, his claims are subject to dismissal because he has failed to allege, let alone adduce, any facts supporting an inference of a retaliatory motive.

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between the protected activity alleged in his complaint and the subsequent misbehavior report is the inference that might be drawn by the timing of his first grievance filed on February 13, 2006, and the misbehavior report issued in March 11, 2006. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report, can sometimes suffice

to defeat a summary judgment motion seeking dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14). In many circumstances, however, this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (citing *Ayers v. Stewart,* 1996 WL 346049, at \*1 (2d Cir.1999)); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, \*7 (N.D.N.Y. April 18, 2006).

**\*12** In this instance, temporal proximity is the only fact that might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Although Crump denies shouting a warning to the inmates "horseplaying" in the bathroom, he admits being in the area of the bathroom door, that he did not immediately produce his identification when requested by C.O. Sears, and that he protested when ordered to do so, denying any wrongdoing. Indeed, the disciplinary hearing conducted by Lieutenant McNally plaintiff pleaded guilty to one of the three charges against him, again admitting his presence in the vicinity of the disturbance, and that he did not immediately comply with defendant Sears' order but tried to provide an explanation. Defendant McNally stated that his determination of guilt was based on the report issued by defendant Sears and his finding that plaintiff's inmate witnesses lacked credibility, and it was made in the context of plaintiff's admissions. Plaintiff does not allege any facts, and there is no evidence in the record, that either C.O. Sears or Lieutenant McNally was even aware of his messhall medical procedures grievance, let alone motivated by that grievance to take adverse action against the plaintiff. Additionally, plaintiff has provided no evidence regarding his prior disciplinary history. Given the totality of these circumstances, no reasonable factfinder could conclude that the misbehavior report and resulting findings of guilt after the Tier II disciplinary hearing were prompted by retaliatory animus. I therefore recommend dismissal of this remaining portion of plaintiff's retaliation claim.

### E. *Harassment*

Though not specifically addressed by defendants in their motion, plaintiff's complaint also generally asserts that he was harassed by defendants; no specific factual allegations are provided, and plaintiff's complaint, though including a great deal of detail on other matters, is vague as to the identity of those corrections workers who are

alleged to have participated in the harassment. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 58-59. According to plaintiff the harassment consisted of being pulled aside to isolated areas and prodded by corrections officers to file a civil complaint against superintendent Epke, targeted for random searches, assigned to the messhall (an apparently less desirable position than he had as a program aide), and called out by corrections officers by name. Crump Tr. (Dkt. No. 28-24) pp. 14, 32, 34, 51 and 73. Liberally construed, plaintiff's allegations of harassment are, at best, an attempt to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment. His complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection.

42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996) (citations omitted). Thus, mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

**\*13** There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff testified at his deposition that no physical force was used against him. Crump Tr. (Dkt. No. 28-25) at p. 42-43. When asked to identify physical injuries sustained as a result of the alleged harassment by prison workers, plaintiff testified at his deposition that he was "freezing for two days [in SHU], starving, they put me in a cold cell so you get proportional rationale meals." *Id.* at p. 105. The record is clear that plaintiff does not claim to have suffered any physical injury as a result of the alleged harassment. Plaintiff has therefore failed to meet the threshold requirement

for an Eighth Amendment violation of showing the "unnecessary and wanton infliction of pain" by prison officials. *Whitley v. Albers,* 475 U.S. 312, 319, 196 S.Ct. 1078, 1084, 89 L.Ed.2d 251, ---- (1986). Consequently, I find plaintiff has failed to establish any facts that would support an Eighth Amendment violation.

### F. *Due Process*

Another component of plaintiff's complaint focuses upon his contention that his right to procedural due process was abridged in connection with his three-day SHU confinement and his later disciplinary hearing. In their motion, defendants assert that plaintiff's claim fails at the outset, in light of his inability to prove the deprivation of a protected liberty interest.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

#### 1. *Liberty Interest*

Addressing first plaintiff's seventy-two hour confinement in SHU, restrictive confinement for administrative reasons generally does not implicate a constitutionally protected liberty interest. *Jones v. Artuz,* No. 93 Civ. 8784, 1994 WL 721362, at *2 (S.D.N.Y.1994) (citing *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990)). Notwithstanding this general rule, a state may by regulation create a constitutionally protected liberty interest if the language employed is unmistakably mandatory. *McMillan v. Scully,* No. 85 Civ. 7280, 1986 WL 7543, at *3 (S.D.N.Y. June 30, 1986) (citing *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675(1972), *overruled in part by, Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418) (1985)).

Here, the record reveals plaintiff was confined to SHU for seventy-two hours for administrative reasons in order to maintain order in the facility while the allegation that he was spreading rumors was investigated.[13] Under the applicable DOCS regulations when an inmate is assigned involuntarily to SHU for administrative reasons, a hearing must be conducted within fourteen days of the

inmate's admission. 7 N.Y.C.R.R. § 301.4(a). Plaintiff was released from SHU in considerably less than fourteen days, before the expiration of the period within which a hearing to determine the propriety of the segregation was even required. Under these circumstances, the controlling regulation does create a protected liberty interest, and his seventy-two hour confinement cannot support a procedural due process claim. *See Malik v. Miller,* 679 F.Supp. 268, 269 (W.D.N.Y.1988) (summary judgment granted dismissing procedural due process claim arising out of administrative confinement for five days pending a disciplinary hearing).

13      "Administrative segregation admission results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b).

**\*14** Turning to the plaintiff's disciplinary confinement in keeplock, the Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey,* 197 F.3d at 583 (quoting *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293, 132 L.Ed.2d 418). Atypicality in a *Sandin* inquiry is normally a question of law. 14 *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997); *see also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

14      In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin.* 15 *Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). 16

15      Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485-86, 115 S.Ct. at 2301. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

16      In fact, in *Colon* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Plaintiff's thirty-day keeplock confinement, without more, is patently insufficient to state a protectable liberty interest. *Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 248 (S.D.N.Y.1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock ... confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.*" ) (quoting *Williams v. Keane,* No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at \*6 (S.D.N.Y. Aug. 25, 1997)). 17 Accordingly, the court finds that dismissal on this basis alone is appropriate.

17      To the extent that plaintiff alleges a liberty interest in his assignment as a program aide relative to his apparent objection to having been temporarily assigned to the messhall after his disciplinary confinement, his claim must fail. It is well recognized that inmates do not have a protected interest to participate in prison programs. *Thompson v. LaClair,* No. 9:08-CV-37, 2008 WL 191212 at \*4 (N.D.N.Y. Jan.22, 2008) (Scullin, S.J.) (citing *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979)).

2. *Procedural Protections*

Even assuming that plaintiff were able to prove the deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process. The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the contours of the required protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-70, 94 S.Ct. at 2978-83. In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence". [18] *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

[18]  The "some evidence" standard under *Hill* has been described as considerably tolerant. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*quoting, inter alia, Luna v. Pico,* 356 F.3d 356, 488 (2d Cir.2004)). Based upon the court's review of the hearing transcript, and in particular plaintiff's admissions during the hearing, I conclude that no reasonable factfinder could determine that the hearing officer's conclusion was not based upon "some evidence".

**\*15**  The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 1. A disciplinary hearing was conducted, and was recorded. *See generally id.* At the commencement of the hearing the plaintiff confirmed that he was aware of and understood the charges against him. Plaintiff was permitted to give an oral statement, as well as to offer testimony from his own witnesses. *See*

*generally id.* At the close of the hearing, when asked if he had any objections to the procedure followed, plaintiff responded that he did not. *Id.* at 7. In addition, after announcing his disposition the hearing officer advised plaintiff of his right of appeal. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 8. Plaintiff later sought review by the superintendent, and the hearing officer's determination was upheld on appeal. Reusner Aff. Exh. J (Dkt. No. 28-18). The hearing officer's finding of guilt on two of the charges was based upon admissions made by plaintiff during the hearing as well as the misbehavior report. As to the third charge, plaintiff pleaded guilty. The hearing officer's determination was therefore supported by some evidence, thereby meeting the minimum requirements of the Fourteenth Amendment. The procedures that were provided to plaintiff thus were adequate to afford plaintiff the minimal process to which he was entitled.

Plaintiff also asserts that when presiding over his Tier II disciplinary proceeding, Lieutenant McNally was not impartial. To be sure, bias on the part of a disciplinary hearing officer can support a claim of procedural due process deprivation under the Fourteenth Amendment. *Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N.Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983)). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009).

Plaintiff has alleged no facts that would lead a reasonable factfinder to conclude that Lieutenant McNally was biased in conducting the hearing. There is no allegation of any special relationship between C.O. Sears, the author of the misbehavior report, and McNally, and, as previously noted, there is no evidence that defendant McNally was even aware of plaintiff's initial grievance. To the contrary, for the reasons explained above, the undisputed evidence shows that Lieutenant McNally fairly conducted the hearing, and that plaintiff was provided more than sufficient due process with respect to the disciplinary proceeding.

To the extent that plaintiff's claim of McNally's bias implicates an insufficient basis for his finding, I have already concluded that the evidence of plaintiff's guilt more than meets the some evidence standard. "[A] plaintiff armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a

well-supported motion for summary judgment." *Francis v. Coughlin,* 891 F.2d 43, 37 (2d Cir.1989). Accordingly, plaintiff's bare allegations, without evidentiary support, are insufficient to establish a claim of hearing officer bias sufficient to withstand defendants' motion for summary judgment. [19] *Id.*

[19]    In his complaint, plaintiff generally alleges in the section entitled "legal claim" that he seeks redress for violation of his Sixth Amendment rights, among other things. That constitutional amendment provides the right to a fair trial in all criminal prosecutions. *See* U.S. CONST. AMEND. VII. Presumably, plaintiff asserts the Sixth Amendment in relation to his disciplinary hearing. However, "prison disciplinary hearings are not treated as 'criminal' for the purposes of the Sixth Amendment." *Sash v. Zenk,* 439 F.3d 61, 63 (2d Cir.), *cert. denied,* 549 U.S. 920, 127 S.Ct. 277, 166 L.Ed.2d 212, S.Ct. 277 (2006); *see also Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981-82. As a result, plaintiff's Sixth Amendment claim should be dismissed.

*16 In light of the lack of evidence in the record demonstrating that plaintiff's procedural due process rights were violated during the course of his disciplinary hearing, I recommend dismissal of these claims. [20]

[20]    Any procedural due process claim premised upon the claimed loss of his personal property while in SHU is also subject to dismissal. The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property. *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983).

### G. *Claims Against Deputy Superintendent Hessel*

Although not specifically addressed by defendants, there is a separate and independent basis for dismissal of plaintiff's claims against Deputy Superintendent Hessel. The only allegations in the complaint against Hessel are found in plaintiff's twenty-fifth cause of action, alleging deprivation of liberty without due process of law in relation to plaintiff's seventy-two hour confinement in SHU. Complaint (Dkt. No. 1) ¶ 137. The complaint otherwise lacks factual allegations detailing Hessel's involvement in this occurrence, and it therefore appears

that the claim is premised solely upon Hessel's role as deputy superintendent.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 2931(2009); *see also, Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

*17 During his deposition plaintiff clarified that he seeks to hold defendant Hessel liable for his confinement in

SHU because "he's the deputy of the jail [,and] he has full knowledge ...." Crump. Tr. (Dkt. No. 28-24) p. 45; *see also, id.* at pp. 100-101. Plaintiff acknowledges that Hessel never spoke to him, and did not order that he be placed in the SHU. Crump. Tr. (Dkt. No. 28-24) p. 101. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (citations omitted). Accordingly, plaintiff's claims against Deputy Superintendent Hessel should be dismissed. *see, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same).

## H. *Violation of State Law*

In addition to setting forth constitutional claims, plaintiff's complaint asserts that his SHU confinement violated New York Correction Law §§ 112, 137(5) and 138(4) and various regulations of the DOCS. [21] To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

[21]   New York Correction Law § 112 generally relates to the duties of the commissioner of the DOCS relating to correctional facilities. *See* N.Y. Correct. Law § 112. In general, section 137(5) prohibits degrading treatment of inmates. *See id.* at § 137(5). Section 138(4) provides that "[i]nmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." *See id.* at § 138(4). Plaintiff also generally alleges violation of 7 N.Y.C.R.R. "Sections 250-300 et. seg." Complaint (Dkt. No. 1) ¶ 98.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). "Furthermore, the violation of a DOCS Directive, alone,

is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson,* 01-CV-1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) (internal quotation marks and citation omitted). This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her in exercising discretion, which he or she retains despite any violation of those directives. *Id.*

Plaintiff's claims relating to state laws and regulations should, therefore, be dismissed.

### J. *Immunity*

Lastly, in support of their motion defendants assert that plaintiff's claims against them are barred by the immunity provided under the Eleventh Amendment as well as the doctrine of qualified immunity, and that his state law claims are precluded by New York Correction Law § 24.

#### 1. *Eleventh Amendment*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. [22] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), *aff'd* 767 F.2d 998 (2d Cir.1985) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. [23] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

[22]   In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is

deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. 547 U.S. 189,193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367,---- (2006).

23     By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

**\*18** It is unclear whether plaintiffs' claims are alleged against defendants in their individual or official capacities, or both. To the extent that plaintiff asserts his claims against defendants in their official capacities, plaintiff's damage claims are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects. As a result, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and plaintiff's damage claim against the defendants in their capacities as state officials be dismissed

#### 2. *New York Correction Law § 24*

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

1. [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,* 119 F.3d 183, 186-87 (2d Cir.1997).[24] Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996). In *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), the Supreme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions. In the wake of *Haywood,* one court in this district has observed that "[a] claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *May v. Donneli,* 9:06-cv-437, 2009 WL 3049613, at * 5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.). In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law § 610, clearly fell within the scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims. *See id.*

24     To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that section. The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection. *Ierardi,* 119 F.3d at 188-89.

In this case plaintiff's pendent state law claims, alleging violations of the New York Correction Law and the DOCS regulations, as well as common law negligence, indisputably arise from actions taken by the defendants in their roles as corrections employees, including the determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged. While they may allege constitutional deprivations and actions exceeding the scope of a corrections officer's authority, these types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against

corrections officers in their individual capacities, whether in state or federal court. *See, e.g. Baker,* 77 F.3d at 15-16; *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb.17, 1994) (McCurn, S.J.). *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (holding Correction Law section 24 applicable to actions against corrections officers for allegedly using excessive force when returning inmates to their cells during a disturbance), *lv. denied,* 70 N.Y.2d 602, 518 N.Y.S.2d 1024, 512 N.E.2d 550 (1987). For this reason, I find that plaintiff's state law claims are precluded by section 24, and recommend that they be dismissed. [25], [26]

[25]    In any event, even if I were to conclude that those state law claims were not precluded, I would recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed." *Stephenson v. Albany County Policymakers,* Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

[26]    In light of the foregoing, I have declined to address defendants' assertion of qualified immunity as further grounds for dismissal of the complaint.

## IV. *SUMMARY AND RECOMMENDATION*

 **\*19** At the heart of plaintiff's complaint is the claim that he was retaliated against for filing a grievance complaining that inmates assigned to work in the messhall did not receive adequate advance medical screening. Out of this arises thirty causes of action alleging violations of various constitutional provisions as well as New York State Correction Law, the DOCS regulations and common law tort claims. Having failed to exhaust his administrative remedies regarding his seventy-two hour SHU confinement, I recommend that all of plaintiff's

claims relating to that event be dismissed on this procedural basis. With respect to his claims of retaliation and those relating to alleged violations of his right to due process, I have concluded that no reasonable factfinder could determine that plaintiff's constitutional rights were violated and therefore recommend dismissal of these claims on the merits. Additionally, plaintiff has not alleged personal involvement on the part of defendant Hessel, thus failing to provide a basis for a finding of liability against him. To the extent that Crump has named defendants in their official capacities, I recommend dismissal based upon the sovereign immunity afforded by the Eleventh Amendment. Finally, because violations of state law and regulations do not state a claim under section 1983, and in any event, plaintiff's claims are precluded by New York Correction Law § 24, I recommend dismissal of all of plaintiff's claims that are premised upon violation of state law. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 28) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 502762

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tolliver v. Skinner, S.D.N.Y., August 10, 2017

2007 WL 1544629

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

George LUNNEY, Plaintiff,

v.

Lieutenant BRURETON, et al., Defendants.

No. 04 Civ. 2438(LAK)(GWG).

|

May 29, 2007.

**Attorneys and Law Firms**

George Lunney, Elmira, NY, pro se.

Benjamin Lee, Assistant Attorney General, New York, NY, for Defendants.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

*TABLE OF CONTENTS*

| | | | |
|---|---|---|---|
| I. | | BACKGROUND ................... | 2 |
| | A. | Facts ...................... | 2 |
| | B. | Procedural History .............. | 5 |
| II. | | APPLICABLE LAW ............... | 8 |
| | A. | Standard of Review on Summary Judgment Motions ............... | 8 |
| | B. | Exhaustion ................ | 10 |
| | | 1. PLRA .............. | 10 |
| | | 2. New York's Inmate Grievance Program% i .......... | 11 |
| III. | | DISCUSSION ................... | 12 |
| | A. | Eighth Amendment Claim Relating to Food in the SHU .............. | 12 |
| | B. | Eighth Amendment Claim of Excessive Force ........ | 16 |
| | | 1. Exhaustion ................ | 16 |
| | | 2. Merits ................... | 21 |
| | C. | Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items ..................... | 26 |
| | | 1. Laundry Services .............. | 2 7 |
| | | 2. Plumbing Problems and Failure to Provide Personal Hygiene Items ..... | 28 |
| | | 3. Personal Involvement ................. | 30 |
| | D. | First Amendment Retaliation Claims .............. | 30 |

1.      *Law Governing First Amendment Retaliation* ............      31

2.      *Claims against Fischer* ...............      32

3.      *Claims against Blot* ..............      34

        a.     Exhaustion of Claims Against Blot% i .........      ........... 34

        b.     *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals,*    ........... 37
                  *and Recreation* ............

            i.     Adverse Action.........................................     38

            ii.     Causal Connection....................................     40

        c.     *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior*    ........... 41
                  *Report* ...............

        d.     *The Merits of Lunney's Allegation that Blot Threatened Physical*    ........... 43
                  *Violence* ..............

        e.     *The Merits of Lunney's Allegation of Retaliatory Assault* .....    ........... 45

4.      *First Amendment Claim Against Frazier* ..........      47

5.      *First Amendment Claim Against Brereton* ........      47

E.      *Unfiled Grievances* ...............      4 8

F.      *Fourteenth Amendment Due Process Claims* ..........      50

     1.      *Law Governing Disciplinary Proceedings* ..........      50

     2.      *Written Disposition of Disciplinary Hearing* ..........      51

Conclusion ........................      55

**\*1** George Lunney, currently an inmate at the Elmira Correctional Facility, has brought this suit *pro se* under [42 U.S.C. § 1983](#) against employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that certain defendants violated his due process rights by improperly conducting a disciplinary hearing that resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that various defendants were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment.

Defendants now move for summary judgment. As described below, the defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Correction Officers Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Officer Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers and (b) against Officer Frazier for his participation in the retaliatory assault.

*I. BACKGROUND*

The facts described below and later in this Report are drawn largely from Lunney's affidavit. *See* Plaintiff's Affidavit, filed June 13, 2006 (Docket # 88) ("Lunney Aff."). In many places, Lunney's affidavit cites to

allegations contained in his amended complaint. *See* Amended Complaint, filed Mar. 24, 2005 (Docket # 34) ("Am.Compl."). That is, the affidavit cites the allegations of the amended complaint without repeating the substance of the incorporated matters under oath or penalty of perjury. Because defendants have not objected to this approach, we proceed as if any such incorporated matters in the Amended Complaint were admissible under Fed.R.Civ.P. 56(e).

A. *Facts*

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. *See* Lunney Aff. ¶ 1 (incorporating Am. Compl. at 3 ¶ 1). Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other correction officers. *Id.* (incorporating Am. Compl. ¶ 2). Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and that he had merely purchased the spaghetti from the commissary. *Id.* Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

**\*2** Lunney received a "Tier III" misbehavior report on May 22, 2002. *Id.* (incorporating Am. Compl. ¶ 3); Inmate Misbehavior Report (reproduced as Ex. A to Notice of Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Lunney Aff. ¶ 2 (incorporating Am. Compl. ¶ 4). Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing/ Inmate Disciplinary Program for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. Lunney Aff. ¶ 2; Am. Compl. at 2.

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. Lunney Aff. ¶ 2.

On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* ¶ 4. On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* ¶ 5. Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 9.

The rehearing commenced on October 15, 2002. *Id.* ¶ 11; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Lieutenant Brereton, [1] and Lunney. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 29-37. Lunney requested permission to leave the hearing, Brereton granted him permission to do so, and Lunney was escorted out. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 34-37. Lunney was again found guilty of possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 59.

[1]    This officer is identified as Lieutenant "Brureton" in the complaint.

Lunney subsequently filed a request for discretionary review with Brian Fischer, at that time the Superintendent of Sing Sing. Lunney Aff. ¶ 13; Am. Compl. at 2. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. Lunney Aff. ¶ 13; Am. Compl. at 2. In an appeal to the Commissioner of the New York State Department of Correctional Services, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). The Acting Director of Special Housing rejected the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002, with respect to the rehearing. *See* Article 78 Petition (reproduced as Ex. E to Motion to Dismiss); Lunney Aff. ¶ 15. On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed

the misbehavior report and ordered the Department of Correctional Services ("DOCS") to expunge all references to the incident from Lunney's institutional record. *See* Decision, Order and Judgment, dated Aug. 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp. to Mot. to Dismiss")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.* at 3.

 **\*3** Lunney was confined to the SHU for 180 days, Lunney Aff. ¶ 17, from May 21, 2002, to November 21, 2002. As is described in greater detail below, during this period Lunney asserts that he was served with cold, spoiled, or poorly prepared food, given inadequate laundry services, and denied hygiene items, showers, meals, and recreation by SHU staff. *Id.* ¶¶ 18, 21-23, 29 (incorporating Am. Compl. ¶ 15(a)-(d), (g)). Lunney also asserts that he was criticized and threatened by SHU staff for filing grievances related to prison conditions, and threatened with transfer by Superintendent Fischer. *Id.* ¶¶ 28, 30, 31 (incorporating Am. Compl. ¶ 15(f)-(h)). Lunney asserts that, on one occasion, he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)-(2)).

### B. *Procedural History*

The original complaint in this action was filed on March 29, 2004. *See* Complaint (Docket # 2) ("Compl."). It alleged the following claims: (1) violation of due process when Selsky convened a new disciplinary hearing while the Article 78 review of the first hearing was pending, Compl. at 7 (¶ 1); (2) violation of due process based on the failure to provide Lunney with a timely written disposition of the second hearing, Compl. ¶ 8; (3) that in violation of the Eighth Amendment, Lunney was subject to "overall poor" conditions of confinement in the Sing Sing SHU, *see id.* at 7 (¶ 3), including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material, Compl. ¶ 16; and (4) that he was retaliated against for filing grievances with respect to conditions in the SHU, *id.* ¶¶ 17, 19; *id.* at 7 (¶ 2), in violation of his rights

under the First Amendment. Lunney sought $10 million in punitive and/or compensatory damages. *Id.* at 8.

Defendants filed a motion to dismiss. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16). On February 23, 2005, this Court dismissed all of Lunney's claims except for: (1) his Eighth Amendment claim against Fischer with regard to improperly prepared food; (2) his First Amendment claim against Fischer alleging that he was threatened with physical retaliation for filing grievances; and (3) his due process claim against Brereton regarding the failure to receive a written disposition of his disciplinary hearing. *See Lunney v. Brureton,* 2005 WL 121720, at \*16 (S.D.N.Y. Jan.21, 2005) ("*Lunney I*"), *adopted by,* 2005 WL 433285, at \*1 (S.D.N.Y. Feb.23, 2005).* Lunney was given the opportunity to replead his claims. *Lunney I,* 2005 WL 121720, at \*16.

Lunney then filed an amended complaint, which restated most of the allegations included in his original complaint. *See Id.* ¶¶ 15. It also contained new claims. Significantly, Lunney amended his original complaint to include as defendants Officers Michael Blot and Parrish Frazier. *See* Am. Compl. ¶ 16(h), (i). The claims in the amended complaint are as follows: (1) Selsky deprived Lunney of his First and Fourteenth Amendment rights by ordering a new disciplinary hearing and "depriving [him] of his right to challenge the original hearing in a court of law," *see id.* ¶ 16(a); (2) Brereton violated Lunney's due process rights by failing to provide him with a written copy of the disposition for the hearing on October 17, 2002, *id.* ¶ 16(f); (3) Robert Murphy, Fischer, and Kikendall violated Lunney's due process rights by failing to remedy Lieutenant Brereton's failure to provide a copy of the disposition, *id.* ¶¶ 16(b)-(d); (4) Fischer violated Lunney's First Amendment rights by threatening to transfer him in retaliation for filing grievances, *id.* ¶ 16(c); (5) Fischer failed to remedy the "numerous substandard conditions of confinement in the S.H.U.," and subjected him to "forced labor without pay," *id.;* (6) Sean Kober violated Lunney's First and Eighth Amendment rights by failing "to operate the Sing Sing I.G.R.C. in accordance with D.O.C.S. policy and thus[ ] deprived plaintiff of his means to petition the government for the redress of grievances," *id.* ¶ 16(e); (7) Anthony Chu violated Lunney's Eighth Amendment rights by failing to remedy "the many problems that existed with the S.H.U. food service program and for failing to provide plaintiff

with wholesome, nutritious and properly prepared meals," *id.* ¶ 16(g); (8) Blot violated Lunney's First, Eighth, and Fourteenth Amendment rights by (a) assaulting him, threatening and harassing him, and depriving him of showers, meals and recreation, all in retaliation for Lunney's filing of grievances; (b) by co-signing a misbehavior report against Lunney for an incident in which Blot was not involved; (c) by threatening Lunney for making complaints against other staff members; (d) by depriving Lunney of access to clean clothing and/or failing to ensure that the clothing was laundered; (e) by failing to provide Lunney with basic hygiene items; and (f) by failing to remedy the plumbing problems in Lunney's SHU cell, *id.* ¶ 16(h); and (9) Frazier violated Lunney's First and Eighth Amendment rights by assisting Blot in the aforementioned violations. *Id.* ¶ 16(i).

**\*4** On April 24, 2006, defendants moved for summary judgment on all claims. [2] On June 13, 2006, Lunney filed opposition papers. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket # 87) ("Pl.Mem."); Lunney Aff. Lunney's papers did not include a statement made in response to the Defendants' 56.1 Statement as required by Local Civil Rule 56.1. Defendants subsequently filed reply papers. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, filed July 28, 2006 (Docket # 91) ("Def. Reply Mem."); Lee Reply Declaration, filed July 28, 2006 (Docket # 92) ("Lee Reply Decl."). Lunney then submitted a sur-reply memorandum with an additional affidavit. Plaintiff's Sur-Reply Memorandum, filed Sept. 12, 2006 (Docket # 96) ("Pl.Sur-Reply"); Affidavit, dated Sept. 7, 2006 (Docket # 97) ("Sur-Reply Aff.").

[2] *See* Notice of Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 72); Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 73) ("Def.Mem."); Defendants' Rule 56.2 Statement, filed Apr. 24, 2006 (Docket # 74); Declaration of Brian Fischer, filed Apr. 24, 2006 (Docket # 75) ("Fischer Decl."); Declaration of Paul Kikendall, filed Apr. 24, 2006 (Docket # 76); Declaration of Robert Murphy, filed Apr. 24, 2006 (Docket # 77); Declaration of Michael Blot, filed Apr. 24, 2006 (Docket # 78) ("Blot Decl."); Declaration of Parrish Frazier, filed Apr. 24, 2006 (Docket # 79) ("Frazier Decl."); Declaration of Sean Kober, filed Apr. 24, 2006 (Docket # 80); Rule 56.1 Statement,

filed Apr. 24, 2006 (Docket # 81) ("Def.56.1"); Chu Declaration in Support of Defendants' Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 82); Declaration of Thomas G. Eagen, filed Apr. 24, 2006 (Docket # 83) ("Eagen Decl."); Declaration of Donald Selsky, filed Apr. 24, 2005 (Docket # 84) ("Selsky Decl."); Declaration of Benjamin Lee, filed Apr. 24, 2006 (Docket # 85) ("Lee Decl.").

## II. *APPLICABLE LAW*

A. *Standard of Review on Summary Judgment Motions* Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial,*' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,*

477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

### B. *Exhaustion*

### 1. *PLRA*

**\*5** The Prison Litigation Reform Act ("PLRA") provides in relevant part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Accordingly, "[c]omplete exhaustion of ... administrative remedies through the highest level for each claim is required." *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2004); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' ") (citations omitted). In addition, the exhaustion must be "proper"-that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2386-87, 165 L.Ed.2d 368 (2006) (internal citation and quotation omitted). Further, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner,* 532 U.S. 731, 740-41, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Nonetheless, an inmate is not required to use this process where it "was reasonable for the inmate to conclude that

his administrative remedies had been exhausted by [a] positive disposition" of some informal complaint. *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005); *accord Dixon v. Goord,* 224 F.Supp.2d 739, 749 (S.D.N.Y.2002) ("The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed."); *Perez v. Blot,* 195 F.Supp.2d 539, 546 (S.D.N.Y.2002).

In this Circuit, when a plaintiff advances a plausible explanation for his failure to exhaust, a court engages in a three-part analysis:

> First, the court must ask: whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether *special circumstances* have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) (emphasis and alterations in original); *accord Curry v. Mazzuca,* 2006 WL 250487, at \*6 (S.D.N.Y. Feb.2, 2006).

Finally, in *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that courts must consider claims in a § 1983 complaint that have been exhausted despite the presence of unexhausted claims. 127 S.Ct. at 923-26.

### 2. *New York's Inmate Grievance Program*

In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program. *See* N.Y. Comp.Codes R. & Regs. tit. 7 ("7 N.Y.C.R.R."), § 701.5. In brief, an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.5(a). Next, after receiving a response from the IGRC, the inmate may appeal to the superintendent of the facility. *Id.* § 701.5(b). Finally, after receiving a response from the superintendent, the prisoner may seek any review of the superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* § 701.5(c). *See Hemphill*, 380 F.3d at 682. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche*, 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases).

## III. *DISCUSSION*

In his opposition papers, Lunney did not submit a statement in response to the defendants' statement under Local Civil Rule 56.1. In light of Lunney's *pro se* status, and in light of the fact that he submitted an affidavit setting forth his disagreements with the defendants' version of the facts, *see* Lunney Aff., the Court will exercise its discretion not to penalize Lunney for this failure. *See, e.g., Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.,* 422 F.3d 72, 75 (2d Cir.2005) ("district court has inherent authority to determine when to overlook or excuse a departure from its own local rules").

We now address the claims made in Lunney's amended complaint.

### A. *Eighth Amendment Claim Relating to Food in the SHU*

Lunney maintains his Eighth Amendment rights were compromised when he was served food that was "cold, spoiled and poorly prepared" on "a near daily basis" during his detention in the SHU. *See* Lunney Aff. ¶ 18; Affirmation of A. Franco, DIN # 01-A-5104, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (milk often spoiled, fruits and vegetables rotten, appearance and quality of meals poor and unpalatable,

inmates forced to refuse meals on numerous occasions); Affirmation of Johnny Casaigne, DIN # 04-A-2867, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (same); Deposition of Johnny E. Casaigne, dated June 24, 2005 (reproduced as Ex. F to Lunney Aff.), at 27 ("I rarely ate the food because when it did come it was ... either spoiled, ice cold or wasn't even cooked right."); Deposition of Alisjandro Franco, dated June 24, 2005 (reproduced as Ex. G to Lunney Aff.), at 19 (refused meals "a few times"). Lunney states that he and other inmates "were often forced to refuse meals due to the poor quality of the food." *See* Lunney Aff. ¶ 18. Lunney also states that complaints and grievances about these problems were ignored, and that inmates "had to resort to refusing entire meals so as to get the attention of" defendants. *See id.* ¶ 19 (incorporating Am. Compl. ¶ 15(a)(1)). Finally, Lunney alleges that he suffered "[w]eight loss and muscle atrophy as a result of not receiving adequate meals." *See Id.* ¶ 18 (incorporating Am. Compl. at 18 (¶ 2)), and that on one occasion he and other inmates "became ill after eating," *see Id.* ¶ 18. He states that the illness consisted of "stomach cramping, nausea, slight fever, chills and diarrhea," and that the inmates received antacid tablets for their discomfort. *See id.* (incorporating Am. Compl. at 18 (¶ 2)); Ambulatory Health Record, dated Aug. 20, 2002 (reproduced as Ex. H to Lunney Aff.) (medical records reflecting a doctor's assessment of "upset stomach," for which Lunney was given antacid tablets). Defendants note that Lunney "acknowledged that other than one alleged incident involving a dinner of rice and beans, [he] was never treated for food poisoning or spoiled food and that he did not know other inmates in the S.H.U. who were treated for food poisoning or spoiled food." *See* Def. 56.1 ¶ 20 (citing Deposition of George Lunney, dated June 23, 2005 (reproduced as Ex. A to Lee Decl.) ("Lunney Dep."), at 123).

**\*7** Defendants argue that Lunney has failed to exhaust his claim that the food in the SHU posed a threat to him and the other SHU inmates. *See* Def. Mem. at 11. With respect to this claim, Lunney does not argue that the grievance process was unavailable to him, that there is a basis for estopping defendants from relying on the exhaustion doctrine, or that there are other special circumstances excusing his failure to exhaust, *see* Pl. Mem. at 9-10-though, as described further below, he does make such an argument with respect to the excessive force and other retaliation claims. *See id.* at 6-7, 12-13. Rather, to support his contention that the food claim is exhausted,

Lunney cites to grievances SS-35888-02 and SS-36314-02, as well as to "a grievance dated Sept. 29, 2002 and the letters sent to D.O.C.S. officials." *See id.* at 9 (citing Ex. K to Lunney Aff.). Grievance SS-35888-02, however, complains only that SHU inmates "received only one cup of milk" and that the inmates "do not get what we're supposed to" in terms of "healthy food items." *See* Grievance SS-35888-02, dated July 20, 2002 (reproduced in Ex. K to Lunney Aff.). It mentions nothing about spoiled food or food that pose an immediate health risk to the inmates. Grievance SS-36314-02 mainly states that Lunney received Rice Krispies for breakfast even though the menu called for Bran Flakes, and thus that he was not receiving the proper amount of fiber in his diet. *See* Grievance SS-36314-02, dated Sept. 24, 2002 (reproduced in Ex. K to Lunney Aff.). It then also makes a brief reference to his food being "ice cold." *Id.* Thus, neither of these grievances support the broad claims now being made in the complaint.

Lunney also provides a copy of a purported grievance dated September 29, 2002. *See* Grievance (reproduced in Ex. K to Lunney Aff.). This grievance-which defendants contend was considered as part of SS-36314-02, *see* Def. Reply Mem. at 8 n. 2-contains a fleeting reference to "spoiled or rotten food" but gives no specifics on when the serving of such food occurred. This generic and unexplained reference to "spoiled or rotten food"-included at the end of a grievance that focuses largely on whether the fiber content of the food met dietary guidelines-was not sufficient to alert the prison officials as to the claims now being made in this complaint. While inmates are held only to a standard of "notice pleading" in grievances, *see Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance statement was far too vague to provide the defendants with notice of when such spoiled food was served, in what manner, and with what frequency. It is thus insufficient to have exhausted this claim.

In any event, Lunney has not met his burden of showing he made the required appeals of even this grievance or that he should be excused from having done so. Although he asserts that this grievance was denied and appealed to the Superintendent, he concedes that he did not appeal it to the CORC, stating only that, based on the Superintendent's reply, "an appeal to the C.O.R.C. was unnecessary." Pl. Sur-Reply at 14. Lunney's general allegations that his grievances "proved ineffective in

correcting the problems with the food" and that he made additional verbal complaints, *see* Lunney Aff. ¶ 19, do not excuse his failure to exhaust. *See, e.g., Curry v. Fischer,* 2004 WL 766433, at *6 (S.D.N.Y. Apr.12, 2004) ("Since informal channels did not lead to the resolution of his complaints, Curry cannot be deemed to have informally exhausted his remedies.") (citing *Hernandez v. Coffey,* 2003 WL 22241431, at *3 n. 4 (S.D.N.Y. Sept.29, 2003) (informal exhaustion cannot be found where no resolution is reached)); *see also Williams v. City of New York,* 2005 WL 2862007, at *10 (S.D.N.Y. Nov.1, 2005) ("It is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements.").

**\*8** Lunney makes general claims about the alleged mismanagement of the grievance process, *see* Pl. Mem. at 71-75, which are discussed further in section III.E below. However, there is no reason why these alleged failures should have excused his obligation to exhaust his claims regarding food. Nor has he shown that he was otherwise prevented from filing grievances on food-a fact most obviously demonstrated by the fact that he filed various food-related grievances as has just been noted. Notably, Lunney asserts that between February 2002 and March 2004 he filed "more than 100 grievances and more than a dozen complaints with outside agencies and D.O.C.S. officials regarding nearly every aspect of his confinement." Pl. Sur-Reply at 19.

In sum, Lunney's claim that his Eighth Amendment rights were violated by the failure of the prison system to provide him with safe food, *see* Am. Compl. ¶ 16(g), is unexhausted and must be dismissed.

### B. *Eighth Amendment Claim of Excessive Force*

Lunney claims that he was assaulted by Officers Blot and Frazier "[d]uring his first week in the S.H.U." after he attempted to notify another officer that his sink and toilet were broken and he was missing certain personal hygiene items. *See* Lunney Aff. ¶ 24. He states that as a result of this assault, he suffered a "[s]mall cut to lip and another to left side of jaw with bruises and contusions to face and body." *See id.* ¶ 25 (incorporating Am. Compl. at 18 (¶ 1)). The defendants argue that this claim is unexhausted and that it fails on the merits. *See* Def. Mem. at 10-11, 30-32. [3]

[3]      Lunney has also asserted that the assault occurred in retaliation for complaints he has made. The

retaliation claim with respect to the assault is discussed separately below in sections III.D.3.e (with respect to Blot) and III.D.4 (with respect to Frazier).

### 1. *Exhaustion*

Lunney states that he did not file a grievance against Blot and Frazier for this assault until after he was transferred to Cayuga Correctional Facility nearly two years later, because Blot threatened him with retaliation if he did so, stating that "he would receive a misbehavior report for assault on staff if he ... filed a complaint and claimed any injuries." *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Blot also told him that if he did file a grievance, "his time in S.H.U. would be longer and harsher." *See id.* Lunney argues that under cases such as *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004), his failure to file a timely grievance was "justifiable." *See* Pl. Mem. at 5-7.

Defendants argue that Lunney's failure to exhaust the excessive force complaint in a timely fashion should not be excused for several reasons: (1) the grievances and appeals Lunney filed in 2004 at Cayuga were untimely, and regardless, made no reference to any instance of excessive force by Officers Blot and Frazier, but only to the Tier III hearing and "conditions of confinement" in the SHU, *see* Def. Reply Mem. at 6; (2) Lunney never mentioned any excessive force by Officers Blot and Frazier until he filed his amended complaint, *id.* at 7; and (3) the Second Circuit excuses failures to exhaust based on threats or retaliation only where "the record contain[s] documented proof of an inmate's prior complaints about the misconduct in a form other than a grievance along with allegations that an inmate was prevented from making these same complaints in the form of a grievance." *See id.* at 6 (citing *Ziemba* and *Hemphill* ).

**\*9** The first question is whether administrative remedies were in fact "available" to Lunney. *Brownell,* 446 F.3d at 311 (citing *Hemphill,* 380 F.3d at 686). To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738; *accord Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). There is no dispute that the prison "provided grievance procedures that inmates claiming excessive force could utilize," *see Hemphill,* 380 F.3d at 686-specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5. Nor is there any dispute that Lunney used these procedures frequently both before and after the

alleged incident with Blot and Frazier. *See* Eagen Decl., Exs. A & B. Indeed, Lunney concedes that he "has an extensive history of prosecuting grievances." *See* Pl. Sur-Reply at 4.

The availability inquiry does not end here, however. In *Hemphill,* the Second Circuit held that the test for deciding whether ordinary grievance procedures were "available" is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." 380 F.3d at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The court went on to note that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *See Hemphill,* 380 F.3d at 688.

Lunney's affidavit suggests that he failed to file a grievance regarding the assault by Officers Blot and Frazier until 2004 because Blot threatened him with retaliation if he did so. *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Specifically, Lunney has asserted that Blot told him if he filed a grievance about the assault, "he would receive a misbehavior report for assault on staff" and that "his time in S.H.U. would be longer and harsher." *See id.* Lunney states that this threat led him to avoid seeking medical attention or filing a complaint regarding the assault by Blot and Frazier until nearly two years later, when he was transferred to Cayuga Correctional Facility. *See id.* Because on this motion for summary judgment, we accept as true the admissible evidence of Lunney, we must assume that Blot did in fact threaten Lunney in the manner Lunney has claimed.

Applying the "ordinary firmness" standard, it is certainly plausible that a reasonable factfinder could conclude that a prisoner in Lunney's situation would be deterred from complaining about an assault that had just occurred. Here, Lunney alleged that he was beaten and that the beating was followed immediately by specific threats, some impliedly physical, if he filed a grievance. *See Hemphill, e.g.,* 380 F.3d at 688-89 (remanding for determination of availability of remedies where officer told plaintiff he had "better drop" his complaint regarding injuries sustained in a beating and not seek any medical attention or the officer would "make your life a living hell"); *McCullough v. Burroughs,* 2005 WL 3164248,

at *4 (E.D.N.Y. Nov.29, 2005) (plaintiff excused from failing to exhaust remedies after he was assaulted by officers in retaliation for prior grievances and during the assault, officer expressly threatened that he would "get [him]") (alteration in original); *accord Hepworth v. Suffolk,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (exhaustion excused where inmate was threatened for filing a grievance); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (inmate subject to physical assault and threats of violence excused from filing grievance); *cf. Benjamin v. Comm'r New York State Dep't of Corr. Servs.,* 2006 WL 783380, at *4 (S.D.N.Y. Mar.28, 2006) (suggesting in dictum that administrative remedies would be rendered unavailable where "the complaint specifically recounted threatening statements made by correctional officers and plaintiff's 'acquiescence' to those threats") (citing *Hemphill,* 380 F.3d at 683-84, 687). Thus, Lunney has established a genuine issue of material fact with regard to the availability of administrative remedies for his claim of excessive force.

**\*10** Defendants contend that because Lunney "has no corroborated documentation of previously complaining about unconstitutional conduct in some form," this Court should not excuse his failure to exhaust this claim. *See* Def. Reply Mem. at 7. They argue that *Hemphill* and *Ziemba* "require[ ]" this result. *See id.* at 6-7. However, neither *Hemphill* nor *Ziemba* held that a plaintiff alleging threats or retaliation in relation to an excessive-force claim is required to have "corroborated documentation of previously complaining" about such force. Each merely noted that there had been some such documentation. For example, in *Hemphill,* the plaintiff alleged that he failed to exhaust his administrative remedies with regard to an excessive-force claim because an officer told him, "I'll make your life a living hell throughout this penal system because I have friends all over." *See* 380 F.3d at 684. The Second Circuit held that the district court was required to consider whether "some seemingly available remedies were rendered unavailable by the threats Hemphill received" or alternatively, whether the defendants' exhaustion defense was estopped by the threats the officer had allegedly made to the plaintiff. *See id.* at 688-89. While the court noted that the plaintiff had written a letter to the superintendent of the prison, *see id.* at 688, the court's holding with respect to these questions did not rely on this fact, *see id.* at 688-89, and specifically noted that his letter to the superintendent did

not necessarily mean that administrative remedies were "available" to him. *Id.*

Nor does it help defendants' argument that Lunney waited until his transfer to another facility, nearly two years later, to submit a grievance of any kind. First, such a delay is consistent with the actions of someone in fear of retaliation by Blot. Second, if Lunney was justified in not filing a grievance at all, he should not be penalized for filing an untimely one.

In sum, construing the record in the light most favorable to Lunney, a factfinder could conclude that administrative remedies were not "available" to Lunney with respect to his claim of excessive force. Accordingly, summary judgment cannot be granted on this question.[4]

4    Defendants assert that "in the event that the Court finds that there is a genuine dispute of material fact concerning exhaustion, and that plaintiff's claims cannot otherwise be dismissed, the proper procedure would be to hold an evidentiary hearing," Def. Reply Mem. at 10, rather than "proceed directly to trial." *Id.* There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. *See, e.g., Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.) (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied,* 540 U.S. 810 (2003); *Priester v. Rich,* 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (same); *see also Dukes v. Doe,* 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering without discussion an "evidentiary hearing" on the question of exhaustion under the PLRA); *cf. Pauling v. Sec'y of Dep't of Interior,* 71 F.Supp.2d 231, 232-33 (S.D.N.Y.1999) (issues of fact with respect to equitable tolling of statute of limitations to be decided by the court). As the Supreme Court has recently affirmed, however, exhaustion is an "affirmative defense," much like a statute of limitations defense. *See Jones v. Bock,* --- U.S. ----, ---- - ----, 127 S.Ct. 910, 919-921, 166 L.Ed.2d 798 (2007). Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that "issues of fact as to the application of that defense must be submitted to a jury." *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243 n. 2 (2d Cir.1984). Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court.

## 2. Merits

Lunney asserts that after he attempted to notify another officer about his plumbing problems and lack of personal hygiene items, Officer Blot approached his cell and told him to "shut the fuck up or we are coming in there and you will not like the results." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(e)(1)). After further discussion between Lunney and Officers Blot and Frazier, Blot called for Lunney's cell door to be opened, and then "rushed into [his] cell and began punching [him] in the head and body." *Id.* Frazier then entered the cell "and placed [Lunney] in a choke hold for several minutes." *See id.* Lunney adds that he sustained "some bruises" from the attack, specifically that his "throat was bruised" where Frazier had grabbed" him and that he had a "couple [of] black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See id.* ¶¶ 24-25 (citing Lunney Dep. at 171-74; *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")).

**\*11** Defendants argue that any injuries Lunney sustained were *de minimis* and thus not actionable under the Eighth Amendment. *See* Def. Mem. at 30-32; Def. Reply Mem. at 26-27.

To establish an Eighth Amendment violation based on a claim of excessive force, "an inmate must meet both an objective and a subjective requirement." *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To meet the objective requirement, "the alleged violation must be 'sufficiently serious' by objective standards." *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective component is "context specific, turning upon 'contemporary standards of decency.' " *See Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). To meet the subjective requirement, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *See Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *See Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7). "Thus, [t]he key inquiry under *Hudson* and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14,

21 (2d Cir.2000) (citing *Davidson,* 32 F.3d at 30) (internal quotation marks omitted).

"However, the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident.' " *Griffin,* 193 F.3d at 91 (quoting *Blyden,* 186 F.3d at 263). This result follows because " '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.' " *Blyden,* 186 F.3d at 263 (quoting *Hudson,* 503 U.S. at 9). Nevertheless, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Furthermore, courts in this circuit have held that "although the subjective component is 'inherently an inquiry into [the] defendant's state of mind, plaintiff need not offer particular evidence of defendant's mental state. For purposes of opposing defendants' summary judgment motion, plaintiff has satisfied his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith.' " *See Watson v. Delgado,* 2006 WL 1716869, at \*5 (S.D.N.Y. June 20, 2006) (quoting *Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000)); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind.").

**\*12** In this case, Lunney states that Blot and Frazier first threatened him and then entered his cell and attacked him without provocation. *See* Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)). Because under Lunney's version of the facts, the officers' alleged use of force could not have been in good faith, he has provided sufficient evidence of the subjective component of an Eighth Amendment violation. *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) ("the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force"); *Santiago,* 91 F.Supp.2d at 673 ("Assuming plaintiff's story to be true, defendant's alleged conduct is clearly unrelated

to any 'good-faith effort to maintain or restore discipline.' ") (citation omitted).

With regard to the objective component, Lunney has alleged that as a result of the assault by Blot and Frazier, he sustained "some bruises," specifically, his "throat was bruised where Frazier had grabbed" him and he had a "couple black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See* Lunney Aff. ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")). While defendants argue that any injuries Lunney suffered were *de minimis* and not documented by medical records, *see* Def. Mem. at 30-32, they point to no case where alleged injuries of this kind were considered outside the protection or the Eighth Amendment. Indeed, *Griffin* held that an inmate's Eighth Amendment claim survived summary judgment where "the only injuries he suffered were a bruised shin and swelling over his left knee," and "the only evidence he intended to offer in support of his claims was his own testimony." *See Griffin,* 193 F.3d at 91. The court explained that although the inmate's claim of excessive force was "weak and his evidence extremely thin, dismissal of the excessive-force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." *See id.* Thus, one court has concluded that "bruising or equivalent injuries may be found by a reasonable fact-finder to constitute minor rather than de minimis harm." *See Watson,* 2006 WL 1716869, at *7 (citing *McCrory v. Belden,* 2003 WL 22271192, at *6 (S.D.N.Y. Mar.22, 2004)) (internal quotation omitted).

Lunney's alleged injuries-involving bruising and contusions-are quite different from the claim of the prisoner in *Boddie,* who had alleged only that he had been "bumped, grabbed, elbowed, and pushed." *See Boddie,* 105 F.3d at 862. In dismissing the claim, *Boddie* noted that the plaintiff "does not maintain that he experienced any pain or injury as a result of the physical contact," and that he did not "allege facts that show that the defendants used force 'maliciously and sadistically to cause harm,' rather than 'in a good-faith effort to maintain or restore discipline.' " *See id.* Both these circumstances are present in Lunney's case, however.

**\*13** In *Espinal v. Goord,* 2001 WL 476070 (S.D.N.Y. May 7, 2001), the court found the plaintiff's injuries to be *de minimis* where he was hit in the face two or three times, making his face turn red. 2001 WL 476070, at *13. However, the plaintiff in that case described these injuries as "really nothing." *Id.* In *Perkins v. Brown,* 285 F.Supp.2d 279 (E.D.N.Y.2003), a prisoner was not permitted to base an excessive force claim on allegations of a "broken lip," swollen nose, eye, fingers, and wrists, jaw pain, chest bruising, and "stress disorder" resulting from being struck, where the only evidence was the plaintiff's testimony and it was contradicted by prior statements of the plaintiff and medical evidence *Id.* at 284. The district court also pointed to a number of factors reflecting that such injuries were in fact *de minimis,* including the plaintiff's assertion that his pain was "nothing major" or "nothing serious." *Id.* In contrast, Lunney has stated that his throat was bruised from being put in choke hold, that he had bruises on his side as well, and that the swelling from these injuries did not subside for about a week.

To the extent the defendants argue that the lack of medical records showing treatment is grounds for dismissing Lunney's claim, the Court rejects this argument inasmuch as there is no requirement that the claim of injury be substantiated in contemporaneous medical records. *See Griffin,* 193 F.3d at 91 (Eighth Amendment claim permitted to proceed to trial even though only evidence supporting it was plaintiff's testimony). Thus, cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records. *See, e.g., Atkins v. County of Orange,* 372 F.Supp.2d 377, 399 (S.D.N.Y.2005); *Davis v. Patrick,* 2000 WL 1154065, at *1 (S.D.N.Y. Aug.14, 2000); *Baskerville v. Goord,* 2000 WL 897153, at *1-2 (S.D.N.Y. July 6, 2000).

Finally, Blot and Frazier are not protected by qualified immunity on this claim. Qualified immunity attaches where (1) a constitutional right would have been violated on the facts alleged; but (2) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *See Saucier v. Katz,* 533 U.S. 194, 200-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Lunney has a constitutional right to be free from a correction officer's use of excessive force, and it could not be objectively reasonable for Officer Blot or Officer Frazier to have believed that the use of excessive force is allowed under the law. *See Calamia v. City of New*

*York,* 879 F.2d 1025, 1036 (2d Cir.1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); *Johnson v. City of New York,* 2006 WL 2354815, at *5 (S.D.N.Y. Aug.14, 2006) (citing cases).

C. *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items*

**\*14** Lunney claims that prison officials violated his Eighth Amendment rights based on the existence of inadequate laundry services, plumbing problems, and the deprivation of personal hygiene items. *See* Lunney Aff. ¶¶ 20-23. While the defendants argue that these claims are unexhausted, *see* Def. Mem. at 11, it is unnecessary to reach this question because the claims fail on the merits.

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state for the prison officials is "deliberate indifference." *Wilson,* 501 U.S. at 302-03.

1. *Laundry Services*

Lunney re-alleges the claim from his original complaint that the laundry services in the SHU were inadequate. *See* Lunney Aff. ¶¶ 20-21. In rejecting this claim on the motion to dismiss, this Court held that there "is no Eighth Amendment violation ... in instances where inmates are provided the opportunity and the supplies to wash their own clothes." *See Lunney I,* 2005 WL 121720, at *8 (citing *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986) (no constitutional violation where inmates were permitted

to wash their clothes in sinks and were provided with laundry detergent)); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 178-79 (S.D.N.Y.2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part,* 343 F.3d 35 (2d Cir.2003). The Court thus concluded that "Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services." *See Lunney I,* 2005 WL 121720, at *8. Lunney asserts that his sink was small and that he was not given soap specifically for laundry purposes. Lunney Dep. at 167. But he has not submitted evidence that would allow a reasonable to jury to conclude that he could not achieve some level of cleanliness with the materials he had. *See generally Benjamin,* 161 F.Supp.2d at 178-79. That Lunney asserts he was without soap for eight days and had a clogged sink for five, as described in the next section, shows at most that he lacked the means to clean his own clothing for a relatively brief period. As such, there was no Eighth Amendment violation.

2. *Plumbing Problems and Failure to Provide Personal Hygiene Items*

**\*15** Lunney alleges that he "was placed in a cell where the sink was clogged and there was no running water." *See* Lunney Aff. ¶ 22. He states that he made "verbal complaints" and that the sink was repaired "on about plaintiff's fifth day in S.H.U." *See id.* (incorporating Am. Compl. ¶ 15(c)). He also states that he did not receive "soap, toothpaste, a toothbrush, and other hygiene items." *See Id.* ¶ 23. While he states that his verbal complaints were ignored, he adds that the problem "was informally resolved on May 29, 2002 when C.O. Lebron of the I.G.R.C. corrected the problem." *See id.*

With regard to toiletries and hygiene items, Lunney fails to show that such a denial rose to the level of deliberate indifference to his health or safety. Courts have typically held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of "toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference' ") (quoting *Farmer,* 511 U.S. at 837) (alterations in original); *Fernandez*

*v. Armstrong,* 2005 WL 733664, at *5-6 (D.Conn. Mar.30, 2005) (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

With regard to Lunney's claim of no running water, defendants have pointed to evidence that Lunney filed a grievance on May 23, 2002, regarding the plumbing problems in his cell, Grievance SS-35563-02, dated May 23, 2002 (reproduced as Ex. J to Lunney Aff.), and that it was repaired the next day. *See* SHU Activity Log, dated May 24, 2002 (reproduced as Ex. D to Lee Reply Decl.). Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period. The "[l]ack of access to running water, by itself, does not constitute the denial of the minimal civilized measure of life's necessities." *James v. Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (no constitutional violation where inmates claimed they lacked running water from cell sinks for several hours every night for over four months); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Castro v. Chesney,* 1998 WL 767467, at *4 (E.D.Pa. Nov.3, 1996) (no constitutional violation where plaintiff placed in a "dry cell" without running water for several days, given water "sometimes" when he asked for it and water was turned on every other day so he could wash his face and brush his teeth).

### 3. *Personal Involvement*

**\*16** In any event, even if some constitutional deprivation had been shown, Lunney's submission does not provide facts that would show that any particular defendant sued here was personally involved in committing the violation. As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.'" *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). He can only be held liable if he was "personally involved in the alleged deprivation." *Id.* While there are number of ways in which such involvement can be shown, *see, e.g., Back,* 365 F.3d at 127 (citing *Colon v. Coughlin,*

58 F.3d 865, 873 (2d Cir.1995)), Lunney has not provided evidence (as opposed to speculation) as to any of them.

In sum, defendants are entitled to summary judgment on Lunney's claims of a temporary lack of running water, plumbing problems, and denial of personal hygiene items.

### D. *First Amendment Retaliation Claims*

Lunney asserts that he was assaulted by Blot and Frazier because he made verbal complaints about SHU conditions, *see* Lunney Aff. ¶ 24; that Blot threatened him with physical violence on several occasions for his writing of grievances, *see id.* ¶¶ 30-31; that Blot denied him recreation, meals, and showers because of his complaints, *see id.* ¶ 29; and that Fischer threatened to transfer him to Attica for writing grievances, *see id.* ¶ 28 (incorporating Am. Compl. ¶ 15(f)). He also asserts in his amended complaint that Brereton fired him from his position as a porter "as a means of retaliation." Am. Compl. at ¶ 15(g)(2). The defendants argue that these claims are unexhausted and fail on the merits. *See* Def. Mem at 9-12, 12-17; Def. Reply Mem. at 9-10, 11-15.

In its prior ruling, the Court dismissed Lunney's general allegations of threats and harassment because "comments that are merely 'insulting' or 'disrespectful' do not give rise to a constitutional violation." *See Lunney I,* 2005 WL 121720, at *11 (citations omitted). The Court also dismissed Lunney's claim that Fischer threatened to transfer him to another facility for writing grievances because, *inter alia,* Lunney did not allege that he was transferred because he filed grievances against prison officials. *See id.* However, the Court did not dismiss Lunney's claim that he was threatened with physical violence for filing grievances. *See id.* (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim)). Lunney's retaliation claims re-appeared in somewhat different form in his amended complaint, *see* Am. Compl. ¶ 16(c), which also contains new retaliation claims against Blot, Frazier and Brereton. *See id.* ¶¶ 15(g)(2), 16(h), (i).

### 1. *Law Governing First Amendment Retaliation*

**\*17** The First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)

("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). "[I]ntentional obstruction of a prisoner's right to seek redress of grievances 'is precisely the sort of oppression that ... section 1983[is] intended to remedy.' " *Id.,* 89 F.3d at 80 (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)) (alterations in original). A prisoner asserting a retaliation claim must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Moreover, in the prison context, the Second Circuit has recognized "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon,* 58 F.3d at 872 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Thus, courts "examine prisoners' claims of retaliation with skepticism and particular care." *Colon,* 58 F.3d at 872.

### 2. *Claims against Fischer*

In his affidavit, Lunney alleges that Fischer "repeatedly threatened" him "in retaliation for his filing of grievances and complaints regarding S.H.U. conditions." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)) (Lunney "subjected to threats of being transferred to Attica" by Fischer, who "made it quite clear to plaintiff that he did not like the fact that plaintiff was writing grievances and complaints to outside agencies."). He further states that his prison records reflect that Fischer attempted to transfer him "under the reason that plaintiff's behavior in Sing Sing was unsuitable." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)). While defendants argue that Lunney's claim should be dismissed because he did not properly exhaust the claim in accordance with the PLRA, it is not necessary to reach this question because the claim fails on the merits.

Lunney's First Amendment claim against Fischer is based on his claim that Fischer "threaten[ed]" him in response to his grievance writing. Am. Compl. ¶ 16(c); Lunney Aff. ¶ 28. But Lunney's only specific allegation on this point is that Fischer "did ... *try* to transfer plaintiff but D.O.C.S.

officials in Albany, New York cancelled the transfer." Lunney Aff. ¶ 28 (emphasis added); *see also* Pl. Mem. at 14-17.

This allegation cannot meet the requirement that the plaintiff experience an "adverse action." *Pidlypchak,* 389 F.3d at 380. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003)).

**\*18** The allegation in the complaint regarding the threats of transfer cannot be objectively viewed as deterring a person of ordinary firmness from exercising First Amendment rights. This is particularly true where Lunney's allegations are devoid of any dates or descriptions of the manner in which Fischer made the alleged threats. Moreover, the lack of dates also makes it impossible to determine whether there was a causal connection between the filing of grievances and the adverse action. Accordingly, summary judgment on this claim should be granted. It is, therefore, unnecessary to reach the question of qualified immunity. *See* Def. Mem. at 34; Def. Reply Mem. at 25.[5]

5   Lunney was transferred some time later, in 2004, to Cayuga Correctional Facility, long after the grievances and alleged threats by Fischer were made. *See* Lunney Aff. ¶ 26. Lunney has not alleged any facts regarding this transfer and also has not provided evidence that Fischer caused this transfer. Notably, there is an affidavit from Fischer stating that he was not involved in Lunney's transfer. *See* Fischer Decl. ¶¶ 5-7; *see generally Davidson v. Donnelly,* 2004 WL 1941349, at *3 (W.D.N.Y. Aug.29, 2004) (no claim for retaliatory transfer where plaintiff provided no

evidence on reason for transfer and prison officials gave reasons).

### 3. *Claims against Blot*

Lunney asserts that (1) Officer Blot denied him showers, meals, and recreation in retaliation for his grievances, *see* Lunney Aff. ¶ 29; (2) that Blot co-signed a misbehavior report against him stemming from an incident to which Blot was not a party; and that Blot subsequently told Lunney, "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," *see id.* ¶ 31 (incorporating Am. Compl. ¶ 15(h)); (3) that Blot threatened to harm Lunney physically if Lunney refused Blot's offer of a bribe to stop writing grievances, *see id.* ¶ 30; and (4) Blot assaulted him in retaliation for verbal complaints about the conditions in the SHU. *See id.* ¶¶ 24-25.

Defendants contend that each of these claims should be dismissed because Lunney failed to exhaust them and also dismissed on the merits. *See* Def. Reply Mem. at 5-7, 10. Defendants further contend that Blot is entitled to qualified immunity "from plaintiff's retaliation claim involving an alleged false misbehavior report ...." Def. Mem. at 34; Def. Reply Mem. at 29-30.

#### a. *Exhaustion of Claims Against Blot*

As to the four claims with respect to which the exhaustion defense has been raised, we have already discussed why Lunney should be excused from having failed to grieve the assault claim, *see* section III.B.1, and the same reasons that excuse the failure to grieve the assault apply equally to the claim that the motive for the assault was to retaliate for protected activity. Accordingly, there is no need to discuss exhaustion with respect to this aspect of the retaliation claim against Blot.

In addition, we conclude, for the reasons discussed in section III.D.3.c below, that Lunney's claim with respect to the false misbehavior report would fail on the merits. Accordingly, our discussion of exhaustion relates only to claims (1) and (3): that is, the claim regarding the denial of showers, meals, and recreation and the claim regarding the threat of physical violence.

Lunney alleges that Blot said: "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time." Am. Compl. ¶ 15(h). He also states that "[Blot] would come in and threaten guys and

tell guys 'listen, I'm going to write you up and you will get a new charge,' " Lunney Aff. ¶ 30 (citing Lunney Dep. at 190); and generally, that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he ... continued to write grievances." Am. Compl. ¶ 15(g). More specifically, in his deposition, Lunney states that Blot became "offended and upset about my writing grievances and he said he didn't like people that wrote grievances"; that he "would complain that he didn't like people writing grievances" and would "criticiz[e]" him for it. Lunney Dep. at 187. Lunney recounts one conversation as follows:

> ***19** [H]e came to me one day and said "listen, I want you to stop writing grievances." And I said "listen, you guys are doing a lot of things wrong down here." He said "listen, if you don't stop writing grievances I'm going to break your fuckin' neck." He said "you're going to have a hard time in the SHU."

*Id.*

As already discussed in the context of Lunney's excessive-force claim, *see* section III.B the Second Circuit has held that "seemingly available remedies [may be] rendered unavailable by threats," *Hemphill*, 380 F.3d at 688, if a "similarly situated individual of ordinary firmness" would not have "deemed them available." *Id.* (citations and quotations omitted). Likewise, the Second Circuit has held that threats by prison authorities may provide grounds for estoppel if defendants "took affirmative action to prevent [the prisoner] from availing himself of grievance procedures." *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (citing cases). [6]

---

[6]     The Second Circuit has recognized that "the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available' to the plaintiff ...." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Liberally construed, Lunney's argument can be read as asserting both that (1) his failure to follow the formal exhaustion process should be excused because Blot's threats rendered the formal grievance process effectively unavailable to him and (2) that Blot's exhaustion defense was estopped by Blot's alleged threats.

Lunney's general assertions regarding threats-without the specific of dates or content of threats-might not be sufficient permit a finding on these points. But his assertion that Blot stated "if you don't stop writing grievances I'm going to break your fuckin' neck," Lunney Dep. at 187, coupled with the allegation that Blot had actually assaulted him previously, would be sufficient to allow a factfinder to conclude that a "similarly situated individual of ordinary firmness" would not have deemed the inmate grievance process available with respect to grievances that involve conduct by Blot. *See, e.g., Hepworth v. Suffolk County,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (inmate beaten and threatened with further violence after testifying against correction officers); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (physical assault coupled with threat to kill inmate after inmate mailed a complaint); *McCullough,* 2005 WL 3164248, at *3-4 (assault with threat to "get [him]" if he filed another grievance). It also raises questions regarding estoppel as to any claim against Blot. Thus, a genuine issue of material fact exists as to (1) whether administrative remedies, though nominally "available," were functionally available to Lunney to grieve these claims-the deprivation of meals, showers and recreation and the threat of physical violence by Blot-against Blot and/or (2) whether Blot's alleged threats estop defendants from raising exhaustion as an affirmative defense.

We now address the merits of the four claims against Blot.

### b. *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation*

**\*20** Lunney states that he was deprived of showers "at least twice a week." Lunney Dep. at 182. He asserts that this occurred "[b]ecause of problems I was having with Blot and my being vocal about the problems, the conditions of SHU." *Id.* at 183. He asserts that he was supposed to get three showers a week. *See* Pl. Mem. at 22. As to recreation, Lunney states that at least "three or four times a week [ ] Blot would come ... by with the list. He'd ask guys if they want recreation. We'd be brought down for breakfast. He'd tell me 'you're staying here.' " *Id.* (citing Lunney Dep. at 185-86). Lunney makes no specific statements as to Blot's depriving him of meals. While Blot denies ever depriving Lunney of meals, showers or recreation, *see* Blot Decl. ¶ 4, we accept Lunney's assertions as true for purposes of this motion.

Defendants challenge whether Lunney has established the second and third prongs of a prima facie case of retaliation: namely, whether (1) the deprivations constitute "adverse action," and (2) there is a causal connection between these deprivations and his grievance writing. Def. Mem. at 15.

*i. Adverse Action.* As an initial matter, defendants argue that Lunney's claim lacks sufficient specificity. Def. Reply Mem. at 13. As is true in response to any motion for summary judgment, Lunney was required to provide evidence sufficient to allow a jury to find in his favor. Thus, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Lunney's allegations regarding denial of meals are completely lacking in any such specifics. His allegations regarding the denials of showers and recreation, however, are sufficiently detailed to allow a trier of fact to conclude that such denials occurred. Accordingly, we limit our discussion to the issue of whether the denial of showers and recreation constitute "adverse action."

As noted, the Second Circuit has held that while "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes,* 239 F.3d at 492-93. Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. Thus, the conduct must be "specifically directed at plaintiff[ ] and substantial enough to deter legitimate grievances against prison officers." *Salahuddin v. Mead,* 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002). Conduct that is *de minimis* does not provide this deterrent effect and does not give rise to actionable retaliation. *Dawes,* 239 F.3d at 493; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights [, harassment] need not be great in order to be actionable. Yet, ... [i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ....")) (alterations in

original). What is *de minimis* varies according to context. *See Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a[ retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. *See Salahuddin,* 2002 WL 1968329, at *4-5 (citing cases).

**\*21** Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation. *Chestnut,* 193 F.3d at 150 (remanding to district court on interlocutory appeal where "there [was] a serious question as to whether ... [plaintiff's] asserted one-day denial of an opportunity to exercise, w[as] more than *de minimis"* ); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); *Lyons v. Wall,* 2006 WL 2945256, at *5 (D.R.I. Oct.13, 2006) (sporadic cold showers are *de minimis* ). Here, however, Lunney alleges a routine denial of showers and recreation such that he regularly had one shower a week instead of two, and three to four hours of recreation a week instead of the normal seven. Pl. Mem. at 22 (citing Lee Decl. Ex. J §§ 304.2, 304.3, 304.5; Lunney Aff. Ex. M at 140-142); *see also Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004) (discussing normal conditions of the SHU as two showers a week and one hour of recreation a day). Defendants have pointed to no case where a constant denial of showers and recreation, in the proportions alleged here, was deemed to be *de minimis* as a matter of law. [7]

[7]    While defendants argue that "the alleged denial of meals, recreation and showers did not deter the exercise of plaintiff's rights as evidenced by his many grievances," Def. Mem. at 15, as noted, the test for adverse action is an "objective test [which] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis,* 320 F.3d at 353).

In sum, defendants are not entitled to summary judgment on this point.

*ii. Causal Connection.* Lunney must also show that there was "a causal connection between the protected speech and the adverse action." *Pidlypchak,* 389 F.3d at 380. *Colon* discusses a number of factors relevant to whether a causal connection exists, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. 58 F.3d at 872-73; *accord Sloane v. Mazzuca,* 2006 WL 3096011, at *14 (S.D.N.Y. Oct.31, 2006); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

Here, a reasonable factfinder might view Blot's decision to deny Lunney recreation and shower privileges as being prompted by Lunney's grievance writing. Lunney states that upon arrival to the SHU, he immediately complained about the conditions of his cell, both verbally and through the filing of written grievances. Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(c)-(e)). On his third day in the SHU, Officers Blot and Frazier assaulted him, and Blot warned him that he would suffer consequences if he filed a grievance. *Id.* (incorporating Am. Compl. ¶ 15(e)(1)-(2)). Nonetheless, Lunney continued to file grievances in the SHU. *See, e.g.,* Ex. K to Lunney Aff. Blot stated to him that he "didn't like people that wrote grievances" and told him "listen, I want you to stop writing grievances" and that "if you don't stop writing grievances I'm going to break your fuckin' neck" and that "you're going to have a hard time in SHU." Lunney Dep. at 187. At the same time, Lunney states that he was routinely denied showers and recreation. Lunney Aff. ¶ 29. Thus, the evidence for causation centers on (1) the fact that there is no explanation provided for the denial of showers and recreation and (2) the evidence that Blot complained to Lunney about his writing grievances and specifically threatened Lunney about them during the same time period that the denial of showers and recreation was taking place. Lunney Dep. at 186-87. While it may also be reasonable to infer, as defendants argue, that the deprivations, if they did occur, were a result Lunney's "extensive disciplinary history," Def. Mem. at 15, on a motion for summary judgment, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson,* 477 U.S. at 255. Thus, Lunney has raised a genuine issue of material fact as to whether Blot denied showers and recreation in retaliation for Lunney's grievances. [8]

[8]    Defendants have made only a conclusory argument as to qualified immunity on this point, *see* Def. Mem. at 33-34, and thus we do not consider it here.

### c. *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report*

**\*22** The filing of a false misbehavior report in response to constitutionally protected activity can constitute actionable retaliation. *See Graham,* 89 F.3d. at 79-81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Jones v. Coughlin,* 45 F.3d 677-78, 680 (2d Cir.1995) (per curiam) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation).

Lunney asserts that a misbehavior report dated June 22, 2003-approximately six months after he left the SHU-"stemmed from plaintiff having sent letters to several facility staff members"-not including Blot-"complaining about being harassed by another staff member, C.O. Davis." *See* Am. Compl. ¶ 15(h); *see also* Misbehavior Report (reproduced in Ex. G. of Lee Decl.). Officer Gary, one of the officers to whom Lunney had sent the letter, wrote the misbehavior report because Lunney's letters violated facility correspondence rules that prohibit "correspond[ence] with dep[artment] employees [without] the express permission of the superintendent." *See* Lee Decl. Ex. G (citing DOCS Directive 4422). Blot "endorsed" the misbehavior report. *See* Def. 56.1 ¶ 22. Lunney was subsequently found guilty of this charge based on "[his] admissions that [he] willfully wrote to a total of 15 officers including officer Gary," *see* Lee Decl. Ex. G, and sentenced to 30 days' keeplock, loss of packages, loss of commissary, and loss of phone privileges.[9] *See id.* Defendants argue that Lunney has not met the elements of a retaliation claim. Def. Mem. at 16-17; Def. Reply Mem. at 14.

[9]    This finding of guilt was "apparently overturned," or at least "modified" on appeal, though to what extent and the reason for such action is not clear from the record. *See* Def. Mem. at 16 (citing Lee Decl. Ex. I).

Lunney's claim is simply disposed of based on the evidence that the misbehavior report had a legitimate justification. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, where a plaintiff has met his "initial burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still obtain summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone."); *see also Sher v. Coughlin,* 739 F.2d 77, 81-82 (2d Cir.1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*23** Assuming without deciding that Lunney had met his initial burden of showing that an improper motive played a substantial part in the decision to discipline him, Lunney concedes that the misbehavior report "stemmed from" a letter he wrote to Officer Gary. Am. Compl. ¶ 15(h). It is undisputed that writing letters to prison guards violates DOCS's policy. *See* DOCS Directive 4422. Lunney has provided no evidence of instances in which prisoners wrote letters to prison guards without receiving disciplinary action. Based on the evidence in the record, it would be purely speculative for a factfinder to conclude that the prison would not have taken the same action against Lunney regardless of any motive it had to punish him for writing grievances. Accordingly, defendants are entitled to summary judgment on this claim.

### d. *The Merits of Lunney's Allegation that Blot Threatened Physical Violence*

Lunney states that Blot threatened him physically, both generally in response to his continued filing of grievances, *see* Lunney Aff. ¶¶ 29-30, and specifically in response to his complaint about another officer. *See id.* ¶ 31. Lunney's most specific allegations consist of two statements: (1) "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," Am. Compl. ¶ 15(h), and (2) "[I]f you don't stop writing grievances I'm going to break your fuckin' neck." Lunney

Aff. ¶ 30 (citing Lunney Dep. at 186-87). He also states more generally that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he [ ] continued to write grievances." Am. Compl. ¶ 15(g). Defendants do not address this claim in their papers, although they argue that Blot is entitled to qualified immunity on it. *See* Def. Reply Mem. at 30.

Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered. *Compare Hepworth,* 2006 WL 2844408, at *8-9 (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment"); *Brown v. Coughlin,* 965 F.Supp. 401 (W.D.N.Y.1997) (threat to inmate that when officers were "done with him" he would not want to "file any more complaints" sufficient for First Amendment retaliation claim); *Thaddeus-X,* 175 F.3d at 396, 398 ("In the prison context ... [h]arassment, physical threats" would "certainly be adverse" action), *with Bartley v. Collins,* 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit," do not rise to the level of adverse action); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially considering the fact that the threat was never carried out); *Cruz v. Hillman,* 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that correction counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful," insufficient to state a retaliation claim). Given the directness and specificity of the alleged threats here, a factfinder could permissibly decide that the threats were such that it would deter an inmate of "ordinary firmness" from engaging in protected activity.

**\*24** Nor should Blot be entitled to qualified immunity. It would not have been "objectively reasonable" for Blot to have believed that it did not violate "clearly established" law regarding retaliation to tell Lunney that he would "break [his] fuckin' neck" if Lunney continued to write

grievances. In other words, the contours of the right to be free from First Amendment retaliation were "sufficiently clear that [Blot] would [have] underst[ood] that what he [was] doing violate[d] that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

e. *The Merits of Lunney's Allegation of Retaliatory Assault*

We have already discussed Lunney's claim that the assault by Blot and Frazier constituted an Eighth Amendment violation. *See* section III.B above. In addition, Lunney asserts that this same assault occurred "because of a verbal complaint he made to another officer regarding his not having hygiene items and the problems with his sink and toilet." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). In his amended complaint, Lunney specifically pleads this as a First Amendment claim as well. *See* Am. Compl. at ¶ 16(h).

Defendants do not make any arguments regarding this claim specifically. Nonetheless, because they moved for summary judgment as to "plaintiff's First Amendment retaliation claim" generally on the ground that there is no "causal relationship between protected activity and adverse action," Def. Mem. at 2, Lunney was obligated to "come forward with admissible evidence supporting [his] claim" on this point. *Feurtado v. City of New York,* 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted). [10]

---

[10]    Because defendants' motion does not contend that verbal complaints cannot constitute constitutionally protected activity, it is unnecessary to reach this question. The Court notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983. *See Smith v. Woods,* 2006 WL 11312347, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd,* 2007 WL 756410, at *1 (2d Cir. Mar.12, 2007); *Gill v. Riddick,* 2005 WL 755745, at *10 (N.D.N.Y. Mar.31, 2005) (citing cases); *Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999); *Malik'El v. New York State Dept. of Corr. Servs.,* 1998 WL 187459, at *4 (N.D.N.Y. Apr.8, 1998); *but see Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) ("verbal confrontation" not protected activity).

Lunney details that after "attempting to inform another officer, who was confined to a control room at least 45 feet away from plaintiff's cell," *see* Am. Compl. ¶ 15(e), that he lacked certain hygiene items,

> [d]efendants Blot and Frazier approached plaintiff's cell and began to state that plaintiff had better "shut the fuck up or we are coming in there and you will not like the results." After attempting to explain his problems to [them] Officer Frazier appeared to become calm and attempted to resolve plaintiff's complaints. However, defendant Blot stated "I don't give a shit about your fucking problems. File a fucking grievance." Defendant Blot then proceeded to yell to the officer in the control booth to have plaintiff's cell opened.

Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). According to Lunney, Blot then entered Lunney's cell and assaulted him, *id.,* though Blot denies that this assault ever took place. Blot Decl. ¶ 3.

Here, the sequence of events-a complaint followed by an immediate assault, accompanied by remarks referring to his complaint-would be sufficient for a jury to find that there was a causal connection between Lunney's complaints and the assault. Accordingly, summary judgment cannot be granted to defendants on this claim.[11]

[11] Defendants make no arguments with respect to qualified immunity on this claim or with respect to the First Amendment claim against Frazier (discussed in the next section), and thus we do not consider the doctrine's applicability with respect to these claims.

#### 4. *First Amendment Claim Against Frazier*

**\*25** Lunney alleges that Frazier assisted Blot "in assaulting plaintiff in retaliation for plaintiff making complaints." Am. Compl. ¶ 16(i). Once again, defendants argue only generally that plaintiff's First Amendment retaliation claim should be dismissed for failure to establish a causal relationship. Def. Mem. at 2. As to Frazier's particular actions, Lunney claims that he "entered the cell and placed [Lunney] in a choke hold for several minutes." Am. Compl. ¶ 15(e)(1). Frazier, like Blot, denies Lunney's allegations of unnecessary physical force. Frazier Decl. ¶ 3. For the same reasons just stated, Lunney's allegations are sufficient to allege a causal connection between his complaints and the assault. Thus,

defendants must be denied summary judgment as to the claim against Frazier.

#### 5. *First Amendment Claim Against Brereton*

Lunney's amended complaint states that he "filed a formal grievance complaint with the I.G.R.C. arguing that he had been fired [from his job as a porter] as a means of retaliation by defendant Brureton." Am. Compl. ¶ 15(g)(2). No further information is provided on this issue. While Lunney makes reference to it in his memorandum of law, Pl. Mem. at 30, he does not address it in his affidavit. Given the conclusory reference in the amended complaint, there is no admissible evidence before the Court that would allow a jury to conclude that Lunney had made out each of the elements of a retaliation claim.

Accordingly, this claim must be dismissed.

#### E. *Unfiled Grievances*

Lunney claims that defendant Kober violated his First and Eighth Amendment rights by denying him "access to an effective Inmate Grievance Program," *see* Lunney Aff. ¶ 32, and thus that Kober "deprived plaintiff of his means to petition the government for the redress of grievances." *See* Am. Compl. ¶ 16(e). Specifically, he alleges that "[g]rievances were not timely filed or they were completely ignored," and that Kober stated they "were never received by his office." *See* Lunney Aff. ¶ 32 (incorporating Am. Compl. ¶ 15(i)). He adds that the Sing Sing IGRC "was not operating in accordance with policy," that grievances "were not being timely filed and responded to," that "investigations were biased and or incomplete," and that "appeals were not timely filed." *See* Am. Compl. ¶ 15(i). While defendants argue that this claim is unexhausted, *see* Def. Reply Mem. at 10, it is unnecessary to reach that issue because the claim fails on the merits.

It is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42 U.S.C. § 1983. *See Cancel,* 2001 WL 303713, at *3 ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *accord Davis v. Castleberry,* 364 F.Supp.2d 319, 323 (W.D.N.Y.2005); *Fernandez,* 2005 WL 733664, at *9; *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998) (citing *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993)).

**\*26** It does not help Lunney's claim if it is construed as one for denial of access to the courts. To state a claim for denial of access to the courts under § 1983, Lunney must demonstrate that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (internal quotation marks omitted). Only those actions which rise to the level of " 'deliberate and malicious interference' " and which " 'actually impeded his access to the court or prejudiced an existing action' " are sufficient to present a claim. *Green v. Phillips,* 2006 WL 846272, at \*11-12 (S.D.N.Y. Mar.31, 2006) (quoting *Cancel v. Goord,* 2001 WL 303713, at \*4 (S.D.N.Y. Mar.29, 2001)); *accord Rivera v. Pataki,* 2005 WL 407710, at \*17-18 (S.D.N.Y. Feb.7, 2005). The evidence presented by Lunney, however, does not satisfy this standard. The operation of the grievance process is relevant to any access-to-the-courts claim only insofar as the procedure is a prerequisite for the filing of a civil suit under the PLRA. Lunney has not shown how the operation of the grievance procedure denied him such access. Moreover, in light of the fact that prisoners are excused from filing grievances where prison officials prevent them from doing so or make the grievance process not "available," *see, e.g., Brownell,* 446 F.3d at 311-12, any such actions-even if they had been demonstrated-could not be shown to have deprived Lunney of his ability to bring any lawsuit. Thus, this claim too must be dismissed.

### F. *Fourteenth Amendment Due Process Claims*
As in his original complaint, Lunney asserts that his right to due process was violated by two separate actions. First, Lunney claims that Selsky improperly ordered a second disciplinary hearing after the Article 78 proceeding had been filed with respect to the first hearing. *See* Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). Second, he argues that defendants' failure to provide him with a timely written disposition of his disciplinary hearing was a violation of his due process rights. *See* Am. Compl. ¶¶ 10, 12. This first claim is identical to one the Court dismissed on the merits in its original ruling, *see Lunney I,* 2005 WL 121720, at \*14, and thus the Court will not reconsider it here. Accordingly, we address only the second claim. [12]

---

[12]    The defendants and Lunney discuss the matter of "hearing officer bias" in their summary judgment papers. *See* Def. Mem. at 23-24; Pl. Mem. at 50-52; Def. Reply Mem. at 21-22. However, Lunney did not raise this claim in his amended complaint or in his affidavit and thus we do not consider it.

### 1. *Law Governing Disciplinary Proceedings*
A party asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz,* 380 F.3d at 654 (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

**\*27** There is no bright-line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating due process protection. *See id.* (citations omitted). However, as in the original motion, defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was later reduced to six months-under the standard established in *Sandin.* It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, we consider whether Lunney was denied due process when he was not provided with a written disposition of his disciplinary hearing and when the second hearing was scheduled.

### 2. *Written Disposition of Disciplinary Hearing*
As noted above, *see* section I.A, Lunney's first disciplinary hearing, in June 2002, resulted in a finding of guilt for which he was sentenced to nine months in the SHU. Lunney appealed this ruling, which was affirmed in August 2002. Lunney then filed an Article 78 petition in the state Supreme Court, which led to an order to show cause directing Selsky to respond to the petition.

In October 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. The rehearing was held in October 2002, and Lunney was again found guilty and sentenced to nine months in the SHU. He again appealed, arguing this time that he had not received a copy of the hearing disposition. His appeal was denied, although his sentence was reduced to six months because the original sentence had exceeded the guidelines "without further justification." *See* Memorandum, dated Nov. 7, 2002 (reproduced in Ex. J to Selsky Decl., filed July 12, 2005 (Docket # 84) ("Selsky Decl.")). Lunney filed a second Article 78 petition with respect to the rehearing, and in August 2003, a judge of the State Supreme Court dismissed the original misbehavior report and concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process.

With regard to the timing and manner of notifying Lunney about the hearing disposition, Lunney acknowledges that he received oral notification of the result on October 17, 2002. *See* Def. 56.1 ¶ 12; Lunney Aff. ¶ 12. It is undisputed that he also received a tape recording of the hearing on this date, and that the tape "contained all [of] the information contained in the written decision including the evidence relied upon and reasons for the penalty imposed." *See* Def. Reply Mem. at 23. [13]

[13] Lunney wrote a letter to Donald Selsky, *see* Letter, dated Nov. 14, 2002 (reproduced in Ex. K to Selsky Decl.), stating that the original tape he received was defective, and requesting a new one. Defendants state, and Lunney does not dispute, that he received a new tape around that time. *See* Def. Mem. at 24.

The written disposition stated that it was based on "the written report by Officer Hadzovic and because it was recovered in the locker which was lock [sic]. Also from the testimony of Sgt. Guadagno who stated that the showers are normally completed by 7:15-7:30 PM." *See* Superintendent Hearing Disposition Rendered, dated Oct. 17, 2002 (reproduced in Ex. H to Selsky Decl.). It noted the reasons for the disposition as: "to impress upon this person the seriousness of this act and to act a[s] a deterrent to other[s]. Also that the possession of illegal weapons in a correctional facility is very detrimental to the safety and security of all those that work and live [h]ere, and this will not be tolerated." *See id.* Lunney makes no allegations regarding what was or was not on the tape.

Nor does he allege that the written decision contained any information that was not on the tape.

**\*28** In its original ruling on this claim, this Court allowed Lunney's claim regarding his failure to receive a written disposition of his disciplinary hearing to proceed because "the right to receive a 'written statement of the disposition' [is] a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell* [418 U.S. 539, 563 (1974) ]." *See Lunney I,* 2005 WL 121720, at *13 (citing *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004)); *see also Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at *2 (S.D.N.Y. Mar.6, 2002); *Silva v. Sanford,* 1998 WL 205326, at *6 (S.D.N.Y. Apr.24, 1998). The Court noted at that time that the defendants might be able to defeat the due process claim based upon additional facts (not contained in the complaint) showing, for example, that Lunney was informed of the disposition or was otherwise given the opportunity to obtain it. *Lunney I,* 2005 WL 121720, at *13. In addition, the Court left open the possibility that the defendants could show entitlement to qualified immunity. *Id.*

Prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted); *Louis v. Ricks,* 2002 WL 31051633, at *11 (S.D.N.Y. Sept.13, 2002) (citing *Powell,* 953 F.2d at 750). Defendants now argue that any failure to provide Lunney with a written disposition of the result of his disciplinary hearing in a timely fashion was harmless, because: (1) "there was no information contained in the written hearing decision not provided to plaintiff before his final challenge to the hearing decision and penalty," *see* Def. Reply Mem. at 23; (2) after receiving a tape recording of the hearing which contained the rationale, "he did not add any new substantive arguments related to the rationale ... because he had already made the best arguments possible," *see* Def. Mem. at 26; and (3) his sentence was reduced for exceeding the guidelines, despite his failure to raise the issue on appeal. *See* Def. Reply Mem. at 23. Thus,

defendants argue, the claim must fail. *See* Def. 56.1 ¶¶ 12, 35; Def. Mem. at 22-23; Def. Reply Mem. at 25-27.

Lunney does not contradict any of the relevant facts asserted by defendants on this point. Rather, he states that although his punishment at the second disciplinary hearing was in the end reduced for exceeding the guidelines, he never made this challenge on appeal. *See* Pl. Mem. at 57. He uses this fact to argue that "[p]erhaps if plaintiff had received a copy of the disposition paperwork, he could have argued on appeal that the penalty ... exceeded the guidelines." *See id.* This is the only harm Lunney points to based on his not having received the written disposition.

 **\*29** Lunney's argument fails for two reasons. First, he was aware of his nine-month sentence following the disciplinary hearing. *See* Def. 56.1 ¶ 12 (citing Lunney Dep. at 93, 100-101). Thus, nothing prevented Lunney from raising the alleged illegality of the nine-month sentence even without a copy of the actual written disposition. Second, Lunney has not shown that there was any potential for any other outcome had he been provided with a copy of the written disposition. For example, he makes no argument that he could have received an even greater sentence reduction had he had access to the written hearing disposition. Given that the error in the sentence was remedied in November 2002 prior to his serving six months in confinement, any failure on his part to raise the argument that his sentence was incorrect was necessarily harmless.

### Conclusion

For the foregoing reasons, defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers (b) against defendant Frazier for his participation in the retaliatory assault. [14]

[14]     Lunney asserts in his amended complaint that Fischer subjected him to "forced labor without pay" while he was in the SHU, *see* Am. Compl. ¶ 16(c). However, this claim is not explained in his affidavit. Nor is any evidence supplied to support it. Accordingly, it is too vague to constitute the basis for a claim and it has not been discussed herein.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 144-45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1544629

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.          24

2012 WL 5472113
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles JUDD, Plaintiff,

v.

GUYNUP, Sgt., Clinton Correctional Facility;
Capt. Paul Woodruff, Hearing Officer, Defendants.

Civ. No. 9:12–CV–00058 (NAM/RFT).
|
Oct. 17, 2012.

**Attorneys and Law Firms**

Charles Judd, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Adrienne J. Kerwin, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** Charles Judd, a New York State prison inmate
proceeding *pro se* and *in forma pauperis,* commenced this
civil rights action, pursuant to 42 U.S.C. § 1983, alleging
that Defendants violated his procedural due process rights
under the Fourteenth Amendment. *See* Dkt. No. 14,
Am. Compl. [1] Defendants now move for dismissal of the
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). Dkt. No. 19. Plaintiff opposes the
Motion. Dkt. No. 21. For the reasons that follow, it is
recommended that Defendants' Motion be **GRANTED**
and the entire Complaint be **DISMISSED.** However, in
light of Plaintiff's *pro se* status, it is further recommended
that Plaintiff be afforded an opportunity to amend his
pleading.

[1]   Plaintiff filed an Amended Complaint as of right
pursuant to Federal Rule of Civil Procedure 15(a)(1)
(A).

# I. BACKGROUND

What follows is a summary of the facts alleged in
the Plaintiff's pleadings and Response [2] to Defendants'
Motion, which must be accepted as true for the purposes
of addressing Defendants' Motion to Dismiss. *See infra*
Part II.A.

[2]   For the purposes of evaluating a motion to dismiss
brought against a *pro se* plaintiff, the Second Circuit
has deemed facts found in a plaintiff's response to
a defendant's motion to dismiss to be part of the
plaintiff's complaint—even though they were not
contained within the original complaint. *See Drake v.
Delta Air Lines, Inc.,* 147 F.3d 169, 170 (2d Cir.1998)
(*per curiam* ).

On August 19, 2011, there was an "uprising" in or near
the North Yard of the Clinton Correctional Facility. Am.
Compl. at ¶ 5. At the time of the uprising there were as
many as 259 inmates in the vicinity of the North Yard at
Clinton. *Id.* Plaintiff, denies participation in the uprising.
*See generally* Am. Compl. Defendant Gunyup, an area
supervisor, was in the North Yard at the time of the
uprising, and directed another officer to lock the Plaintiff
up. *Id.* at ¶ 10; Pl.'s Opp'n at p. 1.

Thereafter, Plaintiff was "charged in a single misbehavior
report for violating a host of prison rules arising from a[n]
uprising at [Clinton]." Pl.'s Affirm. at ¶ 4. The report did
"not indicate the words or actions [Plaintiff] employed in
the alleged incident[.]" Am. Compl. at ¶ 5. On August 26,
2011, a superintendent's hearing was held and presided
over by Defendant Woodruff. *Id.* at ¶ 1.

The evidence presented at the hearing included the
testimony of Plaintiff, the testimony of Defendant
Guynup, and video of the uprising. *Id.* at ¶¶ 3 & 11.
Throughout the duration of the hearing, Plaintiff averred
that he was not in the area where the alleged incident took
place nor involved in any way in the uprising. *Id.* at ¶¶ 1, 4,
& 9. Defendant Guynup testified that "no Staff member
observed plaintiff engag[ing] and/or participat[ing] in
the alleged uprising." *Id.* at ¶ 11. Furthermore, "at no
relevant time[ ]" did the videotapes reviewed by Defendant
Woodruff "clearly ... identify [ ] the Plaintiff." *Id.* at ¶ 4.
Nevertheless, Defendant Woodruff found Plaintiff guilty
and sentenced him to 545 days of confinement in SHU,
with a concomitant "loss of all privileges commissary,

phone, packages; and loss of good time credit." *Id.* at ¶ 1; Pl.'s Affirm. at ¶ 7. Plaintiff appealed Defendant Woodruff's determination. *Id.*

On October 26, 2011, Defendant Woodruff's decision was reversed and a new hearing was ordered. Amend. Compl., Attach. Supt. Hr'g Review. Thereafter a rehearing was conducted by J. Earl on November 9, 2011, and all charges were "dismissed because there was no 'Substantial Evidence' in the record to find the Plaintiff guilty as charged." Pl.'s Affirm. at ¶ 7.

**\*2** During his confinement in SHU, Plaintiff's blood pressure increased, requiring him to take medication, and he suffered from depression. Pl.'s Opp'n at p. 1.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679–80.

**\*3** With this standard in tow, we consider the plausibility of Plaintiff's Amended Complaint.

**B. Eleventh Amendment**

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations

omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540.

In the instant case, Plaintiff seeks only monetary damages. Therefore, Plaintiff's claims against all Defendants in their official capacities should be **DISMISSED.**

**C. Due Process**

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[.]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*4** Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr.3, 1998) (citing *Wright v. Coughlin,*

*132 F.3d 133, 136 (2d Cir.1998)*); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*5** Plaintiff asserts that he was deprived of due process in connection with the Woodruff hearing because he was found guilty without sufficient evidence. Prior to assessing the substance of this claim, we must determine whether, as a result of this disciplinary hearing, Plaintiff was deprived of a protected liberty interest.

On August 26, 2011, Defendant Woodruff sentenced Plaintiff to serve 545 days in SHU, without "any privileges" including commissary, phone, packages, and good time credit. However, Plaintiff's conviction was subsequently overturned on appeal and Plaintiff was released from SHU on either October 26, 2011 or November 9, 2011. [3] Therefore, despite being sentenced to 545 days of SHU confinement, Plaintiff only actually served between 67 and 76 days. Accordingly, Plaintiff's argument that the 545–day SHU sentence implicated a liberty interest is fatally flawed. Am. Compl. at ¶ 6. Plaintiff incorrectly assumes that the material time period in a *Sandin* analysis is the length of the sentence imposed rather than the length of time an inmate actually spent in SHU confinement. However, courts in this Circuit have interpreted *Sandin* and its progeny to mean just the opposite. That is, in the Second Circuit, it is the length of the *actual* punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and, not as the Plaintiff would argue, the length of the sentence imposed. *Scott v. Albury,* 156 F.3d 283, 287–88 (2d Cir.1998) ("No right to due process is implicated in the prison context *unless* a liberty interest has been deprived, and we read *Sandin [v. Conner]* to require that we look to actual punishment in making this determination."). Thus, the Second Circuit has made clear that whether a punishment is atypical and significant is to be measured by the time actually spent in disciplinary confinement, not the potential time that might have been spent. Therefore, the relevant period of confinement for the purposes of our *Sandin* analysis is the 67–76 days Plaintiff spent in SHU confinement in connection with the sentence that was ultimately reversed, and not the 545–day period Plaintiff was initially sentenced to.

[3] It is unclear from the Plaintiff's pleading whether he was released from SHU after his case was overturned and a rehearing was demanded on October 26, 2011, or whether he remained incarcerated until all charges were dismissed on November 9, 2011. Thus, it is not possible to know from the pleading exactly how long Plaintiff was actually segregated in SHU.

Moreover, in the Second Circuit, SHU confinement under **normal conditions** of SHU confinement "lasting fewer than 101 days ha[s] been found not to amount to atypical and significant hardship." *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 606 (S.D.N.Y.2009) (citing *Sealy v. Giltner,* 197 F.3d at 588–90). A number of district courts in this Circuit have found that periods of SHU

confinement around or exceeding 67–76 days did *not* constitute a deprivation under *Sandin. See Edmonson v. Coughlin,* 1996 WL 622626, at \*4–5 (W.D.N.Y. Oct.4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Alvarado v. Kerrigan,* 152 F.Supp.2d 350, 355 (S.D.N.Y.2001) (93 days) (citing *Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y. July 28, 2000) (75 days confinement); *Jackson v. Johnson,* 15 F.Supp.2d 341, 361–62 (S.D.N.Y.1998) (99 days); *Trice v. Clark,* 1996 WL 257578 at \*3 (S.D.N.Y. May 16, 1996) (150 days)). That is not to say that any period of confinement that does not last longer than 101 days cannot be atypical. *See Palmer v. Richards,* 364 F.3d at 65 (noting that SHU confinements of less than 101 days could constitute atypical and significant hardships if the conditions were more severe than the "normal SHU conditions"). Rather, it means that in the absence of some allegation that the conditions of the confinement were harsher than the "ordinary incidents of prison life," such a short period of confinement would not ordinarily implicate a cognizable liberty interest.

 **\*6** Plaintiff's pleading is completely devoid of factual allegations regarding how the SHU conditions differed from the ordinary incidents of prison life as experienced by other SHU or general population inmates at Clinton. The only allegations submitted by the Plaintiff relevant to the conditions he endured during his confinement in SHU, are two terse statements Plaintiff haphazardly threw into the Affirmation attached to his Amended Complaint and in his brief Response to the Defendants' Motion to Dismiss. In his Affirmation, Plaintiff merely notes that his disciplinary sentence included a concomitant denial of all privileges, including phone, commissary, and packages, as well as a loss of good time credit. Pl .'s Affirm. at ¶ 7. In his Opposition, Plaintiff expands on his alleged suffering by noting that while in SHU, his blood pressure increased, requiring medication, and he suffered from depression. Dkt. No. 21. Even when construed liberally, these additional facts do not support a plausible inference that the conditions of his confinement were unduly harsh or atypical in comparison with the ordinary incidences of prison life at Clinton.

The Plaintiff's naked allegations that as a condition of his confinement he lost package, phone, and commissary privileges are insufficient to support the inference that these losses were atypical for SHU or general population inmates at Clinton. In order to survive a motion to dismiss Plaintiff must allege that these deprivations represented conditions "much more severe than normal SHU conditions." *See Parks v. Smith,* 2009 WL 3055279, at \*10 (N.D.N.Y. Aug.17, 2009) ("Where a prisoner contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory is purely speculative."). Here Plaintiff has merely noted that he lost these privileges, he has not alleged that such losses were in any way more severe than the losses faced by other SHU detainees.

With regard to the Plaintiff's medical ailments, the Court will not assume that the conditions of his confinement caused Plaintiff's medical issues. Absent some allegation establishing a causal connection between the Plaintiff's medical problems and the conditions he endured while in segregative confinement, these allegations are insufficient to state a plausible due process claim. *C.f. Delaney v. Selsky,* 899 F.Supp. 923, 927–28 (N.D.N.Y.1995) (finding atypical conditions of confinement where a seven foot tall prisoner in an SHU cell—which is smaller than a normal cell—was forced "to stand or lay in an uncomfortable and compromising position," causing him to experience "back problems"). Absent some allegation to the contrary there is no reason to believe that the Plaintiff would not have suffered from the very same medical ailments had he been confined to general population.

 **\*7** Lastly, Plaintiff's allegations with regard to the loss of good time credits is insufficient to establish a deprivation of a liberty interest. Putting aside for the moment that his sentence was reversed on appeal, the Second Circuit has made clear that an inmate has no liberty interest in the opportunity to earn good time credit. *Abed v. Armstrong,* 209 F.3d 63, 66–67 (2d Cir.2000) (noting that good time credit is a discretionary matter and thus an inmate has no liberty interest in the opportunity to earn good time credit); *see also* N.Y. CORRECT. LAWW § 803 (outlining New York's discretionary good time credit program).

Therefore, in light of the fact that Plaintiff's period of confinement was relatively short and he has not stated sufficient facts from which to conclude that the conditions of the his confinement were significantly different than the typical conditions of general population or SHU confinement at Clinton, the Court recommends that the Plaintiff's due process claim against Defendant Woodruff be **DISMISSED.**

### D. Defendant Guynup

Plaintiff's allegations regarding Defendant Guynup are poorly pled and confusing. It is unclear as to how, if at all, Defendant Guynup was personally involved in any alleged wrongdoing. Plaintiff's allegations against Defendant Guynup are few in number, and for the most part, are wholly conclusory. The Plaintiff made three allegations from which any personal involvement on the part of Defendant Guynup, if it exists at all, could be culled: (1) "Sgt. Guynup, as area Superior, had ratified, condoned, sanctioned, and particip [ ]ated" in the actions that led to his confinement in SHU; (2) that he ordered another correction officer to "lock [Plaintiff] up;" and (3) that he testified at the Plaintiff's hearing. Am. Compl. at ¶¶ 10 & 11; Pl.'s Affirm. at p. 1. As to point one when construed liberally, it would appear that the Plaintiff is attempting to state that Defendant Guynup is liable by virtue of his role as a supervisor. Defendant's argue that Defendant Guynup cannot be held liable in a supervisory capacity because he is not in fact a supervisor, and even if he were, Plaintiff has failed to allege that Defendant Guynup was personally involved in any wrongdoing. For the reasons that follow, we agree with the Defendants and recommend that Plaintiff's claims against Defendant Guynup be **DISMISSED.**

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions,

has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**\*8** The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority). As alleged, the involvement of Defendant Guynup, does not fall into any of these categories.

First, Plaintiff fails to provide any facts support the proposition that Guynup "ratified, condoned, sanctioned and participa[ ]ted" in a constitutional violation. Am. Compl. at ¶ 10. Plaintiff, at best, casts this as an argument. *Id.* ("Plaintiff [ ] argue[s] ... Sgt. Guynup ... ratified, condoned, sanctioned...."). Such conclusory statements, by themselves, cannot constitute a cause of action. It is possible that the Plaintiff intended to allege that the Defendant Guynup became personally involved when he ordered the Plaintiff to be locked up after the uprising on August 19. The Plaintiff's vague allegation, and paucity of facts that Defendant Guynup locked him up cannot be the basis for Defendant's personal involvement.[4]

4     Had Plaintiff clearly alleged that Defendant Guynup personally placed him in SHU, or directed that he be placed in SHU, on August 19, after the uprising, our analysis on the point of personal involvement would have been different. However, our ultimate conclusion would not change, because Plaintiff failed to identify a cognizable liberty interest that could sustain a due process claim. *See supra* Part II.B.

The only other allegation made by Plaintiff that could support an inference of personal involvement is Plaintiff's allegation that Defendant Guynup appeared and testified

at his hearing. Plaintiff alleges that Defendant Guynup testified that no staff member observed Plaintiff engaged in or participating in the uprising. Am. Compl. at ¶ 11. Merely testifying at a disciplinary hearing—particularly when the testimony given is favorable to the accused —is insufficient to establish personal involvement. *See Muhammad v. Pico,* 2003 WL 21792158 at \*16–17 (S.D.N.Y. Aug.5, 2003).

A common sense evaluation of the aforementioned factors leads us to the conclusion that the Plaintiff has failed to sufficiently allege any facts which could plausibly support a claim against Defendant Guynup based on personal involvement or supervisory liability. Therefore, we recommend that Defendants' Motion to Dismiss the claims against Defendant Guynup be **GRANTED.**

### E. Leave to Amend

The Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)); *see also Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se* ] complaint gives any indication that a valid claim might be stated."). As stated above the Amended Complaint is devoid of sufficient facts from which to conclude that the conditions of Plaintiff's confinement were unduly harsh or atypical, more importantly, Plaintiff has failed to sufficiently allege that a cognizable liberty interest was at stake in this case. Therefore, we find that Plaintiff has failed to state a claim upon which relief could be granted and dismissal would be appropriate. The Amended Complaint is similarly devoid of any factual allegations linking Defendant Guynup's personal involvement, beyond the allegation that he is a supervisor, to any wrongdoing or constitutional infringement. However, in light of Plaintiff's *pro se* status, this Court recommends he be provided an opportunity to amend his Complaint to cure the deficiencies described herein, namely, providing further factual allegations regarding the conditions of his 67 to 76 day confinement in SHU, and setting forth a proper basis to find that Defendant Guynup participated in any wrongdoing. [5]

5    Any amended complaint should contain factual allegations connecting the variation in these conditions to the health problems experienced by the Plaintiff. Additionally, Plaintiff should make a conscientious effort to include a more thorough and detailed time line of the his SHU confinement, including the dates he was confined to and released from SHU.

**\*9** Should the District Judge adopt this recommendation, we provide the following guidance for Plaintiff in drafting an amended complaint. Plaintiff should note that any amended complaint, ***which shall supersede and replace in its entirety the previous Complaint,*** must contain a caption that identifies, by name, each individual and/or entity that Plaintiff is suing in the present lawsuit, and must bear the case number assigned to this action. **Plaintiff should note that any defendant not named in the amended pleading shall not be a defendant in this action.** No portion of any prior Complaint shall be incorporated into his amended complaint by reference. The body of Plaintiff's amended complaint must contain ***sequentially numbered paragraphs containing only one act of misconduct per paragraph.*** If Plaintiff claims that his civil and/or constitutional rights were violated by more than one defendant, or on more than one occasion, he shall include a corresponding number of paragraphs in his amended complaint for each such allegation, with each paragraph specifying (i) the alleged act of misconduct; (ii) the date on which such misconduct occurred; (iii) the names of each and every individual who participated in such misconduct; (iv) where appropriate, the location where the alleged misconduct occurred; and, (v) the nexus between such misconduct and Plaintiff's civil and/ or constitutional rights.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 19) be **GRANTED;** and it is further

**RECOMMENDED,** that in light of his *pro se* status, the Plaintiff be **GRANTED LEAVE TO AMEND** prior to dismissing the entire case; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5472113

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.